**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:24-CV-896 |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, | § § § § | |
| Defendant. | § § | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

STEVE M. DOLLAR
ALLISON L. SILVERMAN
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019

THOMAS A. COULTER
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001

RYAN E. MELTZER
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, TX 78701

JAMES J. JARECKI
PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY
1200 N. 7th Street
Harrisburg, PA 17102

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

PROCEDURAL HISTORY....................................................................................2

STATEMENT OF FACTS.......................................................................................5

STATEMENT OF QUESTIONS INVOLVED.......................................................16

LEGAL STANDARDS..........................................................................................16

ARGUMENT..........................................................................................................17

    I.     This Action Exceeds the CFPB's Statutory Authority......................17

        A.     The CFPB Lacks Authority Over the Bankruptcy Code.........17

        B.     The CFPA Cannot Be Interpreted to Permit CFPB Enforcement of the Bankruptcy Code....................................20

    II.    The CFPB Has Failed to State a Claim Under the CFPA.................32

        A.     The CFPB's Attempt to Retroactively Apply Its New Statutory Interpretation to PHEAA Violates Due Process......32

        B.     The CFPB Has Failed to State a Claim Under Section 5531..........................................................................35

        C.     The CFPB Has Failed to State a Claim Under Section 5536..........................................................................38

    III.   The CFPB Has Failed to Join Necessary Parties ...............................41

        A.     The Lenders Are Necessary Parties and Should be Joined......41

        B.     The CFPB Has Failed to Identify the Affected Lenders..........44

CONCLUSION.......................................................................................................45

## TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Aalabdulrasul v. ACS*,
No. 11-AP-09089, 2012 WL 1597277 (Bankr. N.D. Iowa May 27, 2012)........43

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021)........21

*Alderwoods Grp., Inc. v. Garcia*,
682 F.3d 958 (11th Cir. 2012)........29

*In re Anderson*,
884 F.3d 382 (2d Cir. 2018)........28, 29, 30

*Becotte v. Coop. Bank*,
No. 15-10812, 2017 WL 886967 (D. Mass. 2017)........19

*Bennett v. U.S. Dep't of Educ.*,
No. 15-AP-06051, 2015 WL 5602881 (Bankr. M.D.N.C. Sept. 22, 2015)........43

*In re Bernhard*,
No. 23-1358, 2024 WL 379468 (3d Cir. Feb. 1, 2024)........29

*Boris v. Nat'l Collegiate Student Loan Tr. 2007-1*,
No. 2:16-CV-19-FtM, 2016 WL 11578271 (M.D. Fla. Nov. 28, 2016)........9

*Brown v. CitiBank, N.A.*,
539 B.R. 853 (Bankr. S.D. Cal. 2015)........9

*Brown v. Transworld Sys., Inc.*,
73 F.4th 1030 (9th Cir. 2023)........30, 31

*Bruce v. Citigroup Inc.*,
75 F.4th 297 (2d Cir. 2023)........30

*Calderone v. Sonic Hous. JLR, L.P.*,
879 F.3d 577 (5th Cir. 2018)........19

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016)........38

*CFPB v. Navient Corp.*,
No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017)........36

* Unless otherwise noted, this brief omits alterations, citations, footnotes, and internal quotation marks in quoted text.

*Chamber of Com. v. CFPB*,
   691 F. Supp. 3d 730 (E.D. Tex. 2023) .......................................22, 23, 24

*Chiang v. Verizon New Eng. Inc.*,
   595 F.3d 26 (1st Cir. 2010) ....................................................................40

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ...............................................................................21

*Cox v. Zale Del., Inc.*,
   239 F.3d 910 (7th Cir. 2001) .................................................................29

*In re Crocker*,
   941 F.3d 206 (5th Cir. 2019) ...........................................................8, 30

*Davis v. HSBC Bank Nev., N.A.*,
   691 F.3d 1152 (9th Cir. 2012) .........................................................36, 37

*Davis v. KeyBank N.A.*,
   No. 2:22-CV-01645, 2024 WL 3106830 (D. Nev. June 21, 2024) ...................31

*Decker v. EduCap, Inc.*,
   476 B.R. 463 (W.D. Pa. 2012) .........................................................9, 26

*In re Duits*,
   No. 14-05277, 2020 WL 256770 (Bankr. S.D. Ind. Jan. 15, 2020) ..................26

*Engel v. R.J. Reynolds Tobacco Co.*,
   No. 2:17-CV-618, 2017 WL 2119805 (E.D. Cal. May 16, 2017) .....................45

*Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*,
   80 F.4th 223 (3d Cir. 2023) .....................................................41, 42, 43, 44

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ...............................................................................32

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...............................................................................24

*Fischer v. United States*,
   144 S. Ct. 2176 (2024) ...........................................................................20

*Freedom Mortg. Corp. v. Dean*,
   647 B.R. 780 (Bankr. M.D. Fla. 2023) ..................................................20

*In re G–I Holdings, Inc.*,
   580 B.R. 388 (Bankr. D.N.J. 2018) .......................................................29

*Gen. Refractories Co. v. First State Ins. Co.*,
   500 F.3d 306 (3d Cir. 2007) ...................................................................42

*Grabis v. Navient Sols., LLC*,
   No. 15-AP-01420, 2018 WL 1508754 (Bankr. S.D.N.Y. Mar. 26, 2018) .........43

*Harris v. PHEAA*,
   696 F. App'x 87 (3d Cir. 2017) ..............................................................4

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000) ..............................................................................20

*Herrell v. Chase Bank USA, N.A.*,
   218 F. Supp. 3d 788 (E.D. Wis. 2016) ..................................................41

*Holden v. Holiday Inn Club Vacations Inc.*,
   98 F.4th 1359 (11th Cir. 2024) ......................................................39, 40

*Homaidan v. Sallie Mae, Inc.*,
   3 F.4th 595 (2d Cir. 2021) ...................................................................9

*Hubbard v. PHEAA*,
   No. 14-AP-1010, 2014 WL 1654703 (Bankr. E.D. Tenn. Apr. 25, 2014) .........43

*In re Joubert*,
   411 F.3d 452 (3d Cir. 2005) ................................................................29

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020) .............................................................33

*Lamando v. Rocket Mortg.*,
   No. 3:23-CV-147, 2024 WL 264034 (N.D.N.Y. Jan. 24, 2024) .....................41

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ........................................................................22

*Mader v. Experian Info. Sols., Inc.*,
   56 F.4th 264 (2d Cir. 2023) ......................................................36, 39, 40

*Madison v. Res. for Hum. Dev., Inc.*,
   233 F.3d 175 (3d Cir. 2000) ................................................................26

*In re Maharaj*,
   681 F.3d 558 (4th Cir. 2012) .................................................................7

*Mata v. Nat'l Collegiate Student Loan Tr. 2006-1*,
   No. 6:18-AP-01089, 2020 WL 5543716 (Bankr. C.D. Cal. July 31, 2020) .........9

*Mayer v. Belichick*,
   605 F.3d 223 (3d Cir. 2010) ..........................................................16, 17

*In re McDaniel*,
   973 F.3d 1083 (10th Cir. 2020) .............................................................9

*In re Merchant*,
   958 F.2d 738 (6th Cir. 1992) ...............................................................10

*Mercy Catholic Med. Ctr. v. Thompson*,
   380 F.3d 142 (3d Cir. 2004) ................................................................27

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   583 U.S. 109 (2018) .................................................................20

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
   595 U.S. 109 (2022) .................................................................17

*NCR Corp. v. BB 2009 Tr.*,
   No. 11-CV-0481, 2012 WL 440744 (D. Del. Feb. 9, 2012) ............44

*In re O'Brien*,
   419 F.3d 104 (2d Cir. 2005) .........................................................9

*In re Orawsky*,
   387 B.R. 128 (Bankr. E.D. Pa. 2008) .........................................7

*In re Pelkowski*,
   990 F.2d 737 (3d Cir. 1993) .........................................................6

*Pertuso v. Ford Motor Credit Co.*,
   233 F.3d 417 (6th Cir. 2000) .....................................................29

*PHH Corp. v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016) .............................................33, 34, 35

*Poling v. K. Hovnanian Enters.*,
   99 F. Supp. 2d 502 (D.N.J. 2000) ...............................................45

*Ritz v. Nissan-Infiniti LT*,
   No. 20-cv-13509, 2023 WL 3727892 (D.N.J. May 30, 2023) ........40

*Roy v. Sallie Mae*,
   No. 09-AP-1406, 2010 WL 1523996 (Bankr. D.N.J. Apr. 15, 2010) ...............9

*Rumer v. Am. Educ. Servs.*,
   469 B.R. 553 (M.D. Pa. 2012) ...................................................26

*Salinas v. U.S. R.R. Ret. Bd.*,
   592 U.S. 188 (2021) .................................................................19

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) .................................................................15

*Simon v. FIA Card Servs., N.A.*,
   732 F.3d 259 (3d Cir. 2013) .......................................................31

*Srinivasan v. Sallie Mae, Inc.*,
   No. 10-AP-1545, 2010 WL 3633062 (Bankr. D.N.J. Sept. 7, 2010) ...............43

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019) .............................................................28, 30

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) .....................................................25

*Thomas v. City of Philadelphia*,
   759 F. App'x 110 (3d Cir. 2019) .......................................................29

*In re Thomas*,
   931 F.3d 449 (5th Cir. 2019) ...............................................................7

*Townsend v. M&T Mortg. Corp.*,
   No. 3:09-CV-1866, 2010 WL 2573825 (M.D. Pa. June 23, 2010) ...................31

*United States v. AMC Ent., Inc.*,
   549 F.3d 760 (9th Cir. 2008) ..............................................................33

*United States v. Harra*,
   985 F.3d 196 (3d Cir. 2021) ...............................................................33

*United States v. Jones*,
   471 F.3d 478 (3d Cir. 2006) ...............................................................24

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ..........................................................................27

*Walls v. Wells Fargo Bank, N.A.*,
   276 F.3d 502 (9th Cir. 2002) .........................................................29, 31

*West Virginia v. EPA*,
   597 U.S. 697 (2022).................................................................21, 22, 32

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001)..........................................................................21

*Zehnder v. FDS Bank*,
   No. 3:09-CV-1865, 2010 WL 11575034 (M.D. Pa. Mar. 18, 2010).................31

**Rules and Statutes**

24 Pa. Cons. Stat. § 5101 ........................................................................4

11 U.S.C. § 307 ....................................................................................14

11 U.S.C. § 523 ...............................................................................3, 6, 26

11 U.S.C. § 524 ....................................................................................28

12 U.S.C. § 5481 ..................................................................................18

12 U.S.C. § 5491 ..................................................................................17

12 U.S.C. § 5492 ..................................................................................17

12 U.S.C. § 5511 ..................................................................................17

12 U.S.C. § 5512 ..................................................................................17

12 U.S.C. § 5514 ..................................................................................17

12 U.S.C. § 5515 ..........................................................................17

12 U.S.C. § 5516 ..........................................................................17

12 U.S.C. § 5531 ................................................17, 20, 35, 37

12 U.S.C. § 5536 ........................................................17, 20, 38

12 U.S.C. § 5561 ................................................................18, 20

12 U.S.C. § 5562 ..........................................................................17

12 U.S.C. § 5564 ..........................................................................17

12 U.S.C. § 5565 ..........................................................................17

28 U.S.C. § 157 ....................................................................28, 29

28 U.S.C. § 586 ..........................................................................14

Bankruptcy Abuse Protection and Consumer Protection Act,
    Pub. L. No. 109–8, 119 Stat. 23 (2005) ...................................7

Dodd–Frank Wall Street Reform & Consumer Protection Act,
    Pub. L. No. 111–203, 124 Stat. 1376 (2010) ........................17

Fed. R. Civ. P. 19 ......................................................41, 42, 44, 45

**Legislative and Administrative Materials**

Bulletin 2023–01: Unfair Billing and Collection Practices After
    Bankruptcy Discharges of Certain Student Loan Debts,
    88 Fed. Reg. 17,366 (Mar. 23, 2023) ................. 13, 15, 22, 25, 26, 27

Consumer Bankruptcy Reform Act of 2022,
    S. 4980, 117th Cong. (2022) ..........................14, 15, 24, 30

Consumer Bankruptcy Reform Act of 2020,
    S. 4991, 116th Cong. (2020) ........................................14, 15

Discharge Student Loans in Bankruptcy Act of 2019,
    H.R. 770, 116th Cong. (2019) ...............................................10

Fairness for Struggling Students Act of 2017,
    S. 1262, 115th Cong. (2017) ..................................................10

Fairness for Struggling Students Act of 2013,
    S. 114, 113th Cong. (2013) ....................................................10

Private Student Loan Bankruptcy Fairness Act of 2023,
    H.R. 138, 118th Cong. (2023) ...............................................10

**Secondary Sources**

Alexandra Sickler & Kara Bruce, *Bankruptcy's Adjunct Regulator*,
72 Fla. L. Rev. 159 (2020)......................................................................14

*Collier on Bankruptcy* (16th ed. 2024) ..................................................28

Jason Iuliano, *Student Loan Bankruptcy and the Meaning of
Educational Benefit*, 93 Am. Bankr. L.J. 277 (2019)...........................8

Jason Iuliano, *The Student Loan Bankruptcy Gap*,
70 Duke L.J. 497 (2020) .......................................................................8

Kara Bruce & Alexandra Sickler, *Big Banks & Small Consequences in
Chapter 13*, 39 Emory Bankr. Devs. J. 559 (2023)...........................25

Kara Bruce & Alexandra Sickler, *The CFPB Enters Consumer
Bankruptcy*, 41 Bankr. L. Letter, no. 10, Oct. 2021 ........................25

Pursuant to LR 7.5, Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA") submits this brief in support of its motion to dismiss. Dkt. 21.

## **INTRODUCTION**

This lawsuit is another front in the Consumer Financial Protection Bureau ("CFPB" or "Bureau")'s ongoing campaign to expand its regulatory authority beyond the explicit and unambiguous bounds set by Congress. The Bureau's enabling legislation, the Consumer Financial Protection Act ("CFPA"), empowers the Bureau to regulate "Federal consumer financial law." Congress defined that term to mean the CFPA and a list of eighteen "enumerated consumer laws." The Bankruptcy Code appears nowhere on that list. In fact, Congress has never expressly authorized the Bureau to regulate any aspect of the Bankruptcy Code, and recent Congressional efforts to grant the Bureau such authority have failed.

The Bureau is undeterred, however. By creatively labeling alleged violations of bankruptcy discharge orders ("Discharge Orders") as "unfair," "deceptive," and "abusive" acts or practices ("UDAAPs") under the CFPA, the Bureau attempts to usurp the role of the United States Trustee Program ("USTP")—the federal body that Congress assigned supervisory and enforcement authority over the Bankruptcy Code—and seize powers reserved to the bankruptcy courts. Its actions run counter to the text of the CFPA, Supreme Court precedent, and a host of federal bankruptcy case law (including decisions confirming that contempt is the sole remedy for breach

of a Discharge Order), and they mark an abrupt reversal of the Bureau's longstanding position on the dischargeability of private student loans. Courts have rejected the Bureau's efforts to use its UDAAP authority to regulate areas of law beyond its jurisdiction, and to use its new interpretations of federal law to punish regulated parties retroactively for actions taken in accordance with its past interpretations. The same result should obtain here, and this case should be dismissed with prejudice.

Even if the Bureau had authority to bring this action, and could lawfully base its CFPA claims on its new interpretation of the Bankruptcy Code, dismissal would still be appropriate. As a matter of law, the acts and practices alleged by the Bureau are not unfair, deceptive, or abusive within the meaning of the CFPA, nor can they give rise to liability under the Fair Credit Reporting Act ("FCRA"). Moreover, the Bureau's complaint makes clear that the lenders of the subject student loans are necessary parties whom the Bureau has failed to join.

## PROCEDURAL HISTORY

The Bureau filed this action on May 31, 2024. Compl. (Dkt. 1). Asserting claims under the CFPA and the FCRA, the Bureau requests monetary and injunctive relief related to PHEAA's alleged handling of private student loan accounts after a standard Discharge Order is issued by a federal bankruptcy court. *Id.* ¶¶ 2, 38–72.[1]

---

[1] On June 21, 2023, almost a year before it filed this suit, the Bureau issued a Civil Investigative Demand ("CID") to PHEAA, seeking documents and information regarding its student loan servicing activities in connection with Discharge Orders.

As the Bureau acknowledges, most private student loans are not discharged in bankruptcy unless a consumer, in addition to seeking general relief under the Bankruptcy Code, also files an adversary proceeding in bankruptcy court and obtains a judicial finding that requiring continued payments on the loan would cause "undue hardship." *Id.* ¶ 2. In other words, a routine Discharge Order—which "is not specific as to the consumer" and "does not identify which of the consumer's debts are discharged or excepted from discharge"—generally does not include private student loans. *Id.* ¶¶ 2, 17. The Bureau alleges, however, that certain types of private student loans—what it calls "non-qualified" loans[2]—are exempt from that rule. *Id.* ¶ 2. For those loans, the Bureau says, the debtor need not commence an adversary proceeding and the bankruptcy court need not find undue hardship; rather, the loans are implicitly covered by the generic Discharge Order entered at the end of the case. *Id.*

According to the Bureau, PHEAA—a government agency of the Commonwealth of Pennsylvania—acts as a national servicer of private student

PHEAA petitioned the Bureau to set aside the CID, and the Bureau denied PHEAA's request in a written decision dated September 7, 2023. Decision & Order on Petition by PHEAA to Set Aside CID, No. 2023-MISC-PHEAA-0001 (Sept. 7, 2023), https://files.consumerfinance.gov/f/documents/cfpb_decision-and-order-on-petition-by-pheaa_2023-09.pdf. PHEAA subsequently did not respond to the CID, and the Bureau took no action to enforce it.

[2] The Bankruptcy Code does not use this term. Rather, it refers to "qualified education loan[s]," meaning those incurred (1) solely to pay the cost of attendance (2) at a Title IV-eligible institution (3) while attending at least half-time. *See* 11 U.S.C. § 523(a)(8)(B). The Bureau alleges that all student loans that are not "qualified education loans" are "non-qualified education loans." *See* Compl. ¶ 25.

loans. *Id.* ¶¶ 3, 12, 23.[3] PHEAA's private loan servicing duties are governed by its contracts with lenders, who alone hold the economic rights in each loan. *See id.* ¶¶ 23–24, 30. As part of that contractual relationship, the lenders direct PHEAA on how to service their loans, including when the loans become subject to a borrower's bankruptcy. *See id.* ¶¶ 28–30. The instructions vary by lender, and PHEAA has no discretion to deviate from a lender's directives. *See id.* PHEAA also has its own standard procedures for processing private loan-related records. *Id.* ¶¶ 28–29.

In the case of private student loans in bankruptcy, both PHEAA's own procedures and its lender-specific instructions recognize the complexity of private student loan discharge and the significance of the filing of an adversary proceeding. *See id.* ¶¶ 28–30. Nevertheless, the Bureau alleges that PHEAA lacks adequate policies and procedures to ascertain whether private student loans are in fact discharged via standard Discharge Orders, without an adversary proceeding and a finding of undue hardship. *Id.* ¶ 35. The Bureau thus charges that, between 2017 and 2021, PHEAA resumed servicing activities on "at least 177 . . . non-qualified education loans" in the wake of a Discharge Order. *Id.* ¶ 36. Nowhere in the complaint, however, does the Bureau allege that any bankruptcy court has found that

---

[3] The General Assembly of the Commonwealth of Pennsylvania created PHEAA by legislation. 24 Pa. Cons. Stat. §§ 5101–5199.9. PHEAA conducts its private student loan servicing activities under the business name "American Education Services" ("AES"). Compl. ¶ 23; *see also, e.g.*, *Harris v. PHEAA*, 696 F. App'x 87, 90 (3d Cir. 2017). In this brief, "PHEAA" refers to both PHEAA and AES.

PHEAA violated any Discharge Order, or that any debtor has invoked any of the available bankruptcy remedies against PHEAA. Instead, the Bureau purports to have made these core bankruptcy determinations entirely on its own.

The Bureau presses five claims against PHEAA under the CFPA and FCRA. All rest on the same premise: PHEAA resumed servicing private student loans that the Bureau believes were within the scope of the Discharge Orders entered in each individual bankruptcy case. Importantly, the Bureau's CID to PHEAA mentioned neither the FCRA nor Regulation V in its Statement of Purpose. The FCRA first emerged as an "enumerated consumer law" in the Bureau's complaint, ten months after PHEAA contested the Bureau's authority to enforce the Bankruptcy Code.

## STATEMENT OF FACTS

The Bureau's complaint paints an incomplete and misleading picture of the law governing private student loan discharge, including the history of legislative and regulatory action on the subject and the Bureau's own past interpretations of the Bankruptcy Code. PHEAA provides this context here, using only matters of public record and other materials cognizable under Rule 12(b)(6).

### A. Beginning in 2005, Private Student Loans Are Generally Non-Dischargeable in Bankruptcy Without an Adversary Proceeding

As the Bureau concedes, the Bankruptcy Code treats student loan debt differently from other classes of debt. *Id.* ¶¶ 2, 18–22. Unlike most debts, which are presumptively discharged by a Discharge Order, student loan debt is carved out

as an ***exception*** to discharge. *Id.* While the Bureau summarily alleges that certain subclasses of private loans fall outside the scope of this exception, *id.* ¶ 22, the text of the Bankruptcy Code and decades of bankruptcy case law indicate otherwise.

Under Section 523(a)(8) of the Bankruptcy Code, educational loans that fall into three broad categories are excepted from discharge unless the debtor institutes an adversary proceeding and proves undue hardship: (1) "loan[s] made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution" (Section 523(a)(8)(A)(i)); (2) "an obligation to repay funds received as an educational benefit, scholarship, or stipend" (Section 523(a)(8)(A)(ii)); and (3) "any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code" (Section 523(a)(8)(B)). 11 U.S.C. § 523(a)(8). This is a sweeping standard by design: "[I]n the case of section 523(a)(8), Congress has revealed an intent to limit the dischargeability of educational loan debt, and [courts] can construe the provision no more narrowly than the language and legislative history allow." *In re Pelkowski*, 990 F.2d 737, 745 (3d Cir. 1993).

The federal judiciary's Official Bankruptcy Forms reflect this framework, announcing that "debts for most student loans" survive bankruptcy:

| Chapter 7 Discharge (Form 318) | Chapter 13 Discharge (Form 3180W) |
|---|---|
| **Some debts are not discharged**<br><br>Examples of debts that are not discharged are:<br><br>   debts that are domestic support obligations;<br><br>   debts for most student loans;<br><br>   debts for most taxes;<br><br>   debts that the bankruptcy court has decided or will decide are not discharged in this bankruptcy case; | **Some debts are not discharged**<br><br>Examples of debts that are not discharged are:<br><br>▪ debts that are domestic support obligations;<br><br>▪ debts for most student loans;<br><br>▪ debts for certain types of taxes specified in 11 U.S.C. §§ 507(a)(8)(C), 523(a)(1)(B), or 523(a)(1)(C) to the extent not paid in full under the plan; |

Bankr. Form 318, https://www.uscourts.gov/sites/default/files/form_b318_0.pdf;

Bankr. Form 3180W, https://www.uscourts.gov/sites/default/files/form_b3180w.pdf.

      The history of Section 523 of the Bankruptcy Code illustrates the trend of legislative action restricting and disfavoring student loan discharge. In 2005, Congress enacted the Bankruptcy Abuse Protection and Consumer Protection Act, Pub. L. No. 109–8, 119 Stat. 23 (2005) ("BAPCPA"), which was largely viewed as providing greater protections to creditors. *See, e.g.*, *In re Maharaj*, 681 F.3d 558, 574 (4th Cir. 2012). Among other things, BAPCPA made it harder for consumers to discharge private educational debt. *In re Orawsky*, 387 B.R. 128, 144 n.26 (Bankr. E.D. Pa. 2008). In effect, BAPCPA equalized the treatment of federal and private student loans in bankruptcy, making clear that discharge generally requires proof of undue hardship in an adversary proceeding. *See id.* ("As a result of [BAPCPA], both government-sponsored ***and*** private student loans are nondischargeable in a chapter 13 bankruptcy."); *see also In re Thomas*, 931 F.3d 449, 453 (5th Cir. 2019) (noting that "Section 523(a)(8) as it stands today excepts virtually all student loans from

discharge" absent undue hardship, and explaining that "Congress's series of amendments clearly evinces an intent to limit bankruptcy's use as a means of offloading student loan debt except in the most compelling circumstances").

Section 523(a)(8) contains two subsections delineating presumptively non-dischargeable student loan debts: Subsection (A), which includes sub-subsections (i) and (ii), and Subsection (B). 11 U.S.C. § 523(a)(8); *see* Compl. ¶¶ 19–20. In October 2019, one federal appeals court held that private student loans do not fall under Subsection (A)(ii) (*i.e.*, they do not qualify as "funds received as an educational benefit, scholarship, or stipend"). *In re Crocker*, 941 F.3d 206, 224 (5th Cir. 2019). That decision, on a matter of first impression among the circuits, departed from the "overwhelming majority" of bankruptcy cases. Jason Iuliano, *The Student Loan Bankruptcy Gap*, 70 Duke L.J. 497, 512 (2020). Relying on a broad understanding of the statute that treated a private student loan as an "educational benefit" if its "stated purpose" was to "fund educational expenses," courts nationwide long "ruled that funds borrowed to pay for everything from tutoring services to bar review courses to vocational schools . . . count as an 'educational benefit' and are, therefore, nondischargeable." Jason Iuliano, *Student Loan Bankruptcy and the Meaning of Educational Benefit*, 93 Am. Bankr. L.J. 277, 285–86 (2019). Although two circuits have followed *Crocker*, those decisions only address Subsection (A)(ii) and have no bearing on the Subsection (B) exemption for "qualified education

loan[s]." *See Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 601–02 (2d Cir. 2021); *In re McDaniel*, 973 F.3d 1083, 1092 (10th Cir. 2020).

Regarding Subsection (B), the Bureau flatly asserts that a variety of private student loans may be categorized as "non-qualified" educational loans that are automatically discharged. Compl. ¶ 22. But essentially every category of private student loan cited by the Bureau has been found exempt from discharge without proof of undue hardship. *See, e.g.*, *Mata v. Nat'l Collegiate Student Loan Tr. 2006-1*, No. 6:18-AP-01089, 2020 WL 5543716, at *3–5, *10 (Bankr. C.D. Cal. July 31, 2020) (nonprofit-funded loans to fund graduate studies at private religious university); *Boris v. Nat'l Collegiate Student Loan Tr. 2007-1*, No. 2:16-CV-19-FtM, 2016 WL 11578271, at *3–4 (M.D. Fla. Nov. 28, 2016) (nonprofit-funded loan to finance cost of minor's rehabilitative school); *Brown v. CitiBank, N.A.*, 539 B.R. 853, 859–60 (Bankr. S.D. Cal. 2015) (bar study loan); *Roy v. Sallie Mae*, No. 09-AP-1406, 2010 WL 1523996, at *1 (Bankr. D.N.J. Apr. 15, 2010) (loan for private tutoring services). The breadth of the exemption for loans "made under any program funded in whole or in part by a governmental unit or nonprofit institution," which courts have interpreted to reach private loans made under any program to which a nonprofit entity "devote[s] its financial resources" (*e.g.*, by guaranteeing the loans), defies the Bureau's attempt at categorical line-drawing. *E.g.*, *Decker v. EduCap, Inc.*, 476 B.R. 463, 466–67 (W.D. Pa. 2012) (citing and following *In re O'Brien*,

419 F.3d 104 (2d Cir. 2005), and *In re Merchant*, 958 F.2d 738 (6th Cir. 1992)).

Simply put, BAPCPA is the law, and only the people's elected representatives have the authority to change it.[4]

B. **For Nearly a Decade, the CFPB Tells the Public That Private Student Loans Are Generally Nondischargeable in Bankruptcy Without an Adversary Proceeding**

While the Bureau's complaint focuses on PHEAA's alleged servicing activities following the receipt of Discharge Orders between 2017 and 2021, Compl. ¶ 36, it conspicuously omits the guidance the Bureau itself provided to the student loan industry both before and throughout that time period. The Bureau's message to the public was clear: All student loans—private and federal—typically require an adversary proceeding and proof of undue hardship before they can be discharged.

In a 2012 report to Congress titled *Private Student Loans*, the Bureau wrote that private student loans "are virtually immune from discharge in bankruptcy," citing Section 523(a)(8).[5] The Bureau specifically recommended that "Congress work with the CFPB and the Department of Education to determine how to afford

---

[4] Over the years, a number of bills have been proposed in Congress to facilitate the discharge of student debt. None have passed. *See, e.g.*, Private Student Loan Bankruptcy Fairness Act of 2023, H.R. 138, 118th Cong. (2023); Discharge Student Loans in Bankruptcy Act of 2019, H.R. 770, 116th Cong. (2019); Fairness for Struggling Students Act of 2017, S. 1262, 115th Cong. (2017); Fairness for Struggling Students Act of 2013, S. 114, 113th Cong. (2013).

[5] CFPB, *Private Student Loans: Report to the Senate Committee on Banking, Housing, and Urban Affairs et al.* 71 (Aug. 29, 2012), https://files.consumerfinance.gov/f/201207_cfpb_Reports_Private-Student-Loans.pdf.

greater flexibility and/or relief to private student loan borrowers who are experiencing financial distress," including by making "changes to the treatment of private student loans in bankruptcy proceedings."[6] Such changes were needed, in the Bureau's view, because "since 2005, private education loans are not dischargeable in bankruptcy unless the borrower can demonstrate undue hardship (like Federal student loans)."[7] Likewise, in its *Supervisory Highlights*, which the Bureau publishes to "share key examination findings" to "help industry limit risks to consumers and comply with federal consumer financial law,"[8] the Bureau consistently advised the public that private student loans are dischargeable only on proof of undue hardship.[9] So too for the Bureau's Private Education Loan Ombudsman, whose annual reports for 2020 and 2021 took the same tack.[10] The

---

[6] *Id.* at 90.

[7] *Id.*

[8] *Supervisory Highlights*, https://www.consumerfinance.gov/compliance/supervisory-highlights.

[9] *See, e.g.*, CFPB, *Supervisory Highlights: Fall 2015*, at 23–24, https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf (stating that "applicable law provides that [student loans] are dischargeable if a borrower proves that repayment would pose an 'undue hardship'" and explaining that representations that such loans are wholly non-dischargeable are deceptive because "borrowers often have avenues to reopen bankruptcy cases or otherwise raise 'undue hardship' challenges to the enforceability of student loans"); CFPB, *Supervisory Highlights: Fall 2014*, at 17, https://files.consumerfinance.gov/f/201410_cfpb_supervisory-highlights_fall-2014.pdf ("To discharge a student loan in bankruptcy, a borrower must affirmatively assert and prove 'undue hardship' in a court.").

[10] *See* CFPB, *Annual Report of the CFPB Private Education Loan Ombudsman* 83 n.161 (2021), https://files.consumerfinance.gov/f/documents/cfpb_education-loan-

Bureau's initial examination procedures for educational loans did not even direct examiners to review for the treatment of student loans in bankruptcy, given the default rule of non-discharge absent undue hardship.[11]

It was not until 2022—the year *after* the time period cited in the complaint—that the Bureau reversed course. The first step, incredibly, was a blog post on the CFPB website, which displays a "legal disclaimer" on its "Consumer Education" pages that the content "is not legal advice or regulatory guidance."[12] On April 12, 2022, the Bureau's Private Education Loan Ombudsman posted an article titled "Busting Myths About Bankruptcy and Private Student Loans" on the CFPB Blog.[13] In this observation piece, the Bureau surmised, contrary to its *Supervisory Highlights* and its reports to Congress, that certain types of private student loans may be

---

ombudsman-annual-report_2021.pdf ("Currently, getting [student] loans discharged in bankruptcy is difficult, though not totally impossible. It requires filing an adversary proceeding (a lawsuit within the bankruptcy)."); CFPB, *Annual Report of the CFPB Private Education Loan Ombudsman* 57 (2020), https://files.consumerfinance.gov/f/documents/cfpb_annual-report_private-education-loan-ombudsman_2020.pdf ("Private student loans began following the same undue hardship standard and Adversary Proceeding requirement in 2005.").

[11] *See CFPB Student Lending Examination Procedures* 3 (2013), https://files.consumerfinance.gov/f/201312_cfpb_exam-procedures_education-loans.pdf; *CFPB Student Lending Examination Procedures* 3 (2012), https://files.consumerfinance.gov/f/201212_cfpb_educationloanexamprocedures.pdf.

[12] *See, e.g., Student Loans*, https://www.consumerfinance.gov/consumer-tools/student-loans.

[13] Robert G. Cameron, *Busting Myths About Bankruptcy and Private Student Loans*, CFPB Blog (Apr. 12, 2022), https://www.consumerfinance.gov/about-us/blog/busting-myths-about-bankruptcy-and-private-student-loans.

subsumed in a standard Discharge Order.[14]  Nevertheless, when the Bureau released its updated examination manual for educational loans five months later,[15] it made no reference to any types of private student loans that it now apparently believed to be discharged via standard Discharge Order.  To the contrary, the new manual retained the language from its predecessor that "private education loans are generally nondischargeable in bankruptcy, unless the borrower can show undue hardship by not discharging the loan."[16]  And that is the same manual the Bureau uses today.

### C. Congress Considers But Declines to Give the CFPB Authority Over the Bankruptcy Code, So the CFPB Tries to Claim That Authority Unilaterally in a "Compliance Bulletin and Policy Guidance"

Also absent from the complaint is any mention of the existing system of federal bankruptcy regulation.  In addition to the presiding bankruptcy court, all consumer bankruptcy cases are subject to supervision—and all violations of the

---

[14] *Id.*  The Bureau's about-face may have been spurred by a letter from several Senators asking the Bureau to investigate student loan servicing practices in the wake of an article by an advocacy group contending that certain types of private student loans should be deemed "non-qualified" educational loans subject to automatic discharge.  Press Release, Sen. Sherrod Brown, Brown, Durbin, Senators Urge CFPB to Investigate Private Student Lenders' Compliance with Bankruptcy Law (Feb. 11, 2022), https://www.brown.senate.gov/newsroom/press/release/brown-urge-cfpb-investigate-private-student-lenders-compliance-bankruptcy-law.

[15] By the Bureau's account, its manual gives examiners "direction on how to assess compliance with federal consumer financial laws."  *Supervision and Examinations*, https://www.consumerfinance.gov/compliance/supervision-examinations.

[16] *CFPB Student Lending Examination Procedures* at 3 (2022), https://files.consumerfinance.gov/f/documents/cfpb_education-loan-examination-procedures_2022-09.pdf; *cf. supra* note 11.

Bankruptcy Code are subject to enforcement—by another federal body: the USTP. Part of the Department of Justice, the USTP is empowered to "raise" and "appear and be heard on any issue in any case or proceeding" under the Bankruptcy Code. 11 U.S.C. § 307; *see also* 28 U.S.C. § 586(a)(3). The USTP "serve[s] as the 'watchdog over the bankruptcy process'" and touts its supervisory and enforcement authority and its "national creditor settlements" with major financial institutions.[17]

The Bureau has no role in this area. Even scholars who advocate to shift supervisory and enforcement authority over the Bankruptcy Code to the Bureau agree that this authority resides with the USTP.[18] Tellingly, however, legislation has been proposed to change this state of affairs. The Consumer Bankruptcy Reform Act ("CBRA"), introduced in 2020 and reintroduced in 2022, would expressly grant the Bureau "authority to exercise supervision and enforcement authority regarding bankruptcy law." *See* Consumer Bankruptcy Reform Act of 2022, S. 4980, 117th Cong. § 201(d) (2022) ("CBRA 2022"). It would accomplish this through two amendments to the CFPA: first, it would add "title 11, United States Code, with respect to individual debtors," to the list of "enumerated consumer laws" under the

---

[17] *About the United States Trustee Program*, U.S. Dep't of Justice, https://www.justice.gov/ust/about-program; *National Creditor Settlements*, U.S. Dep't of Justice, https://www.justice.gov/ust/national-creditor-settlements.

[18] *See* Alexandra Sickler & Kara Bruce, *Bankruptcy's Adjunct Regulator*, 72 Fla. L. Rev. 159, 198–99 (2020) (the USTP "is bankruptcy's primary structural safeguard" and "performs many administrative, regulatory, and enforcement functions, including monitoring creditor misconduct in the bankruptcy system").

Bureau's jurisdiction; and second, it would designate "violations of discharge injunction[s]" a "prohibited act" subject to CFPB enforcement. *Id.* §§ 201(c), (d); *see also* Consumer Bankruptcy Reform Act of 2020, S. 4991, 116th Cong. § 201(c), (d) (2020) ("CBRA 2020"). In addition, the CBRA would require the Bureau to establish a Memorandum of Understanding with the USTP "to ensure coordination in providing assistance to and serving individual debtors in bankruptcy seeking to resolve complaints related to their bankruptcy cases." CBRA 2022 § 201(a). Bluntly stated, if the Bureau already held bankruptcy enforcement power, then these proposals in the CBRA—sponsored by the Senator often credited as the brainchild of the CFPB, *see Seila Law LLC v. CFPB*, 591 U.S. 197, 205–06 (2020)—would be superfluous.

In any event, Congress never advanced the CBRA, and thus the Bureau never acquired "authority to exercise supervision and enforcement authority regarding bankruptcy law." CBRA 2022 § 201(d). In March 2023, however, the Bureau devised a new strategy to simply seize that authority by issuing a self-serving "compliance bulletin and policy guidance," free from the constraints of the Administrative Procedure Act ("APA")'s notice and comment requirements, and declaring that violations of Discharge Orders are UDAAPs. Bulletin 2023–01: Unfair Billing and Collection Practices After Bankruptcy Discharges of Certain Student Loan Debts, 88 Fed. Reg. 17,366 (Mar. 23, 2023) ("Bulletin"). In the Bulletin, the Bureau espoused its new interpretation of Section 523(a)(8), advancing the theory it

unveiled in its April 2022 blog post, and warned—with no acknowledgment of its years of contrary guidance—that it would enforce its novel interpretation prospectively and penalize noncompliance retroactively. *Id.* at 17,367–68.

<h2 style="text-align:center"><u>STATEMENT OF QUESTIONS INVOLVED</u></h2>

This motion presents three questions. First, whether this action exceeds the Bureau's statutory authority and therefore must be dismissed under Rule 12(b)(6). Second, whether the Bureau has stated a claim for violations of the CFPA and FCRA that can withstand dismissal under Rule 12(b)(6). Third, whether the owners of the subject private student loans are necessary parties under Rule 19, and whether the Bureau's failure to join those parties commands dismissal under Rule 12(b)(7).

<h2 style="text-align:center"><u>LEGAL STANDARDS</u></h2>

On a Rule 12(b)(6) motion, the Court must "accept all factual allegations as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). To survive dismissal, "a complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* Neither "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" will suffice. *Id.* Rather, the Court disregards legal conclusions and examines whether the complaint "contain[s] sufficient factual allegations so as to state a facially plausible claim for

relief." *Id.* at 229–30. The Court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." *Id.* at 230.

<div align="center">**ARGUMENT**</div>

## I.  THIS ACTION EXCEEDS THE CFPB'S STATUTORY AUTHORITY

### A.  The CFPB Lacks Authority Over the Bankruptcy Code

It is beyond dispute that the Bureau has no express authority over the Bankruptcy Code. As a federal agency, the Bureau's powers are defined by—and confined to—its enabling legislation. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) (per curiam) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). The Bureau's enabling legislation, the CFPA—enacted by Congress as Title X of the Dodd–Frank Act—limits the Bureau's authority to "Federal consumer financial law." *See* Dodd–Frank Wall Street Reform & Consumer Protection Act, Pub. L. No. 111–203, tit. X, 124 Stat. 1376, 1955 (2010) ("Dodd–Frank"). The statute repeatedly, and consistently, delineates the agency's powers and duties using that defined term. *See* 12 U.S.C. §§ 5491(a), 5492(a), 5511(a)–(c), 5512(a)–(d), 5514(b)–(d), 5515(b)–(c), 5516(b)–(c), 5536(a), 5561(2), (5), 5562(c), 5564(a), 5565(a)–(c).[19]

---

[19] Even when a CFPA provision does not itself refer to "Federal consumer financial law," as in the case of Section 5531, which sets forth the Bureau's authority to prohibit UDAAPs, the statute still incorporates the term by reference. *See* 12 U.S.C.

Nowhere is this more stark than in Section 5564, which grants the Bureau "litigation authority"—the very authority the Bureau cites as grounds for this action: "If any person *violates a Federal consumer financial law*, the Bureau may, subject to sections 5514, 5515, and 5516 of this title, commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." *Id.* § 5564(a) (emphasis added); *see* Compl. ¶¶ 8, 10, 11, 38.

"Federal consumer financial law" is defined to mean "the provisions of this title" (*i.e.*, the CFPA), "the laws for which authorities are transferred under subtitles F and H, and any other rule or order prescribed by the Bureau under this title, an enumerated consumer law, or pursuant to the authorities transferred under subtitles F and H." 12 U.S.C. § 5481(14). "Enumerated consumer law" is another defined term, meaning eighteen specific federal statutes listed in the CFPA. *Id.* § 5481(12)(A)–(R). Nowhere in that list—nor in subtitles F and H—is there any mention of the Bankruptcy Code.

This is no accident. The term "Bankruptcy Code" is expressly defined in Title II of Dodd–Frank and appears more than *thirty times* there. *See* Dodd–Frank § 201(a)(2) ("The term 'Bankruptcy Code' means title 11, United States Code.");

---

§ 5531(a) (the Bureau "may take any action authorized under part E"); *id.* § 5561(5) ("violation" under Part E means "any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law").

*see also, e.g.*, *id.* §§ 202(c), (e), (f), 203(c), 205(c), 208(a), (b), 215(a), 216(a), 217(a) (referencing the Bankruptcy Code). Similarly, the term "title 11," denoting the Bankruptcy Code, appears nearly **twenty times** across five separate titles of Dodd–Frank. *See, e.g.*, *id.* §§ 165(d)(4), 210(m)(2), 713(a), 763, 1101(b), 1106(c), 1401, 1405(a), 1414. Neither term appears even once in the CFPA (Title X). And when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion." *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 197 (2021). Against this backdrop, there can be no question that Congress placed the Bankruptcy Code beyond the Bureau's purview.

Judicial constructions of the CFPA are in accord. The CFPA is "a comprehensive act." *Becotte v. Coop. Bank*, No. 15-10812, 2017 WL 886967, at \*7 (D. Mass. 2017). It "enumerates eighteen federal consumer financial laws that are to be implemented and enforced by the [CFPB]," and those same laws are "subject to the [Bureau's] jurisdiction." *Id.* at \*7 & n.20. It follows that the Bureau lacks jurisdiction to enforce laws other than those Congress specifically listed in Section 5481. *See Calderone v. Sonic Hous. JLR, L.P.*, 879 F.3d 577, 580 (5th Cir. 2018) ("[A] CFPA retaliation claim cannot lie where statutory interpretation shows that the reported discrimination is not in violation of a law within the CFPB's jurisdiction."). This is not a novel proposition. Even before *Chevron* was overruled, federal courts

refused to defer to the Bureau's interpretation of the Bankruptcy Code "because Congress never charged the CFPB with administering the Bankruptcy Code." *Freedom Mortg. Corp. v. Dean*, 647 B.R. 780, 783 (Bankr. M.D. Fla. 2023).

### B. The CFPA Cannot Be Interpreted to Permit CFPB Enforcement of the Bankruptcy Code

*1. The CFPB Cannot Recast Bankruptcy Code Violations as UDAAP Violations to Expand Its Authority Beyond Congressional Limits*

Because Congress has not granted the Bureau express authority over the Bankruptcy Code, settled rules of statutory construction bar the Bureau's effort to assert the same authority impliedly through its UDAAP powers. At the outset, both CFPA provisions directed to UDAAPs incorporate "Federal consumer financial law," either expressly (Section 5536) or by reference (Section 5531). *See* 12 U.S.C. §§ 5531(a), 5536, 5561(5). That was Congress's clear mandate, and its words must be given effect. *See Fischer v. United States*, 144 S. Ct. 2176, 2187 (2024) (courts have an "obligation to give meaning where possible to each word and provision" in a statute); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 123 (2018) (rejecting agency interpretation that "read[] the words . . . completely out of the statute," and cautioning that courts are "not free to 'rewrite the statute' to the Government's liking"); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]e begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'").

Moreover, an interpretation of the UDAAP provisions that would enable the Bureau to police the Bankruptcy Code—a statute plainly excluded from its ambit—would nullify the boundaries set by Congress and defy any limiting principle. A long line of Supreme Court precedent forbids that result. As the Court recently admonished in rejecting a similarly aggressive agency position:

> Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].' Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme. Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.' We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'

*West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."); *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013) ("The fox-in-the-henhouse syndrome is to be avoided . . . by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority."); *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Given the stakes, any conceivable ambiguity as to the scope of the Bureau's

authority must be construed against it, *see West Virginia*, 597 U.S. at 723, and, as the Court underscored last term, the agency's own interpretation merits no deference at all, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Indeed, even "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency," the Court's role "is, as always, to independently interpret the statute and effectuate the will of Congress subject to congressional limits." *Loper Bright*, 144 S. Ct. at 2263. After all, "agencies have no special competence in resolving statutory ambiguities"; "[c]ourts do," and when an ambiguity concerns the scope of an agency's own power, that is "perhaps the occasion on which abdication in favor of the agency is *least* appropriate." *Id.* at 2266.

To be sure, this is not the Bureau's first attempt at regulating an area of law beyond its jurisdiction. Just last year, a federal court struck down the Bureau's effort to enforce anti-discrimination law under the guise of its UDAAP authority. *See Chamber of Com. v. CFPB*, 691 F. Supp. 3d 730, 740–43 (E.D. Tex. 2023), *appeal docketed*, No. 23-40650 (5th Cir. Nov. 8, 2023). As with the Bulletin here, the Bureau there had engaged in covert rulemaking contrary to the APA by changing its examination manual to decree discrimination (including disparate impact) to be a potential UDAAP and directing its examiners to scrutinize companies' policies and procedures on the subject. *Id.* at 733–36. In granting summary judgment against the Bureau, the court held that the manual update exceeded the Bureau's authority

to regulate UDAAPs. *Id.* at 739–44, 746. As the court explained, the Bureau's interpretation of "unfair" practices as reaching discrimination conflicted with the plain text of the CFPA, which described the two concepts separately and "g[ave] the agency authority to police 'discrimination' only in specific areas," and ran afoul of the major questions doctrine. *Id.* Because nondiscrimination statutes already "can and do guard against discrimination, protect consumers, and regulate financial-services companies" by "mak[ing] meaningful choices about what classes are protected or not, what conduct is prohibited or allowed, and what defenses and remedies are available or not," the court wrote, accepting the Bureau's position would have "significant political implications as to both state and federal power." *Id.* at 740–42. And without "exceedingly clear language" from Congress authorizing that result, the Bureau's interpretation could not stand. *Id.* at 743.

So too here. Just as Congress knew how to refer to "discrimination" and chose not to empower the Bureau to broadly police it, Congress equally knew how to refer to the Bankruptcy Code and chose not to place it under the Bureau's authority. Likewise, just as supervision and enforcement of antidiscrimination law is entrusted to authorities other than the Bureau, supervision and enforcement of bankruptcy law is entrusted to the USTP and overseen by the bankruptcy courts. The logic of the *Chamber of Commerce* decision applies with full force in this action and compels the same result: A holding that the Bureau's attempt to "use [its] UDAAP authority"

to police bankruptcy law is "beyond the agency's statutory authority to regulate [UDAAPs] under the Dodd–Frank Act." *Id.* at 746.

In fact, there is even more compelling evidence here that the Bureau's UDAAP authority cannot be construed as it suggests: the CBRA. That bill proposes to amend the CFPA to give the Bureau the power it presently lacks. Not only would the CBRA grant the Bureau "authority to exercise supervision and enforcement authority regarding bankruptcy law" by adding the Bankruptcy Code to the list of enumerated consumer laws in Section 5481(12), it would also designate the violation of a Discharge Order a "prohibited act" under Section 5536(a). *See* CBRA 2022 § 201(c), (d). Common sense dictates that these amendments are intended to serve a purpose, and they properly inform the interpretation of the CFPA. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (while a statute "may have a range of plausible meanings" upon enactment, "subsequent acts can shape or focus those meanings," and, in fact, "a specific policy embodied in a later federal statute should control [the] construction of the [earlier] statute, even though it ha[s] not been expressly amended"); *United States v. Jones*, 471 F.3d 478, 482 (3d Cir. 2006) ("Given that Congress passed an accompanying statute that explicitly covers theft, it cannot be the case that Congress intended § 1347 to be interpreted so broadly as to convert an instance of simple theft into health care fraud merely because the theft was perpetrated by an employee of a health care benefit program."). Far from merely

codifying existing powers, the CBRA, if enacted, would effect a "dramatic change to the regulatory landscape" by placing the Bankruptcy Code "under the CFPB's regulatory purview" and "add[ing] the Bankruptcy Code to the list of 'federal consumer financial laws' the Bureau is empowered to enforce" through litigation.[20]

To the extent that the Bureau intends to draw on its Bulletin for support, any such reliance would be unavailing. The Bulletin has no legal force and is entitled to no weight. Notwithstanding the Bureau's bootstrapping characterization of the Bulletin as a "general statement of policy" that "does not impose any legal requirements," 88 Fed. Reg. at 17,368, the Bulletin amounts to substantive rulemaking in violation of the APA. *See Texas v. EEOC*, 933 F.3d 433, 441–42, 451 (5th Cir. 2019) (explaining that courts "consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations," and so qualify as substantive rules that must go through notice and comment, and affirming as modified the district court's injunction against enforcement of agency's interpretive guidance). Even accepting that characterization at face value, the Bulletin would only be "entitled to respect"

---

[20] Kara Bruce & Alexandra Sickler, *The CFPB Enters Consumer Bankruptcy*, 41 Bankr. L. Letter, no. 10, Oct. 2021; *see also* Kara Bruce & Alexandra Sickler, *Big Banks & Small Consequences in Chapter 13*, 39 Emory Bankr. Devs. J. 559, 562 (2023) (the CBRA "embraces our proposed approach" and "creates a regulatory role for the CFPB in bankruptcy" by "giv[ing] the CFPB supervisory and enforcement authority—but not rulemaking authority—over the Bankruptcy Code").

under *Skidmore* "to the extent [it] ha[s] the 'power to persuade.'" *Madison v. Res. for Hum. Dev., Inc.*, 233 F.3d 175, 186 (3d Cir. 2000). It fails on all counts.

The Bureau simply assumes in the Bulletin that any "private student loan" in one of six categories is beyond the scope of Section 523(a)(8)(A)(i) by ignoring one of the two independent conditions in the statute (*i.e.*, loans "made, insured, or guaranteed by a governmental unit, ***or*** made under any program funded in whole or in part by a governmental unit or nonprofit institution"). *See* 88 Fed. Reg. at 17,367 ("In addition to not fitting the definition of 'qualified education loan,' these loans are not made, insured, or guaranteed by a governmental unit, and are not educational benefits, scholarships, or stipends."). This omission matters because courts have consistently ruled that loans "made under any program funded in whole or in part by" a nonprofit include private student loans guaranteed by nonprofits—a sizeable category of loans that the Bureau attempts to write out of the statute. *See Decker*, 476 B.R. at 468; *see also, e.g.*, *In re Duits*, No. 14-05277, 2020 WL 256770, at *2 (Bankr. S.D. Ind. Jan. 15, 2020) (citing cases). What's more, if the analysis proceeds to Section 523(a)(8)(B), the question of whether a private student loan is "a qualified education loan, as defined in section 221(d)(1)" of the Internal Revenue Code, is fact-intensive and often presents disputes best resolved in an adversary proceeding. *See, e.g.*, *Rumer v. Am. Educ. Servs.*, 469 B.R. 553, 562 (M.D. Pa. 2012).

In short, given that the Bankruptcy Code is not even a statute administered by

the Bureau, and the Bureau's new interpretation of Section 523(a)(8) misreads the text and departs from decades of precedent as well as the agency's own longstanding position, the Bulletin merits no respect under *Skidmore*. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 361 (2013) (rejecting deference to agency's guidance manual because its "failure to address the specific provisions of th[e] statutory scheme" and its "generic" discussion of the governing standards "call[ed] [its] conclusions into serious question"); *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 155 (3d Cir. 2004) (agency's "internally conflicting positions . . . militate against affording deference" to its interpretive rule).

> 2. *The CFPB's UDAAP Theory Intrudes on Bankruptcy Jurisdiction and Disrupts the System of Bankruptcy Regulation That Congress Designed*

Every alleged act or omission that the Bureau seeks to frame as a UDAAP is rooted in bankruptcy law and PHEAA's alleged conduct in connection with individual bankruptcy proceedings around the country. Ultimately, the Bureau accuses PHEAA of continuing to service private student loans that the Bureau believes fell within the scope of the form Discharge Order issued by the presiding bankruptcy court in each borrower's case. Those allegations, taken as true, would show violations of the corresponding discharge injunctions. Allowing the Bureau to base UDAAP claims on such alleged violations would upend Congress's chosen system of bankruptcy regulation, effectively supplanting the USTP and transferring

from a bankruptcy court to an executive agency the authority to adjudicate violations of the bankruptcy court's own Discharge Order.

The federal bankruptcy system is a model of comprehensive regulation. Start with Discharge Orders. To ascertain whether a particular debt has been discharged, either a debtor or a creditor can request a judicial determination of dischargeability. 4 *Collier on Bankruptcy* ¶ 523.04 (16th ed. 2024). This can take the form of an adversary proceeding in bankruptcy court—filed either during the bankruptcy case or after its conclusion, on a motion to reopen the case to obtain a dischargeability ruling—or it can be raised in a state or other non-bankruptcy court. *Id.* It can also be raised as a defense in a post-stay collection action or a post-discharge contempt action in bankruptcy court. *Id.* ¶¶ 523.04, 524.02[2][c]. Importantly, though, "determinations as to the dischargeability of particular debts" are core proceedings under the Bankruptcy Code, 28 U.S.C. § 157(b)(2)(I), meaning "those that involve 'more pressing bankruptcy concerns,'" *In re Anderson*, 884 F.3d 382, 388 (2d Cir. 2018). This makes sense because, as the Bureau concedes, standard Discharge Orders are "not specific as to the consumer" and "do[] not identify which of the consumer's debts are discharged." Compl. ¶ 17. Additionally, efforts to collect on a discharged debt violate the injunction incorporated into every Discharge Order and are punishable as contempt. 11 U.S.C. § 524(a); *see Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019). And, like dischargeability findings, a contempt motion to enforce a

discharge injunction is a core bankruptcy proceeding. *See* 28 U.S.C. § 157(b)(2)(O); *In re G–I Holdings, Inc.*, 580 B.R. 388, 424–25 (Bankr. D.N.J. 2018).

Consistent with this framework, the enforcement of discharge injunctions is the exclusive province of the issuing court. The "weight of circuit authority" holds that Section 524 of the Bankruptcy Code does not imply a private right of action. *In re Joubert*, 411 F.3d 452, 456 (3d Cir. 2005). "Instead, violations of this court-ordered injunction are enforceable ***only*** by the bankruptcy court and ***only*** by a contempt citation." *Anderson*, 884 F.3d at 391 (emphasis added); *see also In re Bernhard*, No. 23-1358, 2024 WL 379468, at *2 (3d Cir. Feb. 1, 2024) ("[T]he remedy for a violation of [a] discharge order is a civil contempt order."); *Thomas v. City of Philadelphia*, 759 F. App'x 110, 112 (3d Cir. 2019) (district court lacked jurisdiction to sanction defendants for violating Discharge Order because it is "settled" that "[a]ny sanction for violating the § 524 injunction must be imposed by the bankruptcy court"); *accord Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 966–68 (11th Cir. 2012); *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507–10 (9th Cir. 2002); *Cox v. Zale Del., Inc.*, 239 F.3d 910, 916–17 (7th Cir. 2001); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421–23 (6th Cir. 2000). "Respect for judicial process" compels this result, as "[t]he power to enforce an injunction is

complementary to the duty to obey the injunction." *Anderson*, 884 F.3d at 391.[21]

Discharge injunctions are also court-specific. That is, one bankruptcy court cannot sanction a violation of another bankruptcy court's Discharge Order. *Bruce v. Citigroup Inc.*, 75 F.4th 297, 302–06 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 565 (2024); *Crocker*, 941 F.3d at 216–17. After all, a claim for violating a discharge injunction "necessarily requires a determination of whether the debt was discharged, which is 'within the exclusive jurisdiction of the bankruptcy court.'" *Brown v. Transworld Sys., Inc.*, 73 F.4th 1030, 1039 (9th Cir. 2023). And the bankruptcy court has "unique expertise in interpreting its injunctions and determining when they have been violated." *Anderson*, 884 F.3d at 390–91. As a result, it "could 'wreak havoc on the federal courts to leave enforcement of the injunctive order of a bankruptcy court in one district to the interpretive whims of a bankruptcy court in another district.'" *Bruce*, 75 F.4th at 304. The strict standard for contempt reinforces this balance. There must be "***no fair ground of doubt*** as to whether the order barred the creditor's conduct," meaning there is no "objectively reasonable basis for concluding that the creditor's conduct might be lawful." *Taggart*, 587 U.S. at 557.

Together, these principles preclude nationwide class actions based on alleged serial violations of Discharge Orders. *See Bruce*, 75 F.4th at 304; *Crocker*, 941 F.3d

---

[21] Notably, the CBRA would amend Section 524 to create a right of action for the violation of a discharge injunction. *See* CBRA 2022 § 104(hh). This confirms that no such right exists and discharge injunctions are enforceable only by contempt.

at 216–17.  They also counsel in favor of precluding federal statutory claims that are premised entirely on violations of Section 524.  *See Brown*, 73 F.4th at 1039 (Fair Debt Collection Practices Act claims are precluded by the Bankruptcy Code); *Walls*, 276 F.3d at 509–11 (same); *Davis v. KeyBank N.A.*, No. 2:22-CV-01645, 2024 WL 3106830, at *1 (D. Nev. June 21, 2024) (same); *Townsend v. M&T Mortg. Corp.*, No. 3:09-CV-1866, 2010 WL 2573825, at *4–5 (M.D. Pa. June 23, 2010) (same); *Zehnder v. FDS Bank*, No. 3:09-CV-1865, 2010 WL 11575034, at *4–5 (M.D. Pa. Mar. 18, 2010) (same).  The same logic applies to the Bureau's CFPA claims, as Congress has denied the Bureau the authority to regulate the Bankruptcy Code under the CFPA.  *Cf. Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 274 (3d Cir. 2013) (the inquiry on bankruptcy preclusion or implied repeal is whether there is a "direct conflict" between the statutes or whether both "can be enforced," considering legislative intent).

The Bureau disregards all of this law.  Without citing a single bankruptcy court order of any kind, the Bureau pleads that PHEAA violated "at least 177" discharge injunctions.  Compl. ¶ 36.  Purportedly on the strength of its own interpretation of Discharge Orders and its selective review of bankruptcy filings, the Bureau has claimed for itself—and taken from the bankruptcy courts and the USTP—the power to unilaterally decide violations of Section 524 and enforce compliance with the Bankruptcy Code and individual Discharge Orders.  The

Bureau's position "represent[s] a 'transformative expansion in [its] regulatory authority'" that would "allow[] it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself," and so the Court has "every reason to 'hesitate before concluding that Congress' meant to confer on [the Bureau] the authority it claims." *West Virginia*, 597 U.S. at 724–25.

## II. THE CFPB HAS FAILED TO STATE A CLAIM UNDER THE CFPA

### A. The CFPB's Attempt to Retroactively Apply Its New Statutory Interpretation to PHEAA Violates Due Process

Even if Congress had authorized the Bureau to police the Bankruptcy Code and punish alleged violations of Discharge Orders as UDAAPs, the Bureau's CFPA claims would fail as a matter of law for several independent reasons. First and foremost, the Bureau's theory of liability contravenes bedrock tenets of constitutional due process. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Due process bars the government from announcing a new interpretation of law and then penalizing a regulated party retroactively for conduct that preceded that interpretation and conformed to the government's previous position. *See, e.g.*, *id.* at 253–54 (FCC violated broadcasters' due process rights when it changed its enforcement policy on indecency and applied it retroactively to sanction earlier broadcasts, as the policy in place at the time "gave no notice" to the broadcasters

that their broadcasts "were a violation of [the statute] as interpreted and enforced by the agency"); *Karem v. Trump*, 960 F.3d 656, 666–67 (D.C. Cir. 2020) (government violated reporter's due process rights when it suspended his credentials in "an 'unpredictable break[] with prior' policy and practice"); *United States v. AMC Ent., Inc.*, 549 F.3d 760, 769–70 (9th Cir. 2008) (district court abused its discretion and violated company's due process rights by requiring it to retrofit all theaters to comply with government's recently announced interpretation of ADA); *cf. United States v. Harra*, 985 F.3d 196, 213 (3d Cir. 2021) (noting that it is difficult "to predict how an agency will construe a statute or regulation at some unspecified point in the future, particularly when that interpretation will depend on the political views of the President in office at [that] time," and "this is where due process steps in").

Again, as with its UDAAP gambit in *Chamber of Commerce*, this is not the first time the Bureau has attempted to change its interpretation of a federal statute and enforce that interpretation retroactively to achieve its policy goals. *See PHH Corp. v. CFPB*, 839 F.3d 1, 44 (D.C. Cir. 2016), *rev'd on other grounds and reinstated in relevant part*, 881 F.3d 75 (D.C. Cir. 2018) (en banc), *abrogated on other grounds by Seila Law*, 591 U.S. 197. In *PHH*, the D.C. Circuit vacated a CFPB enforcement order for offending due process with a similar "about-face." *Id.* There, the Bureau initiated an enforcement action against a mortgage lender for violating RESPA, a federal statute governing real estate transactions, by participating in

captive reinsurance arrangements. *Id.* at 11. Even though the government had "authoritatively interpreted" RESPA since 1997 to permit those arrangements under specific conditions, and the lender—along with the rest of the industry—had structured its operations accordingly, the Bureau decided in 2015 that captive reinsurance arrangements were prohibited by the statute. *Id.* at 11, 45–46. It then applied its "newly minted interpretation" retroactively to the lender, notwithstanding its reliance on the prior interpretation, and sanctioned it for past acts to the tune of $109 million. *Id.* at 11–12. Writing for the panel, then-Judge Kavanaugh chastised the Bureau for disregarding "fundamental anti-retroactivity principles" that he called "Rule of Law 101." *Id.* at 48. He did not mince words: "When a government agency officially and expressly tells you that you are legally allowed to do something, but later tells you 'just kidding' and enforces the law retroactively against you and sanctions you for actions you took in reliance on the government's assurances, that amounts to a serious due process violation." *Id.*

*PHH* "fit[s] this case precisely." *Id.* For years, the Bureau told the public that private student loans were non-dischargeable in bankruptcy without an adversary proceeding, and did not even instruct its own examiners on post-bankruptcy servicing procedures. *See supra* pp. 10–13; *cf. PHH*, 839 F.3d at 48 (guidance "provided by top [agency] officials" and "given repeatedly" sufficed for the industry to reasonably rely on the agency's pronouncements, even without formal

rulemaking). Bankruptcy courts likewise interpreted Section 523(a)(8) to exempt virtually all private student loans from discharge absent proof of undue hardship. *See supra* pp. 6–10; *cf. PHH*, 839 F.3d at 45 (noting that the government's "consistent and repeated interpretation of [RESPA] was widely known and relied on" in the industry and had been "acknowledged and approved" by courts). In short, PHEAA "acted in reliance upon numerous government pronouncements authorizing precisely the conduct in which [it] engaged." *PHH*, 839 F.3d at 49. Yet the Bureau now alleges that, in light of a new interpretation of Section 523(a)(8) that it published in the Federal Register in March 2023 without notice and comment, PHEAA violated "at least 177" Discharge Orders during a preceding four-year timespan (*i.e.*, 2017–2021) and can be charged retroactively with UDAAPs. "The Due Process Clause does not countenance the CFPB's gamesmanship." *Id.*

### B.    The CFPB Has Failed to State a Claim Under Section 5531

The Bureau's UDAAP claims fail on their own terms as well. With respect to "unfair" practices, the Bureau must establish that (1) "the act or practice causes or is likely to cause substantial injury to consumers," (2) which is "not reasonably avoidable by consumers," and (3) which "is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1). The Bureau alleges two "unfair" practices by PHEAA: "collecting on discharged non-qualified education loans" and "failing to maintain policies and procedures to assess whether

the loans [it] services are discharged by an Order of Discharge."  Compl. ¶ 42.

Even accepting the Bureau's conclusory allegation that these acts are likely to cause substantial injury to consumers, any such injury is reasonably avoidable.  "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact."  *CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *21 (M.D. Pa. Aug. 4, 2017).  The question "is not whether subsequent mitigation was convenient or costless, but whether it was reasonably possible."  *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

While the Bureau contends that consumers "cannot avoid AES's further collection attempts or its furnishing inaccurate credit information" because consumers "have no control over their servicer's collection or furnishing practices," Compl. ¶¶ 45–46, this ignores that consumers have ample options to mitigate any injury after the fact.  For example, consumers can initiate an adversary proceeding, reopen their bankruptcy case, file for contempt, notify PHEAA (or their lender) of a Discharge Order, or request a judicial finding of dischargeability.  *See supra* pp. 28–30; *see also Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 271 (2d Cir. 2023) (reciting a borrower's "options to resolve [a] dispute" over the dischargeability of private student loan debt).  The Bureau has conceded as much in its complaint and

its past publications.  *See id.* ¶ 54 (consumers can stop collection attempts via court order); *Supervisory Highlights: Fall 2015*, *supra* note 9, at 23–24 (borrowers "often have avenues to reopen bankruptcy cases or otherwise raise 'undue hardship' challenges to the enforceability of student loans").  This is fatal to the Bureau's unfairness claim.  *See Davis*, 691 F.3d at 1169 (no "unfair" practice claim where a consumer could avoid the risk of an annual fee by closing his account without using the card; the fact that doing so would "negative[ly] impact . . . his credit score" did not render the harm not "reasonably avoidable").

With respect to "abusive" practices, to state a claim under the lone subsection of Section 5531 that the Bureau invokes here (subsection (2)(B)), Compl. ¶¶ 50–51, the Bureau must establish that the act or practice "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service," 12 U.S.C. § 5531(d)(2)(B).  Citing the same two practices as in its unfairness claim, the Bureau alleges that those practices "take unreasonable advantage of the inability of consumers to protect their interests in using their private student loans" because they "deprive consumers of their legal rights to avoid collection of a loan discharged in bankruptcy," while "AES is compensated for its continued servicing of these loans after discharge."  Compl. ¶ 52.  Again, even accepting the Bureau's internally contradictory assertion that consumers have an interest in "using the[] private student loans" that they have

purportedly sought to discharge in bankruptcy, as the Bureau well knows, those consumers have ready access to an array of options to protect that interest. *See supra* pp. 36–37. Moreover, consumers' "legal rights to avoid collection," as alleged in the complaint, derive entirely from and depend entirely on bankruptcy law. Those rights come into being upon the issuance of a Discharge Order, and the interpretation and enforcement of that order is a matter reserved for the bankruptcy court that issued it. *See supra* pp. 28–31.

Lastly, with respect to "deceptive" practices, the Bureau's claim fails for a simple reason: It rests entirely on the premise that each of the loans referenced in the complaint actually fell within the scope of the corresponding bankruptcy court's standard Discharge Order. *See* Compl. ¶¶ 57–59. In other words, the acts alleged by the Bureau are "deceptive" only to the extent that (1) they falsely represent that the loans are still owed and (2) they are likely to mislead consumers acting reasonably under the circumstances. *See CFPB v. Gordon*, 819 F.3d 1179, 1192 & n.7 (9th Cir. 2016). Neither is true, for the reasons outlined throughout this brief.

## C. The CFPB Has Failed to State a Claim Under Section 5536

The Bureau's fallback FCRA claim also fails as a matter of law. In that claim, which the Bureau tacked on to its complaint in an obvious attempt to shoehorn its *ultra vires* bankruptcy enforcement effort into an "enumerated consumer law," the Bureau alleges that PHEAA lacks "reasonable" policies and procedures to ensure

the accuracy of information it furnishes regarding "borrowers whose non-qualified education loans had been discharged in bankruptcy." Compl. ¶ 66. The dischargeability of private student loan debt, however, constitutes a "*legal* inaccuracy [that] is not cognizable under the FCRA." *Mader*, 56 F.4th at 266.

The FCRA's "inaccuracy" test focuses on "objectively and readily verifiable information." *Id.* at 269; *accord Holden v. Holiday Inn Club Vacations Inc.*, 98 F.4th 1359, 1369 (11th Cir. 2024). An inaccuracy that "evades objective verification" does "not meet this statutory test." *Mader*, 56 F.4th at 269. Where, for example, it turns on an "unresolved legal question," *id.* at 270, or a "dispute without a straightforward answer," *Holden*, 98 F.4th at 1368, there can be no FCRA liability.

As the Second Circuit explained in *Mader*, private student loan debt is a case in point. There, the plaintiff alleged that a credit-reporting company had violated the FCRA by reporting that he continued to carry private educational debt after his Chapter 7 discharge. *Mader*, 56 F.4th at 265–66. In affirming the dismissal of the FCRA claims, the Second Circuit held that the plaintiff had alleged a non-actionable "legal inaccuracy" because his claim "hinge[d] on the resolution of an unsettled legal question." *Id.* The court emphasized that there was "no bankruptcy order explicitly discharging this debt," and, in fact, both the debtor and the creditor "continued to treat the debt as outstanding following [the plaintiff's] bankruptcy." *Id.* at 269. "Instead," the court wrote, "the accuracy of [the] reporting that the debt was still

owed depends on whether it is 'dischargeable,' which itself depends on whether section 523(a)(8)(A)(i) applies to Excel Grad loans," and "that question, finally, turns on the unsettled meaning of the word 'program' within section 523(a)(8)(A)(i)." *Id.* Put differently, the claim "require[d] both resolving a contested statutory question and applying the resulting statutory construction to disputed facts regarding the structure of [the] loan program," all of which demanded "bespoke attention and legal reasoning." *Id.* at 266, 270.

To the extent that these kinds of "inaccuracies" evade objective verification, a furnisher (such as PHEAA) cannot fairly be held liable under the FCRA for failing to have "reasonable written policies and procedures" to detect and prevent them. *See id*. In other words, the FCRA's mandate that furnishers "establish reasonable policies and procedures regarding the accuracy and integrity of the information furnished" must be construed in light of the requirement that a cognizable "inaccuracy" be "objectively and readily verifiable." *Holden*, 98 F.4th at 1363, 1369.[22] Indeed, the FCRA does not require furnishers to ensure that the debts they report would survive any and all legal challenges. *See Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 38–39 (1st Cir. 2010) ("[F]urnishers are 'neither qualified nor

---

[22] Although the Third Circuit has not spoken, district courts have held that a legal dispute over the validity of a debt cannot support an FCRA claim against a furnisher. *See, e.g.*, *Ritz v. Nissan-Infiniti LT*, No. 20-cv-13509, 2023 WL 3727892, at *5–7 & n.10 (D.N.J. May 30, 2023), *appeal docketed*, No. 23-2181 (3d Cir. June 27, 2023).

obligated to resolve' matters that 'turn[] on questions that can only be resolved by a court of law.'"); *Lamando v. Rocket Mortg*., No. 3:23-CV-147, 2024 WL 264034, at *10 (N.D.N.Y. Jan. 24, 2024) ("[W]hether furnishers of information are required to report subsequent payments on a mortgage after a discharge in bankruptcy . . . is not cognizable under the FCRA."); *Herrell v. Chase Bank USA, N.A*., 218 F. Supp. 3d 788, 793 (E.D. Wis. 2016) (whether bank furnished information about allegedly discharged debt was not a "factual inaccuracy" sufficient to support FCRA claim).

## III. THE CFPB HAS FAILED TO JOIN NECESSARY PARTIES

### A. The Lenders Are Necessary Parties and Should be Joined

Finally, in the event that the Court accepts the Bureau's claim that its UDAAP powers lawfully permit enforcement of the Bankruptcy Code, the Bureau's allegations mandate that the lenders of the subject private student loans be added to this case as defendants. The Bureau's failure to join—or even identify—those lenders warrants dismissal under Rule 12(b)(7).

Rule 12(b)(7) commands a multi-step analysis. *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223, 232 (3d Cir. 2023). The Court first must decide whether the absent parties should be joined as "necessary" parties under Rule 19(a). *Id.* A party is necessary if it "claims an interest relating to the subject of the action and is so situated that disposing of the action in [its] absence may . . . as a practical matter impair or impede [its] ability to protect the interest," or if, "in [its]

absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1). Then, if the party is necessary but absent, it "should be joined" if feasible. *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). Finally, if the party cannot be joined, the Court must determine whether "equity and good conscience" favor dismissal. Fed. R. Civ. P. 19(b).

Unquestionably, the lenders—the owners and issuers of the student loans that the Bureau insists were discharged in bankruptcy—are necessary parties under Rule 19(a)(1)(B). The lenders are at the very core of this action. The upshot of the Bureau's charges is to bar PHEAA from performing its contractual obligations under its servicing agreements with the lenders. *See* Compl. ¶ 72 (requesting retrospective and prospective injunctive relief). Were that not enough, the Bureau also seeks the "[r]escission or reformation of contracts, the refund of moneys paid, restitution, [and] disgorgement or compensation for unjust enrichment"—relief that would directly impact all of the lenders' rights. *Id.* Although the complaint is vague on this score, the Bureau apparently aims to abrogate at least one of two distinct sets of contracts: (1) the servicing agreements between the lenders and PHEAA; and/or (2) the promissory notes between the lenders and the borrowers. The lenders are the only common party. And "parties owning rights under disputed contracts . . . generally have a legally protected interest under Rule 19(a)(1)(B)(i)." *Epsilon*

- 42 -

*Energy*, 80 F.4th at 233. In fact, contracting parties "have been described as 'the paradigm of an indispensable party.'" *Id.* at 234 n.15.

Bankruptcy case law bears this out. In an analogous scenario—adversary proceedings to determine the dischargeability of student loans—courts have consistently held that the lenders are the real party in interest and loan servicers like PHEAA are properly dismissed because they have no direct financial interest in the outcome of the matter. *See, e.g.*, *Grabis v. Navient Sols., LLC*, No. 15-AP-01420, 2018 WL 1508754, at *5 (Bankr. S.D.N.Y. Mar. 26, 2018) ("[T]he only proper defendants in an action to determine the dischargeability of student loan indebtedness are the parties who hold that indebtedness."); *Bennett v. U.S. Dep't of Educ.*, No. 15-AP-06051, 2015 WL 5602881, at *1–2 (Bankr. M.D.N.C. Sept. 22, 2015) ("This court agrees with other courts that have dismissed § 523(a)(8) actions against student loan servicers on the ground that there is no debt owed to the servicer to find dischargeable."); *Hubbard v. PHEAA*, No. 14-AP-1010, 2014 WL 1654703, at *4 (Bankr. E.D. Tenn. Apr. 25, 2014) ("Debtor has sued the wrong party in suing the servicer of his student loan, rather than the owner or guarantor of the loan."); *Aalabdulrasul v. ACS*, No. 11-AP-09089, 2012 WL 1597277, at *1–2 (Bankr. N.D. Iowa May 27, 2012) ("[T]he Defendant here, AES, is not owed a debt by the Debtor. Accordingly, AES cannot provide the relief Debtor seeks under 11 U.S.C. § 523(a)(8)."); *Srinivasan v. Sallie Mae, Inc.*, No. 10-AP-1545, 2010 WL 3633062,

at *3 (Bankr. D.N.J. Sept. 7, 2010) ("Since there is no debt due from the Plaintiff/Debtor to Defendant [servicer], no purpose would be served in declaring the [student loan] debt dischargeable.").

The lenders are also necessary parties insofar as the Court cannot award complete relief in their absence. Fed. R. Civ. P. 19(a)(1)(A). By the Bureau's account, "complete relief" requires refunds and the recission or reformation of contracts. Compl. ¶ 72. Given the two sets of contracts implicated by the Bureau's request, this relief self-evidently cannot be awarded without the lenders, much less exacted against PHEAA by court order. *See, e.g.*, *NCR Corp. v. BB 2009 Tr.*, No. 11-CV-0481, 2012 WL 440744, at *3–4 (D. Del. Feb. 9, 2012) (absent party was required in declaratory judgment action over a license agreement because, even though it was not a signatory, it and its actions were "essential to the interpretation, validity, and scope" of the agreement and the relief sought would likely have an effect on its and the parties' "separate and competing interests").

## B. The CFPB Has Failed to Identify the Affected Lenders

The next step of the Rule 12(b)(7) analysis is to determine whether the absent but necessary parties can feasibly be joined. *Epsilon Energy*, 80 F.4th at 233. The Bureau's breach of its obligations under Rule 19(c) have made this analysis impossible, and the Bureau properly may be held liable for its default.

The Bureau baldly refers to 7,934 loans that PHEAA allegedly "collected or

attempted to collect . . . after a bankruptcy proceeding," 177 of which it alleges were "non-qualified education loans" that it asserts were discharged.  Compl. ¶ 36.  Only the Bureau knows which loans, involving which lenders and which consumers, are at issue.  Rule 19(c) unconditionally requires the Bureau, as plaintiff, to state both "the name, if known, of any person who is required to be joined if feasible but is not joined" and "the reasons for not joining that person."  Fed. R. Civ. P. 19(c).  The Bureau has abdicated this responsibility, preventing the Court from determining whether it is feasible to join the lenders as required.  The consequences are the Bureau's alone to bear.  *See, e.g.*, *Poling v. K. Hovnanian Enters.*, 99 F. Supp. 2d 502, 517 n.16 (D.N.J. 2000) (because plaintiffs had not adequately complied with Rule 19(c), court could infer that joinder of absent parties would be infeasible); *see also Engel v. R.J. Reynolds Tobacco Co.*, No. 2:17-CV-618, 2017 WL 2119805, at *2 (E.D. Cal. May 16, 2017) (dismissing complaint "[b]ecause plaintiff has not indicated why joinder is not feasible").

## CONCLUSION

PHEAA respectfully requests that the Court dismiss the complaint in full, with prejudice, and afford PHEAA all other relief to which it may be entitled.

Dated:    August 13, 2024          Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

 */s/ Steve Dollar*
Steve Dollar (*Pro Hac Vice*)
Allison L. Silverman (*Pro Hac Vice*)
1301 Avenue of the Americas
New York, New York 10019-6022
Tel.:  (212) 318-3000
steve.dollar@nortonrosefulbright.com
allison.silverman@nortonrosefulbright.com

Thomas A. Coulter (*Pro Hac Vice*)
799 9th Street NW, Suite 1000,
Washington, DC 20001-4501
Tel.:  (202) 662-4765
tom.coulter@nortonrosefulbright.com

Ryan Meltzer (*Pro Hac Vice*)
98 San Jacinto Boulevard, Suite 1100,
Austin, Texas  8701-4255
Tel.:  (512) 536-5234
ryan.meltzer@nortonrosefulbright.com

- and -

James J. Jarecki (PA 89580)
Pennsylvania Higher Education
Assistance Agency
1200 N. 7th Street
Harrisburg, PA 17102
Tel.:  (717) 720-1568
james.jarecki@pheaa.org

*Attorneys for Defendant Pennsylvania*
*Higher Education Assistance Agency*

## CERTIFICATE OF WORD COUNT

I, Steve Dollar, hereby certify that the foregoing Brief in Support of Defendant's Motion to Dismiss is in compliance with LR 7.8(b)(3) and, pursuant to the Court's Verbal Order of August 8, 2024, Dkt. 27, does not exceed 45 pages in length.

/s/ Steve Dollar
Steve Dollar

## CERTIFICATE OF SERVICE

I, Steve Dollar, hereby certify that a true and correct copy of the foregoing Brief in Support of Defendant's Motion to Dismiss was served upon all counsel of record who are deemed to have consented to electronic filing through the Court's CM/ECF system on this 13th day of August, 2024.

*/s/ Steve Dollar*
Steve Dollar