## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:24-CV-896 |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, | § § § § | |
| Defendant. | § | |

## UNREPORTED ELECTRONICALLY AVAILABLE CASES CITED IN DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS

# Index of Unpublished Cases

| Case Name | Page # |
|---|---|
| *Aalabdulrasul v. ACS*,<br>No. 11-AP-09089, 2012 WL 1597277 (Bankr. N.D. Iowa May 27, 2012) | 4 |
| *Becotte v. Coop. Bank*,<br>No. 15-10812, 2017 WL 886967 (D. Mass. 2017) | 7 |
| *Bennett v. U.S. Dep't of Educ.*,<br>No. 15-AP-06051, 2015 WL 5602881 (Bankr. M.D.N.C. Sept. 22, 2015) | 16 |
| *Boris v. Nat'l Collegiate Student Loan Tr. 2007-1*,<br>No. 2:16-CV-19-FtM, 2016 WL 11578271 (M.D. Fla. Nov. 28, 2016) | 19 |
| *CFPB v. Navient Corp.*,<br>No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) | 23 |
| *Davis v. KeyBank N.A.*,<br>No. 2:22-CV-01645, 2024 WL 3106830 (D. Nev. June 21, 2024) | 48 |
| *Engel v. R.J. Reynolds Tobacco Co.*,<br>No. 2:17-CV-618, 2017 WL 2119805 (E.D. Cal. May 16, 2017) | 50 |
| *Grabis v. Navient Sols., LLC*,<br>No. 15-AP-01420, 2018 WL 1508754 (Bankr. S.D.N.Y. Mar. 26, 2018) | 53 |
| *Hubbard v. PHEAA*,<br>No. 14-AP-1010, 2014 WL 1654703 (Bankr. E.D. Tenn. Apr. 25, 2014) | 64 |
| *In re Bernhard*,<br>No. 23-1358, 2024 WL 379468 (3d Cir. Feb. 1, 2024) | 68 |
| *In re Duits*,<br>No. 14-05277, 2020 WL 256770 (Bankr. S.D. Ind. Jan. 15, 2020) | 72 |
| *Lamando v. Rocket Mortg.*,<br>No. 3:23-CV-147, 2024 WL 264034 (N.D.N.Y. Jan. 24, 2024) | 75 |
| *Mata v. Nat'l Collegiate Student Loan Tr. 2006-1*,<br>No. 6:18-AP-01089, 2020 WL 5543716 (Bankr. C.D. Cal. July 31, 2020) | 87 |

| Case Name | Page # |
|---|---|
| *NCR Corp. v. BB 2009 Tr.*,<br>No. 11-CV-0481, 2012 WL 440744 (D. Del. Feb. 9, 2012) | 97 |
| *Ritz v. Nissan-Infiniti LT*,<br>No. 20-cv-13509, 2023 WL 3727892 (D.N.J. May 30, 2023) | 103 |
| *Roy v. Sallie Mae*,<br>No. 09-AP-1406, 2010 WL 1523996 (Bankr. D.N.J. Apr. 15, 2010) | 110 |
| *Srinivasan v. Sallie Mae, Inc.*,<br>No. 10-AP-1545, 2010 WL 3633062 (Bankr. D.N.J. Sept. 7, 2010) | 112 |
| *Townsend v. M&T Mortg. Corp.*,<br>No. 3:09-CV-1866, 2010 WL 2573825 (M.D. Pa. June 23, 2010) | 116 |
| *Zehnder v. FDS Bank*,<br>No. 3:09-CV-1865, 2010 WL 11575034 (M.D. Pa. Mar. 18, 2010) | 121 |

2012 WL 1597277

Only the Westlaw citation is currently available.

United States Bankruptcy Court,

N.D. Iowa.

In re Mohammed A. AALABDULRASUL, Debtor.

Mohammed A. Aalabdulrasul, Plaintiff,

v.

ACS; American Education Services; National Collegiate Trust; Sun

Trust Bank; JP Morgan Chase Bank; Simm Associates, Inc., Defendants.

Bankruptcy No. 11–02108.

|

Adversary No. 11–09089.

|

May 7, 2012.

**Attorneys and Law Firms**

Yara El–Farhan Halloush, Cedar Rapids, IA, for Plaintiff.

Douglas Robert Lindstrom, Jr., Lane & Waterman LLP, Davenport, IA, Stephanie L. Hinz, Pickens, Barnes & Abernathy, Cedar Rapids, IA, for Defendant.

JP Morgan Chase Bank NA, pro se.

Sun Trust Bank, pro se.

Simm Associates, Inc, pro se.


**ORDER ON MOTION TO DISMISS AMERICAN EDUCATION SERVICES UNDER RULE 7021 (Doc. # 11)**

THAD J. COLLINS, Chief Judge.

 **\*1** Plaintiff, Mohammed Abdulmuttalib Aalabdulrasul, filed a Chapter 7 bankruptcy petition on September 14, 2011. He filed the current adversary on December 9, 2011, arguing that his obligation on five student loans he co-signed for his brother, Ali A. Abdulrasul, should be discharged. The complaint states in part:

> [T]he Defendants herein are identified as the three original lenders—Chase-JP Morgan Chase Bank NA, Sun Trust Bank, and Education Finance Partners/Union Bank of California. This third lender does not appear to have any involvement in the administration of the student loan, nor has any correspondence address for the entity been found, so its interests are being represented through its servicing agent, American Education Services and ACS Education Services.

(Complaint, ECF Doc. No. 1, at 3.)

On March 20, 2012, Defendant American Education Services (AES) filed a Motion to Dismiss under Federal Rule of Bankruptcy Procedure 7021 and Federal Rule of Civil Procedure 21. A telephonic hearing on the Motion was held on March 30, 2012. Plaintiff was represented by Yara El–Farhan Halloush and AES was represented by Douglas Lindstrom. The Court took the matter under advisement.

Federal Rule of Civil Procedure 21 provides:

> Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.

Fed.R.Civ.P. 21. AES argues it should be "dismissed from this action pursuant to Federal Rule of Civil Procedure 21 because [it] is not a real party-in-interest; [it] does not have and has never had a proprietary interest in any of the loans." (Mt., ECF Doc. No. 11, at 1.) In support of its motion, AES presents an affidavit from Shelly Bowman which attests that AES is merely the loan servicer on three of the five loans and does not have any connection at all with the two remaining loans. Debtor does not dispute that AES is simply the loan servicer on three of the five loans. Debtor objects to AES's motion arguing that if the Court discharges the debt there is a chance, AES, as the loan servicer, may still attempt to collect the debt. If AES is not a party to the case, Debtor questions what affect a discharge would have on AES's further collection efforts.

The Court finds that Debtor's concern is not sufficient to deny the Motion. In *Srinivasan v. Sallie Mae, Inc.,* No. 10–1545, 2010 WL 3633062 (Bankr.D.N.J. Sept. 7, 2010), the court held that a determination of dischargeability of a student loan, when only the loan servicer was named as a defendant, would serve no purpose. In *Srinivasan,* the plaintiff moved for default judgment against Sallie Mae. Sallie Mae argued there was no case to pursue because it was merely the servicer of the loan. The court held in part:

> None of the entities identified as the holder or owner of the consolidated loan is Sallie Mae, Inc. The court finds that the Debtor does not owe a debt to Sallie Mae, Inc. and did not owe a debt to Sallie Mae, Inc. on the date she filed bankruptcy. Sallie Mae, Inc. has merely been the servicer of her consolidated student loan. Since there is no debt due from the Plaintiff/Debtor to the Defendant, Sallie Mae, Inc., no purpose would be served in declaring the debt dischargeable. In light of the foregoing, the court denies the application by the Debtor for entry of judgment by default against Sallie Mae, Inc. and will close this adversary proceeding.

**\*2** *Id.* at \*3.

As in *Srinivasan,* the Defendant here, AES, is not owed a debt by the Debtor. Accordingly, AES cannot provide the relief Debtor seeks under 11 U.S.C. § 523(a)(8). Consequently, AES's Motion to Dismiss will be granted and AES will be dismissed from the above-captioned adversary. Additionally, should this adversary be resolved in Debtor's favor, Defendants Chase–JP Morgan Chase Bank NA and Suntrust will be directed to notify AES of the outcome immediately to guard against any further potential collection efforts—thus curing Debtor's concerns.

**WHEREFORE,** Defendant American Education Services' Motion to Dismiss American Education Services as a Party Pursuant to Federal Rule of Bankruptcy Procedure 7021 and Federal Rule of Civil Procedure 21 (ECF Doc. # 11), is **GRANTED.**

**FURTHER** American Education Services is **DISMISSED** from the above-captioned action.

**All Citations**

Not Reported in B.R., 2012 WL 1597277

End of Document     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 886967

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

Robert BECOTTE

v.

The COOPERATIVE BANK

CIVIL ACTION NO. 15-10812-RGS

|

Filed 03/06/2017

**Attorneys and Law Firms**

Paul F. Kelly, Kevin C. Merritt, Sasha N. Gillin, Segal Roitman, LLP, Boston, MA, for Robert Becotte.

Liam T. O'Connell, Joseph T. Toomey, Nutter McClennen & Fish LLP, Boston, MA, for the Cooperative Bank.

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Richard G. Stearns, UNITED STATES DISTRICT JUDGE

 **\*1** Robert Becotte, reported management lapses at the Cooperative Bank to state and federal regulators and fellow Bank officers and, by his accounts, was fired for his deeds. He alleges wrongful retaliation by the Bank in violation of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), 12 U.S.C. § 1831j, and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (CFPA), 12 U.S.C. § 5567. The Bank claims that Becotte was terminated for reasons that have nothing to do with his purported whistleblowing. It now moves for summary judgment. [1]

BACKGROUND

The plausible facts, taken in the light most favorable to Becotte as the nonmoving party, are as follows. In 1998, the Cooperative Bank was born out of the merger of Roslindale Cooperative Bank and Charlestown Cooperative Bank. Becotte moved to the new Bank as its Treasurer and Chief Financial Officer (CFO), titles that he held throughout his tenure. In 2004, Becotte took on the additional duties of Chief Compliance Officer (CCO), which he performed until 2012. Becotte received excellent performance reviews, and in most years, merit-based salary increases.

In 2011, then Bank President John McCarthy nominated Becotte as one of three potential candidates to succeed him. Acting on the recommendation of an outside consulting firm, McCarthy passed over Becotte and elevated Board Chairman William O'Neill. The following year, Becotte was removed as CCO and, as a result, saw a $15,000 reduction in his annual salary. [2] On January 17, 2014, the Bank terminated Becotte.

The backstory is as follows. In 2006, Becotte learned that then Bank President Paul Ladouceur was using a Bank credit card for personal expenses. Believing this to violate the banking laws as well as internal Bank policy, Becotte raised his concerns directly with Ladouceur. He also reported the misuse of the credit card to Eugene Blumenrich, the Bank's attorney, and to the then Board of Directors (Joseph Cefalo, Frances Giannakopoulos, and William O'Neill).

In 2007, the Federal Deposit Insurance Corporation (FDIC) and Massachusetts Division of Banks (MDoB) conducted a Safety and Soundness Examination of the Bank. Becotte spoke to the examiners about Ladouceur's misfeasance. At some point, the examiners located a letter written by Blumenrich to the Bank's bonding company. The letter characterized Ladouceur's failure to reimburse the Bank as an "innocent lack of attention." Becotte told the examiners that, in his view, the letter was an attempt to whitewash Ladouceur's misconduct. [3]

**\*2** In the fall of 2011, the Board hired consultants WTK Associates, Inc. (WTK), to evaluate the three potential successors to then President McCarthy. WTK gave high marks to Becotte, noting that he

> has demonstrated the ability to oversee the financial accounting, financial reporting, and budgeting/forecasting of the Bank, as well as the other areas for which he has responsibility. He has done so with the level of performance that provides safety and soundness, supporting the other areas of the Bank as required. He also appears to have the skill-set or many of the key characteristics required to satisfy the position requirements of the President and CEO of the Bank.

Def.'s Ex. 7 at 7 (Dkt #27-7). [4]

The third candidate, William O'Neill, the Chairman of the Board, was a practicing dentist on the verge of retirement. Were he to be chosen, WTK recommended a transition plan that would allow O'Neill to apprentice with McCarthy until January of 2013, when he would become full-time President and CEO. In addition, the plan contemplated that McCarthy would remain with the Bank as a Senior Vice President during the remainder of 2013 to assist O'Neill as needed.

In March of 2012, several of the Bank's senior managers met with Joseph Cefalo, the new Board Chairman, to voice misgivings about the selection of O'Neill, "a dentist without banking experience." The managers presented Cefalo with a memorandum detailing their concerns. After the meeting, Cefalo forwarded the memo to Becotte and Internal Auditor Brian Mahoney with the instruction to "burn it." Becotte Aff. ¶ 10; Mahoney Aff. ¶ 5.

In June of 2012, Becotte approached Cefalo to press the issue of the managers' continuing concerns about O'Neill's sub-par performance. Told to put it in writing, Becotte hand-delivered a "No Confidence Letter" to Cefalo just prior to the June 14, 2012 meeting of the Board. *See* Def.'s Ex. 1 at 13. The letter was signed by seven members of senior management and requested a meeting with the Board. No meeting occurred and neither Cefalo nor any other member of the Board responded to the Letter. [5]

In the spring of 2012, Bank employees, including Brian Mahoney, sought out Becotte to report a pattern of unusual check cashing by President McCarthy. In April of 2012, another senior manager told Becotte that McCarthy had been "frequently seen stuffing cash into his pockets at the teller windows." Becotte Aff. ¶ 12. Becotte asked Mahoney to review McCarthy's history of cash transactions at the Bank. The review revealed that McCarthy had cashed a large number of checks against employees'' accounts. Although Becotte had given McCarthy permission on a few occasions in 2008 to use his own account to cash checks, he revoked his authorization in 2009, when he discovered that McCarthy had occasionally used the account without his knowledge. Two other Bank employees (Judy Butler in 2010 and Jack Lynch in 2011) complained to Becotte when McCarthy asked to use their personal accounts to cash checks. [6]

**\*3** Most of McCarthy's checks appeared to have been cashed against Chairman O'Neill's account. O'Neill and McCarthy were friendly and socialized both in and outside the Bank, so at that time Becotte did not know whether O'Neill had authorized McCarthy to use his account. Mahoney and Becotte met with Cefalo to express their concerns about McCarthy's check cashing habits, his limited work hours and general unavailability to employees, and the lack of employee confidence at the prospect

of O'Neill becoming the permanent President and CEO. On July 3, 2012, after reviewing Mahoney's summary of McCarthy's check cashing activity, the Board suspended McCarthy and named O'Neill as acting President.

At the direction of the Audit Committee, O'Neill hired an outside accountant, Shatswell McCleod & Company, to compile an inventory of McCarthy's irregular cash withdrawals. The review, which was completed in August of 2012, identified 735 checks, totaling in excess of $590,000 that McCarthy had cashed by placing holds on employee accounts. The majority of the checks—480 totaling in excess of $350,000—were cashed using O'Neill's account. O'Neill told the auditors that he was unaware of McCarthy's activity involving his account. *See* Pl.'s Ex. 7. The auditors' report, however, listed instances in which O'Neill had accompanied McCarthy to the teller window to authorize the cashing of a check. [7] The report also found checks cashed by McCarthy that had been endorsed by O'Neill. [8]

The Board terminated McCarthy on August 22, 2012, and made O'Neill full-time President and CEO. [9] In August of 2012, the Bank's senior managers were summoned to a meeting with the Board of Directors. According to Becotte and Mahoney, "during the meeting Cefalo read management the riot act about having to bring up issues with banking regulators. Cefalo said something to the effect of 'if this happens again, heads will roll.' " Becotte Aff. ¶ 17; Mahoney Aff. ¶ 17. Mahoney further testified that "after the check-cashing incident, the Board became both dismissive and hostile to Becotte in Audit Committee meetings." Mahoney Aff. ¶ 19. He understood "that the Board blamed Becotte for events leading to the dismissal of McCarthy." *Id.*

In September of 2012, Cefalo circulated a questionnaire among Bank managers asking when they first became aware of the McCarthy check-cashing scheme. [10] Shortly thereafter (in October of 2012), O'Neill and Cefalo stripped Becotte of his duties as CCO officer and reduced his salary. O'Neill wrote a letter to the Board faulting Becotte for his "indefensible" failure to take action earlier in the McCarthy matter. *See* Def.'s Ex. 1-B (Dkt #27-1 at 15.). After acknowledging Becotte's "strong understanding of the financial aspects of banking" and the positive views held by outside vendors of his "financial acumen," O'Neill proposed that Becotte "continue to serve as the CFO with some changes in his job description and his assurance of his corporate fidelity." *Id.* At the October 2012 Board meeting, a motion was made and seconded to terminate Becotte's employment, although it did not pass. [11]

**\*4** The FDIC and MDoB conducted another Safety and Soundness examination of the Bank in the first quarter of 2013. Becotte was interviewed by the examiners about McCarthy's check cashing scheme. Becotte also complained to the examiners about

> the Board's penchant for selecting third-party firms to legitimize Board decisions, Cefalo's failure to disclose material information about management's concerns to the full Board, the Board's succession planning and relationship with WTK, McCarthy's compensation for hours he did not work, the selection of O'Neill as president, the no confidence letter, the shortcomings of the Shatswell Report, and board fees.

*Id.* ¶ 20. According to Becotte, the bank examiners knew none of this prior to his disclosures, including the "lack of CEO oversight, and of the Bank's weak whistle blowing procedures." *Id.* In May of 2013, the examiners shared their preliminary findings with the Board.

After reviewing the examiners' concerns, the Board hired two outside consultants—Phillip O'Connor to evaluate the operational practices of the Bank, and Thomas Grottke of Northeaster Banking Services Group to review corporate governance and management. One of the issues Grottke addressed was Becotte's continued viability as both Treasurer and CFO. As part of his assessment, Grottke identified potential replacement candidates for the position of CFO, one of whom was Phillip O'Connor. [12]

In July of 2013, the FDIC issued its Report of Examination (ROE). [13] The ROE faulted the Board's oversight of the Bank and for inadequate succession planning, noting that the Directors, not McCarthy, had a fiduciary duty to select candidates for WTK to assess. The FDIC also criticized Cefalo for failing to promptly share the mangers' No-Confidence Letter with the Board to provide them "the opportunity to review the letter and address the concerns raised by the senior management team prior to the appointment of Mr. O'Neill as acting and then permanent CEO." ROE at 5. The ROE noted that the Bank had failed to put in place whistleblower procedures that might have led to an earlier exposure of McCarthy's check-cashing scheme. [14]

After issuing the ROE, the FDIC and MDoB took informal corrective action in the form of a Memorandum of Understanding (MOU) that the Bank signed in September of 2013. The MOU required the Bank to take steps to improve the integrity and competence of the Board and the Bank's management.

The Bank responded by hiring an outside firm, RMPI Consulting, to develop a management plan addressing the requirements of the MOU. John Gallo, a principal at RMPI, [15] developed the plan by reviewing documents, and surveying and interviewing Board members and senior management. [16] Becotte Aff. ¶ 21. Becotte alleges that directors Barnes and Cefalo heavily influenced Gallo's work—that he regularly consulted with them, allowed them to review his draft report, and accepted and incorporated their comments and changes. Barnes Dep. at 99, 106; Cefalo Dep. at 90, 97; Gallo Dep. at 108.

**\*5** In its final report to the Board, RMPI concluded that Becotte did "not appear to have the combination of leadership and analytical skills to be the Bank's [CFO] at this time." [17] Def.'s SOF ¶ 29. RMPI recommended that the Bank "immediately dismiss Mr. Becotte as CFO of The Cooperative Bank." *Id.*

On January 17, 2014, the Bank terminated Becotte. Thomas Barnes, the acting President and CEO, told Becotte that the Bank had decided to change direction and that his termination was based on "performance." Becotte Aff. ¶ 23. On May 15, 2014, Becotte filed a charge with the Secretary of Labor (through the Occupational Safety and Health Administration), pursuant to 12 U.S.C. § 5567, alleging that his termination was in retaliation for his whistleblowing. After more than 210 days elapsed without any formal action by the Secretary, on March 12, 2015, Becotte filed this lawsuit in the federal district court. On February 2, 2017, the court heard oral argument on the Bank's motion for summary judgment.

DISCUSSION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *McGrath v. Tavares*, 757 F.3d 20, 25 (1st Cir. 2014) (The district court awards summary judgment only if it concludes that "the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."). A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

FIRREA

An insured depository institution violates FIRREA when it "discharges or otherwise discriminates against any employee because the employee ... provides information to any Federal Banking agency or the Attorney General regarding—

(A) a possible violation of any law or regulation; or

(B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health and safety by the depository institution or any director, officer or employee of the institution.

12 U.S.C. § 1831j(a)(1). FIRREA whistleblower protections do not encompass internal complaints made to institutional management. *Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1279-1280 (11th Cir. 2006). FIRREA, however, explicitly adopts the whistleblower friendly burdens of proof set out in the Whistleblower Protection Act (WPA). 5 U.S.C. § 1221(e)(1); 12 U.S.C. § 1831j(f). Under the WPA, an employee need only prove that his complaint was "a contributing factor" in the adverse personnel action. *Id.*

> The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that—

> **\*6** (A) the official taking the personnel action knew of the disclosure; and

> (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

*Id.* While "a contributing factor" is not further defined in the WPA, several courts have taken language from the WPA's legislative history defining it as "any factor which alone, or in connection with other factors, tends to effect, in any way, the outcome of the decision." *See Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993), quoting 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S.20). "[A] whistleblower need not demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action." *Id.* at 1141. Once a plaintiff establishes a prima facie case under the WPA, the burden shifts to the defendant to prove "by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." 5 U.S.C. § 1221(e)(2).

The Bank moves for judgment on Becotte's FIRREA claim asserting that it acted on the neutral recommendation of RMPI, its outside consultant in terminating Becotte. It also argues that Becotte has failed to show a sufficient temporal connection between his complaints to the Board and his termination to compensate for an alleged lack of direct evidence of retaliation.

For his part, Becotte notes that there is no dispute regarding his reporting of McCarthy's check cashing scheme to the FDIC and the MDoB, his complaints about the Board's failure to properly oversee the internal management of the Bank, and the "flawed" selection of O'Neill as the Bank's president and CEO, the disgruntlement of senior managers at the decision, the failure of Chairman Cefalo to bring critical information to the attention of the Board, the Board's use of supposedly independent outside consultants "to legitimize [its] decisions," and former president McCarthy's various shortcomings. Pl.'s Statement of Facts (SOF) ¶ 34. There is also evidence in the record of anger on the part of Cefalo and the Board in general at Becotte's disclosures to the examiners and at his persistent complaints to the Bank's officers and directors. [18] Finally, there is a dispute of fact regarding the timing between the complaints and disclosures and Becotte's firing. [19]

Turning to the Bank's temporal proximity argument, only where "an employee relies solely on a chronological relationship" to establish causation must temporal proximity be "very close." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 87-88 (1st Cir. 2016), quoting *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (if temporal proximity is the only evidence of causality establishing prima facie retaliation, proximity must be "very close"; twenty months is insufficient). As Becotte has marshalled direct and circumstantial evidence, as well as temporal proximity in support of his claim, his prima facie case of retaliation is well made.

**\*7** As the Bank's position that it relied on RMPI's recommendation in terminating Becotte easily satisfies its burden of production, the court will turn directly to Becotte's evidence of pretext. Becotte points to RMPI's Gallo's testimony that he based his termination recommendation on Becotte's failure to submit a timely budget to the Board, and that had he been made aware that the Board itself had voted to delay the budget, his recommendation that Becotte be terminated would likely have been different. *Id.* ¶ 29; Gallo Dep. at 139-140. Becotte notes that his termination was not mentioned in the first ten drafts of Gallo's report, and surfaced only in the 11th draft. *Id.* Becotte notes that the only intervening circumstance concerning Becotte

that occurred between drafts was a meeting Gallo had with Cefalo and Barnes. *Id.* Becotte contends that the likely influence of Barnes and Cefalo on Gallo's recommendation (particularly given the history of Cefalo's hostility towards him) presents a question of fact for the jury. While the issue is a close one, given the FIRREA's relatively lenient contributing factor test, *see* 5 U.S.C. § 1221(e)(1), I agree.

### CFPA (Dodd-Frank)

The CFPA "is a comprehensive act that enumerate[s] eighteen federal consumer financial laws that are to be implemented and enforced by the Consumer Financial Protection Bureau [CFPB]."[20] The Act "provides for employee protection from retaliation because the employee has engaged in protected activity pertaining to the offering or provision of consumer financial products or services," and also "protects a covered employee's activity relating to any provision of law that is subject to the jurisdiction of the Bureau." 12 U.S.C. § 5567(a)(1). The Act instructs the CFPB to take action "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service." 12 U.S.C. § 5531.

A covered employer, such as the Bank, violates the CFPA if it

> terminate[s] or in any other way discriminate[s] against ... any covered employee ... by reason of the fact that such employee ... has—(1) provided [or] caused to be provided ... information to the employer, the Bureau, or any other State local, or Federal, government authority or law enforcement agency relating to any violation of, or any act or omission that the employee reasonably believes to be a violation of, any provision of this title or any other provision of law that is subject to the jurisdiction of the [Consumer Financial Protection] Bureau, or any rule, order, standard, or prohibition prescribed by the Bureau.

12 U.S.C. § 5567(a)(1). The CFPA, unlike FIRREA, covers internal complaints made to the employer. As under FIRREA, the complainant's protected activity need only be a contributing factor in the adverse employment action. 12 U.S.C. § 5567(c)(3). Moreover, "prior knowledge of the protected conduct by a decision maker has been held in multiple cases to be evidence of a causal link to an adverse action." Nick M. Beermann, *Understanding SOX Whistleblower Protections*, 2016 WL 3476537, at *n.26 (May, 2016) (Thomson Reuters).

It is undisputed that Bank officers and the Board knew that Becotte had made internal complaints to Cefalo about both McCarthy and O'Neill (as well as complaints to the FDIC and the MDoB). All Board members eventually knew of the senior managers' No-Confidence Letter, and several expressed the belief that the Letter had been fomented by Becotte. Becotte argues that, apart from violating various banking regulations, McCarthy's placing holds on depositors' accounts "created interest free loans in violation of Truth-in-Lending Act"; "caused inconvenience to Bank customers in violation of Graham Leach Bliley Act"; and "violated the overdraft disclosure regulations of the Truth in Savings Act." Compl. ¶¶ 25-27.

**\*8** In response, the Bank raises what on the surface appears a hair-splitting objection, but on closer examination is grounded in the wording of the CFPA itself. The protections of the CFPA are triggered when a service provider "offers or provides to a consumer any financial product or service not in conformity with Federal consumer financial law." 12 U.S.C. § 5536. The Bank argues that while Becotte may have flagged potential violations of state and federal law involving McCarthy and O'Neill, these did not amount to a "transaction with a consumer," because their account holds and check cashing concerned employee accounts and not those of customers.

This argument raises three questions: Who is a consumer under the CFPA? Is an employee of the Bank who is also an account holder a consumer within the meaning of the CFPA? In either case, must the transaction impact the consumer directly or is a transient interference with a consumer's ownership rights in his or her account sufficient for CFPA purposes?

The first question is easily answered. In that the CFPA does not give the word consumer a technical definition, the court presumes that Congress meant the ordinary meaning to apply, that is, a consumer is a person who acquires a good or service for personal use.[21] The second question can be answered narrowly given the fact that the Bank is organized as a cooperative institution. All of the depositors of a cooperative bank are member-owners of the bank. Consequently, there is no basis for distinguishing, as the Bank does, between employee deposit accounts and other customer accounts. Finally, given the intent of Congress that the Act be liberally interpreted, it would seem that the impact of wrongdoing on the consumer need not be permanent, but need only interfere in some tangible way with consumer's rights in the account. Again, while the issue is a reasonably close one as a matter of law, the court will resolve it in Becotte's favor as the nonmoving party.

ORDER

For the foregoing reasons, the motion for summary judgment on Becotte's claims under FIRREA and the CFPA are <u>DENIED</u>. The Clerk will set the case for trial.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 886967

## Footnotes

1　The Bank also asserts a technical defense to the CFPA allegation, which will be discussed in due course.

2　The loss in salary was offset by a three percent merit raise, resulting in a net annual loss of $9,548 in compensation.

3　The meeting minutes of the Board of Directors show an awareness of Becotte's disclosures to the bank examiners about Ladouceur's credit card abuses (although they disagreed with the wisdom of informing the Bank's bonding company). The Board eventually terminated Ladouceur and the FDIC banned him from the banking industry for "violations of law, unsafe or unsound banking practices, and/or breaches of fiduciary duty." FDIC Order—Dkt #58-3.

4　McCarthy selected Becotte as one of the three candidates. Becotte testifies that he did not apply to be a candidate and "had an open selection process been employed, [he's] not sure he would have applied." Becotte Aff. ¶ 7 (Dkt #52).

5　Director Robert Norberg later testified that he saw the No-Confidence Letter as nothing more than Becotte's "sour grapes" for having been passed over as Bank President. Norberg Dep. at 41-42.

6　Becotte does not dispute that McCarthy's asking employees for permission to cash checks against their accounts did not violate Bank policy, or any state or federal law or regulation.

7　Mahoney testified that O'Neill, despite being implicated in the check cashing scheme, had designated himself the contact person for the auditors and had met with them on a daily basis. Mahoney at one point expressed his concern to Glenn McCleod that the "independence of the review was [being] compromised by O'Neill's involvement." Mahoney Aff. ¶ 14.

8　Becotte claims that the Board submitted the Shatswell report to the FDIC without management's review. While the Board ultimately permitted managers to read the report, it did so under a requirement of strict confidentiality. After his own

reading of the report, Becotte wrote a letter to the Board pointing out the report's "many mistakes and inaccuracies." Becotte Aff. ¶ 15; *see* Pl.'s Ex. 8.

9    The Board did not fill McCarthy's intended transitional role as Senior Vice President of Risk Management and advisor to O'Neill.

10    Reilly testified that it "was his understanding that Cefalo was upset because someone had spoken to the FDIC about McCarthy." Reilly Aff. ¶ 12.

11    Norberg testified that while O'Neill supported Becotte's termination, he delayed in firing him because he wanted "a month or so to kind of get his feet wet." Norberg Dep. at 58.

12    Despite his serving as an outside consultant for the Bank, O'Connor eventually accepted the Board's invitation to replace Becotte.

13    According to Becotte, the FDIC and MDoB finished the Safety and Soundness Examination of the Bank in March of 2013, but withheld publication of the ROE until the summer of 2013.

14    On November 18, 2013, the FDIC banned McCarthy from the banking industry because of his "violations of law and/or regulation, unsafe or unsound banking practices, and/or breached of fiduciary duty ... [involving] personal dishonesty ... and/or willful continuing disregard for the safety and soundness of the Bank." Pl.'s Ex. 9.

15    Gallo had offered Barnes a job in 2012, which he declined. In 2013, Barnes solicited Gallo to submit a bid on the development of the management plan for the Bank. Barnes Dep. at 26.

16    In or about August of 2013, the Bank issued a formal response to the ROE. Becotte states that he reviewed the Bank's response on September 11, 2013, and recalls "that the Directors took issue with the regulators' findings about the Board [and] expressed dissatisfaction that the regulators collected information about the Directors from Bank management and staff without speaking to the Directors directly." *Id.*

17    Specifically, RMPI found Becotte's "standard monthly report package ... was limited and perfunctory," lacking "profitability analysis, both at the product and customer level." *Id.* ¶ 30. RMPI also recommended O'Neill be replaced. The Board accepted the recommendation and terminated him. O'Neill Dep. at 130-131.

18    While the Bank argues that Becotte failed to provide the FDIC with any information it did not know, counsel agree that a prior disclosure is not a bar to a retaliation claim under FIRREA (as it would be in a *qui tam* setting).

19    The Bank argues that an interval of nearly eight months between Becotte's reporting and his termination—Becotte says the lapse was six months.

20    Among the laws subject to the jurisdiction of the CFPB are the Electronic Fund Transfer Act (establishing consumer rights for participants in electronic fund transfer systems by, among other things, placing limits on consumers' liability for unauthorized account withdrawals), the Gramm-Leach-Bliley Act (requiring financial institutions to protect the security of and against unauthorized access to customer records and information), the Truth in Savings Act (requiring the disclosure of terms and conditions of depository accounts), the Fair Credit Reporting Act (requiring, among other things, financial institutions to establish programs to detect and prevent fraud and identity theft in opening and maintaining accounts), certain parts of the Federal Deposit Insurance Act, and the Expedited Funds Availability Act. *See* 12 U.S.C. §§ 5481(12).

21    It will be remembered that a deposit is a liability, not an asset of a bank, in the sense that it is a debt owned by the depositor. Hence, it qualifies as a "good."

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5602881
Only the Westlaw citation is currently available.
United States Bankruptcy Court, M.D. North Carolina,
Winston-Salem Division.

IN RE: Michael James BENNETT, Debtor.
Michael James Bennett, Plaintiff,

v.

U.S. Department of Education and Pennsylvania Higher Education
Assistance Agency d/b/a FedLoan Servicing, Defendants.

Case No. 14–51218
|
Adv. Pro. No. 15–06051
|
Signed September 22, 2015

**Attorneys and Law Firms**

Michael James Bennett, 328 Pennsylvania Ave., Winston-Salem, NC 27104

Gregory Chocklett, 711 Harvey St., Raleigh, NC 27608

Pennsylvania Higher Education Assistance Agency, 1200 North Seventh St., Harrisburg, PA 17102-1444

William P. Miller, Bankruptcy Administrator, P.O. Box 1828, Greensboro, NC 27402

### *ORDER ON MOTION TO DISMISS*

LENA MANSORI JAMES, UNITED STATES BANKRUPTCY JUDGE

**\*1** This adversary proceeding came before the Court for hearing on September 9, 2015, after due and proper notice, upon the motion by Pennsylvania Higher Education Assistance Agency d/b/a FedLoan Servicing ("PHEAA") to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively to drop PHEAA from the adversary proceeding (the "Motion to Dismiss"). At the hearing, Michael James Bennett (the "Plaintiff") appeared pro se, and Gregory P. Chocklett appeared on behalf of PHEAA. For the reasons stated herein, the Court will dismiss PHEAA as a defendant from this adversary proceeding.

Michael James Bennett (the "Plaintiff") filed a complaint against the U.S. Department of Education and PHEAA to determine the dischargeability of student loan debt under 11 U.S.C. § 523(a)(8) (the "Complaint"). According to his Complaint, the Plaintiff undertook loans to pay for tuition and expenses at Case Western Reserve University School of Law, the University of Akron, and Saint Louis University. In December 2012, the Plaintiff consolidated his educational loans through the U.S. Department of Education's William D. Ford Direct Consolidation Loan Program and, as he states in the Complaint, "became indebted to one or more of the Defendants in the original principal amount of $76,110.79." The Complaint further alleges that "Plaintiff is uncertain who owns or is in physical custody of the promissory note(s) and/or security agreements evidencing the debt."

In response to the Complaint, defendant PHEAA filed the Motion to Dismiss, asserting that PHEAA is merely the servicer of the educational loans at issue and is not the holder, originator, owner, assignee, or guarantor of the loans. Def.'s Mem. Supp. Mot.

Dismiss 2. [1] Along with the Motion to Dismiss, PHEAA filed a copy of the Federal Direct Consolidation Loan Application and Promissory Note, which identifies the U.S. Department of Education as the lender. PHEAA also filed the Affidavit of Marc Brisco, who identifies himself as the Vice President of Loan Operations for FedLoan Servicing at PHEAA.

The Plaintiff filed a response to PHEAA's Motion to Dismiss in which he clarified that he knows that the U.S. Department of Education is the owner of loans. Pl.'s Mem in Opp'n to PHEAA's Mot. Dismiss 2–3. Nevertheless, the Plaintiff asks the court to retain PHEAA as a party, asserting that PHEAA is in the best position to provide correct information about the loans. At the hearing on the Motion to Dismiss, the Plaintiff reiterated that he was aware that PHEAA was the servicer, not the lender, and requested that the court allow him some "leeway" so he could obtain further information about his student loans.

Rule 12(b)(6) provides for dismissal where a party has failed "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The facts alleged must be sufficient "to raise a right to relief above the speculative level" and state a claim "that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007). When considering a motion to dismiss, the court must take all well-pleaded factual allegations as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Pursuant to Rule 12(d), when considering a 12(b)(6) motion, if matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed.R.Civ.P. 12(d). Although PHEAA has filed a notarized affidavit in support of its motion, the Court will rule on the Motion without consideration of this affidavit. The Complaint does not specifically allege that the Plaintiff is indebted to PHEAA, and it is clear from both the Plaintiff's own pleading in response to the Motion to Dismiss and from his oral argument that he agrees PHEAA is the servicer of his student loan, not the lender.

**\*2** The Plaintiff's Complaint seeks to discharge his student loan debt under § 523(a)(8). The Plaintiff acknowledges in his response that it is the U.S. Department of Education, the owner of the student loans, that can discharge the debt under § 523(a)(8). The Plaintiff argues that he seeks merely to obtain information from PHEAA. This court agrees with other courts that have dismissed § 523(a)(8) actions against student loan servicers on the ground that there is no debt owed to the servicer to find dischargeable. *E.g., Shanks v. Sallie Mae (In re Shanks),* No. 14–52925–BEM, Adv. No. 14–5189–BEM, 2014 WL 4365962, at *1 (Bankr.N.D.Ga. Aug. 28, 2014); *Hubbard v. Pennsylvania Higher Educ. Assistance Agency (In re Hubbard),* No. 13–15606, Adv. No. 14–1010, 2014 WL 1654703, at *4 (Bankr.E.D.Tenn. Apr. 25, 2014); *Aalabdulrasul v. ACS (In re Aalabdulrasul),* No. 11–02108, Adv. No. 11–09089, 2012 WL 1597277, at *2 (Bankr.N.D.Iowa May 7, 2012); *see also Srinivasan v. Sallie Mae, Inc. (In re Srinivasan),* No. 10–12732(RTL), Adv. No. 10–1545(RTL), 2010 WL 3633062, at *3 (Bankr.D.N.J. Sept. 7, 2010), *aff'd,* No. 10–5661(JAP), 2011 WL 3040218 (D.N.J. July 25, 2011) (denying motion for default judgment on § 523(a)(8) complaint against student loan servicer). While the Court is not unsympathetic to the Plaintiff's desire to obtain information about his student loan, a cause of action under § 523(a)(8) against the loan servicer is not the appropriate procedure in which to do so.

Accordingly, PHEAA's motion to dismiss is hereby GRANTED, and PHEAA is dismissed as a defendant from this adversary proceeding.

**SO ORDERED.**

**All Citations**

Not Reported in B.R. Rptr., 2015 WL 5602881

**Footnotes**

1       Defendant PHEEA filed its Motion to Dismiss on August 7, 2015, and a Memorandum in Support of its motion on August 27, 2015.

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 11578271
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Fort Myers Division.

Michael BORIS, Plaintiff,

v.

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1
and Clarfield, Okon, Salomone & Pincus, P.L., Defendants.

Case No: 2:16-cv-19-FtM-99CM
|
Signed 11/28/2016

**Attorneys and Law Firms**

Joseph C. LoTempio, The Dellutri Law Group, PA, Ft. Myers, FL, for Plaintiff.

Michael Schuette, Sessions, Fishman, Nathan & Israel, LLC, Tampa, FL, for Defendants.

**REPORT AND RECOMMENDATION** [1]

CAROL MIRANDO, United States Magistrate Judge

 **\*1** This matter comes before the Court upon review of Plaintiff's Motion for Leave to File Amended Complaint (Doc. 21). Defendants National Collegiate Student Loan Trust 2007-1 ("NCSLT") and Clarfield, Okon, Salmone & Pincus, P.L. ("Clarfield") oppose the requested relief. Doc. 22. Plaintiff filed a reply to the response (Doc. 22). Doc. 26.

On January 11, 2016, Plaintiff filed a Complaint, alleging that NCSLT and Clarfield (collectively "Defendants") violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. Doc. 1 at 4-7. Plaintiff claims that on or about January 26, 2007, he executed a promissory note in the amount of $43,950.00 to Bank of America ("BOA") for purposes of financing his child's education. *Id.* ¶ 7. Plaintiff alleges that in March 2007, BOA transferred Plaintiff's debt to NCSLT. *Id.* ¶ 9. According to the Complaint, Plaintiff filed a voluntary Chapter 7 bankruptcy petition with the bankruptcy court of this District on March 21, 2013, and the court discharged his debts on October 10, 2013. *Id.* ¶¶ 10, 12. Despite the bankruptcy court's order, Plaintiff argues that Defendants attempted to collect Plaintiff's debt. *Id.* ¶¶ 20, 26, 33, 40, 46, 53. On March 10, 2016, Defendants filed a motion to dismiss the Complaint (Doc. 1) on the grounds that NCSLT is not a debt collector within the definition of the FDCPA, and Plaintiff's loan at issue was not discharged. Doc. 15 at 1-2.

Plaintiff subsequently filed the present motion, arguing that an amended complaint will eliminate Defendants' objections and narrow this case's issues. Doc. 21 at 1. Plaintiff's proposed amended complaint contains additional allegations that (1) NCSLT qualifies as a debt collector within the definition of the FDCPA because its principal purpose is debt collection; (2) Plaintiff defaulted on his payments at some point; and (3) BOA transferred Plaintiff's debt to NCSLT by way of an agreement, which does not specify Plaintiff's actual account. Doc. 21-1 ¶¶ 5, 9, 10; Doc. 22 at 6. Plaintiff attached a copy of Plaintiff's promissory note, the transfer agreement between BOA and NCSLT, the schedules filed with Plaintiff's bankruptcy petition, the bankruptcy court's order of discharge, and NCSLT's state lawsuit against Plaintiff. [2] Doc. 21-1 at 14-30.

Defendants argue that Plaintiff's proposed amended complaint is futile because it will not survive a motion to dismiss. Doc. 22 at 7. Defendants assert that the proposed amended complaint still does not sufficiently allege that NCSLT is a debt collector

and that the bankruptcy court discharged Plaintiff's debt to NCSLT, which Defendants define as a "student loan." *Id.* at 9-10. Plaintiff filed a reply to Defendants' response, alleging that his proposed amended complaint is not futile. Doc. 26.

Rule 15, Federal Rules of Civil Procedure, provides that, for amendments not filed as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Although leave to amend shall be freely given when justice so requires, a motion to amend may be denied on numerous grounds such as undue delay, undue prejudice to the defendants, and futility of the amendment." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1287 (11th Cir. 2003) (internal quotation marks omitted).

**\*2** A motion to amend a complaint will be denied as futile when the proposed amendment to a complaint would not survive a motion to dismiss. *Coventry First, LLC v. McCarty*, 605 F.3d 865, 869 (11th Cir. 2010). A complaint will be dismissed if it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). "When a district court denies the plaintiff leave to amend a complaint due to futility, the court is making the legal conclusion that the complaint, as amended, would necessarily fail." *St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*, 198 F.3d 815, 822 (11th Cir. 1999). The court considering a motion to dismiss need not assume that the complaint's legal conclusions are true, and the legal conclusions "must be supported by factual allegations." *Bentley v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1370 (S.D. Fla. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

Here, the Court examines whether Plaintiff's proposed amendments regarding (1) NCSLT's status as a debt collector under the FDCPA and (2) the bankruptcy court's discharge of Plaintiff's debt to NCSLT will withstand a motion to dismiss. *See Coventry First*, 605 F.3d at 869. First, a debt collector under the FDCPA means "[1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C.A. § 1692a(6); *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1313 (11th Cir. 2015). Generally, creditors are not subject to the FDCPA. *Davidson*, 797 F.3d at 1313. A creditor, however, does not include any person "to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." *Id.* In other words, "consumer's creditors, a mortgage servicing company, or an assignee of a debt are not considered 'debt collectors,' as long as the debt was not in default at the time it was assigned." *Correa v. BAC Home Loans Servicing LP*, No. 6:11-cv-1197-Orl-22DAB, 2012 WL 1176701, at \*11 (M.D. Fla., Apr. 9, 2012).

Here, the Court finds that Plaintiff's proposed amended complaint does not sufficiently allege that NCSLT is a debt collector. Plaintiff's allegation that he defaulted on payments of his debt "at some point" after signing the promissory note still does not clarify whether the debt was in default when BOA assigned the debt to NCSLT. Doc. 21-1 ¶¶ 9-10. Furthermore, as Defendants point out, Plaintiff's claim that NCSLT's principal purpose is debt collection is a legal conclusion and lacks any factual allegations to support the claim. *Correa*, 2012 WL 1176701, at \*12 (holding that citing to the general definition of "debt collector" in a conclusory manner is a legal conclusion and insufficient to state a claim for relief); *See Ashcroft*, 556 U.S. at 664; *Davidson*, 797 F.3d at 1318.

In addition, the alleged entire transfer agreement between BOA and NCSLT submitted by Defendants shows that Plaintiff's debt was not in default at the time of the transfer. Doc. 22-1 at 1. Plaintiff's proposed amended complaint includes an additional allegation that the transfer agreement between BOA and NCSLT did not transfer Plaintiff's account from BOA to NCSLT. Doc. 21-1 ¶ 10. In support, Plaintiff cites to the transfer agreement between BOA and NCSLT, alleging that the agreement does not specify Plaintiff's account as being transferred. *Id.*

Defendants argue that Plaintiff's proposed amended complaint refers to the partial transfer agreement and that the entire transfer agreement speaks to the contrary. Doc. 22 at 9. Defendants claim that the Court should consider the entire document because Plaintiff's proposed amended complaint refers to the agreement, and the agreement is integral to Plaintiff's new allegation. Doc.

22 at 9 n.5. Defendants also assert that the entire agreement shows BOA's transfer of Plaintiff's account to NCSLT before the debt was in default. *Id.* at 9.

**\*3** The Court finds persuasive Defendants' argument that the Court should consider the entire transfer agreement in deciding whether the proposed amended complaint would withstand a motion to dismiss and reviews the allegedly entire transfer agreement submitted by Defendants. *Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 492 n.2 (11th Cir. 2009) (holding that in ruling on a motion to dismiss, the district court properly considered the credit agreement not attached to the amended complaint because the plaintiff referred to the agreement in its amended complaint and the agreement was integral to the claims presented).

The alleged entire agreement submitted by Defendants includes specifics of Plaintiff's loan and shows that at the time of the transfer, Plaintiff's loan had an outstanding unpaid interest of $178.56 and no capitalized interest. Doc. 22-1 at 1. In contrast to Plaintiff's allegations, the details of the agreement not only show that the transfer agreement identified Plaintiff's loan but also demonstrate that the loan was not in default at the time of the transfer. Doc. 21-1 ¶¶ 9-10; Doc. 22-1 at 1. In his reply, Plaintiff does not argue that these specifics are not part of the entire agreement or that the agreement's details are incorrect. Doc. 26. Based on review of the entire transfer agreement and the proposed amended complaint, the Court finds that Plaintiff's proposed allegations that NCSLT is a debt collector and that the transfer agreement between BOA and NCSLT did not transfer Plaintiff's account from BOA to NCSLT would not withstand a motion to dismiss.

With regard to the nature of Plaintiff's debt, Defendants argue that Plaintiff's debt is a student loan and was not discharged in his bankruptcy case. Doc. 22 at 10. Plaintiff responds that the purpose of Plaintiff's debt was to enroll his child in Diamond Ranch Academy for rehabilitation, not for higher education. Doc. 26 at 3. Hence, Plaintiff claims that his debt does not qualify as a student loan under 11 U.S.C. § 523(a)(8).[3] *Id.* at 4.

In defining whether a loan is a student loan under 11 U.S.C. 523(a)(8), "the proper focus should be on the kind of debt involved, rather than how the money was spent, or who was the borrower." *In re Salter*, 207 B.R. 272, 275 (Bankr. M.D. Fla. 1997). Based on the above principles, the courts have found that a student loan's lack of educational benefit does not render 11 U.S.C. § 523 inapplicable to the loan. *In re Kidd*, 458 B.R. 612, 620 (Bankr. N.D. Ga. 2011) (holding that the student loan was not dischargeable even when the school closed before the plaintiff could finish her education); *In re Cardona*, No. 15-16365-BKC-LMI, 2015 WL 9459883, at \*3 (Bankr. S.D. Fla., Dec. 23, 2015) ("[When] the delineated purpose of the loan is for education, whether that purpose is indicated by the title of the loan, or in the application for the loan or extension of credit, and the use of the funds is consistent with the delineated purpose, [ ] those funds do constitute 'funds received for an educational benefit.' ").

**\*4** Here, Plaintiff's Complaint and proposed amended complaint clearly state that the loan from BOA was "for purpose of sending his son, a minor child, to Diamond Ranch Academy." Docs. 1 ¶ 7, 21-1 ¶ 7. Indeed, Plaintiff's alleged use of the loan was consistent with the alleged purpose, which was to enroll his minor child in school. Docs. 1 ¶ 8, 21-1 ¶ 8; *See In re Cardona*, 2015 WL 9459883, at \*3. Furthermore, Plaintiff's attached promissory note shows that Plaintiff's loan is titled as "TERI K-12 Loan" and includes information about a "student," such as the student's name, social security number, and school. Docs. 1-1 at 2, 21-1 at 14.

Based on the above analysis, regardless of whether the targeted education was for rehabilitation, Plaintiff's promissory note and allegations in the Complaint and the proposed amended complaint make clear that the nature of Plaintiff's loan was to pay for his child's educational expenses and that Plaintiff's use of the loan was consistent with the loan's nature. *See in re Salter*, 207 B.R. at 275; Doc. 1-1 at 2; Doc. 21-1 ¶¶ 7-8; Doc. 21-1 at 14. As a result, the Court finds persuasive that the proposed amended complaint still does not sufficiently allege that Plaintiff's debt is not a student loan and was discharged in Plaintiff's bankruptcy case.

ACCORDINGLY, it is respectfully

**RECOMMENDED:**

1. Plaintiff's Motion for Leave to File Amended Complaint (Doc. 21) be **DENIED**.

2. Plaintiff be directed to answer Defendants' motion to dismiss (Doc. 15) within **seven (7) days** of the Court's Order.

**DONE** and **ENTERED** in Fort Myers, Florida on this 28th day of November, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11578271

## Footnotes

1    A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

2    Plaintiff attached to the proposed amended complaint the same set of documents as exhibits to the original Complaint. Docs. 1-1, 1-2, 1-3, 1-4, 1-5.

3    A discharge of an individual's debt in bankruptcy does not include:

     **(8)** unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, [a debt] for--

     **(A)(i)** an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

     **(ii)** an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

     **(B)** any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

     11 U.S.C. 523(a)(8).

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 3380530

Only the Westlaw citation is currently available.

United States District Court, M.D. Pennsylvania.

CONSUMER FINANCIAL PROTECTION BUREAU, Plaintiff,

v.

NAVIENT CORPORATION, et al., Defendants.

3:17-CV-101

|

Filed 08/04/2017

**Attorneys and Law Firms**

Andrea J. Matthews, Brandis C. Anderson, Nicholas K. Jabbour, Ebony S. Johnson, Lawrence DeMille-Wagman, Thomas H. Kim, Consumer Financial Protection Bureau, Washington, DC, for Plaintiff.

Daniel P. Kearney, Gideon Hart, Jonathan E. Paikin, Karin Dryhurst, Matthew T. Martens, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, Daniel T. Brier, Donna A. Walsh, Myers Brier & Kelly, LLP, Scranton, PA, for Defendants.

## <u>MEMORANDUM OPINION</u>

Robert D. Mariani, United States District Judge

**\*1** This case requires the Court to resolve several issues of statutory interpretation with respect to Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act as well as address whether the structure of the independent executive agency created by the Act, the Consumer Financial Protection Bureau, offends the Constitution. For the reasons that follow, the Court finds (1) the Bureau was within its statutory authority to bring an enforcement action without first engaging in rulemaking, (2) there are no constitutional defects with the structure of the Consumer Financial Protection Bureau, and (3) the Bureau's Complaint against Navient is adequately pleaded.

## I. INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff, the Consumer Financial Protection Bureau ("CFPB" or "Bureau"), filed a Complaint in the above captioned action on January 18, 2017. (Doc. 1). The eleven count Complaint alleges that Defendants, Navient Corporation, Navient Solutions, Inc., and Pioneer Credit Recovery, Inc., (collectively "Navient"), committed various violations of the Consumer Financial Protection Act ("CFP Act" or "Act"), 12 U.S.C. §§ 5531, 5536 (Counts I-VIII), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e (Counts IX-X), and Regulation V of the Fair Credit Reporting Act, 12 C.F.R. § 1022.42 (Count XI). (Doc. 1). On March 24, 2017, Navient filed a Motion to Dismiss or, in the alternative, for a More Definite Statement. (Doc. 28). Specifically, Navient raised the following arguments: (1) Counts I-VIII should be dismissed because the Bureau lacks authority to bring suit under the CFP Act without first engaging in rulemaking to declare specific acts or practices unfair, deceptive, or abusive; (2) the entire Complaint should be dismissed because the structure of the CFPB is unconstitutional and therefore the Director of the Bureau was acting without authority when he authorized the present suit; (3) Counts I-IV and Counts VII-X fail to state a claim for which relief can be granted; and (4) Count VI is so vague that Navient is unable to respond to it by way of an answer. (Doc. 29). For the reasons that follow, the Court will deny Navient's Motion in its entirety.

## II. FACTUAL ALLEGATIONS

Plaintiff's Complaint alleges the following facts which this Court accepts as true for the purposes of this Motion:

Navient Corporation is a company specializing in loan management, loan servicing, and asset recovery. (Doc. 1 at ¶ 18). In that role, Navient Corporation holds contracts with the U.S. Department of Education for the servicing of over six million federal student loans. (*Id.* at ¶¶ 2, 21-23). In turn, Navient Solutions (formerly Sallie Mae) and Pioneer Credit Recovery are both wholly-owned subsidiaries of Navient Corporation. (*Id.* ¶¶ 16-17). As relevant to this action, Navient Solutions services federal and private student loans while Pioneer Credit Recovery performs debt collection activities on delinquent and defaulted student loans. (*Id.*).

As a loan servicer, Navient Solutions is responsible for managing student loan borrowers' accounts, which includes activities such as processing monthly payments and communicating with borrowers about repayment of their loans. (*Id.* at ¶ 3). Navient Solutions has repeatedly encouraged those borrowers who are having trouble paying their monthly bill to contact Navient Solutions. (*Id.* at ¶ 38). For example, Navient Solutions' webpage contained the following statement: "If you're experiencing problems making your loans payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation." (*Id.*). The U.S. Department of Education's webpage has similarly encouraged financially troubled borrowers to contact their loan servicer for help. (*Id.* at ¶ 37).

**\*2** Most federal loan borrowers experiencing financial difficulties have several options to address unaffordable monthly payments. (*Id.* at ¶ 27). One such option is forbearance. (*Id.* at ¶ 33). Although forbearance allows a borrower to stop making payments temporarily, interest continues to accrue and will eventually capitalize on the principal of the loan. (*Id.* at ¶¶ 33, 35). Thus, a borrower who places his or her loan in forbearance for a long period of time is likely to see a significant increase in the total amount he or she must ultimately pay back and, upon resuming repayment, may be required to make a larger monthly payment than was required before entering forbearance. (*Id.* at ¶ 35). As a result, forbearance is not a good option for those experiencing long-term financial hardship. (*Id.*).

Another option for borrowers with certain eligible federal loans is to enter into one of several different types of income-driven repayment plans that calculate a borrower's monthly payment based on his or her income and family size and result in an affordable monthly payment that can be as low as $0 per month. (*Id.* at ¶¶ 27-30). For some borrowers, income-driven repayment plans offer several secondary benefits as well, including (1) an interest subsidy where the government pays off the unpaid accruing interest, preventing it from being added to the principal, and (2) treating low payments as "qualifying payments" for certain programs that forgive the balance of the loan after a borrower makes a certain number of qualifying payments. (*Id.* at ¶¶ 31-32). Because of these benefits, income-driven repayment plans are usually the best option for those borrowers experiencing long-term financial hardship. (*Id.* at ¶ 36).

Nevertheless, entering a borrower into an income-driven repayment plan is more time-intensive and expensive for Navient Solutions then putting a borrower's loan into forbearance. (*Id.* at ¶¶ 47-49). While a Navient Solutions customer service representative can put a borrower's loan into forbearance quickly over the phone, generally without filling out any paperwork, entering a borrower into an income-driven repayment plan involves lengthy conversations about different plans, helping a borrower fill out the initial application, and possessing both the initial and annual renewal paperwork. (*Id.* at ¶¶ 42-45, 48). Thus, Navient Solutions has had to increase its staff size—and overall operating costs—as the number of borrowers entering income-driven repayment plans has increased. (*Id.* at ¶ 46). Additionally, taking the time to enter a borrower into an income-driven repayment plan is less appealing to Navient Solutions' customer service representatives because they are compensated, in part, based on how short they can keep their average call. (*Id.* at ¶ 43). As a result, Navient Solutions, through its customer service representatives, routinely entered financially distressed borrowers into forbearance without adequately discussing—or sometimes discussing at all—the option of income-driven repayment plans. (*Id.* at ¶¶ 40-41, 49, 51). As a consequence of guiding borrowers—including those borrowers who had demonstrated long-term financial difficulties—into forbearance and

even multiple consecutive forbearances, Navient Solutions routinely had more borrowers with loans in forbearance then in income-driven repayment plans. (*Id.* at ¶¶ 50-53). This has imposed significant monetary costs on those borrowers who qualified for an income-driven repayment plan but whose loans were placed in forbearance. (*Id.* at ¶ 54).

For those borrowers who did enroll in an income-driven repayment plan, Navient Solutions was obligated to send a written notice with the requirements for annual renewal of the plan. (*Id.* at ¶ 60). Unless a borrower properly recertified his or her income and family size once a year, the borrower would automatically be removed from the income-driven repayment plan. (*Id.* at ¶ 55). Even temporary removal from the plan would result in one or more of the following negative consequences for borrowers: (1) an immediate increase in his or her monthly payment; (2) the addition of any unpaid, accrued interest onto the principal; and (3) the loss of an interest subsidy. (*Id.* at ¶¶ 56-57).

**\*3** From mid-2010 to March of 2015, for those borrowers who had consented to receiving electronic communication, Navient Solutions sent borrowers an email with the subject line of either "Your Sallie Mae Account Information" or "New Document Ready to View," when the borrower's annual renewal notice was available. (*Id.* at ¶¶ 66-67, 69). Upon opening the email, a borrower would be instructed that "a new education loan document is available. Please log in to your account to view it." (*Id.* at ¶ 70). The email would also contain a hyperlink to Navient Solutions' website, where a borrower could log in to his or her account and view the renewal notice. (*Id.* at ¶ 68). Upon changing both the subject line and body of the email in March of 2015 to contain more descriptive information concerning which specific document was available, renewal rates for borrowers more than doubled. (*Id.* at ¶¶ 75-76).

For those borrowers who had not consented to receiving electronic communication, Navient Solutions would send the annual renewal notice through the mail. (*Id.* at ¶ 61). From January of 2010 until December of 2012, the mailed notice stated that the borrower's participation in an income-driven repayment plan would "expire in approximately 90 days" and that the "renewal process may take at least 30 days." (*Id.* at ¶ 62). It further told borrowers to fill out the renewal forms completely and that if a borrower "provid[ed] incorrect or incomplete information the [renewal] process will be delayed." (*Id.* at ¶ 64). The renewal notice, however, did not (1) provide any specific date for which a borrower's participation in an income-driven repayment plan would expire, (2) specify that submitting an incomplete or inaccurate renewal form may result in his or her removal, at least temporarily, from the plan, or (3) explain that certain irreversible consequences such as the capitalization of unpaid interest would occur if the plan expired, even temporarily. (*Id.* at ¶¶ 61, 63, 65).

Another one of Navient Solutions' responsibilities was the processing of student loan payments. (*Id.* at ¶ 97). This involved receiving a borrower's check and both allocating the payment between his or her multiple loans and applying the payment to each loan according to the terms of the promissory note. (*Id.* at ¶ 100). Many payments, however, were either misallocated or misapplied by Navient Solutions. (*Id.* at ¶¶ 100-102). These errors occurred for multiple reasons, including that Navient Solutions (1) did not disclose its payment allocation methodology, (2) failed to read borrowers' allocation and application instructions, and (3) failed to implement borrowers' instructions properly. (*Id.* at ¶¶ 103-106). Such processing errors resulted in a range of negative consequences for borrowers including the assessment of improper late fees and interest, the loss of certain benefits, and having inaccurate negative information about them shared with consumer reporting agencies. (*Id.* at ¶ 108).

If a borrower discovered such a processing error, he or she would need to contact Navient Solutions to correct it. (*Id.* at ¶ 107). Nevertheless, even after reporting an error, some borrowers experienced the same processing errors month after month. (*Id.* at ¶ 109). This occurred because an error reported only to the first level of Navient Solutions' customer service was not categorized or tagged in such a manner as to allow the company to identify the underlying issues causing the errors. (*Id.* at ¶¶ 110-112). As a result, Navient Solutions was generally unable to prevent the reoccurrence of errors that borrowers were experiencing month after month. (*Id.* at ¶ 112).

For those borrowers who failed to make payments on their student loans, after a certain number of missed payments, the loan would enter default status. (*Id.* at ¶ 119). Some student loans which entered default were referred to Pioneer Credit Recovery for collection. (*Id.* at ¶¶ 9-10). In addition to being referred to collection, there are at least two other negative consequences of

a federal student loan entering default. (*Id.* at ¶¶ 9-10, 119, 126). First, multiple negative notations indicating the default are placed on the borrower's credit report. (*Id.* at ¶ 119). Second, the U.S. Department of Education begins assessing collection fees on the loan. (*Id.* at ¶ 126).

**\*4** When certain federal student loans entered default, Pioneer could enroll borrowers into the federal loan rehabilitation program. (*Id.* at ¶¶ 11, 115). The federal loan rehabilitation program helps borrowers get their loan out of default status and back into active repayment status. (*Id.* at ¶¶ 113-114). Additionally, completion of the program removes some, but not all, of the negative notations from a borrower's credit history and forgives any remaining unpaid collection fees. (*Id.* ¶¶ 113, 119-120, 125, 128, 132). Nevertheless, in calls with borrowers, Pioneer collectors routinely overstated the benefits of the rehabilitation program by claiming that all negative information on a borrower's credit history would be removed and all collection fees would be forgiven. (*Id.* at ¶¶ 122, 129-132).

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### IV. ANALYSIS

As discussed above, Navient first raises two broad attacks against the power of the CFPB to maintain all or most of the present action against them before they argue for dismissal of individual counts and for a more definite statement. The Court will address each of Navient's arguments in turn.

### A. Statutory Authority to Bring Suit before Rulemaking

Navient first argues that the CFPB lacks statutory authority to bring an enforcement action without first engaging in rulemaking to declare a specific act or practice unfair, deceptive, or abusive. (Doc. 29 at 12-14). This argument requires the Court to interpret provisions of Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act. "The first step in interpreting a statute is to determine 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " *Marshak v. Treadwell*, 240 F.3d 184, 192 (3d Cir. 2001) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S. Ct. 843, 136 L.Ed. 2d 808 (1997)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. "When the statutory language has a clear meaning, [a court] need not look further." *Valansi v. Ashcroft*, 278 F.3d 203, 209 (3d Cir. 2002).

**\*5** Here, the statutory provision at issue provides, in relevant part,

### (a) In general

The Bureau may take any action authorized under part E to prevent a covered person [1] or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.

### (b) Rulemaking

The Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. Rules under this section may include requirements for the purpose of preventing such acts or practices.

12 U.S.C. § 5531. Part E of the Act, titled "Enforcement Powers," provides, in part, that "[i]f any person violates a Federal consumer financial law, the Bureau may ... commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a).

In addition to section 5531, section 5492 states that "[t]he Bureau is authorized to establish the general policies of the Bureau with respect to all executive and administrative functions, including ... implementing the Federal consumer financial laws through rules, orders, guidance, interpretations, statements of policy, examinations, and enforcement actions." 12 U.S.C. § 5492(a)(10). Further, section 5512 provides that "[t]he Director may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof," and then delineates standards for rulemaking. 12 U.S.C. § 5512(b).

Navient's argument is in essence that the CFPB is authorized to "take any action authorized under part E"—which includes enforcement actions—only to prevent a regulated entity "from committing or engaging in an unfair, deceptive, or abusive act or practice *under Federal law.*" 12 U.S.C. § 5531(a) (emphasis added). According to Navient, the use of the term "under Federal law" looks to the following subsection on rulemaking which allows the CFPB to "identify[ ] as unlawful unfair, deceptive, or abusive acts or practices." Thus, Navient argues that until the CFPB uses its rulemaking authority to declare an act or practice unlawful, that act or practice is not unlawful under federal law, and therefore cannot serve as a basis for an enforcement action. (Doc. 29 at 13; Doc. 43 at 3-4; Oral Arg. Tr., Doc. 55 at 96).

This argument fails in light of another section of the Act that plainly declares that "[i]t shall be unlawful for ... any covered person or service provider ... to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). Thus, there appears to be no reason why the CFPB cannot base an enforcement action on a violation of this provision of federal law. Indeed, reading sections 5531(a), 5536(a)(1)(B), and 5564(a) together, their plain language provides that the CFPB may, among other things, commence a civil action "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law," 12 U.S.C. § 5531(a), and that one such violation of federal law occurs when a "covered person ... engage[s] in any unfair, deceptive, or abusive act[s] or practice[s]," 12 U.S.C. § 5536(a)(1)(B). [2]

**\*6** At oral argument, Navient argued that subsections (c) and (d) of section 5531 support its position:

**(c) Unfairness**

**(1) In general**

The Bureau shall have no authority under this section to declare an act or practice in connection with a transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service, to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that—

**(A)** the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

**(B)** such substantial injury is not outweighed by countervailing benefits to consumers or to competition.

...

**(d) Abusive**

The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—

**(1)** materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

**(2)** takes unreasonable advantage of—

**(A)** a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

**(B)** the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

**(C)** the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531. Navient argues that these provisions—specifically, the use of the word "declare" in each subsection—constrain the CFPB's authority to engage in rulemaking. (Oral Arg. Tr., Doc. 55 at 98-102). According to Navient, because "declare" refers to rulemaking, and not litigation, the only way the CFPB would be statutorily authorized to initiate litigation is in the circumstances where the Bureau first declares an act or practice unlawful through rulemaking. (*Id.*). Otherwise, Navient contends, the CFPB could avoid these limitations by bringing a lawsuit and arguing that unfairness and abusiveness mean whatever the Bureau wanted it to mean without constraint from the Act. (*Id.*).

Navient, however, has failed to explain—or cite to any authority which would explain—why "declare" must refer only to rulemaking and not litigation, and why it would be improper for the CFPB to declare something unlawful through litigation. *See generally FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015). The Court is not persuaded that the language

of section 5531 should be read in the manner advocated by Navient. Subsections (c) and (d) of section 5531 fall within the section of the Act titled "Prohibiting unfair, deceptive, or abusive acts or practices." That section states that the Bureau may (a) "take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law," and (b) "prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices." 12 U.S.C. § 5531(a)-(b). The section then states the requirements that must be met before the Bureau can declare an act or practice unfair or abusive. 12 U.S.C. § 5531(c)-(d). There is no reason, therefore that subsections (c) and (d) should not constrain the CFPB equally in litigation and in rulemaking.

**\*7** In the end, Navient is unable to point to any clear language in the statutory scheme that requires the CFPB to first engage in rulemaking before bringing an enforcement action for unfair, deceptive, or abusive acts or practices. The plain meaning of the statutory language provides that the CFPB has both the power to engage in rulemaking, 12 U.S.C. §§ 5512(b)(1), 5531(b), and litigation, 12 U.S.C §§ 5531(a), 5564(a), to address unfair, deceptive, or abusive acts or practices. The most harmonious construction of these provisions is that the CFPB may proceed either via rulemaking or an enforcement action. [3] This interpretation is supported not only by the plain language of the provisions at issue, but finds support in other places as well.

First, all of the language regarding rulemaking is permissive. *See* 12 U.S.C. § 5531(b) ("The Bureau may prescribe rules...."); 12 U.S.C. § 5512(b)(1) ("The Director may prescribe rules...."). Nevertheless, the Act provides that the Bureau "*shall* regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a) (emphasis added); *see also* 12 U.S.C. § 5511(a) ("The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive."). Thus, if rulemaking was a prerequisite for the Bureau to exercise any of its enforcement powers under Part E, [4] it would make little sense for rulemaking to be designated permissive in the language of the statute itself.

Second, this interpretation is consonant with how courts have interpreted the older but analogous language found in the Federal Trade Commission Act ("FTC Act"). That scheme provides, in part, that the Federal Trade Commission ("FTC")

> shall have no authority under this section ... to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

15 U.S.C. § 45(n). This Court is unaware of any court that has held that the use of "declare" in section 45(n) requires the FTC to proceed via rulemaking before institution of an enforcement action. Instead, "Circuit Courts of Appeal have affirmed FTC unfairness actions in a variety of contexts *without* preexisting rules or regulations specifically addressing the conduct-at-issue." *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 618 (D.N.J. 2014) *aff'd*, 799 F.3d 236 (3d Cir. 2015).

**\*8** In sum, the Court finds that the plain language of the CFP Act does not impose a requirement on the Bureau to engage in rulemaking before bringing an enforcement action. Nonetheless, Navient contends that dismissal of Counts I-VIII are still warranted because the CFPB's failure to promulgate rules before filing the present action has left Navient without fair notice of what acts or practices the Bureau considered unfair, deceptive, or abusive. (Doc. 29 at 14-15; Doc. 43 at 5-6). The Navient Defendants, however, do not contend that the CFP Act is unconstitutionally vague on its face. (Doc. 43 at 6). Instead, they are arguing that "[t]he CFPB's suit is an attempt to retroactively 'declare' new student loan servicing obligations." (*Id.* at 5).

Navient's argument misstates the nature of this lawsuit. The CFP Act makes it "unlawful for ... any covered person or service provider ... to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). The CFPB's lawsuit does

not retroactively impose any requirements on Navient. Instead, it seeks to impose liability for Navient's alleged acts or practices that the CFPB believes violates section 5536(a)(1)(B) of the CFP Act. As discussed further below, this case involves "ordinary judicial interpretation of a civil statute." *Wyndham*, 799 F.3d at 253. As such, the relevant legal question is not whether Navient had fair notice of what acts or practices the CFPB has *interpreted* as unlawful under the Act, but only whether Navient had fair notice of what the Act requires.

This same argument, within the context of the FTC Act, arose in *FTC v. Wyndham Worldwide Corporation*, 799 F.3d 236 (3d Cir. 2015). In *Wyndham*, the FTC filed a lawsuit against Wyndham Worldwide Corporation alleging that the company's deficient cybersecurity, which had led to customer data being stolen, was an unfair practice in violation of the FTC Act. *Id.* at 240. Wyndham moved to dismiss, arguing that because there was no relevant FTC rule or adjudication on the matter, it lacked fair notice that its cybersecurity practices could violate the unfairness provision of the FTC Act. *Id.* On interlocutory appeal of the denial of Wyndham's motion, the Third Circuit held that

> if the federal courts are to decide whether Wyndham's conduct was unfair in the first instance under the statute without deferring to any FTC interpretation, then this case involves ordinary judicial interpretation of a civil statute.... The relevant question is not whether Wyndham had fair notice of the FTC's interpretation of the statute, but whether Wyndham had fair notice of what the *statute itself* requires.

*Id.* at 253-54. With the issue properly framed, the Third Circuit found that "for civil statutes that regulate economic activities," such as the FTC Act, "a party lacks fair notice when the relevant standard is 'so vague as to be no rule or standard at all.' " *Id.* at 250, 255 (quoting *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631-32 (3d Cir. 2013)). Stated otherwise, "[f]air notice is satisfied ... as long as the company can reasonably foresee that a court could construe its conduct as falling within the meaning of the statute." *Id.* at 256.

Therefore, in light of *Wyndham*, Navient's fair notice argument fails if it was reasonably foreseeable to Navient that a court could construe their alleged conduct as unfair, deceptive, or abusive under the CFP Act. Navient, however, has only advanced arguments as to why it did not have fair notice of *the Bureau's* interpretation of the CFP Act. (Doc. 29 at 14-15; Doc. 43 at 5-6). But, as discussed above, the CFPB's interpretation of whether its allegations constitute unfair, deceptive, or abusive acts or practices is irrelevant to whether Navient had fair notice of the conduct the CFP Act itself proscribes. Stripped of these irrelevant arguments, Navient's position reduces to its assertion that it complied with the Higher Education Act, the Department of Education's regulations related to the Higher Education Act, and Navient's contracts with the Department of Education. (*Id.*). Nevertheless, even assuming the truth of these assertions, complying with other statutory, regulatory, and contractual obligations does not relieve Navient of its obligation to refrain from committing acts that are unlawful under the CFP Act. Nor does it begin to explain why it was not reasonably foreseeable to Navient that a court could construe the acts or practices alleged in the Complaint as violations of the CFP Act. As Navient has put forth no specific argument as to how or why the standards found in the CFP Act are so vague as to be no standards at all when applied to the facts of this case, the Court need not address this argument further. *See Commonwealth of Pa. v. HHS*, 101 F.3d. 939, 945 (3d Cir. 1996) (noting that arguments that are not squarely argued are waived).

**\*9** In sum, the Court finds no merit in Navient's assertion that the CFP Act requires the CFPB to engage in rulemaking before initiating an enforcement action, or that Navient lacked fair notice of what the CFP Act proscribes.

### B. Constitutionality of the Agency's Structure

Next, Navient argues that the CFPB's structure improperly interferes with the President's powers under Article II of the Constitution because it combines the following three characteristics: (1) the agency is headed by a single director who wields

executive power; (2) the director is only removable for cause; and (3) the agency is funded outside the normal budgetary process. (Doc. 29 at 15-16). At oral argument, counsel for Navient made clear that it is not any one of these attributes in isolation that renders the Bureau constitutionally problematic, but the combination of all three together. (Oral Arg. Tr., Doc. 55 at 75, 78, 81). Thus, to fully understand Navient's arguments, it is important to first understand how the CFPB is structured.

The Consumer Financial Protection Bureau is an independent agency within the Federal Reserve System created by the Consumer Financial Protection Act of 2010, otherwise known as Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act. 12 U.S.C. § 5491(a); Pub. L. No. 111-203, § 1001, 124 Stat. 1376, 1955 (2010). The Bureau is headed by a single director, appointed by the President with the advice and consent of the Senate, who serves a fixed five year term. 12 U.S.C. § 5491(b)(1)-(2), (c)(1). "The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). As for funding, the Director determines the amount of the Bureau's yearly operating expenses and that amount is transferred to the CFPB from the Federal Reserve System. 12 U.S.C. § 5497(a)(1). In a given fiscal year, however, the Bureau is prohibited from receiving more than twelve percent of the Federal Reserve System's operating expenses. 12 U.S.C. § 5497(a)(2)(A)(iii).

The CFP Act instructs that the Bureau "shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). To accomplish this directive, the Bureau can "prescribe rules and issue orders and guidance," 12 U.S.C. § 5512(b)(1), "engage in joint investigations and requests for information," 12 U.S.C. § 5562(a)(1), "conduct hearings and adjudication proceedings," 12 U.S.C. § 5563(a), "commence a civil action," 12 U.S.C. § 5564(a), and refer appropriate matters for criminal prosecution, 12 U.S.C. § 5566. Generally speaking, the CFPB may only exercise these authorities within the realm of federal consumer financial law, but the Act also provides more specific subject matter limitations on the Bureau's powers. 12 U.S.C. § 5517.

In both their brief and at oral argument, Navient argued that this structure brings the CFPB so far outside of the control of the President that it violates Article II of the Constitution. To address this argument, the Court begins by reviewing the underlying principles that will guide its analysis of the issue at hand.

Article II of the Constitution begins by proclaiming that "[t]he executive Power shall be vested in a President of the United States of America." U.S. CONST. art. II, § 1, cl. 1. It further instructs that the President "shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. With respect to the appointment of officers, the Constitution provides that the President

> **\*10** shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2. Thus, under the Appointments Clause, officers are divided into two classes. *United States v. Germaine*, 99 U.S. 508, 509, 25 L.Ed. 482 (1878). "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley v. Valeo*, 424 U.S. 1, 132, 96 S. Ct. 612, 46 L.Ed. 2d 659 (1976).

Nevertheless, while the Constitution provides some detail concerning the appointment of officers, the document does not speak to the President's power to remove either principal or inferior officers. Accordingly, in 1926, the Supreme Court took up the question of what limits could properly be placed on the President's power to remove appointed officers within the executive branch. *Myers v. United States*, 272 U.S. 52, 47 S. Ct. 21, 71 L.Ed. 160 (1926). *Myers* involved a postmaster of the first class who was appointed by the President with the advice and consent of the Senate for a four year term. *Id.* at 106. The relevant

statute provided that postmasters of the first class could only "be removed by the President by and with the advice and consent of the Senate." *Id.* at 107. Nevertheless, two and a half years into Myers's term, the President demanded his resignation. *Id.* at 106. When Myers refused, the President, through the Postmaster General, terminated him without Senate approval. *Id.* Myers then filed a lawsuit for back pay. *Id.* In a lengthy opinion authored by former President and then Chief Justice Taft, the Supreme Court, after a thorough review of the historical record, held that Congress could not "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power." *Id.* at 161.

Nine years later, the Supreme Court addressed a slightly different question in *Humphrey's Executor v. United States, 295* U.S. 602, 55 S. Ct. 869, 79 L.Ed. 1611 (1935). Humphrey was a principal officer appointed by President Hoover, with the advice and consent of the Senate, to serve a seven year term as a commissioner on the FTC. *Id.* at 618. Unlike *Myers*, the relevant statute in this case did not condition removal of the commissioner on Senate approval, but instead provided "that 'any commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.' " *Id.* at 619 (quoting 15 U.S.C. § 41). Two years into Humphrey's term, President Roosevelt was elected and requested Humphrey's resignation so that the President could appoint someone of his own choosing. *Id.* at 618-19. After Humphrey refused to resign, the President terminated him. *Id.* at 619.

After first determining that the language of the statute restricted the President's power to remove commissioners at will, the Court turned to the question of whether such a restriction was an unconstitutional limit on the President's Article II powers. *Id.* at 621-26. On that point, the government argued that language in *Myers* supported an unfettered presidential power of removal, such that any limitation on the President's ability to terminate executive officers at will was unconstitutional. *Id.* at 626. The Court responded that

> **\*11** the narrow point actually decided [in *Myers*] was only that the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress. In the course of the opinion of the court, expressions occur which tend to sustain the government's contention, but these are beyond the point involved and, therefore, do not come within the rule of stare decisis. In so far as they are out of harmony with the views here set forth, these expressions are disapproved.

*Id.* The Court then went on to describe the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628. Therefore, according to the Court, the FTC could not "in any proper sense be characterized as an arm or an eye of the executive," but instead "acts in part quasi legislatively and in part quasi judicially." *Id.*

Accordingly, the unanimous Court held that the "illimitable power of removal is not possessed by the President in respect of officers of the character of those just named." *Id.* at 629. Looking to future cases, the Court instructed that "[w]hether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause will depend upon the character of the office." *Id.* at 631.

The Court reaffirmed this principle in 1958 when it held that the President could not, without cause, remove a member of the War Claims Commission—a body set up to adjudicate certain classes of claims involving those who sustained an injury during World War II—because that agency was judicial in nature. *Wiener v. United States*, 357 U.S. 349, 355-56, 78 S. Ct. 1275, 2 L.Ed. 2d 1377 (1958). In response to "the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission," the Court "conclude[d] that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it." *Id.* at 356.

Over thirty years later, in *Morrison v. Olson*, 487 U.S. 654, 108 S. Ct. 2597, 101 L.Ed. 2d 569 (1988), the Supreme Court addressed the question of whether Congress may place restrictions on the President's power to remove an inferior officer within the executive branch who performs core executive functions. Specifically, *Morrison* involved Title VI of the Ethics in Government Act, 28 U.S.C. §§ 591-599, which allowed a special court, upon request by the Attorney General, to appoint "an 'independent counsel' to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws." *Id.* at 660-61. The Office of the Independent Counsel automatically terminated upon completion of his or her investigations or prosecutions, but otherwise the independent counsel could only be removed by the Attorney General and only for cause. *Id.* at 663-64. After one such independent counsel was appointed pursuant to the Ethics Act, she caused a grand jury to issue subpoenas to several government officials. *Id.* at 668. Those officials moved to quash the subpoenas on the basis that, among other reasons, the Ethics Act violated Article II and the principle of separation of powers. *Id.* at 668-69.

 **\*12** Responding to the argument that *Myers* was controlling because the independent counsel exercised core executive powers, the Court held that

> the determination of whether the Constitution allows Congress to impose a "good cause"-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as "purely executive." The analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II.... [T]he characterization of the agencies in *Humphrey's Executor* and *Wiener* as "quasi-legislative" or "quasi-judicial" in large part reflected our judgment that it was not essential to the President's proper execution of his Article II powers that these agencies be headed up by individuals who were removable at will. We do not mean to suggest that an analysis of the functions served by the officials at issue is irrelevant. But the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light.

*Id.* at 689-91 (footnotes omitted). The Court then analyzed whether the for cause removal provision inhibited the President's ability to perform his constitutional functions under Article II. *Id.* at 691. After determining that the independent counsel was "an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority," but one who "exercise[d] no small amount of discretion and judgment," the Court found that "the President's need to control the exercise of that discretion" was not "so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691-92.

Further, with respect to the President's Article II powers, the Court also found that the removal provision did not

> impermissibly burden[ ] the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act. This is not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the "faithful execution" of the laws. Rather, because the independent counsel may be terminated for "good cause," the Executive, through the Attorney General, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act....

*Id.* at 692. Thus, the Court concluded that the for cause removal provision did not "sufficiently deprive[ ] the President of control over the independent counsel" so as "to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws." *Id.* at 693.

**\*13** Turning to the question of whether the Ethics Act violated the principle of separation of powers, the Court first observed that this was not a case in which there was any legislative or judicial usurpation of executive functions. *Id.* at 693-95. The Court then held that the Ethics Act did not "impermissibly undermine[ ] the powers of the Executive Branch, or disrupt[ ] the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 695 (internal citations, alterations, and quotations marks omitted). In coming to this conclusion, the Court found that

> the Act does give the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel. Most importantly, the Attorney General retains the power to remove the counsel for "good cause," a power that we have already concluded provides the Executive with substantial ability to ensure that the laws are "faithfully executed" by an independent counsel.

*Id.* at 696.

Most recently, in 2010, the Court in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 483-84, 130 S. Ct. 3138, 177 L.Ed. 2d 706 (2010), addressed the question of whether an inferior officer on the Public Company Accounting Oversight Board may be given for cause removal protection when the principal officers of the Securities and Exchange Commission who oversee the Board can themselves only be removed for cause. Finding such a structure unconstitutional, the Court distinguished prior decisions that had upheld for cause removal restrictions, reasoning that

> [t]he added layer of tenure protection makes a difference. Without a layer of insulation between the Commission and the Board, the Commission could remove a Board member at any time, and therefore would be fully responsible for what the Board does. The President could then hold the Commission to account for its supervision of the Board, to the same extent that he may hold the Commission to account for everything else it does.

> A second level of tenure protection changes the nature of the President's review. Now the Commission cannot remove a Board member at will. The President therefore cannot hold the Commission fully accountable for the Board's conduct, to the same extent that he may hold the Commission accountable for everything else that it does.

*Id.* at 495-96. Thus, the Court concluded, "[b]y granting the Board executive power without the Executive's oversight, this Act subverts the President's ability to ensure that the laws are faithfully executed." *Id.* at 498.

With this line of cases to guide its analysis, the Court addresses whether the structure particular to the CFPB violates the Constitution. Even on this narrow point, however, the Court does not write on a blank slate. Four published cases have addressed this topic as of this writing.

The first two published opinions, *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082 (C.D. Cal. 2014), and *CFPB v. ITT Educational Services, Inc.*, 219 F. Supp. 3d 878 (S.D. Ind. 2015), found no constitutional deficiencies. Relying on *Humphrey's Executor and Morrison*, both district courts found the for cause removal provision did not impermissibly invade the President's Article II powers. *Morgan Drexen*, 60 F. Supp. 3d at 1087-89; *ITT Educ. Servs.*, 219 F. Supp. 3d at 893-94. Similarly, both courts also rejected the idea that there was any constitutional significance to the fact that (1) the CFPB is funded outside the normal appropriation process, and (2) the CFPB is run by a single director, as opposed to a multi-member board or commission. *Morgan Drexen*, 60 F. Supp. 3d at 1089, 1092; *ITT Educ. Servs.*, 219 F. Supp. 3d at 894-97. Finally, both courts also rejected the argument that the combination of the above characteristics in one agency rendered the CFPB unconstitutional. *Morgan Drexen*, 60 F. Supp. 3d at 1092; *ITT Educ. Servs.*, 219 F. Supp. 3d at 895.

**\*14** The Court of Appeals for the District of Columbia was the next court to issue a published opinion on this topic. *See PHH Corp. v. CFPB*, 839 F.3d 1, (D.C. Cir. 2016), *reh'g en banc granted, order vacated*, (Feb. 16, 2017). In a lengthy and detailed opinion, the *PHH* court found it constitutionally untenable for the CFPB to be headed by a single director who could only be removed for cause. *Id.* at 8. The panel's majority summarized their rationale as follows:

> In order to preserve individual liberty and ensure accountability, Article II of the Constitution assigns the executive power to the President. The President operates with the assistance of subordinates, but the President acts as a critical check on those subordinates. That check provides accountability and protects against arbitrary decisionmaking by executive agencies, thereby helping to safeguard individual liberty. Article II has been interpreted by the Supreme Court to allow independent agencies in certain circumstances. Independent agencies lack the ordinary constitutional checks and balances that come from Presidential supervision and direction. But to ensure some check against arbitrary decisionmaking and to help preserve individual liberty, independent agencies have traditionally been structured as multi-member bodies where the commissioners or board members can check one another. The check from other commissioners or board members substitutes for the check by the President. As an independent agency with just a single Director, the CFPB represents a sharp break from historical practice, lacks the critical internal check on arbitrary decisionmaking, and poses a far greater threat to individual liberty than does a multi-member independent agency.

*Id.* at 30-31. To remedy the constitutional deficiency, the court severed the for cause removal provision, making the Director removable at the will of the President. *Id.* at 39.

Subsequently, the Court of Appeals for the District of Columbia granted a rehearing en banc and the *PHH* opinion was vacated. *See PHH Corp. v. CFPB*, 2017 U.S. App. LEXIS 2733 (D.C. Cir. 2017). As of this writing, the en banc court has not issued an opinion.

The latest published opinion to address the constitutionality of the CFPB's structure is *CFPB v. Future Income Payments*, LLC, —— F. Supp. 3d ——, 2017 WL 2190069 (C.D. Cal. 2017). Applying *Humphrey's Executor* and *Morrison*, the *Future Income* court found that "the CFPB's structure is at least as constitutionally sound as the FTC" and that "there [was] no textual basis in the Constitution for concluding that independent agencies must be led by multimember commissions." *Id.* at \*6. Addressing the *PHH* decision, the court observed that

> whether to structure an independent agency as a multimember or director-led body depends on the proper weighing of the advantages and drawbacks of each structure. But neither the text of the Constitution nor any Supreme Court precedent supports drawing a constitutional distinction between multimember and director-led independent agencies, so the question is properly reserved for the political branches and the democratic process.

*Id.* at \*9.

This Court comes to the same conclusion as that reached by our sister district courts, namely that *Humphrey's Executor* and *Morrison* compel the conclusion that the CFPB's structure does not violate the Constitution. As discussed above, Navient has argued that the combination of three characteristics of the Bureau's structure render it unconstitutional: (1) the agency is headed by a single director who wields executive power; (2) the director is only removable for cause; and (3) the agency is funded outside the normal budgetary process. (Doc. 29 at 15-16). Although it is not entirely clear whether Navient has argued that

this structure violates Article II by impermissibly interfering with the President's duty to "take Care that the Laws be faithfully executed," or whether they have argued that it violates the principle of separation of powers by undermining the President's executive powers—*Morrison* clearly addressed these as two separate and distinct concerns—this Court is convinced that, under either analysis, the Bureau's structure is not constitutionally deficient.

**\*15** With respect to whether CFPB's structure violates Article II, the Court first notes that the provision providing that the Director of the Bureau may only be removed for cause is nearly identical to the for cause removal provision found to be constitutionally permissible in *Humphrey's Executor. Compare* 12 U.S.C. § 5491(c)(3) ("The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office") *with* 15 U.S.C. § 41 ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."). The similarities between *Humphrey's Executor* and this case do not end there. First, both the CFPB and the agency at issue in *Humphrey's Executor*, the FTC, are charged with similar tasks in comparable subject matter. In 1935, the FTC was tasked with "prevent[ing] persons, partnerships, or corporations ... from using unfair methods of competition in commerce." Federal Trade Commission Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914). The Bureau is similarly directed to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws," 12 U.S.C. § 5491(a), and "prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with" consumer financial products, 12 U.S.C. § 5531(a).

Second, "[t]he CFPB's authority closely parallels the FTC's powers considered in *Humphrey's Executor*." *Future Income Payments, LLC*, 2017 WL 2190069, at \*6. Just as the CFPB does now, in 1935 the FTC had the power to conduct investigations, promulgate rules, conduct administrative adjudications, and issue cease-and-desist orders. *Compare* 12 U.S.C. §§ 5512(b), 5562-5563 *with* Federal Trade Commission Act, §§ 5-6. Unlike the CFPB, however, in 1935 the FTC could not bring a civil action in a district court for monetary penalties. [5] Nevertheless, the FTC could bring actions in court to enforce its orders and regulated entities were subject to fines for failing to comply with lawful requests of the Commission. Federal Trade Commission Act, §§ 5, 10. Further, in 1975, the FTC gained the explicit authority to "commence a civil action to recover a civil penalty in a district court of the United States." *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 205(a), 88 Stat. 2183, 2200-01 (1975) (codified as amended at 15 U.S.C. § 45(m)(1)(A)). In the intervening forty years no court questioned the continued validity of the holding of *Humphrey's Executor* in light of the change.

In addition to *Humphrey's Executor*, the Supreme Court's decision in *Morrison* supports the conclusion that the removal provision here does not violate the Constitution. Even though *Morrison* involved an inferior officer "with limited jurisdiction and tenure and lacking policymaking or significant administrative authority," the Court made clear that a provision limiting removal "only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties" did not "impermissibly burden[ ] the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act." *Morrison*, 487 U.S. at 663, 691-92; *see also Bowsher v. Synar*, 478 U.S. 714, 729, 106 S. Ct. 3181, 92 L.Ed. 2d 583 (1986) ("The statute permits removal for 'inefficiency,' 'neglect of duty,' or 'malfeasance.' These terms are very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will."). There is no basis to characterize the CFP Act's removal provision as more burdensome.

**\*16** Finally, the removal provision does not have any of the qualities that the Supreme Court found constitutionally troubling in *Free Enterprise Fund*. The Director of the CFPB is not insulated by a second layer of tenure and is removable directly by the President. As such, the President "may hold the [Director] to account for everything ... [he or she] does." *Free Enter. Fund*, 561 U.S. at 495-96. Accordingly, in light of the above, *Humphrey's Executor and Morrison* are controlling with respect to the for cause removal provision. *See Future Income Payments, LLC*, 2017 WL 2190069, at \*6, *Morgan Drexen*, 60 F. Supp. 3d at 1087-89; *ITT Educ. Servs.*, 219 F. Supp. 3d at 893-94.

Next, looking at the other two characteristics of the Bureau's structure that Navient identified—its funding and single director structure—neither is constitutionally concerning by itself. With respect to the fact that the CFPB is funded by a percentage of

the Federal Reserve System's earnings, 12 U.S.C. § 5497(a), and not through the normal appropriations process, Navient argues that this makes the Director unaccountable to both Congress and the President. (Doc. 29 at 16 n.12; Oral Arg. Tr., Doc. 55 at 80-81). Congress, however, "may choose ... to loosen its own reins on public expenditure ... [and] decide not to finance a federal entity with appropriations." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004). Moreover, although the CFPB is funded outside of the appropriations process, Congress has not relinquished all control over the agency's funding because it remains free to change how the Bureau is funded at any time. Navient's argument in this regard does not support its claim that *the President's* powers under Article II have been curtailed.

Nor does the Court see how the agency's funding significantly removes the CFPB from the control of the President. Navient argues that the President lacks control over the CFPB because the President cannot annually propose the level of funding the President believes the agency should receive and cannot veto a congressional budget that funds the CFPB. (Oral Arg. Tr., Doc. 55 at 80-81). Although the President does propose a budget that includes levels of funding that he or she believes an agency should receive, it is Congress that actually sets the agency's level of funding in the appropriations bill. And although the President may veto an appropriations bill, the President lacks the power to veto a specific budget line such as an individual agency's funding. In order for the President to reject a specific agency's funding through the exercise of a veto, the President would have to veto the entire appropriations bill. U.S. CONST. art. I, § 7, cl. 2. Thus, while this presidential power serves as an important check on Congress's power, its application is too diluted at the agency level for this Court to find that removal of the CFPB from the appropriations process inhibits the President from executing his or her Article II powers.

More importantly, however, this argument ignores the fact that an independent agency with funding outside the normal appropriations process has existed for over one hundred years. *See* Federal Reserve Act, Pub. L. No. 63-43, § 10, 38 Stat. 251, 261 (1913) (codified as amended at 12 U.S.C. § 243). Moreover, the Federal Reserve Board of Governors' composition presents no anomaly. There are at least five other independent agencies that operate completely outside of the normal annual appropriations process. *See* 12 U.S.C. § 1811, *et seq.* (Federal Deposit Insurance Corporation);[6] 12 U.S.C. § 1755 (National Credit Union Administration); 12 U.S.C. § 4516 (Federal Housing Finance Agency); 12 U.S.C. § 2250 (Farm Credit Administration); 15 U.S.C. § 7219 (Public Company Accounting Oversight Board). None of these agencies' funding structures, however, have ever been held to violate Article II of the Constitution. Consequently, the Court cannot say that the CFPB's system of funding, by itself, violates the Constitution.

 **\*17**  Nor can the Court say that a single director structure by itself violates the Constitution. Indeed, many executive agencies are headed by a single individual. In addition, at least three other independent agencies are headed by a single individual. *See* 5 U.S.C. § 1211 (Office of Special Counsel); 12 U.S.C. § 4512 (Federal Housing Finance Agency); 42 U.S.C. § 902 (Social Security Administration). Thus, the CFPB's single director structure, in and of itself, does not offend the Constitution.

At oral argument, counsel for Navient agreed that each of the structural aspects of the CFPB could be found in other agencies. (Oral Arg. Tr., Doc. 55 at 75). Consequently, Navient does not argue that any of these attributes in isolation violates the Constitution. Instead, Navient argues that these three otherwise unoffending attributes, when combined together in a single agency, run afoul of Article II and bring this case outside of the holdings of *Humphrey's Executor* and *Morrison*. (*Id.* at 78-79, 81).

As outlined above, two of the core holdings in *Morrison* were that (1) the mere fact that an agency exercises executive functions does not necessarily mean it falls outside of the holding of *Humphrey's Executor*, and (2) a for cause removal provision is not a significant bar to the President's ability to supervise and control heads of independent agencies. *Morrison*, 487 U.S. at 688-91, 696. Navient has failed to put forth any persuasive arguments as to why the three characteristics Navient has identified combine to unconstitutionally prevent the President from ensuring that the Bureau is performing its functions under the CFP Act. Indeed, to the contrary, there is good reason to believe that these characteristics function to increase the President's ability to supervise the Bureau over other independent agencies.

As the CFPB argues in its brief, because the Bureau is headed by a single Director instead of a multi-member body, it is easier for the President to hold the director accountable for the actions of the agency. (Doc. 36 at 16). With a multi-member body, it is more difficult to assess or allocate responsibility among the members of the body for policy decisions or actions taken because decision making is made within the group and may be the product of compromise. In contrast, with a single director, it is very clear who made the decision. Further, it is a similarly difficult task to hold an individual commissioner or board member responsible for the acts or omissions of the agency. This is not the case with a single director whose responsibility for any agency action or omission is easily assessed.

Further, the President's appointment of a single director, as opposed to a member of a multi-member commission or board, has an immediate impact because the appointee, and the appointee alone, now heads the agency. In contrast, in the case of a multi-member agency, the establishment of majority control of the agency requires successive appointments by the President and, at least in some instances, will take more time. For example, because the President serves a four year term and the Director serves a five year term, eighty percent of presidential terms will enable the President to appoint a Director. In contrast, the FTC has five commissioners with staggered seven year terms. 15 U.S.C. § 41. Because of the manner in which the commissioners' terms are staggered, only four-sevenths, or approximately fifty-seven percent, of presidential terms will enable a president to appoint a controlling majority of three or more commissioners. [7]

**\*18** Navient, however, points to the *PHH* decision. (Doc. 29 at 16). As a reminder, the *PHH* panel held that the for cause removal provision in combination with the single director structure was unprecedented and unconstitutional. The panel's holding proceeded on the basis that, because independent agencies lack presidential supervision and direction, they are traditionally set up as multi-member bodies so that "[t]he check from other commissioners or board members substitutes for the check by the President." *PHH Corp.*, 839 F.3d at 30-31. No Supreme Court decision has adopted the principle that the Constitution allows multi-member bodies whose members are removable only for cause because, in lieu of checks from the President, the members provide checks on each other.

To the extent that Navient also argues that CFPB's structure violates the principle of separation of powers, this argument fares no better. As laid out above, this is not a case, and Navient does not so argue, that either the legislative or judicial branch has usurped executive power. Nevertheless, legislation may still violate the principle of separation of powers if it "impermissibly undermines the powers of the Executive Branch, or disrupts the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions." *Morrison*, 487 U.S. at 695 (internal citations, alterations, and quotations marks omitted). Given this Court's above analysis and its conclusion that the CFPB's structure does not impede a president's ability to execute his or her Article II powers, the Court sees no reason to conclude differently here.

In sum, the Court finds that the CFPB's structure does not violate Article II or the principle of separation of powers in that it does not impede the President's ability to "take Care that the Laws be faithfully executed." Accordingly, the Court will deny Navient's Motion to Dismiss on these grounds.

In any event, were this Court, or any other, to find that the CFPB's structure violates Article II, Dodd-Franks has a severance clause that provides that "[i]f any provision of this Act ... or the application of such provision ... to any person or circumstance is held to be unconstitutional, the remainder of this Act ... and the application of the provisions of such to any person or circumstance shall not be affected thereby." 12 U.S.C. § 5302. Accordingly, when the *PHH* court found the for cause provision violated the Constitution, the panel "remed[ied] the constitutional violation ... by severing the for-cause removal provision from the statute" and making the Director of the CFPB removable by the President at will. *PHH Corp.*, 839 F.3d at 37-39.

If any of the provisions Navient has identified were to be held unconstitutional and are severed from the CFP Act, the question then presented is how would such a ruling affect the present lawsuit. At oral argument, Navient advocated for the position that, if the CFPB's structure is unconstitutional, then the Director is acting outside of Executive control and therefore the actions of the Director in bringing the current lawsuit are unauthorized and void. (Oral Arg. Tr., Doc. 55 at 82). As a result, Navient argues that the present lawsuit should be dismissed if any provision is found unconstitutional. (*Id.* at 82-84). Conversely, the

CFPB argued that if the for cause provision was severed, the President, if he did not approve of the current lawsuit, could simply instruct the Director to dismiss the action. (*Id.* at 94). If the present Director refused, the President could simply remove the Director and replace him with someone who would dismiss the lawsuit. (*Id.*).

This Court views the latter position as the more prudent course of action for two reasons. First, and most importantly, it finds support in the case law. *See, e.g., Buckley*, 424 U.S. at 142 (according "*de facto* validity" to the past acts of the Federal Election Commission even though four members of the Commission were appointed in violation of the Appointments Clause); *John Doe Co. v. CFPB*, 849 F.3d 1129, 1133 (D.C. Cir. 2017) ("[T]he Supreme Court and this court have often accorded validity to past acts of unconstitutionally structured governmental agencies."). Second, it affords the President the ability to make the determination as to whether or not he or she wishes for the Director to continue with the present litigation.

**\*19**  Accordingly, in the event that the Bureau's structure is found to be unconstitutional and the problematic provisions are severed from the CFP Act, the severance would not affect the CFPB's ability to maintain the present suit.


### C. Count I

Turning to the individual claims against Navient, [8] Count I of the CFPB's Complaint alleges that Navient violated the CFP Act's prohibition on abusive acts or practices. Specifically, the Complaint alleges that Navient's webpage stated that Navient would help borrowers find a repayment option appropriate for the individual borrower's situation but that Navient instead steered borrowers into forbearance without adequately advising them about other repayment options. (Doc. 1 at ¶¶ 139-142). Navient argues that Count I should be dismissed because they had no duty to provide individualized financial counseling to borrowers. (Doc. 29 at 18).

The CFP Act makes it "unlawful for ... any covered person or service provider ... to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). An act or practice is not abusive unless it meets certain statutory criteria. 12 U.S.C. § 5531(d). One way an act or practice can be abusive is if it "takes unreasonable advantage of ... the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C).

Navient argues that Count I is deficient because it only alleges an omission on their part. (Doc. 29 at 18). The Complaint, Navient contends, does not allege that they made any false statements or misrepresentations, but only that Navient did not provide adequate financial counseling. (*Id.*). Navient therefore argues that "[b]orrowers could not reasonably rely on Navient to counsel them into alternative payment plans unless Navient had an affirmative duty to provide such individualized financial counseling." (*Id.* at 20). The law, according to Navient, imposes no such duty because Navient is a loan servicer, not a fiduciary. (*Id.* at 20-21).

Navient's arguments cloud, rather than clarify, the issue. Navient's alleged practice is abusive under the CFP Act if Navient took unreasonable advantage of a borrower's reasonable reliance that Navient would act in the borrower's interest. The CFPB has alleged that Navient made various statements on their webpage that indicated that if a borrower in financial distress contacted them, Navient would give them enough information about different repayment options so the borrower could make an informed decision about which repayment plan was right for them. (Doc. 1 at ¶ 38-39). For example, the Complaint alleges that Navient's webpage contained the following statement: "If you're experiencing problems making your loans payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation." (*Id.* at ¶ 38). The Complaint further alleges that, when borrowers called, Navient representatives did not give complete information on income-driven repayment plans and instead pushed borrowers into forbearance. (*Id.* at ¶¶ 40-41, 49, 51). Finally, the Complaint alleges that this was both detrimental to borrowers and beneficial to Navient. (*Id.* at ¶ 45, 49, 54). This is sufficient at the pleading stage to allege that Navient took unreasonable advantage of borrowers' reasonable reliance on Navient's statements that Navient would give them adequate information to properly choose a repayment plan.

 **\*20** Navient's focus on whether the law imposes an underlying duty is misplaced for two reasons. First, the statutory language does not state that a duty is an element of an abusive act or practice but instead states that a loan servicer cannot take unreasonable advantage of "the reasonable reliance by the consumer" that the loan servicer will "act in the interests of the consumer." The concept of reasonable reliance, however, is not always paired with a preexisting legal duty. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 90 ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."). It is therefore enough that a borrower's reliance that a loan servicer will act in their interest is reasonable, irrespective of whether a legal duty actually exists on the part of the loan servicer to act in the borrower's interest.

Second, although Navient contends that the Complaint alleges only omissions, the Complaint alleges that Navient placed reliance inducing statements on their webpage. Thus, even assuming the truth of Navient's arguments that there must be some underlying legal duty in order for a borrower's reliance to be reasonable, the Court is satisfied that Navient's active conduct created a duty to act in accordance with their own statements. [9]

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count I of the CFPB's Complaint.

### D. Count II

Count II of the CFPB's Complaint alleges that the same factual allegations that form the basis of Count I also violate the CFP Act's prohibition on unfair acts or practices. (Doc. 1 at ¶¶ 144-47). An act or practice is not unfair under the CFP Act unless (1) "the act or practice causes or is likely to cause substantial injury to consumers," (2) such substantial injury "is not reasonably avoidable by consumers," and (3) "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(C)(1); *see also ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913. Navient's only argument for dismissal of Count II is that the harm in this case was reasonably avoidable. Thus, Navient takes issue only with the second element of the unfairness standard.

 **\*21** "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (citing *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)). [10] Thus, "[i]n determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010).

With respect to reasonable avoidability, the Bureau's Complaint alleges that Navient gave borrowers who called them incomplete or, on other occasions, no information about income-driven repayment plans and instead pushed borrowers into forbearances. (Doc. 1 at ¶¶ 49, 51, 145). The Complaint further alleges that, as a result, borrowers ended up in forbearance instead of being able to make an informed decision as to what repayment plan was best for their circumstances. (*Id.* at ¶¶ 51-53, 145). These allegations, taken as true for the purpose of this Motion, are sufficient to state a claim that the injury to borrowers was not reasonably avoidable.

Navient, however, argues that because they made numerous disclosures that provided borrowers with information about income-driven repayment plans and because there was information publicly available about income-driven repayment plans, any injury was reasonably avoidable. (Doc. 29 at 19, 24). Navient states that this Court can consider this information because federal law requires Navient to make such disclosures and there is no allegation that Navient did not make them. (Oral Arg. Tr., Doc. 55 at 22-23, 26). Even assuming the truth of Navient's contentions, dismissing Count II would require this Court to rule, as a matter of law, that borrowers understood the disclosures that were made to them so that they had "reason to anticipate the impending harm and the means to avoid it." These facts are not before the Court at the pleading stage and therefore, the Court cannot make such a ruling.

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count II of the CFPB's Complaint.

### E. Count III

Navient next seeks dismissal of Count III of the CFPB's Complaint which alleges that Navient violated the CFP Act's prohibition on unfair acts or practices by failing to adequately notify borrowers who were enrolled in income-driven repayment plans that their annual recertification notice was available. (Doc. 1 at ¶¶ 149-153). Specifically, the Complaint alleges that Navient obscured the fact that the recertification notice was available by sending borrowers—who consented to electronic notification —an email with the subject line of either "Your Sallie Mae Account Information" or "New Document Ready to view," and text in the body of the email that stated "a new education loan document is available. Please log in to your account to view it." (*Id.* at ¶¶ 66-67, 69-70). To know that the "new education loan document" was specifically an income-driven repayment plan recertification notice, a borrower would need to click on a hyperlink in the email and go to Navient's website, where the borrower could then log in to his or her account and view the renewal notice. (*Id.* at ¶ 68).

**\*22** As stated in the prior section, an act or practice is not unfair under the CFP Act unless (1) "the act or practice causes or is likely to cause substantial injury to consumers," (2) such substantial injury "is not reasonably avoidable by consumers," and (3) "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(C) (1). Once again, Navient has only taken issue with the second element of the unfairness claim. Specifically, Navient argues that the harm was reasonably avoidable because borrowers could simply click on the provided link and log into their accounts to avoid the harm. [11] (Doc. 29 at 25-26; Oral Arg. Tr., Doc. 55 at 28-29, 31-36).

Given the allegations in the Complaint, the Court finds that, at this early stage, it cannot rule as a matter of law that the harm was reasonably avoidable. First, the allegation that the email itself does not contain any information as to what document was available or express any urgency in the matter would plausibly support a conclusion that borrowers did not "have reason to anticipate the impending harm." Second, the Complaint alleges that when Navient changed both the subject line and the body of the email to inform borrowers that the recertification notification was available, the rate at which borrowers renewed their income-driven repayment plans more than doubled. (Doc. 1 at ¶¶ 75-76). This allegation, taken as true for the purposes of this Motion, indicates that a good number of borrowers did not avoid the harm when presented with Navient's original email. The allegation that many people did not avoid the harm plausibly supports the allegation that the harm was not reasonably avoidable by borrowers.

**\*23** Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count III of the CFPB's Complaint. [12]

### F. Count IV

Navient next moves to dismiss Count IV of the Bureau's Complaint. Count IV alleges that the income-driven repayment plan recertification notice that Navient sent borrowers through the postal mail between July 2011 until December of 2012 was a deceptive act or practice in violation of the CFP Act. (Doc. 1 at ¶¶ 155-59). Specifically, the Bureau's Complaint alleges that Navient's notice stated that if a borrower "provid[ed] incorrect or incomplete information the [renewal] process will be delayed," and thus implied that delay was the only consequence of submitting incorrect or incomplete information, when in truth it could have several irreversible consequences. (*Id.* at ¶¶ 64-65, 155-56).

Unlike unfair and abusive acts or practices, the term "deceptive ... act or practice" is not defined in the CFP Act. The same term, however, also appears in the more heavily interpreted FTC Act. Therefore, courts have construed "deceptive ... act or practice" to have the same meaning under the CFP Act as it does under the FTC Act. *See, e.g., Gordon*, 819 F.3d at 1193 n.7;

*ITT Educ. Servs.*, 219 F. Supp. 3d at 903; *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1369-70 (N.D. Ga. 2015). Thus, "[a]n act or practice is deceptive if: (1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.' " *Gordon*, 819 F.3d at 1192-93 (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)). "Deception may be found based on the net impression created by a representation." *Id.* at 1193 (internal quotation marks omitted).

Navient argues that the statement in the renewal letter was not likely to mislead a reasonable borrower because, "[w]hile the notice states that failure to submit a complete and accurate application may result in a processing delay, it does *not* state that no other consequences could result from such failure." (Doc. 29 at 27). Navient further argues that other parts of the letter explain the consequence of not completing the recertification, and that the statement that the CFPB cites is taken out of context. (*Id.* at 28-29). Along with their brief, Navient submitted two examples of the renewal letter they used along with the renewal forms issued by the United States. (Docs. 29-3, 29-4); *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that district courts, on a motion to dismiss, may consider a document "*integral to or explicitly relied* upon in the Complaint." (internal quotation marks omitted)).

 **\*24**  Upon review of the attachments, the Court cannot say, as a matter of law, that the letter was not likely to mislead a borrower acting reasonably under the circumstances. Under the plausibility standard of *Iqbal/Twombly*, neither the alleged cause of action nor the allegations of fact underlying it are capable of resolution as a matter of law on Navient's Motion to Dismiss. The Bureau has stated a plausible claim for relief that Navient's letter created a false impression that a processing delay was the only adverse consequence of filing an incomplete or inaccurate applications when, according to the Complaint, there was a host of other negative consequences. This is sufficient at the pleading stage to allege a claim for a deceptive act or practice.

Nevertheless, in their reply brief Navient argues that the CFPB's claim is still inadequate because the Bureau's claim is limited only to those borrowers making inadvertent errors or omissions. (Doc. 43 at 17). Thus, according to Navient, "[b]orrowers who ... *mistakenly* submitted a defective form necessarily did so because of a mistake, not based on any alleged misrepresentation." (*Id.*). A fair inference from the Complaint, however, is that borrowers who were misled into believing that a processing delay was the only negative consequence of submitting an incomplete or inaccurate form were not as careful when filling out the form as they would have been if they had known the true consequences of an error or omission.

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count IV of the CFPB's Complaint.

### *G. Counts VII-X*

Counts VII-X of the Bureau's Complaint allege that Navient, while working to enroll borrowers into the federal loan rehabilitation program, engaged in deceptive acts or practices in violation of both the CFP Act and the Fair Debt Collection Practices Act ("FDCPA"). (Doc. 1 at ¶¶ 172-91). Specifically, the Complaint alleges that Navient employees told borrowers in default that completion of the federal loan rehabilitation program would remove all adverse information from their credit histories and that all assessed collection fees would be forgiven, when in fact only some of the adverse information would be removed from borrowers' credit histories and only some of the collection fees would be forgiven. (*Id.* at ¶¶ 173-74, 179-80).

Navient raises two arguments for dismissal of these counts. First, Navient argues that Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies to deception claims under the CFP Act and the FDCPA and that a party is not allowed to plead such claims "on information and belief" as the Bureau has done here. (Doc. 29 at 30-31). Second, Navient argues that the alleged statements of Navient's employees could not be material because "a borrower would not choose default over rehabilitation because he or she misunderstood that some portion of payments made during the program would be allocated to collection fees rather than ultimately forgiven." (*Id.* at 31-32). The Court will address each argument in turn.

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Only one published case has addressed whether this heightened pleading standard applies to deception claims under the CFP Act. In *CFPB v. Frederick J. Hanna & Associates, P.C.*, the district court held that claims for deception under the FDCPA and the CFP Act should not be subject to Rule 9(b) for three reasons. 114 F. Supp. 3d at 1371-74. First, "Rule 9(b) expressly applies only to claims alleging 'fraud or mistake,' and as the Tenth Circuit and several district courts have reasoned, consumer protection claims are not claims of fraud, even if there is a deceptive dimension to them." *Id.* at 1372. Second, "the United States Supreme Court has consistently cautioned against extending this heightened pleading standard beyond claims for fraud or mistake." *Id.* Third, applying Rule 9(b) "to consumer protection claims is not only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes." *Id.* at 1373. Thus, the Court held that Rule 9(b) did not apply to FDCPA or CFP Act claims. *Id.* at 1373-74.

**\*25** This Court finds the rational underlying the *Frederick J. Hanna & Associates* decision persuasive and adopts it. Therefore, the Court holds that Rule 9(b)'s heightened pleading standard does not apply to the Bureau's claims brought under the FDCPA or the CFP Act. *Cf. FTC v. Freecom Commc'n, Inc.*, 401 F.3d 1192, 1203-04 n.7 (10th Cir. 2005) (noting that applying Rule 9(b) to claims under the FTC Act was "inconsistent with the purpose of the FTC Act and highly impractical" and that a deception "claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b)").

Nonetheless, Navient argues that Third Circuit precedent forecloses the above conclusion. (Doc. 29 at 30-31). Two of the cases Navient cites, *In re Westinghouse Securities Litigation*, 90 F.3d 696 (3d Cir. 1996), and *Shapiro v. UJB Financial Corporation*, 964 F.2d 272 (3d Cir. 1992), address whether Rule 9(b) applies to claims under the Securities Exchange Act of 1934 that are grounded in fraud. These cases thus stand for the unremarkable proposition that when a cause of action under the Securities Exchange Act is grounded in fraud, Rule 9(b) applies. CFP Act and FDCPA claims, however, "are not claims of fraud, even if there is a deceptive dimension to them." *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1372. Indeed, as discussed above, an act or practice is deceptive under the CFP Act, "if: (1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.' " *Gordon*, 819 F.3d at 1192-93 (quoting *Pantron I Corp.*, 33 F.3d at 1095). Thus, unlike a fraud claim, the CFP Act does not have an intent element. Likewise "[u]nlike a fraud claim, the FDCPA 'does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute.' " *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1372 (quoting *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010)); *see also Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) ("To recover damages under the FDCPA, a consumer does not need to show intentional conduct on the part of the debt collector.").

As both *In re Westinghouse Securities Litigation* and *Shapiro v. UJB Financial Corporation* recognized, "Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." 90 F.3d at 710; 964 F.2d at 284. Therefore, requiring the CFPB to plead in conformity with Rule 9(b) would graft an intent requirement onto the claims under the FDCPA and CFP Act that is not otherwise present. [13]

**\*26** Next, Navient argues that the representations that Navient allegedly made to borrowers were not material because, even with complete information, borrowers would have entered the rehabilitation program instead of remaining in default. (Doc. 29 at 31-32). A fact-based argument such as this, however, is premature at the pleading stage. Discovery may show that Navient is correct that borrowers in default had no other good option except to enter the federal rehabilitation program. In such a case, the alleged misrepresentations, if proven, may not be material. The facts necessary to judge this argument, however, are not presently before this Court. As a result, Navient's argument is well outside of the scope of a motion to dismiss. [14]

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Counts VII-X of the CFPB's Complaint.

*H. More Definite Statement*

Lastly, Navient argues that they require a more definite statement with respect to Count VI before they can respond by way of an answer. (Doc. 29 at 29-30). Count VI of the Complaint alleges that Navient committed an unfair act or practice in violation of the CFP Act by failing to have policies and procedures in place to prevent the same payment processing errors from reoccurring month after month. (Doc. 1 at ¶¶ 167-71).

The clear text of Federal Rule of Civil Procedure 12(e) states that a party may move for a more definite statement when a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." FED. R. CIV. P. 12(e). The rule "is directed to the rare case where because of the vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive pleading." *Schaedler v. Reading Eagle Publ'n*, 370 F.2d 795, 798 (3d Cir. 1967). "Motions for a more definite statement are not viewed with favor and should be granted only if the allegations contained in the complaint are so vague that the defendant cannot reasonably be expected to frame a response to it." *Wilson v. United States*, 585 F. Supp. 202, 205 (M.D. Pa. 1984).

Navient's brief provides no specifics as to why they need a more definite statement except to say that "the Complaint describes only a random assemblage of customer service issues, vague accusations about the adequacy of policies and procedures, and an apparent disagreement with payment allocation methodologies." (Doc. 29 at 29). Upon review of the Complaint the Court finds that this is not the "rare case" where the Complaint "is so vague or ambiguous that the party cannot reasonably prepare a response." The Bureau's Complaint provides multiple specific examples of payment processing errors and then alleges that Navient failed to have policies and procedures in place to identify and prevent the same processing errors from occurring month after month. These allegations are specific enough for Navient to respond to by way of an answer.

Accordingly, the Court will deny Navient's motion for a More Definite Statement as to Count VI.

## V. CONCLUSION

For the reasons outlined above, this Court will deny Navient's Motion to Dismiss or, in the alternative, for a More Definite Statement, (Doc. 28), in its entirety. A separate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3380530

## Footnotes

1    There appears to be no dispute that all three Defendants are covered persons or are deemed to be covered persons under the Act. (Doc. 1 ¶¶ 16-17, 19).

2    In their reply brief, Navient argues that this statutory interpretation is defectively circular because section 5536(a)(1)(B) does not say what conduct constitutes an unfair, deceptive, or abusive act or practice. (Doc. 43 at 3-4). This, however, overlooks the reality that these terms are defined both under the Act and within the common law. *See* 12 U.S.C. § 5531(c)-(d); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 902-06 (S.D. Ind. 2015) (discussing the meaning of both "unfair" and "abusive" as defined in the Act); *CFPB v. CashCall, Inc.*, 2016 WL 4820635, at *12 (C.D. Cal.

2016) (noting that "unfair," "deceptive," and "abusive" are "terms that have established meanings under other consumer-protection statutes"); *see also CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) (applying the deceptive standard used in the FTC context to the CFP Act).

3   *See Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 173 L.Ed. 2d 443 (2009) (recognizing "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and alterations omitted)); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 180-82 (2012) (discussing the "Harmonious-Reading" cannon of statutory interpretation which provides that "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

4   In addition to litigation authority, Part E of the Act provides that the CFPB has investigatory powers, 12 U.S.C. § 5562, adjudication powers, 12 U.S.C. § 5563, and the power to make referrals for criminal prosecution, 12 U.S.C. § 5566.

5   In this vein, Navient argues that the CFPB is unlike other independent agencies because, in part, it exercises "broad executive authority." (Doc. 29 at 17). Although the Court in *Humphrey's Executor* rested its conclusion partially on the fact that the FTC was "in part quasi legislatively and in part quasi judicially" and therefore could not "in any proper sense be characterized as an arm or an eye of the executive," 295 U.S. at 628, the Court in *Morrison* distanced itself from this classification system, stating that "whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" 487 U.S. at 689. The *Morrison* Court further noted that "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Id.* at 689 n.28. Thus, while "analysis of the functions served by the officials at issue is [not] irrelevant," *Id.* at 691, the mere fact that the CFPB may perform certain tasks that could be considered "executive powers" does not necessarily bring it outside of the holding of *Humphrey's Executor*.

6   *See also Slattery v. United States*, 635 F.3d 1298, 1328 (Fed. Cir. 2011) (Gajarsa, J., dissenting) (observing that "the FDIC does not receive funding through congressional appropriation. There is no provision within the FDIC's enabling statute authorizing the appropriation of funds to the Deposit Insurance Fund ('DIF'), the fund the FDIC uses to perform its insurance and regulatory functions. Simply put, the FDIC is a self-funded entity.").

7   The Federal Trade Act provides, in pertinent part,

The first Commissioners appointed shall continue in office for terms of three, four, five, six, and seven years, respectively, from September 26, 1914, the term of each to be designated by the President, but their successors shall be appointed for terms of seven years, except that any person chosen to fill a vacancy shall be appointed only for the unexpired term of the Commissioner whom he shall succeed: *Provided, however*, That upon the expiration of his term of office a Commissioner shall continue to serve until his successor shall have been appointed and shall have qualified.

15 U.S.C. § 41. This creates a repeating seven year sequence where no commissioner's term expires in year one and two and one commissioner's term expires annually in years three through seven. Cross-referencing these commissioner term expirations with the presidential terms creates a twenty-eight year cycle (seven presidential terms) in which some presidential terms will allow for the appointment of three or four commissioners, while other terms will only allow a president to appoint two commissioners. For example, the 1917 to 1921 presidential term allowed for the appointment of four FTC commissioners, while the presidential term beginning in 1921 allowed only for two appointments. This was followed by four available appointments for the 1925 presidential term, two appointments for the 1929 presidential term, three appointments each for the 1933 and 1937 presidential term, and two appointments for the 1941 presidential term. This twenty-eight year cycle then started over with the 1945 presidential term. Consequently, for every seven presidential terms, four presidential terms will allow for the appointment of three or more commissioners, while three presidential terms will only allow for the appointment of two commissioners.

8    For simplicity sake and because Navient Solutions, Navient Corporations, and Pioneer Credit Recovery, Inc. are all represented by the same counsel and have filed a singular motion, the Court will refer to the individual counts as against "Navient," even though not all Defendants are named in each individual count.

9    Navient cites two published cases for the proposition that "publicly disseminated statements reaching millions of borrowers cannot create a fiduciary-type relationship or obligation." (Doc. 29 at 22). Neither of the cases Navient cites, however, are factually analogous or applicable to the case at hand. In *Barron Partners, LP v. Lab123, Inc.*, the court held that the statements on a webpage that the counterclaim Defendant "assists and invests in private companies that commit to immediately go public" and "helps companies go public 'by introducing them to proven professionals including lawyers and accountants to navigate through the going public process cost effectively and painlessly' " did not give rise to a duty to disclose the counterclaim Defendant's "managing partner's prior criminal record and related prior misconduct." 593 F. Supp. 2d 667, 670-72 (S.D.N.Y. 2009). Further, *Alpine Bank v. Hubbell* held that it was not reasonable for the counterclaim plaintiff to rely on the bank's advertising slogan "So ... you're about to buy a new home, or build one. You concentrate on your dream. We'll take care of everything else" because it was puffery that "no reasonable person would rely on as assertions of particular facts." 555 F.3d 1097, 1101, 1106-07 (10th Cir. 2009). In contrast, the case at hand involves the allegation that Navient made a specific statement that it would give a borrower sufficient information to make an informed decision about which repayment plan would be best for his or her situation and then failed to follow through with that promise. Thus, the cases Navient relies on are not factually analogous to the present case. Finally, Navient also cites two unpublished opinions that merit no further discussion here except to say that neither opinion is factually similar to the present case and are therefore unpersuasive.

10   The definition of unfair act or practice under the CFP Act is almost identical to the definition of unfair act or practice under the FTC Act. *Compare* 12 U.S.C. § 5531(c)(1) *with* 15 U.S.C. § 45(n). Because the FTC Act has been more heavily interpreted by courts, this Court will use interpretations of § 45(n) as a guide to what reasonably avoidable means in the context of the CFP Act.

11   At oral argument, Navient analogized their email to the outside of an envelope. (Oral Arg. Tr., Doc. 55 at 29, 31-39). According to Navient, just like their email, envelopes rarely have information on the outside letting the recipient know of the specifics of what is inside. It is up to the letter's recipient to open the envelope and see what is inside, just as it was up to the borrower to click on the link and log onto Navient's webpage and see what the document concerned. Without getting into a lengthy discussion about the comparability of email and postal mail, the Court does not find the two situations analogous because the CFPB's Complaint alleges that, with respect to the email Navient sent, both the email's subject line and the text in the body of the email were similarly lacking in pertinent information. Thus, according to the Complaint, in order to find out that the renewal notice was available and that the borrower needed to take action on it, the borrower had to open the email, click on a hyperlink, log into Navient's webpage, and open the document— all allegedly without being given any initial indication as to what the document referred to in the email concerns and whether or not the matter is urgent. Thus, if a comparison has to be made, a more apt analogy is that a borrower opening the email is comparable to a recipient opening the envelope. That is, both the letter recipient and the email recipient have to take an initial first action by opening the letter or email. Both the letter recipient and the email recipient are then presented with additional information, i.e. the letter itself or the text in the body of the email. The Bureau's contention is that even the information inside the email—or by analogy, inside the envelope—was lacking. Navient's email as alleged in the Complaint would thus be more analogous to receiving an envelope, opening it, and finding that the letter instructed the recipient to call a phone number to receive more information as to what the letter concerns.

12   Navient also argues that "sending secure information in this manner is a widely accepted practice under federal law." (Doc. 29 at 26). This argument, however, misses the point. The Complaint cannot be read to fault Navient for sending an email notifying borrowers that the recertification letter is available on Navient's webpage. Instead, the Complaint alleges that the contents of the email was insufficient to inform borrowers of the nature of the document that was available and the urgency of the matter.

13    Navient also cites to *Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007), a case which recognized that Rule 9(b) applied to claims brought under the New Jersey Consumer Fraud Act ("NJCFA"). Although an injured party need not always prove intent to state a claim under the NJCFA, *see Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994), the Court finds *Frederico* and other cases dealing with the NJCFA inapplicable for two reasons. First, unlike the CFP Act and the FDCPA, the NJCFA falls expressly within Rule 9(b) because it is primarily concerned with fraud. N.J. STAT. ANN. § 56:8-2. Second, other courts in this circuit have held that the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL"), 73 P.S. § 201-3, which is not primarily concerned with fraud, does not require a plaintiff to meet Rule 9(b)'s requirements when pleading deception. Similar to the CFP Act, the PUTPCPL prohibits certain "unfair or deceptive acts or practices." *Id.* "Unfair or deceptive acts or practices" is defined, in part, as "[e]ngaging in any ... fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). However, "to the extent plaintiffs allege deceptive conduct [under the PUTPCPL], plaintiffs do not need to allege the elements of common law fraud or, as a result, meet Rule 9(b)'s particularity requirement, which applies only to claims of fraud." *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 469 (E.D. Pa. 2009); *see also Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 955 F. Supp. 2d 452, 463 (E.D. Pa. 2013); *Schnell v. Bank of N. Y. Mellon*, 828 F. Supp. 2d 798, 807 (E.D. Pa. 2011); *Vassalotti v. Wells Fargo Bank, N.A.*, 732 F. Supp. 2d 503, 511 (E.D. Pa. 2010).

14    In a footnote, Navient also argues that, because the FDCPA has a one-year statute of limitations, those claims should be limited to conduct that occurred after January 18, 2016. (Doc. 29 at 32 n.24). Because this issue was not fully briefed by the parties, the Court declines to address it at this time. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3106830
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Amanda DAVIS, Plaintiff

v.

KEYBANK N.A., et al., Defendants

Case No.: 2:22-cv-01645-JAD-EJY

|

Signed June 21, 2024

**Attorneys and Law Firms**

George Haines, Gerardo Avalos, Freedom Law Firm, LLC, Las Vegas, NV, Scott C. Harris, Pro Hac Vice, Milberg Coleman Bryson Phillips Grossman, PLLC, Raleigh, NC, for Plaintiff.

Jared Inouye, Bennett Tueller Johnson & Deere, Salt Lake City, UT, for Defendant KeyBank N.A.

**Order Adopting Bankruptcy Court's Recommendation and Dismissing and Closing Case**

[ECF No. 59]

Jennifer A. Dorsey, United States District Judge

**\*1** Plaintiff Amanda Davis sues KeyBank N.A. and American Education Services, LLC for collecting on debts that she claims were discharged in bankruptcy and for reporting those debts as current to credit-reporting agencies. She brings claims for unjust enrichment and violations of the bankruptcy code, the Fair Credit Reporting Act (FCRA), and Nevada's Deceptive Trade Practices Act (NDTPA). [1] A year ago I referred to the District of Nevada Bankruptcy Court "all core bankruptcy issues in this case and non-core issues that the parties consent to be adjudicated by the bankruptcy court—subject to the limitations on that court's jurisdiction." [2]

On June 4, 2024, the bankruptcy court transmitted a memorandum decision dismissing Davis's claim that the defendants violated the court's bankruptcy-discharge injunction under 11 U.S.C. § 524 (a core bankruptcy issue), finding that there is no private right of action under that statute. [3] The court also recommends that I dismiss Davis's remaining unjust-enrichment, FCRA, and NDTPA claims (non-core bankruptcy issues) because allowing those claims would "enable Davis to bring a private right of action against defendants through the back door," a move that is foreclosed by Ninth Circuit precedent. [4]

Under 28 U.S.C. § 157(c)(1), "a bankruptcy court may hear a proceeding that is not a core proceeding but that is otherwise related" to a core bankruptcy issue. [5] To resolve those non-core issues, "the bankruptcy judge [must] submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment [must] be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." [6] Federal Rule of Bankruptcy Procedure 9033 gives parties 14 days to "serve and file ... written objections [that] identify the specific proposed findings or conclusions objected to and state the grounds for such objection." [7] Any part of the bankruptcy judge's recommendation that has been objected to must be reviewed de novo. [8]

Neither party objected to the bankruptcy court's recommendation, and the deadline to do so has passed. I find that the recommendation to dismiss Davis's unjust-enrichment, FCRA, and NDTPA claims is legally correct. In *Brown v. Transworld Systems Inc.*, the Ninth Circuit reiterated its longstanding holding that "a debtor who alleges a violation of a bankruptcy court's discharge order has no private right of action under 11 U.S.C. § 524" and cannot "pursue a [Fair Debt Collection Practices Act] claim based on a violation of the discharge order," since permitting such a claim "would allow a private right of action 'through the back door.' " [9] The bankruptcy judge persuasively reasoned that the same prohibition applies to Davis's attempts to challenge the defendants' alleged discharge-injunction violations through her unjust-enrichment, FCRA, and NDTPA claims. [10] As the bankruptcy judge held, Davis's sole remedy is to seek a contempt order under 11 U.S.C. § 105, and she is currently pursuing that remedy in bankruptcy court. I agree with the bankruptcy judge's reasoning, adopt it here, dismiss Davis's remaining claims, and close this case.

### Conclusion

**\*2** IT IS THEREFORE ORDERED that the United States Bankruptcy Court for the District of Nevada's recommendation to dismiss plaintiff Amanda Davis's claims for unjust enrichment and violations of the Fair Credit Reporting Act and the Nevada Deceptive Trade Practices Act **[ECF No. 59] is ADOPTED** in its entirety. Those claims are **DISMISSED** with prejudice.

### All Citations

Slip Copy, 2024 WL 3106830

### Footnotes

| | |
|---|---|
| 1 | *See* ECF No. 16 (amended complaint). |
| 2 | ECF No. 58. |
| 3 | ECF No. 59 at 10–13. The bankruptcy court retains jurisdiction over a motion for contempt that Davis filed in that court challenging the defendants' alleged violation of the discharge injunction. |
| 4 | *Id.* at 13 (citing *Walls v. Wells Fargo Bank N.A.*, 276 F.3d 502, 506–09 (9th Cir. 2002) and *Brown v. Transworld Sys., Inc.*, 73 F.4th 1030, 1038 (9th Cir. 2023)). |
| 5 | 28 U.S.C. § 157(c)(1). |
| 6 | *Id.* |
| 7 | Fed. R. Bank. P. 9033(b). |
| 8 | *Id.* at 9033(c); *see also In re Nantahala Village, Inc.*, 976 F.2d 876, 880 (4th Cir. 1992) (holding that a district court need not review a bankruptcy judge's findings and conclusions if the parties didn't timely object). |
| 9 | *Brown*, 73 F.4th at 1038. |
| 10 | ECF No. 59 at 13–14. |

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2119805
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Julius ENGEL, Plaintiff,

v.

R.J. REYNOLDS TOBACCO CO., Philip Morris USA, Inc., and Does 1–10, Defendants.

Civ. No. 2:17–618 WBS GGH
|
Signed 05/16/2017

**Attorneys and Law Firms**

Julius Michael Engel, Engel Law Group, Sacramento, CA, for Plaintiff.

Patrick J. Gregory, Shook, Hardy & Bacon L.L.P., Steven N. Geise, Jones Day, San Diego, CA, for Defendants.

MEMORANDUM AND ORDER RE: MOTION TO DISMISS

WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

 **\*1**  Plaintiff Julius Engel brought this action against R.J. Reynolds Tobacco Co. and Philip Morris USA, Inc., for wrongful death arising out of the death of his wife. The matter is now before the court on defendant's Motion to dismiss for failure to join a necessary party, failure to state a claim upon which relief can be granted, and preemption. (Defs.' Mot. (Docket No. 7).)

I. Factual and Procedural Background
Plaintiff alleges that his wife, Mary Engel, died from cardiovascular disease in August 2016. (Notice of Removal, Ex. 1 ("Compl.") at 3 (Docket No. 1–2).) Defendants' "tobacco and nicotine products" allegedly caused her death. (Id. at 3, 6.) Decedent is survived by plaintiff and their three adult children. (Id. at 6.)

Plaintiff brought a wrongful death action against defendants in Sacramento County Superior Court, alleging (1) negligence, (2) intentional tort, (3) products liability, and (4) breach of warranty. (Id. at 1, 3.) Defendants subsequently removed the case to federal court on the basis of diversity jurisdiction. (Docket No. 1.)

II. Discussion
Federal Rule of Civil Procedure 12(b)(7) permits a party to move for dismissal due to the failure to join a necessary party under Federal Rule of Civil Procedure 19. See Fed. R. Civ. P. 12(b)(7); Paiute–Shoshone Indians of the Bishop Cmty. v. City of Los Angeles, 637 F.3d 993, 1002 (9th Cir. 2011). Rule 19 imposes a three-step inquiry: "(1) is the absent party necessary...under Rule 19(a)? (2) If so, is it feasible to order that the absent party to be joined? (3) If joinder is not feasible, can the case proceed without the absent party, or is the absent party indispensable such that the action must be dismissed?" Salt River Project Agric. Improvement & Power Dist. v. Lee, 672 F.3d 1176, 1179 (9th Cir. 2012). A party is necessary if:

> (1) in the party's absence, the court cannot accord complete relief among existing parties; (2) the absent party has an interest in the action and resolving the action without him may impair or impede his ability

to protect that interest; and (3) the absent party has an interest in the action and resolving the action in his absence may leave an existing party subject to multiple or inconsistent obligations.

Backer v. United States, Civ. No. 1:13–1552 AWI GSA, 2014 WL 4267500, at *2 (E.D. Cal. Aug. 29, 2014) (citing Fed. R. Civ. P. 19(a)(1)). If joinder of a necessary party is not feasible, a plaintiff must nevertheless allege the name of the necessary party and the reasons for not joining that person. Fed. R. Civ. P. 19(c).

Under California law, wrongful death is a statutory claim. Ruttenberg v. Ruttenberg, 53 Cal. App. 4th 801, 807 (2d Dist. 1997). The decedent's "surviving spouse, domestic partner, children, and issue of deceased children" may bring a wrongful death cause of action. Cal. Civ. Proc. Code § 377.60. "While each heir designated in section 377.60 has a personal and separate wrongful death cause of action, the actions are deemed joint, single and indivisible and must be joined together in one suit." Corder v. Corder, 41 Cal. 4th 644, 652 (2007). Because the actions are joint, single, and indivisible, federal courts have held that absent heirs are necessary parties in wrongful death cases. Backer, 2014 WL 4267500, at *3; see A.D. v. Cal. Highway Patrol, No. C 07–5483 SI, 2009 WL 733872, at *4 (N.D. Cal. Mar. 17, 2009); Estate of Burkhart v. United States, No. C 07–5467 PJH, 2008 WL 4067429, at *7 (N.D. Cal. Aug. 26, 2008). Therefore, "[a]n heir who brings a wrongful death action has 'a mandatory duty to join all known omitted heirs in the "single action" for wrongful death.' " A.D., 2009 WL 733872, at *4 (quoting Ruttenberg, 53 Cal. App. 4th at 808).

 **\*2** Here, the decedent's alleged heirs for a wrongful death cause of action are her surviving spouse and her "three grown children." (Compl. at 2.) The only plaintiff in this action, however, is the decedent's surviving spouse. Because the decedent's three grown children are heirs under section 377.60, they are necessary parties. See A.D., 2009 WL 733872, at *5. Plaintiff argues that he is the only "first tier" heir because all of the children are adults and therefore it is not necessary to join decedent's adult children in this action. Plaintiff's position, however, is unsupported by case law. See, e.g., Estate of Burkhart, 2008 WL 4067429, at *7 ("An heir who files a wrongful death action is required to properly join all known heirs in the action." (citing Cross v. Pac. Gas & Elec. Co., 60 Cal. 2d 690, 692–93 (1964))). Further, section 377.60, which defines who are heirs for purposes of a wrongful death action, does not define different "tiers" of heirs or state that adult children are not heirs. Accordingly, the decedent's children are necessary parties.

The court must next determine whether joinder of decedent's children is feasible and, if not, whether they are indispensable parties. See Salt River, 672 F.3d at 1179. Plaintiff does not, however, allege why joinder of the necessary parties is not feasible, as required by Rule 19(c). The court is thus unable to determine whether joinder is feasible.

Because plaintiff has not indicated why joinder is not feasible, the court will grant defendants' Motion to dismiss the Complaint for failure to join a necessary party. See Bickoff v. Wells Fargo Bank, N.A., No. 11–CV–02452 BEN (WVG), 2012 WL 3637381, at *3 (S.D. Cal. Aug. 20, 2012). In the First Amended Complaint, plaintiff must either join all necessary parties or indicate why it is not feasible to join the necessary parties under Rule 19(c).

Because the court will grant defendants' Motion to dismiss under Rule 12(b)(7), the court need not address defendants' Motion to dismiss for failure to state a claim and preemption. The parties also agree to strike Exhibit 1 to defendants' Motion.

IT IS THEREFORE ORDERED that defendant's Motion to dismiss for failure to join a necessary party be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendants' Motion to dismiss for failure to state a claim and conflict preemption be, and the same hereby is, DENIED AS MOOT.

IT IS FURTHER ORDERED that Exhibit 1 to defendants' Motion to dismiss (Docket No. 7–2) be, and the same hereby is, STRICKEN.

Plaintiff has twenty days from the date this Order is signed to file a First Amended Complaint, if he can do so consistent with this Order.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2119805

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1508754
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States Bankruptcy Court, S.D. New York.

IN RE: Michael GRABIS, Debtor.

Michael Grabis, Plaintiff,

v.

Navient Solutions, LLC, et al., Defendants.

Case No. 13–10669–JLG
|
Adv. Pro. No. 15–01420–JLG
|
Signed March 26, 2018

**Attorneys and Law Firms**

MICHAEL GRABIS, 1 Hays Drive, Morristown NJ 07960, Plaintiff–Debtor, pro se

JOON H. KIM, Acting United States Attorney for the Southern District of New York, 86 Chambers Street, 3rd Floor, New York, New York 10007, By: Dominika Tarczynska, Esq., Assistant United States Attorney, Attorneys for Defendant–U.S. Department of Education

## MEMORANDUM DECISION GRANTING DEPARTMENT OF EDUCATION'S MOTION TO DISMISS

HONORABLE JAMES L. GARRITY, JR., UNITED STATES BANKRUPTCY JUDGE

**\*1** Michael Grabis, the debtor herein (the "**Debtor**"), reopened his no-asset chapter 7 case to seek an order discharging his student loan indebtedness pursuant to section 523(a)(8) of the Bankruptcy Code, 11 U.S.C. § 523(a)(8). He commenced this adversary proceeding to obtain that relief and has named the Department of Education ("**DOE**"), among others, as a defendant in his Third Complaint (as defined below). The matter before the Court is DOE's motion to dismiss the complaint. [1] The Debtor opposes the motion. [2] For the reasons stated herein, the motion is GRANTED.

Jurisdiction

This Court has jurisdiction over the motion pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M–431), dated January 31, 2102 (Preska, C.J.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Facts [3]

Background
On March 5, 2013, the Debtor, through counsel, filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this Court. *See* ECF No. 1. [4] In his petition, the Debtor represented that: (i) he had fewer than 50 creditors; (ii) the estimated

value of his assets was less than $50,000; and (iii) his liabilities exceeded $100,000, but were less than $500,000. In addition, he estimated the value of his personal property at $11,631.00, and reported that he did not hold any "contingent and unliquidated claims of [any] nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims." In the list of "Creditors Holding Unsecured Nonpriority Claims" accompanying his petition, the Debtor included six claims held by Sallie Mae totaling approximately $161,781.[5] Plaintiff did not list any amounts as due and owing to DOE, although he included DOE on the creditor matrix.[6] DOE did not file a proof of claim in the Debtor's case. On April 8, 2013, Roy Babitt, Esq., in his capacity as the chapter 7 trustee of the Debtor's estate, issued his "Report of No Distribution" in the chapter 7 case. *See* ECF No. 6.[7] On June 11, 2013, the Court (Peck, J.)[8] entered a "Discharge of Debtor Order of Final Decree," and closed the case. ECF No. 8.

**\*2** On July 31, 2013, the Debtor filed a *pro se* motion to reopen his bankruptcy case in order to file an adversary proceeding to seek discharge of his student loan debt. *See* ECF No. 10 ("**Reopen Motion")**.[9] In doing so, the Debtor, acting *pro se*, also asked the Court to waive the filing fee to reopen the case. *See* ECF No. 11 (the "**Fee Waiver Motion**"). Judge Peck granted the Reopen Motion, but denied the Fee Waiver Motion, without prejudice. Accordingly, by order dated August 27, 2013, Judge Peck directed that "the case shall be reopened upon payment of the appropriate fee by the Debtor or further order of the Court after a renewed request for waiver of such fee for cause shown." *See* ECF No. 12. On December 10, 2013, the Debtor filed (i) a *pro se* motion renewing his request to reopen the case to file an adversary complaint (the "**Second Reopen Motion**") [ECF No. 13];[10] and (ii) a *pro se* motion renewing his request to waive the fee to reopen the case (the "**Second Fee Waiver Motion**") [ECF No. 14]. Judge Peck denied the Second Reopen Motion as moot, and denied the Second Fee Waiver Motion without prejudice. *See* ECF No. 15.

On December 15, 2015, the Debtor commenced this adversary proceeding by filing a complaint for the discharge of his student loans pursuant to section 523(a)(8) of the Bankruptcy Code. *See* AP ECF No. 1. Without limitation, in support of the complaint, the Debtor alleged, in substance, that while pursuing an undergraduate degree in business, he borrowed close to $100,000 in both federal and private student loans, that such indebtedness had grown to more than $180,000, and that repayment of that indebtedness presented an undue hardship to him in his effort to obtain a "fresh start" through his bankruptcy case. *See* Complaint at 1. In the complaint, the Debtor named the following defendants: Sallie Mae Servicing ("**Sallie Mae**"), Navient Solutions, Inc. ("**Navient**"), Lafayette College and the University of Vermont ("**UVM**"). *Id.* As the holder of the private student loans, Navient filed an answer to the complaint. *See* AP ECF No. 4 (the "**Navient Answer**").[11] The Educational Credit Management Corporation ("**ECMC**") filed an answer to the complaint. *See* AP ECF No. 6. In it, ECMC asserted that in its capacity as a federal student loan guarantor in the Federal Family Education Loan Program ("**FFELP**"), it holds an interest in two consolidation loans owed by the Debtor, each of which was disbursed on or about June 24, 2005, in the original principal amounts of $19,934 and $30,096, respectively (the "**Consolidation Loans**"). *See id.* n. 1. It maintained that the Debtor is seeking to have the Consolidation Loans declared dischargeable in this adversary proceeding and that when the action was commenced, US Bank ELT Brazos ELA Inc., as the lender of the Consolidation Loans, filed a claim under the guarantees of the underlying promissory notes with the guarantor, USA Funds, Inc. ("**USAF**"). *Id.* It contended that by agreement, USAF assigned to ECMC for defense, its student loan accounts that are in bankruptcy. Thus, ECMC asserted that it is the proper party in interest in this lawsuit with respect to the Consolidation Loans. *Id.* On March 1, 2016, ECMC filed a motion pursuant to Fed. R. Civ. P. 24(a) and (b), as made applicable herein by Bankruptcy Rule 7024, to intervene in this adversary proceeding. *See* AP ECF No. 11. In support of its motion ECMC submitted a declaration of an ECMC Litigation Specialist (the "**ECMC Declaration**"), who explained that when the Debtor filed the adversary proceeding, the Consolidation Loans were transferred to ECMC by operation of law and that ECMC holds all right, title and interest in the two Consolidation Loans. *See* AP ECF No. 11–2, ¶¶ 2–5.[12] The Debtor opposed the motion. *See* AP ECF No. 13. After hearing argument on ECMC's motion, and by order dated March 24, 2016, the Court granted ECMC's motion to intervene. *See* AP ECF No. 16.

**\*3** On April 15, 2016, the Debtor filed an amended complaint that added DOE, but dropped UVM, as defendants. *See* AP ECF No. 18.[13] At that time, the Debtor failed to request that a summons be issued with respect to DOE and failed to serve DOE with the complaint. On September 25, 2017, the Debtor filed the "Third Adversary Complaint for Discharge of Student

Loans" against Sallie Mae, Navient, Lafayette College, DOE, and ECMC. *See* AP ECF No. 84 (the "**Third Complaint**"). The Debtor effected service of that complaint on DOE and on October 18, 2017, the DOE, through its counsel, filed a notice of appearance herein. *See* AP ECF No. 88.

The Third Complaint

The Debtor explains that he filed this adversary proceeding "as an addition to my core bankruptcy proceeding to discharge my student loans under [Bankruptcy] Rule 4007(b), 11 U.S.C [§] 523 (a)(8), as per my rights to a 'fresh start' under the U.S. Bankruptcy Code." Third Compl. at 2. He alleges that there are two reasons why this Court should grant him such relief. First, he says that he is entitled to "the full discharge of the unqualified private loan portion of my debt and full discharge of my federal debt, both [sic] under section 523(a)(8) of the [B]ankruptcy [C]ode[,]" because

> [u]nder the standard tests for discharge of student loans I have made a good faith effort to repay my loans, I am currently unable and will be unable to repay the loans for a considerable period, and I have not been able to maintain a minimal standard of living as defined by the poverty guidelines.

*Id.* To that end, he asks this Court

> to recognize that the size and nature of my debt make my case fundamentally different from any guidelines decided under the Brunner case standard which dealt with federal student loans for graduate education under $15,000 dollars close to 30 years ago in an economic environment far different from today. My debt is largely unqualified private student loans which are dischargeable under the [B]ankruptcy [C]ode. The Southern District of New York has jurisdiction of the Brunner standard.

*Id.* Second, he maintains that he is entitled to relief under section 523(a)(8) to redress the harm caused to him by the defendants. He says that "I believe that my degree issuing college and lenders did not act in good faith in the origination and servicing of my student loans and, in fact, acted to collude, embezzle, and purposely defraud me as a student borrower." *Id.* at 1–2. Thus, as an alternative, and in addition to, his *Brunner* based arguments, he asserts that "I am alleging fraud, breach of contract, and unjust enrichment in my defense of repayment." *Id.*

The Third Complaint does not rest on those allegations or on the Debtor's claim for relief under section 523(a)(8). In addition, the Debtor is asking for damages that he says he has suffered by reason of the defendants' fraud. He maintains that although he is "seeking the full discharge of the unqualified private loan portion of my debt and my federal debt, both [sic] under sections 523(a)(8) of the [B]ankruptcy [C]ode[,] [t]he fraud that occurred also caused damage to me personally and I am asking the court to grant damages from these parties to pay towards the debt and personal costs incurred as a result of the fraud." *Id.* at 2. To that end, and as relevant to the motion, the Debtor alleges that DOE, "as the primary overseer of my loan programs, was also derelict in its duties to protect my rights as a borrower and to keep me informed on any matters related to my debt." *Id.* at 5. Specifically, he asserts that "in and around 2004 and well after my graduation from college, Sallie Mae knowingly acted to alter the terms of my loans by communicating without my knowledge to the U.S. Department of Education and Congressional officials to remove bankruptcy rights afforded to me under the [B]ankruptcy [C]ode and included in the original covenant of my borrowing agreement." *Id.* He maintains that "[i]n allowing Sallie Mae to negotiate new terms without my knowledge, the Department of Education also created a precarious and damaging situation for me personally." *Id.* Thus, he maintains that "the integrity of my loans and the terms governing its service have been destroyed." *Id.* He asks this Court "to recognize these serious factors in granting a discharge of my private loans and any further damages from ... the Department of Education that are viewed as appropriate." *Id.* Further, the Debtor alleges that DOE "also failed to make clear that the US Government had

already determined certain levels of student loan debt as toxic and prohibitive to certain careers including any job that requires a security clearance." *Id.* He asserts that in his career search he has found "that certain jobs I applied and would qualify for have been blocked by my student loan debt[,]" and that "[t]his fact has created a damaging situation where possible gainful employment has been removed as a possibility." *Id.* He says that since he has "reached the age limit in the application process for some of these jobs, he is asking this Court "to instruct the Department of Education [to] act in good faith in granting a waiver or assisting in procuring a waiver in this regard." *Id.* at 6.

**\*4** In response to the Third Complaint, DOE filed this motion to dismiss. [14]

## Discussion

There are two components to DOE's motion. First, DOE contends, among other things, that pursuant to Fed. R. Civ. P. 21, it should be deleted as a party to the Debtor's claim for relief under section 523(a)(8), because it does not own any portion of the Debtor's student loan indebtedness, and, as such, is not a proper party to that claim since it has no connection to the relief that the Debtor is seeking. Second, it argues that the Debtor's fraud claim must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction. [15] The Court will consider those arguments below.

## Claim for Relief Under § 523(a)(8)

As noted previously, the Consolidation Loans were issued under FFELP. [16] Under that program "students attending eligible postsecondary schools may borrow money for tuition and expenses from participating lenders, such as banks. These loans are insured by participating 'guaranty agencies' which, in turn, are reinsured by the Department of Education." *Calise Beauty Sch., Inc. v. Riley,* 941 F. Supp. 425, 427 (S.D.N.Y. 1996). DOE administers FFELP and has promulgated appropriate regulations to carry out and enforce the FFELP program. *College Loan Corp. v. SLM Corp.,* 396 F.3d 588, 590 (4th Cir. 2005); *see generally* 34 C.F.R. §§ 682.400 *et seq.* In essence, the program works as follows: (i) if a student fails to repay a FFELP loan, the lender submits all relevant records to the guaranty agency and requests reimbursement; (ii) if that agency determines that the lender properly performed the servicing and collection functions, the guarantying agency repays the lender for the outstanding balance on the loan; (iii) that agency must then undertake its own collection efforts; and (iv) if those efforts are unsuccessful, it can look to the DOE for repayment. *See Calise Beauty Sch., Inc. v. Riley,* 941 F. Supp. at 427 (citations omitted). The regulations implementing FFELP are clear that FFELP loans are neither issued nor held by DOE. Rather, DOE acts as a reinsurer that, in certain circumstances, must reimburse lenders for their losses. [17]

**\*5** There is no question that the resolution of the Debtor's claim that his student loan indebtedness is dischargeable under section 523(a)(8) is within the "core" jurisdiction of this Court. *See* 28 U.S.C. § 157(b)(2)(I). [18] Actions to discharge student loan indebtedness, like this one, are "premised on the res, not on the persona ... [a] debtor does not seek money damages or any affirmative relief ... by seeking to discharge a debt ... he seeks only a discharge of his debts." *Tennessee Student Assistance Corp. v. Hood,* 541 U.S. 440, 450 (2014). Thus, the only proper defendants in an action to determine the dischargeability of student loan indebtedness are the parties who hold that indebtedness. *See Himes v. Educ. Credit Mgmt. Corp. (In re Himes),* No. 00–80532, 2001 WL 34076414, at \*1 (Bankr. C.D. Ill. Aug. 29, 2001) (finding that "[g]enerally, the proper defendant to be named in the complaint is the holder of the student loan as of the date the complaint is filed.") (citing *In re Bernal,* 207 F.3d 595 (9th Cir. 2000) ).

Rule 21 states in relevant part that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. Courts have broad discretion to grant relief under this rule, "when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation." *City of Syracuse v. Onondaga County,* 464 F.3d \297, 308 (2d Cir. 2006) (quoting *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 214 F.R.D. 152, 154 (S.D.N.Y. 2003) ). In assessing the merits of DOE's request for relief under Rule 21,

this Court can consider the Hom Declaration. *See Cohn v. KeySpan Corp.*, 713 F. Supp. 2d 143, 153 (S.D.N.Y. 2010) ("In deciding a motion to drop a party pursuant to Rule 21, the Court may consider affidavits filed by the defendants challenging the allegations against them in the complaint.") (citation omitted). Ms. Hom's undisputed testimony is that ECMC, as guarantor, owns the Consolidation Loans, and that DOE does not own any loans for the Debtor. *See* Hom Decl. ¶¶ 4–6. [19] Relief under Rule 21 dismissing a party from an action is especially appropriate "when there is clearly no right or basis of relief from a party." *Barrundia v. City of New York*, No. 84 Civ. 6801, 1988 WL 96063, at *4 (S.D.N.Y. Sept. 8, 1988). *See also Glendora v. Malone*, 917 F. Supp. 224, 227 n.3 (S.D.N.Y. 1996) ("[T]he [C]ourt may rely on Rule 21 to delete parties that have no connection to the claims asserted."). That is the case here. DOE is not a creditor of the Debtor and does not own any of the student loans at issue in this adversary proceeding. It has no connection to the relief the Debtor is seeking under section 523(a)(8), and as such, is not a proper party to that claim for relief. Accordingly, the Court grants DOE's request for relief under Rule 21 and dismisses it as a party to the Debtor's claim for relief under section 523(a)(8). *See Shank v. Educ. Credit Mgmt. Corp. (In re Shank)*, No. 07–7087, 2008 WL 3166492, at *2 n.5 (Bankr. E.D. Va. Aug. 5, 2008) (finding that because the DOE did not hold any of the debtor's loans, it had no interest in the matter and it was just and efficient to dismiss it from the adversary proceeding pursuant to Rule 21); *Aalabdulrasul v. ACS (In re Aalabdulrasul)*, No. 11–9089, 2012 WL 1597277, at *1–2 (Bankr. N.D. Iowa May 7, 2012) (granting defendant AES's motion to dismiss under Rule 21 because AES is not the real party in interest where it does not have a proprietary interest in any of the debtor's student loans and was merely acting as loan servicer in three of the debtor's five co-signed student loans); *see also Gallagher v. Educ. Credit Mgmt. Corp. (In re Gallagher)*, 333 B.R. 169, 173–74 (Bankr. D.N.H. 2005) (denying debtor's request to join American Student Association Corporation ("**ASAC**") as defendant to action under § 523(a)(8) where ASAC assigned underlying loan to ECMC and finding that "ASAC is not a proper party to the instant case."); *In re Srinivasan*, Adv. No. 10–1545, 2010 WL 3633062 (Bankr. D.N.J. Sept. 7, 2010) (denying request for entry of default judgment against Sallie Mae in action under § 523(a)(8) where NSLDS report showed that Sallie Mae did not own underlying loan, because "there is no debt due from the [debtor] to [Sallie Mae].").

**\*6** The Court finds no merit to the Debtor's assertions to the contrary. The Debtor contends that "ECMC is a debt collector, not a law firm for [DOE] and they have no right under the law to intervene in this proceeding." Debtor's Resp. at 3. The Court previously ruled, over the Debtor's objection, that ECMC is the federal student loan guaranty agency that holds title to the Consolidation Loans and, as such, is a proper party defendant in this case. *See* AP ECF No. 16. Moreover, in any event, where, as here, the Debtor is seeking the discharge of a FFELP loan on the basis of undue hardship, applicable regulations mandate that ECMC, as the guarantor, defend against the action. *See* 34 C.F.R. § 682.402(h)(1) (ii) & (i)(l)(ii)-(iv). The Debtor also contends that DOE should remain a party to this action because there are financial consequences to DOE whether or not he successfully discharges his student loan indebtedness. *See* Debtor's Resp. at 3. [20] That DOE may be indirectly benefitted if the Debtor begins making payments on account of the loan simply does not vest DOE with an interest in the loan that it does not have. Moreover, DOE's reimbursement obligations are not triggered, if at all, until after the completion of this adversary proceeding. Further, those reimbursement obligations are between ECMC and DOE, not DOE and the Debtor. *See* 34 C.F.R. § 682.402(k)(l)(i)(A). Finally, the Debtor argues that DOE should remain a party to this action because ECMC did not hold the loans at the time he commenced this adversary proceeding. Debtor's Resp. at 3. [21] However, that is irrelevant because at that time, the loans were held by USA Funds, the guaranty agency that took assignment of the loans from the original lender after the Debtor defaulted, not DOE. *See* ECMC Declaration ¶¶ 3–5, *supra* n. 12

## Fraud Claim

As noted, in asserting his claim for relief under section 523(a)(8), the Debtor alleges both that he is "alleging fraud, breach of contract, and unjust enrichment in my defense of repayment[,]" and that "the fraud that occurred also caused damage to me personally and I am asking the court to grant damages from these parties to pay towards the debt and personal costs incurred as a result of the fraud." Third Compl. at 2. However, in his opposition to the motion, the Debtor explained that

> I want to be clear that I have never meant my mention of fraud in this proceeding to mean a tort fraud charge. I simply mean to describe an IRS tax fraud that is happening and has happened in conjunction

with the distribution and service of my debt that will show my true cost of attendance and that a large portion of my loans are beyond the cost of attendance and therefore unqualified and dischargeable under 523 (a) (8).

*Id.* at 2. Thus, the Court understands that the Debtor is not seeking damages against DOE in the Third Complaint.

However, to the extent the Debtor is asserting a fraud tort claim and seeking other affirmative relief against DOE, the Court dismisses those claims for lack of subject matter jurisdiction. Pursuant to Rule 12(b)(1), a court can dismiss a complaint, or counts thereof, for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). On a Rule 12(b)(1) motion, the plaintiff carries the burden of establishing that the court has subject matter jurisdiction to adjudicate his claims. *See Smith v. Masterson,* No. 05 Civ. 2897, 2006 WL 2883009, at *6 (S.D.N.Y. Sept. 29, 2006) ("The party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence, that the court has subject matter jurisdiction." (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996) ) ). A *pro se* litigant "attempting to bring a case in federal court must still comply with the relevant rules of procedural and substantive law, including establishing that the court has subject matter jurisdiction over the action." *Ally v. Sukkar*, 128 Fed.Appx. 194, 195 (2d Cir. 2005); *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (noting that a *pro se* litigant is not exempt "from compliance with relevant rules of procedural and substantive law"). Dismissal for lack of subject matter jurisdiction is proper under Rule 12(b)(1) when the Court lacks statutory or constitutional authority to adjudicate it. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). When assessing a motion brought under Rule 12(b)(1), the Court may consider evidence outside of the pleadings. *Id.; see also Barone v. United States*, No. 12 Civ. 4103 (LAK), 2014 WL 4467780, at *4 (S.D.N.Y. Sept. 10, 2014).

**\*7** A bankruptcy court's jurisdiction "is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). *See also In re Fairfield Sentry*, 458 B.R. 665, 674 (S.D.N.Y. 2011) ("Subject matter jurisdiction over bankruptcy cases is a creature of statute."). Pursuant to sections 157 and 1334 of title 28 of the United States Code, the Court has "core" jurisdiction over all cases under title 11 and any or all proceedings "arising under" or "arising in" title 11, and "non-core" jurisdiction over proceedings or matters "related to" a case under title 11. *See* 28 U.S.C. §§ 157, 1334. *See also In re Fairfield Sentry*, 458 B.R. at 674 ("bankruptcy jurisdiction is divided into 'core' and 'non-core' jurisdiction.") (citations omitted); *Stern v. Marshall*, 564 U.S. 462, 474–76 (2011) (discussing core and non-core jurisdiction).

Proceedings that "arise under" the Bankruptcy Code are those "that clearly invoke substantive rights created by federal bankruptcy law." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108–09 (2d Cir. 2006). *See also In re Adelphia Commc'ns Corp.*, 307 B.R. 404, 413 (Bankr. S.D.N.Y. 2004) (noting that "[a]rising under jurisdiction relates to federal question claims of a particular type—those federal questions that have their origin in title 11 of the United States Code (i.e., the Bankruptcy Code), and where relief is sought based upon a right created by title 11.") (internal quotation marks omitted) (footnote omitted). In contrast, the focus of "arising in" jurisdiction is on matters that "are not based on any right expressly created by [T]itle 11, but nevertheless would have no existence outside of the bankruptcy." *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010) (quotations omitted). Thus, "[a] claim arises in a bankruptcy proceeding if it would have no practical existence *but for* the bankruptcy." *Delaware Trust Co. v. Wilmington Trust, N.A.,* 534 B.R. 500, 511 (S.D.N.Y. 2015). *See also Ames Dep't Stores Inc. v. Lumbermens Mut. Cas. Co. (In re Ames Dep't Stores, Inc.)*, 542 B.R. 121, 135 (Bankr. S.D.N.Y. 2015) (explaining that a claim "arises in" a bankruptcy case if the claim, by its very nature, "can only be brought in a bankruptcy case, because it has no existence outside of bankruptcy."). The fiduciary fraud claim does not "arise under" the Bankruptcy Code because it is predicated on state or common law, not on rights originating in the Bankruptcy Code. Nor does it "arise in" the Debtor's bankruptcy case because it is not a claim that can only be brought in a bankruptcy action. Accordingly, the Court lacks core jurisdiction over the claim. *See, e.g., Krys v. Sugrue*, No. 08 Civ. 3086, 2008 WL 4700920 at *11 (S.D.N.Y. Oct. 23, 2008) (fraud claims not within court's core jurisdiction); *Maa–Sharda, Inc. v. First Citizens Bank & Trust, Co. (In re Maa–Sharda, Inc.),* Bankr. No. 14–21380, Adv. P. No. 15–2003, 2015 WL 1598075, at *5 (Bankr. W.D.N.Y. April 9, 2015) (state law "fraud on the court" cause of action not within court's "core" jurisdiction).

Non-core proceedings are those that are not core "but that [are] otherwise related to a case under title 11." *See* 28 U.S.C. § 157(c)(1); *see also Stern,* 564 U.S. at 477 ("The terms 'non-core' and 'related' are synonymous" (quoting *Collier on Bankruptcy* ¶ 3.02[2], p. 3–26, n. 5 (16th ed. 2010) ) ). "The test for determining whether litigation has a significant connection with a pending bankruptcy [sufficient to confer bankruptcy jurisdiction] is whether its outcome might have any conceivable effect on the bankruptcy estate." *Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),* 676 F.3d 45, 53 (2d Cir. 2012) (internal quotation marks omitted) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ). *Accord Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) ("[A] civil proceeding is 'related to' a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate." (internal quotation marks omitted) ). Here, the Debtor in seeking an award of damages, "to pay towards the debt and personal costs incurred as a result of the fraud." Third Compl. at 2. Further, he is asking the Court "to instruct the Department of Education [to] act in good faith in granting a waiver [of unspecified age-related job requirement] or assisting in procuring a waiver in this regard." *Id.* at 6. Resolution of those claims can have no effect on the Debtor's estate and, as such, are outside the Court's non-core, related to jurisdiction.

**\*8** Moreover, and in any event, the Debtor is barred from asserting the fraud and other claims for relief against DOE because it has not waived its sovereign immunity with respect to such claims. For that additional reason, this Court lacks subject matter jurisdiction over those claims. The doctrine of sovereign immunity bars suits against the United States and a federal agency, like DOE, unless Congress has waived its immunity by statute. *See Liffiton v. Keuker*, 850 F.2d 73, 77 (2d Cir. 1988) ("It is well settled that the United States is immune from suit except where [C]ongress, by specific statute, has waived sovereign immunity.") (citation omitted); *see also Diaz v. United States*, 517 F.3d 608, 611 (2d Cir. 2008) (noting that "absent a waiver," the "principal of sovereign immunity ... shields the federal government and its agencies from suit.") (citations omitted). "[T]he terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586–87 (1941) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.") (footnote omitted). Thus, because the doctrine is "jurisdictional in nature," the Debtor bears the burden of establishing that its claims against DOE fall within an applicable waiver. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2003) (citations omitted); *see also Williams v. N.Y. City Housing Auth.*, No. 07–civ–7587, 2009 WL 804137, at \*4 (S.D.N.Y. March 16, 2009) (stating that to defeat a motion to dismiss a complaint based on sovereign immunity, "the plaintiff must identify a specific statue that waives the sovereign immunity of the government for that type of claim."). The Debtor has failed to meet that burden. He does not contend that Congress has specifically waived DOE's immunity from suit with regard to the claims asserted against DOE in the Third Complaint, and the Court is not aware of any such waiver. [22] Rather, he asserts that because DOE filed an *amicus curiae* brief, at the request of the First Circuit Court of Appeals, in *Murphy v. ECMC* (*see* Order dated June 9, 2015, Case No. 14–1691 (1st Cir.) [Doc. # 00116847467] ), it is deemed to have waived its sovereign immunity in that case and, because of the similarity between this case and the *Murphy* case, DOE should be deemed to have waived sovereign immunity in this case. *See* Debtor's Resp. at 1–2. Thus, he asserts that the Court "must not allow [the] dismissal [of DOE from this adversary proceeding]." *Id.* 2. ("Furthermore, the fact that the Department of Education is arguing so intently to de dismissed when they know they have waived their immunity and intervened on recent similar cases is intentionally deceptive and the court must recognize this fact as well in refusing dismissal."). The Court finds no merit to that assertion. In submitting its *amicus curiae* brief, DOE did not waive its sovereign immunity in *Murphy. Cf. Jamul Action Comm. v. Stevens*, No. 2:13–CV–01920, 2014 WL 3853148, at \*9 (E.D. Cal. Aug. 5, 2014) (declining to find that tribe had waived sovereign immunity based upon filing of *amicus curiae* brief). It has not otherwise waived its immunity herein.

Conclusion

**\*9** Based on the foregoing, pursuant to Fed. R. Civ. P. 21, the Court dismisses DOE as a party to the Debtor's claim for relief under section 523(a)(8) of the Bankruptcy Code. To the extent that the Debtor is pursuing a fraud claim against DOE, the Court dismisses it and related claims pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction.

SETTLE ORDER ON NOTICE.

**All Citations**

Not Reported in B.R. Rptr., 2018 WL 1508754

## Footnotes

1   *See* Notice of Motion, Memorandum of Law In Support of the Department of Education's Motion to Dismiss and the Declaration of Lola Hom (the "**Hom Declaration**") [AP ECF No. 102]; Reply Memorandum of Law In Support of the Department of Education's Motion to Dismiss [AP ECF No. 106]. As used herein, "AP ECF No." refers to a document filed of record in the Debtor's adversary proceeding (15–01420 (JLG) ).

2   *See* Response to Department of Education on being defendant/request for dismissal [AP ECF No. 105] (the "**Debtor's Response**").

3   The facts are not in dispute.

4   "ECF No." refers to a document filed of record in the Debtor's chapter 7 case (13–10669 (JLG) ).

5   The Sallie Mae claims are, as follows:

   Installment account opened 06/05: $57,765.00

   Installment account opened 10/99: $32,003.00

   Installment account opened 09/01: $31,184.00

   Installment account opened 10/00: $23,762.00

   Installment account opened 01/99: $ 8,862.00

   Installment account opened 03/99: $ 8,205.00

6   The Debtor listed DOE in his creditors matrix, as follows:

   US Dept[.] Of Education

   ATTN: BORROWERS SERVICE DEPT

   Po Box 5609

   Greenville, TX 75403

7   The Report of No Distribution reads, as follows:

   I, Roy Babitt, having been appointed trustee of the estate of the above-named debtor(s), report that I have neither received any property nor paid any money on account of this estate; that I have made a diligent inquiry into the financial affairs of the debtor(s) and the location of the property belonging to the estate; and that there is no property available for distribution from the estate over and above that exempted by law. Pursuant to Fed R Bank P 5009, I hereby certify that the estate of the above-named debtor(s) has been fully administered. I request that I be discharged

from any further duties as trustee. Key information about this case as reported in schedules filed by the debtor(s) or otherwise found in the case record: This case was pending for 1 months. Assets Abandoned (without deducting any secured claims): $ 0.00, Assets Exempt: $ 11631.09, Claims Scheduled: $ 193272.24, Claims Asserted: Not Applicable, Claims scheduled to be discharged without payment (without deducting the value of collateral or debts excepted from discharge): $ 193272.24.

ECF No. 6.

8     The case originally was assigned to Judge James Peck. After Judge Peck retired from the bench, the case was reassigned to Judge Garrity.

9     In support of the Reopen Motion, the Debtor stated, in part:

I, Michael Grabis, am making a motion to reopen my bankruptcy petition under Chapter 7 originally filed on 3/6/2013 and closed on 6/11/2013. I am making this motion in order to file an adversary pursuant to discharge of student loan debts. I was not instructed in my previous hearing that I would not have the opportunity to challenge these debts or that a separate motion or that filing of an adversary would be required for any consideration of discharge.

ECF No. 10.

10     The request in support of the Second Reopen Motion is identical to that set forth in the Reopen Motion.

11     In part, and in substance, in its answer, Navient admitted that the Debtor was indebted to Navient on account of five "private" educational loans, with an aggregate balance, including principal, interest and fees, in excess of $119,095.39. *See* Navient Answer ¶ 1.

12     In part, the ECMC Declaration states, as follows:

2. ECMC is a Minnesota not-for-profit corporation and guaranty agency created under the direction of the U.S. Department of Education to provide guaranty services pursuant to the Federal Family Education Loan Program ("FFELP"). Under FFELP, lenders use their own funds to make loans to students attending postsecondary institutions. These loans are guaranteed by guaranty agencies and insured by the federal government. *See* 20 U.S.C. § 1078(a)-(c). In its role as a guarantor under FFELP, ECMC accepts the transfer of title to certain student loan accounts on which the student loan borrower has filed for bankruptcy or when a debtor has filed an adversary proceeding seeking discharge of his/her student loans for undue hardship.

3. Attached hereto as Exhibit A is a true copy of the Federal Consolidation Loan Application and Promissory Note executed by Plaintiff, Michael R. Grabis ("Plaintiff"), on March 1, 2005 (the "Note"). Pursuant to the Note, Plaintiff consolidated the student loans listed therein into two (2) consolidation loans under FFELP (the "Consolidation Loans").

4. Subsequently, Sallie Mae Servicing, the servicer of the Consolidation Loan, issued a Loan Consolidation Disclosure Statement and Repayment Schedule, notifying Plaintiff that the lender of the Consolidation Loans was USB as Trustee Trinity HEA, and the guarantor was United Student Aid Funds ("USAF")....

5. Upon Plaintiffs default under the Consolidation Loans, the lender made a claim under the guaranty with USAF, which took assignment of them. Subsequently, when Plaintiff filed [this] adversary proceeding, the Consolidation Loans were transferred to ECMC by operation of law; *See* letter from Joni M.—Anderson of USA Funds, dated January 31, 2016, a true copy of which is attached hereto as Exhibit C. Accordingly, ECMC holds all right, title, and interest in the Consolidation Loans.

ECMC Decl. ¶¶ 2–5.

13    By Stipulation of Dismissal dated February 29, 2016, UVM released and forgave, in its entirety, the Debtor's unpaid student account of $846.35, and agreed that it would take no further action to collect that debt. In turn, the Debtor dismissed the UVM from the adversary proceeding, with prejudice. *See* AP ECF No. 15.

14    At an October 27, 2017 status conference in this action, DOE advised that it intended to move to dismiss the case on the grounds that it is not a proper party to the litigation because it does not hold a claim against the Debtor, and to dismiss the fraud claim on the grounds that the Court lacks subject matter jurisdiction over those claims and because, in any event, DOE has not waived its sovereign immunity for such claims. At the Court's request, in furtherance of settlement discussions among DOE and the Debtor, DOE provided the Debtor with a letter setting forth the bases for its assertion that DOE should be dismissed from the Third Complaint. *See* AP ECF No. 89. During a November 16, 2017, conference, the Debtor advised that he intended to proceed with his litigation against DOE, and on November 21, 2017, the Court entered a scheduling order for DOE's motion to dismiss. AP ECF No. 99.

15    Fed. R. Civ. P. 12(b)(2) and 21 are made applicable to this adversary proceeding pursuant to Bankruptcy Rules 7012 and 7021, respectively.

16    FFELP was formerly known as the Guaranteed Student Loan Program and is authorized under Title IV, Part B of the Higher Education Act of 1965, *as amended*, 20 U.S.C. § 1071, *et seq.*

17    For example, 34 F.R.R. § 682.402(k)(1)(i)(A) mandates that the DOE reimburse the guaranty agency "for its losses on bankruptcy claims paid to lenders after ... [a] determination by the court that the loan is dischargeable under 11 U.S.C. 523(a)(8) with respect to a proceeding initiated under chapter 7 or chapter 11[.]"

18    That section states that "[c]ore proceedings include, but are not limited to ... determinations as to the dischargeability of particular debts." 28 U.S.C. § 157(b)(2)(I).

19    In her declaration, Ms. Hom stated, in relevant part, as follows:

   4. Based upon my review of the information contained in the [National Student Loan Database System ("NSLDS") ], I have confirmed that the [DOE] does not hold any loans for Michael Grabis.

   5. The information in the NSDLS indicates that Mr. Grabis has two consolidated Federal Family Education Loans ("FFEL") outstanding. Loan 1 was disbursed in the amount of $19,934 on June 24, 2005. Loan 2 was disbursed in the amount of $30,096 on June 24, 2005. Both of these loans are currently held by the Transitional Guaranty Agency ("TGA").

   6. It is my understanding that TGA has changed its name to [ECMC]; however, the NSLDA system still uses the TCA name.

   Ms. Hom's declaration is consistent with the ECMC Declaration filed in support of the ECMC Motion to Intervene. *See supra*, n. 12.

20    Specifically, the Debtor asserts:

   The Department of Education also being deceptive in not describing its ongoing interest in my loans in the future. The Department of Education will collect revenue from my loans if and when I start paying again or if I do not. As they stated they reimburse any party in this case for judgement of relief in my favor. They will also collect revenue from seizing tax returns and social security benefits if I remain in default. Again, they are intentionally deceiving the court on this issue.

   Debtor's Resp. at 3.

21      He says the following:

> The Department of Education admits in its response pleadings that it is an original creditor listed in my bankruptcy, that they have control and overall executive authority over the federal loans portion of my debt, and that they are paying or reimbursing ECMC to participate, and that ECMC did not intervene in the proceeding until after it was already filed. The DOE does not mention that Navient was the party that filed claim for all of my student loans when I filed the adversary proceeding and that Navient then simply transferred the federal portion of my debt to ECMC. The Department of Education was again being deceptive in not stating that Navient, who was and is a paid contractual servicer of the Department of Education, claimed the entirety of my loans.

Debtor's Resp. at 3.

22      In reaching that conclusion, the Court has considered two provisions in particular. First, section 106 of the Bankruptcy Code addresses the "deemed" waiver of sovereign immunity in bankruptcy cases. Pursuant to section 106(a)(1), the sovereign immunity of a governmental unit like DOE is abrogated to the extent set forth in section 523 of the Bankruptcy Code. 11 U.S.C. § 106(a)(1). However, that section makes no provision for the award of damages or other relief to parties to a proceeding to determine an exception to discharge. Thus, even if DOE was properly named as a defendant with regard to the Debtor's request for relief under section 523(a)(8) (which it was not), section 106(a) provides no basis for finding a waiver of DOE's immunity. *Cf. In re Griffin*, 415 B.R. 64, 68 (Bankr. N.D.N.Y. 2002) ("Code § 106(a) expressly abrogates sovereign immunity of a governmental unit with respect to Code § 362 and an award of actual damages for its violation."). Further, section 106(c) provides for a waiver of sovereign immunity to permit a debtor to offset claims against a governmental unit that constitute estate property against the claims or interests filed on behalf of such governmental unity. 11 U.S.C. § 106(c). It is inapplicable here because DOE has not filed a claim in the case. Second, the Federal Tort Claims Act ("**FTCA**") provides the framework under which the United States has consented to suits involving common law tort or negligence claims. *See* 28 U.S.C. §§ 2671–80. *See also Done v. Wells Fargo, N.A.*, No. 12–CV–04296, 2013 WL 3785627, at *5 (E.D.N.Y. July 18, 2013) ("The FTCA is generally the exclusive avenue for a suit against the United States for damages resulting from the negligent or wrongful act of any employee within the scope of his or her employment.") (citation omitted). However, it provides no benefit to the Debtor because it excludes fraud claims from the scope of its coverage. *See* 28 U.S.C. § 2680(h). *See also Done v. Wells Fargo, N.A.*, No. 12–CV–04296, 2013 WL 3785627, at *5 (E.D.N.Y. July 18, 2013) (noting that Congress has expressly carved out fraud claims from the FTCA's coverage) (citing 28 U.S.C. § 2680(h); *Sanchez Tapia v. U.S.*, 338 F.2d 416 (2d Cir. 1964) ) ); *see also Covington v. U.S. By & Through Dep't of Air Force*, 303 F. Supp. 1145, 1149 (N.D. Miss. 1969) ("All claims of fraud of any type are excluded from the operation of the Federal Tort Claims Act, and this would include both fraud in factum as well as in inducement, both actual and constructive fraud, intrinsic and extrinsic fraud, and other species of deceit or false representation. In the case at bar it was defendant's alleged misrepresentations which induced plaintiffs' reliance thereon, giving rise to their tort claim, and whether plaintiffs style their cause of action fraudulent inducement or otherwise, it still bottoms on alleged factual misrepresentations and is barred by [§] 2680(h).").

---

**End of Document**                                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1654703
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
E.D. Tennessee,
Winchester Division.

In re Steven Erich HUBBARD, Debtor;
Steven Erich Hubbard, Plaintiff
v.
Pennsylvania Higher Education Assistance Agency, Defendant.

Bankruptcy No. 13–15606.
|
Adversary No. 14–1010.
|
Signed April 25, 2014.

**Attorneys and Law Firms**

Steven Erich Hubbard, pro se.

E. Jerome Melson, Gentry, Tipton & McLemore, P.C., Knoxville, TN, for Defendant.

**MEMORANDUM**

SHELLY D. BUCKER, Bankruptcy Judge.

**\*1** The debtor Steven Erich Hubbard ("Debtor" or "Plaintiff") filed a complaint in this adversary proceeding against defendant Pennsylvania Higher Education Assistance Agency ("PHEAA" or "Defendant"). [Doc. No. 1, Complaint]. [1] He seeks the dischargeability of certain student loans pursuant to 11 U.S.C. § 523(a)(8). He further seeks declaratory relief from this court pursuant to 11 U.S.C. § 105(a) that certain student loans pose an "undue hardship" upon him.

The Defendant PHEAA has filed a motion to dismiss the Debtor's Complaint claiming that it is not the guarantor or owner of the loans, but is merely the servicer of the debt. [Doc. Nos. 5, 6]. The Debtor opposes the motion. [Doc. No. 8].

The court has reviewed the motion, the briefing of the parties, the record, and the applicable law and now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052. For the reasons explained *infra,* the court determines that the Defendant's motion for summary judgment will be GRANTED.

### I. Background

The Debtor filed his Chapter 7 voluntary bankruptcy petition on November 4, 2013. [Bankr.Case No. 13–15605, Doc. No. 1]. He listed the Defendant on his Schedule F as a creditor holding an unsecured nonpriority claim in the amount of $9,384.14. *Id.* at p. 22. The Debtor asserts that according to the National Student Loan Data System, he owes several student loans to PHEAA. He contends that he owes $14,016 in principal to PHEAA and $213 in accumulated interest. He further alleges that he obtained the student loans in order to attend Schoolcraft College, Washtenaw Community College, and Wayne State University and to obtain a bachelor's degree in accounting and finance. Complaint, ¶¶ 18,19.

The Debtor's Complaint contends that payment of such student loans constitutes an undue hardship pursuant to 11 U.S.C. § 523(a)(8). In the Complaint the Debtor describes his financial difficulties, including the financial obligations he is incurring to help support his permanently disabled mother. Complaint, ¶¶ 22–23. He asserts that his mother is unable to work and receives no governmental or private income to pay her living expenses or for her medical care. *Id.*

The Defendant's argument is simple. It alleges that it is not the owner or the guarantor of any of the loan obligations listed by the Debtor in the Complaint. Instead, it is the servicer of such loans for the United States Department of Education. The Defendant has filed an exhibit in support of its motion to dismiss that is the Affidavit of Lee C. Koller. [Doc. No. 5–1, ("Koller Affidavit") ]. In the affidavit, Mr. Koller, the Vice President of Loan Operations at "Fed Loan Servicing," a fictitious name used by PHEAA, indicates that he has personal knowledge of the Debtor's student loans at issue in this adversary proceeding. Koller Aff., ¶ 2. His affidavit indicates:

I am familiar with the accounts of Steven Erich Hubbard (collectively the "Hubbard accounts").

**\*2** Through Fed Loan Servicing, PHEAA's role in the management of the Hubbard accounts is limited to that [of] "Servicer".

As Servicer, Fed Loan Servicing performs functions in the administration and collection of student loan obligations under the terms of a servicing agreement with the owners of the loans that comprise the accounts.

Neither PHEAA nor Fed Loan Servicing, are an owner or holder of any loans that comprise the accounts of Steven Erich Hubbard, nor do they hold any financial interest in the loans that comprise the accounts.

Fed Loan Servicing services six (6) loans in the account of Steven Erich Hubbard on behalf of the holder and guarantor thereof, the United States Department of Education.

Koller Aff., ¶¶ 2–7.

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6), incorporated into adversary proceedings by Federal Rule of Bankruptcy Procedure 7012(b), allows a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "treat as true all of the well-pleaded allegations of the complaint." *Bower v. Federal Express Corp.,* 96 F.3d 200, 203 (6th Cir.1996)). In addition, a court must construe all allegations in the light most favorable to the plaintiff. *Bower,* 96 F.3d at 203 (citing *Sinay v. Lamson & Sessions,* 948 F.2d 1037, 1039 (6th Cir.1991)).

The Supreme Court has explained "an accepted pleading standard" that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). The complaint " 'must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.' " *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)).

In this adversary proceeding the Defendant attached the Koller Affidavit in support of its motion to dismiss. [Doc. No. 5–1]. When a party attaches material outside of the pleadings to support its motion to dismiss, the court should convert the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) to one for summary judgment pursuant to Fed.R.Civ.P. 56. *See Wysocki v. Int'l Business Machine Corp.,* 607 F.3d 1102, 1104 (6th Cir.2010). Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). The court concludes that the Debtor, representing himself pro se, has had an opportunity to respond to the Defendant's motion to dismiss. He has filed a response to the motion to dismiss, as well as an affidavit in support of an entry of default. [Doc. Nos. 7, 8]. In addition, because the court has determined to give the

Debtor time to move to add the U.S. Department of Education as a defendant, the Debtor will not be prejudiced by the court's conversion of the motion to dismiss into one for summary judgment.

**\*3** Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable to bankruptcy adversary proceedings. *See* Fed. R. Bank. P. 7056. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Morris v. Crete Carrier Corp.,* 105 F.3d 279, 280–81 (6th Cir.1997); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987); *Kava v. Peters,* No. 09–2327, 2011 WL 6091350, at *3 (6th Cir. Dec.7, 2011).

Once the moving party presents evidence sufficient to support a motion under Fed.R.Civ.P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *60 Ivy Street,* 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 211, 220 (6th Cir.1996).

### III. Analysis

Other courts have dismissed defendants who are not the parties in interest in a lawsuit. *See e.g., Cummings v. Jai Ambe, Inc.,* No. 11–CIV–8213, 2013 WL 620186, at *4 (S.D.N.Y. Feb. 13, 2013) (noting that "the previous case was dismissed because the Plaintiff brought the action against the incorrect defendants, not due to a lack of personal jurisdiction...."); *Bennett v. Strategic Restaurants Acquisition Co., LLC,* No. 09–295–C, 2009 WL 3150433, at *1, n. 1 (M.D.La. Sept.30, 2009) (noting that "[d]efendant Burger King moved to dismiss or remand the action arguing that it was not the proper party defendant and identified SRAC as the correct owner of the Burger King at issue.... The court granted defendant's motion to dismiss based on the fact that plaintiff named the wrong defendants....").

In *Cullinane v. Arnold* the district court addressed a motion to dismiss a case brought against individual employees of the Internal Revenue Service ("IRS") instead of the IRS itself. No. SA CV 97–779GLT(EEX), 1998 WL 241510 (C.D.Cal. Mar. 30, 1998). The court granted a motion to dismiss the individual employees, noting:

> However, since Plaintiff has not named the IRS as a party, but has named individual employees of the IRS as the Defendants, the Court must dismiss this complaint. The head of an agency or other agency officials sued in their official capacities are not proper party defendants under FOIA. The only proper party defendant to Plaintiff's FOIA action is the Internal Revenue Service. This Court will construe plaintiff's request for a writ of mandamus as a FOIA claim. Since Plaintiff's complaint names improper defendants, the motion to dismiss the claim is GRANTED. Plaintiff is given 45 days leave to amend in order to name the Internal Revenue Service as the proper defendant.

**\*4** *Id.* at *2.

In this proceeding the Debtor has failed to provide any evidence rebutting the Defendant's assertion that it is not the owner of the student loans at issue. He has failed to create a genuine issue of material fact regarding the ownership of the student loans. His response does not contend that PHEAA is the owner of the student loans, only that he must be allowed to join the proper party, the U.S. Department of Education through the use of Fed.R.Civ.P. 19.

The court concludes that this case bears similarities with the *Cullinane* case. It appears that the Debtor has sued the wrong party in suing the servicer of his student loan, rather than the owner or guarantor of the loan. However, because the Debtor is pursuing his claims *pro se,* the court will allow him additional time to move to amend his complaint to add the U.S. Department of Education as a defendant in this adversary proceeding. The Plaintiff's claims against the Defendant PHEAA will be dismissed, and the Defendant's motion will be granted.

### IV. Conclusion

As noted *supra,* the court concludes that the Debtor has failed to raise a genuine issue of material fact regarding whether the Defendant was the owner of his student loans. The Defendant has provided evidence in the form of an affidavit based on personal knowledge that it was not the owner or guarantor of the Debtor's student loans at issue. Therefore, the Defendant's motion to dismiss, converted to a motion for summary judgment, will be GRANTED. The Debtor will have 45 days from the date of this memorandum and accompanying order to move to amend his Complaint to add the U.S. Department of Education as a defendant.

A separate order will enter.

**All Citations**

Not Reported in B.R., 2014 WL 1654703

### Footnotes

1    All docket entry reference numbers refer to docket entries for Adversary Proceeding No. 14–1010, unless otherwise noted.

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 379468

Only the Westlaw citation is currently available.

United States Court of Appeals, Third Circuit.

IN RE: Gary BERNHARD

Gary Bernhard, Appellant

v.

Brian Kull; Theresa B. Kull; Paul A. Bucco, Esq.; Nathaniel J. Flandreau,

Esq.; John J. Dorsey, Esq.; David S. Makara, Esq.; Davis, Bucco & Ardizzi

No. 23-1358

|

Submitted Under Third Circuit L.A.R. 34.1(a) October 31, 2023

|

(Filed: February 1, 2024)

On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. No. 2-22-cv-00854), District Judge: Honorable Juan R. Sanchez

**Attorneys and Law Firms**

Anthony A. Frigo, Esq., Mark S. Pearlstein, Esq., Wayne, PA, for Gary Bernhard.

Paul A. Bucco, Esq., Davis Bucco & Makara, Conshohocken, PA, for Brian Kull, Theresa B. Kull.

Albert A. Ciardi, III, Esq., Daniel S. Siedman, Esq., Ciardi Ciardi & Astin, Philadelphia, PA, for Paul A. Bucco, Esq., Nathaniel J. Flandreau, Esq., John J. Dorsey, Jr., Esq., David S. Makara, Esq., Davis Bucco & Ardizzi.

Before: JORDAN, ROTH., and AMBRO, Circuit Judges

OPINION [*]

JORDAN, Circuit Judge.

**\*1** The Bankruptcy Court entered a discharge order in Gary Bernhard's 2011 Chapter 7 bankruptcy proceeding, which made Bernhard no longer liable for his debt to Brian and Theresa Kull. The Bankruptcy Court ruled that the Kulls violated the order when they attempted to collect on their loans, but the Court did not hold the Kulls in contempt. The District Court affirmed. Bernhard now appeals, arguing that the Kulls and their attorneys did not have an objectively reasonable basis for concluding that their collection efforts might be lawful under the discharge order.

## I. BACKGROUND [1]

Bernhard was an owner of GB Excavating ("GBE"). In 2008, GBE experienced financial difficulties, causing Bernhard to approach his long-time friend, Brian Kull, for a loan. Kull made two loans to Bernhard from an account he held jointly with his wife, Theresa: a loan for $10,000 in 2008, and another for $50,000 in 2009. Two months after the second loan, Bernhard signed a promissory note ("Note 1"), payable to Brian for $60,000, plus interest. An appraisal for twelve pieces of equipment was attached to the note, with two items – a CAT Crawler and a Bomag Roller – circled to indicate that those items were to be considered security for repayment. Over a period of five months in 2009, Bernhard or GBE paid $3,500 on the note.

In early 2011, Bernhard told Brian Kull that he was considering filing for bankruptcy. When Kull asked whether the debt to him would be included in the proceeding, Bernhard said, "no." (App. at 29.) In March 2011, GBE ceased operations. Two months later, it sold the Bomag Roller for $16,000, with none of the proceeds going to the Kulls.

In July 2011, Bernhard initiated a Chapter 7 bankruptcy proceeding in the Eastern District of Pennsylvania. In his petition, he listed both personal and GBE debts. Bernhard did not list Note 1, nor did he inform the Trustee or his attorney of the debt. He did not inform the Kulls of the bankruptcy filing. They did not learn of the bankruptcy until December 15, 2011, after the deadline to file an objection or complaint concerning Note 1's dischargeability.

In February 2012, Bernhard signed a second promissory note ("Note 2") with the Kulls for $63,800. Note 2 covered the unpaid principal amount of the 2008 and 2009 loans, plus accrued interest.[2] Bernhard also redrafted his will to include Brian. For the next six years, Bernhard made small, intermittent payments to the Kulls, totaling $11,177.66.

After seven years, Bernhard still had not repaid the loan. In February 2019, the Kulls, through their attorneys, the Davis Bucco Appellees,[3] sued Bernhard in the Court of Common Pleas of Montgomery County, alleging unjust enrichment and breach of contract based on Note 2. Bernhard argued in response that the debt had been discharged by his 2011 bankruptcy proceeding. The Montgomery County Court disagreed and overruled his objections. Bernhard tried to remove the case to the District Court, but the matter was remanded for lack of jurisdiction. Bernhard then initiated an adversary proceeding in the Bankruptcy Court, alleging that the Kulls and their attorneys were in contempt of the December 15, 2011 Discharge Order. He asked for an order requiring the Appellees to cease all collection efforts and pay his attorney's fees.

**\*2**  After a trial, the Bankruptcy Court held that the Kulls' debt was covered by the discharge order and that their attempts to collect on the debt violated the order, but the Court declined to hold the Appellees in contempt and to award attorney's fees. Bernhard appealed the Bankruptcy Court's contempt ruling and the denial of his request for attorney's fees. The District Court affirmed. This timely appeal followed.

## II. DISCUSSION [4]

The only issue before us relates to the Bankruptcy Court's denial of Bernhard's contempt motion.[5] In *Taggart v. Lorenzen*, the Supreme Court said that a bankruptcy court may hold a creditor in contempt when "there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." 139 S. Ct. 1795, 1801 (2019). By holding that the Kulls and the Davis Bucco Appellees were not in contempt, the Bankruptcy Court found that they had an objectively reasonable basis to think that their collection efforts did not violate the discharge order. Bernhard contests that application of *Taggart* to the facts of this case.

A discharge in a bankruptcy proceeding "operates as an injunction against the commencement or continuation of an action ... to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]" 11 U.S.C. § 524(a)(2). To implement or enforce discharge injunctions, bankruptcy courts turn to § 105 of the Bankruptcy Code, which enables them to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title," and to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules[.]" § 105(a). "[T]he weight of circuit authority" holds that "§ 105(a) does not authorize separate lawsuits as a remedy for bankruptcy violations[.]" *In re Joubert*, 411 F.3d 452, 456 (3d Cir. 2005); *see also In re Cont'l Airlines*, 203 F.3d 203, 211 (3d. Cir. 2000) ("[S]ection 105(a) has a limited scope. It does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code." (internal quotation marks omitted)). So, the remedy for a violation of discharge order is a civil contempt order. *Cf. Taggart*, 139 S. Ct. at 1801 (sections 524(a)(2) and 105(a) "authorize a court to impose civil contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order"); *see also* 4 *Collier on Bankruptcy* ¶ 524.02[2][a] (16th ed. 2022) ("Civil contempt, imposed under the court's section 105 powers, is the normal sanction for violations of the discharge injunction.").

**\*3** A court may impose sanctions for civil contempt when there is clear and convincing evidence that (1) a valid order of the court existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order. *Robin Woods, Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994); *see In re Englert*, 495 B.R. 266, 271 (Bankr. W.D. Pa. 2013) ("[T]he debtors received a discharge, the defendant was aware of the discharge and th[e] collection efforts were nevertheless continued."). As noted earlier, the Supreme Court has specified in *Taggart* that a creditor may be held in contempt "when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." 139 S. Ct. at 1801. Only when "there *is no fair ground of doubt* as to whether the order barred the creditor's conduct" is a contempt holding warranted. *Id.* at 1799.

Bernhard argues that the Bankruptcy Court "wrongfully concluded" under *Taggart* that the Appellees had an objectively reasonable basis for concluding that their conduct was lawful, and that the District Court "affirmed [the Bankruptcy Court] without addressing the issues concerning ... mis-application of law." (Opening Br. at 1, 7.) But his arguments are unavailing.

The Bankruptcy Court made sixty-five factual findings in its well-considered opinion, and Bernhard contests none of them. (App. 25-34.) He merely argues that the Bankruptcy Court should have considered other facts more heavily when applying *Taggart* and thus "mis-applied" the law. (Opening Br. at 4.) He ignores the Bankruptcy Court's finding that his own "actions undoubtedly ... misled the Kulls into the erroneous, but reasonable belief, that their debt had been excluded from [his] bankruptcy and had not been discharged. In so doing, Bernhard himself created fair grounds to doubt that the discharge order barred" the Appellees' conduct. (App. at 13.)

We agree. Bernhard's own actions "obscured the applicability of the discharge order to the debt owed to the Kulls." (App. at 52.) Because there was fair ground to doubt whether the Kulls and the Davis Bucco Appellees' actions were barred by the discharge order, Bernhard's effort to add contempt sanctions to the disappointment and loss he has already heaped on his one-time friends and their attorneys fails.

### III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's affirmance of the Bankruptcy Court's judgment.

### All Citations

Not Reported in Fed. Rptr., 2024 WL 379468

### Footnotes

| | |
|---|---|
| \* | This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent. |
| 1 | We have looked to the Findings of Fact outlined in the Bankruptcy Court's Opinion, as adopted by the District Court, and verified through our and the District Court's review of the record. |
| 2 | Neither Note 1 nor Note 2 had agreed upon payment schedules or a due date for full repayment. |
| 3 | For convenience, we will refer to all Appellees other than the Kulls – the Davis, Bucco & Ardizzi law firm, Paul A. Bucco, Nathaniel J. Flandreau, John J. Dorsey, and David S. Makara – as the "Davis Bucco Appellees." |
| 4 | The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157 and 1334. The District Court had jurisdiction under 28 U.S.C. § 158(a). We have jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291. The District Court sat as an appellate court when reviewing the Bankruptcy Court's order, so "we review the Bankruptcy Court's legal determinations *de novo* and review its factual determinations for clear error." *In re Bocchino*, 794 F.3d 376, 379-80 (3d Cir. 2015). "A bankruptcy |

court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts." *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999) (citation omitted).

5     While, at times, Bernhard disputes the Bankruptcy Court's factual findings, as well as legal determinations made by the District Court and Bankruptcy Court, the sole issue argued on appeal is whether the District Court misapplied the test set forth in *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019).

---

**End of Document**               © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 256770
Only the Westlaw citation is currently available.
United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

IN RE: Clarice Joann DUITS, Debtor

CASE NO. 14-05277-RLM-13
|
Signed January 15, 2020

Attorneys and Law Firms

J. Andrew Sawin, Richard John Shea, Jr., Sawin & Shea LLC, Indianapolis, IN, for Debtor.

### ORDER DENYING DEBTOR'S MOTION FOR ORDER OF CONTEMPT

Robyn L. Moberly, United States Bankruptcy Judge

**\*1** This matter came for hearing before the Court on January 6, 2020 on the Debtor's Motion for Order of Contempt, seeking sanctions against National Collegiate Student Loan Trust ("NCT") and its attorneys, Weltman, Weinberg & Reis Co., LPA, ("Weltman") for their alleged willful violations of the discharge injunction. For the reasons stated below, the court denies the motion.

### *Background*

The debtor obtained no fewer than five loans between 2005 and 2007 from JPMorgan Chase ("Chase") to pay education expenses. In each case, the debtor signed a "non- negotiable credit agreement". In at least two of the credit agreements, the following language appeared in bold:

> **I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code. Specifically, I understand that you have purchased a guaranty of this loan, and that loan is guaranteed by The Education Resource Institute, Inc. ("TERI"), a non-profit institution.**

The remaining credit agreements contained substantially similar, and additional, language:

> **I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at the School. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resource Institute, Inc. ("TERI"), a non-profit institution or (b) this is a qualified education loan as defined in the Internal Revenue Code. This**

**means that if, in the event of bankruptcy, my other debts are discharged, I will probably still have to pay this loan in full.**

The debtor does not dispute that TERI guaranteed the loans.

The debtor filed her chapter 13 case on June 3, 2014. By that point, NCT had acquired the loans and subsequently filed 5 separate proofs of claim in the bankruptcy case. No action to determine the dischargeability of the loans was filed during the pendency of the case and the debtor received a chapter 13 discharge on September 21, 2019.

In early November 2019, Weltman sent the debtor letters seeking collection of the outstanding loans. The debtor has moved for the Court to hold NCT and Weltman in contempt of the discharge order and seeks sanctions for violation of the discharge injunction. Section 524(a)(1) enjoins the collection of discharged debts. The debtor maintains that the loans here were discharged because they do not fit under the exceptions to discharge found in § 523(a)(8).

### *Section 523(a)(8)*

Section 523(a)(8) provides that a discharge under Section 727 does not discharge a debt:

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for--

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

**\*2** (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

This section envisions three distinct scenarios under which an education loan or benefit is excepted from discharge. The first (§ 523(a)(8)(A)(i)) deals with loans where government units or nonprofit institutions are involved. The third (§ 523(a)(8)(B)) involves education loans that are defined under in 26 U.S.C. § 221(d) as "qualified education loans".

The debtor argues that the loans were not excepted from discharge under the second scenario in 523(a)(8)(A)(ii) and in support of that assertion refers the Court to the case of *Crocker v. Navient Solutions, LLC (In re Crocker),* 941 F.3d 206 (5th Cir. 2019). The debtor in *Crocker* successfully argued that the loans she borrowed to take the bar exam and use for career training were discharged and thus, the lender who pursued collection post discharge was in violation of the discharge injunction.

The loans in *Crocker* did not fit under the first scenario of § 523(a)(8)(A)(i) because they were private loans that had not been made or guaranteed by a governmental unit or a nonprofit institution. Nor did they qualify as education loans under the Internal Revenue Code under the third scenario of § 523(a)(8)(B). The only alternative for the lender was to argue that the loans were excepted from discharge under the second scenario of § 523(a)(8)(A)(ii). The *Crocker* court held that § 523(a)(8)(A)(ii) applies "only to education payments that are not initially loans but whose terms will create a reimbursement obligation upon the failure of conditions of the payments" and that the "educational benefit" provided for in that section "is limited to conditional payments with similarities to scholarships and stipends". *Id.* at 223. The obligation in *Crocker* definitely was a "loan" and repayment was unconditional. It did not fit within the § 523(a)(8)(A)(ii) exception and thus was discharged.

The Court agrees that the loans here do not fit under the second scenario of § 523(a)(8)(A)(ii) and thus are not excepted from discharge *under that section* for those same reasons. However, an education loan is nonetheless excepted from discharge if it fits any of the scenarios under § 523(a)(8).

Based on the evidence presented, the loans here fit both the first and the third scenarios. They were initially funded by a private lender but were guaranteed by TERI, a nonprofit institution. Even if the debtor had shown that TERI did not fund the loans or even pay the initial lender on the guaranty is of no significance because TERI's guaranty "helps fund a program because it encourages a lender to extend credit that may not be otherwise available." *In re Greer-Allen*, 602 B.R. 831, 838 (Bankr. D. Mass. 2019). A majority of the courts considering the dischargeability of TERI-guaranteed loans have held that a TERI guarantee comes under the broad definition of "funded" as that term appears in § 523(a)(8)(A)(i). See, *In re O'Brien*, 419 F.3d 104, 106 (2nd Cir. 2005) (TERI's guarantee satisfies the "funded" requirement of § 523(a)(8)(A)(i) because TERI was clearly devoting some of its financial resources to supporting the guaranty program); *In re Taratuska*, Civil Action No. 07-11938-RCL, 2008 WL 4826279 at *4 (D. Mass. August 25, 2008) (TERI played a meaningful part in procurement of the loan because the for-profit entity's funding of the loan was conditioned upon TERI's participation in guaranteeing the loans); *In re Holguin,* No. 15-11410-j7, Adv. No. 18-1042J, 2019 WL 6880081 (Bankr. D. N. M. December 17, 2019.

**\*3** The credit agreements signed by the debtor provided, and the debtor does not dispute, that the loans were also "qualified education loans" as defined in the Internal Revenue Code, meeting the third scenario in § 523(a)(8)(B).

Accordingly, the loans were excepted from discharge under § 523(a)(8)(A)(i) and § 523(a)(8)(B). NCT and Weltman attempted to collect debts that had not been discharged and that is not contemptuous conduct under § 524(a)(1). The Debtor's motion is DENIED. [1]

**SO ORDERED.**

**All Citations**

Not Reported in B.R. Rptr., 2020 WL 256770

## Footnotes

1    Post hearing, the debtor and creditor brought to the Court's attention for the first time that the TERI program is now defunct. The Court gave the debtor a week in which to review the effect of TERI's current defunct status upon the loans here, and, if TERI's later demise is relevant, to request an additional hearing. The debtor has not requested an additional hearing. While not an issue in this case at this point, the Court surmises that it would be extraordinarily unusual for TERI's subsequent demise to retroactively alter JPMorgan Chase's, and later, NCT's, contractual rights with respect to TERI's obligations under the guaranties.

2024 WL 264034

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Renee LAMANDO, Plaintiff,

v.

ROCKET MORTGAGE, Defendant.

3:23-CV-147 (MAD/ML)

|

Signed January 24, 2024

**Attorneys and Law Firms**

TAMIR SALAND, ESQ., STEIN SAKS, PLLC, One University Plaza - Suite 620, Hackensack, New Jersey 07601, Attorney for Plaintiff.

MATTHEW SINON MULQUEEN, ESQ., BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, 165 Madison Avenue, Suite 2000, Memphis, Tennessee 38103, Attorney for Defendant.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, United States District Judge:

## I. INTRODUCTION

**\*1** On February 3, 2023, Plaintiff Renee Lamando commenced this action against Equifax Information Services, LLC, Experian Information Solutions, Inc., and Rocket Mortgage alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq. See* Dkt. No. 1. Plaintiff voluntarily dismissed her claims against Experian Information Solutions, Inc. and stipulated to dismissal of her claims against Equifax Information Services, LLC. *See* Dkt. Nos. 27, 28, 31, 32. As such, Rocket Mortgage is the only remaining Defendant.

Presently before the Court is Rocket Mortgage's ("Defendant") motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). [1] *See* Dkt. No. 16. Plaintiff responded and Defendant replied. *See* Dkt. Nos. 18, 22. For the following reasons the motion is granted.

## II. BACKGROUND

Plaintiff entered into an "FHA mortgage" agreement on March 10, 2016, with Rocket Mortgage. *See* Dkt. No. 1 at ¶ 19; Dkt. No. 18-2 at 5. [2] Rocket Mortgage is a "furnisher of information" to credit reporting agencies. *See* Dkt. No. 1 at ¶¶ 12, 66-69; *see also* 15 U.S.C. § 1681s-2. On June 5, 2019, Plaintiff filed for Chapter 7 bankruptcy. *See* Dkt. No. 1 at ¶ 14; Dkt. No. 18-2 at 7. Plaintiff's Experian credit report listed her mortgage with Rocket Mortgage as "Discharged through Bankruptcy Chapter 7," with an "Original Balance" of $121,754, a "Monthly Payment" of $0, and the "Highest Balance" of $0. Dkt. No. 1 at ¶ 19; Dkt. No. 18-2 at 5. Plaintiff states that "a consumer's mortgage is included by default," in bankruptcy, but because she "continued to pay off her mortgage subsequent to her bankruptcy," her "mortgage was therefore not discharged in Chapter 7 Bankruptcy." Dkt. No. 1 at ¶¶ 15-17. "On or about October 15, 2021, Plaintiff paid this account in full." *Id.* at ¶ 21. Plaintiff alleges that

her mortgage account is "erroneously reporting as if her mortgage was discharged in bankruptcy." *Id.* at ¶ 18. Plaintiff notified Equifax Information Services, LLC and Experian Information Solutions, Inc. of her dispute, *see id.* at ¶¶ 22-29, and claims that such delivery put Defendant on notice of the issue. S*ee id.* at ¶¶ 67, 75. In its answer to Plaintiff's complaint, Defendant "admits that it was made aware of disputes raised by Plaintiff with regard to credit reporting on the mortgage loan at issue." Dkt. No. 15 at ¶ 42. Plaintiff's credit report indicates that she disputed the Chapter 7 bankruptcy information in November 2022. *See* Dkt. No. 18-2 at 6-7. Her dispute was "[r]einvestigat[ed]" but "[t]his item remained unchanged." *Id.* The credit report noted that the Chapter 7 bankruptcy would be "[o]n [r]ecord [u]ntil Jun[e] 2029." *Id.*

 **\*2**  Plaintiff alleges that Defendant violated the FCRA by failing to: (1) investigate Plaintiff's dispute; (2) review all relevant information; and (3) "correctly report results of an accurate investigation to the credit reporting agencies." Dkt. No. 1 at ¶ 69. Plaintiff contends that Defendant's actions resulted in injuries to Plaintiff in the form of "loss of credit, loss of the ability to purchase and benefit from credit, a chilling effect on future applications for credit, and the mental and emotional pain, anguish, humiliation and embarrassment of credit denials." *Id.* at ¶ 82.

Defendant moves to dismiss Plaintiff's complaint on five grounds: (1) the credit reporting is accurate; (2) Plaintiff failed to satisfy a condition precedent to commencing this action; (3) Plaintiff's issues are legal rather than factual; (4) Plaintiff lacks Article III standing; and (5) Defendant did not willfully violate the FCRA. *See* Dkt. No. 16-1 at 2-7.

## III. DISCUSSION

### A. Legal Standards

#### *1. Standard of Review*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). [3]  In considering legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers*, 282 F.3d at 152-53).

To survive a motion to dismiss, a party need only plead "a short and plan statement of the claim," FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007) (citation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 555 U.S. at 678, 129 S.Ct. 1187 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of the entitlement of relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Ultimately, "when the allegations in the complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, 127 S.Ct. 1955, or where a plaintiff has "not nudged [its] claim across the line from conceivable to plausible the[ ] complaint must be dismissed[,]" *id.* at 570, 127 S.Ct. 1955.

#### *2. Fair Credit Reporting Act*

The FCRA regulates credit reporting to ensure "confidentiality, accuracy, relevancy, and proper utilization of" consumers' information. 15 U.S.C. § 1681(b). The FCRA "imposes several duties on those who furnish information to consumer reporting

agencies." *Longman v. Wachovia Bank, Nat'l Ass'n*, 702 F.3d 148, 150 (2d Cir. 2012) (citing 15 U.S.C. § 1681s-2). "Among these are duties to refrain from knowingly reporting inaccurate information, ... and to correct any information they later discover to be inaccurate." *Id.* (citing 15 U.S.C. § 1681s-2(a)(1)-(2)). The FCRA provides consumers the right to dispute any information reported to a credit reporting agency. *See id.* (citing 15 U.S.C. §§ 1681g(c)(1)(B)(iii), 1681i(a)(1)(A), 1681s-2(a)(8)).

> **\*3** If a dispute is filed with the agency, both the agency and the furnisher of that information have a duty to reasonably investigate and verify that the information is accurate. *See* §§ 1681i(a)(1)(A), 1681s-2(b). If a dispute is filed directly with the furnisher, the furnisher only has a duty to investigate in certain circumstances established by regulation. *See* § 1681s-2(a)(8); 16 C.F.R. § 660.4; *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 35 & n.8 (1st Cir. 2010).

*Id.*

"[A]fter a furnisher receives notice from a [credit reporting agency] that a consumer disputes the 'completeness or accuracy' of furnished information, the furnisher must (1) investigate the disputed information, (2) review all relevant information provided by the CRA, and (3) report the results of the investigation to the CRA." *Mohnkern v. Equifax Info. Servs., LLC*, No. 19-CV-6446, 2021 WL 5239902, *3 (W.D.N.Y. Nov. 10, 2021) (quoting 15 U.S.C. §§ 1681s-2(b)(1)(A)-(C)). Section 1681s-2 requires that a furnisher of information "shall not furnish any information relating to a consumer to any consumer reporting agency if the [furnisher] knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A). "Reasonable cause to believe that the information is inaccurate" is defined as "having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information." *Id.* § 1681s-2(a)(1)(D). The Code of Federal Regulations defines "accuracy" as

> that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly: (1) Reflects the terms of and liability for the account or other relationship; (2) Reflects the consumer's performance and other conduct with respect to the account or other relationship; and (3) Identifies the appropriate consumer.

12 C.F.R. § 1022.41(a).

## B. Defendant's Motion to Dismiss

### *1. Article III Standing*

Defendant argues that Plaintiff has not "allege[d] any facts demonstrating that the harm she complains of was not simply caused by her admitted bankruptcy and its effects on her credit score." Dkt. No. 16-1 at 4. Therefore, Defendant moves to dismiss Plaintiff's complaint for failure to establish "any injury from the alleged violation of the FCRA" sufficient to demonstrate Article III standing. *Id.* at 6. Plaintiff argues "that the inaccurate information contained in the credit reports was disseminated" to potential creditors, establishing an injury in fact, which is traceable to Defendant's conduct. Dkt. No. 18 at 12.

"To establish Article III standing under the U.S. Constitution, a plaintiff must show (1) an injury in fact (2) caused by the defendant, (3) that would likely be redressable by the court." *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 279-80 (2d Cir. 2023) (citing *Thole v. U.S. Bank Nat'l Ass'n*, 590 U.S. ——, 140 S. Ct. 1615, 1618, 207 L.Ed.2d 85 (2020)). "[A] federal court may resolve only 'a real controversy with real impact on real persons.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (quoting *American Legion v. American Humanist Ass'n*, 588 U.S. ——, 139 S. Ct.

2067, 2103, 204 L.Ed.2d 452 (2019)). "It is well established in principle that the pleading standard for constitutional standing is lower than the standard for a substantive cause of action." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018). In the context of an FCRA claim, the Supreme Court has explained that "a bare procedural violation, divorced from any concrete harm" is not enough to satisfy the injury-in-fact requirement of Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). The Supreme Court explained in *TransUnion* that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424, 141 S.Ct. 2190 (quoting *Spokeo, Inc.*, 578 U.S. at 341, 136 S.Ct. 1540).

**\*4** "The standing inquiry [can be] distinguishe[d] between (i) credit files that consumer reporting agencies maintain internally and (ii) the consumer credit reports that consumer reporting agencies disseminate to third-party creditors." *TransUnion*, 594 U.S. at 434, 141 S.Ct. 2190 (concluding that the plaintiffs who alleged that their "reports were disseminated to third-party businesses" had standing, but the plaintiffs whose information was "not provide[d] ... to any potential creditors" lacked standing). "Where a plaintiff claims that an improper notation on his credit report resulted in a credit score reduction that could cause him reputational and financial harm, the absence of allegations of dissemination to third parties requires dismissal." *Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 392 (E.D.N.Y. 2022) (collecting cases); *see also Swainson v. Lendingclub Corp.*, No. 21-CV-5379, 2022 WL 2704629, *7-8 (S.D.N.Y. June 24, 2022) (concluding that an allegedly decreased credit score, without evidence of dissemination of that score, did not confer standing).

In Plaintiff's complaint, she alleges "soft and hard pulls on [her] credit reports," by potential credit lenders. Dkt. No. 1 at ¶ 41. [4] She contends that, due to the inaccuracies in her credit report caused by Defendant's actions and inactions, she was denied five new lines of credit. *See* Dkt. No. 1 at ¶¶ 34-41. Plaintiff's Experian credit report reflects these "pulls." Dkt. No. 18-2 at 7-30.

Defendant argues that Plaintiff does not address how the bankruptcy itself could have been the cause of her credit denials. *See* Dkt. No. 16-1 at 5-6. Defendant correctly notes that conclusory allegations that "are purely speculative" are not enough, on their own, to create standing. *See* Dkt. No. 22 at 5-6; *see also Wan v. TransUnion LLC*, No. 22-CV-115, 2022 WL 955290, *1-2 (E.D.N.Y. Mar. 30, 2022) (finding no standing because (1) "[the p]laintiff's allegations that she suffered 'limited credit opportunities' and harm to her 'otherwise positive credit' do not constitute concrete injury" absent "an allegation that these circumstances resulted in a materialized injury[ ] or a sufficiently imminent and substantial risk of injury" and (2) "[the p]laintiff's allegations that inaccurate information about her was distributed ... to one or more third parties similarly does not constitute concrete injury because the complaint does not clearly allege any facts demonstrating disclosure to third parties") (citation omitted).

At this stage, accepting Plaintiff's allegations as true, and as corroborated by her credit report, she has sufficiently alleged an injury—denial of credit—that is traceable to Defendant's conduct—not reporting that she paid off her mortgage. *See Spokeo, Inc.*, 578 U.S. at 335, 136 S.Ct. 1540 ("[T]he FCRA applies to companies that regularly disseminate information bearing on an individual's 'credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living' ") (quoting 15 U.S.C. § 1681a(d)(1)); *see also TransUnion*, 594 U.S. at 432-33, 141 S.Ct. 2190 (holding that when the plaintiffs' credit "reports were disseminated to third parties" those plaintiffs "suffered a concrete injury in fact under Article III," similar to "the harm associated with the tort of defamation").

Although it may be true that "[b]ankruptcy is known to have a significant negative effect on an individual's credit score," Dkt. No. 16-1 at 6, Plaintiff sufficiently alleges that Rocket Mortgage should have reported subsequent payments on her mortgage and that the failure to do so resulted in the denials of credit because creditors did not have all of the information. As such, the Court denies Defendant's motion on this ground.

### *2. Accuracy of Credit Report*

**\*5** Defendant argues that Plaintiff's complaint should be dismissed because her credit report was accurate. *See* Dkt. No. 16-1 at 2-3. Plaintiff states that she "subsequently paid off the debt in its entirety after the discharge, which is not reflected on [her]

credit report." Dkt. No. 18 at 18; *see* Dkt. No. 1 at ¶¶ 32, 33, 44. She contends that "all relevant facts are conceded by the parties. Plaintiff owed the debt, her personal liability was discharged in bankruptcy, but the debt remained and she paid it in full after the discharge." Dkt. No. 18 at 26.

"To state a claim under section 1681s-2(b) of the FCRA ... a plaintiff must allege that '(1) a credit furnisher received notice of a credit dispute from a [CRA][,] [ ] (2) the furnisher negligently or willfully failed to conduct a reasonable investigation' " and (3) "that the information reported by a furnisher to a CRA was inaccurate." *Mohnkern*, 2021 WL 5239902, at *3 (quotations omitted); *see also Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023) (citing *Shimon v. Equifax Info. Sols., Inc.*, 994 F.3d 88, 91 (2d Cir. 2021)) ("[T]o prevail on a section 1681e claim against a consumer reporting agency, it is necessary for a plaintiff to establish, among other things, that a credit report contains an inaccuracy"). "[A] credit report is inaccurate 'either when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect.' " *Mader*, 56 F.4th at 269 (quoting *Shimon*, 994 F.3d at 91); *see Khan v. Equifax Info. Servs., LLC*, No. 18-CV-6367, 2019 WL 2492762, *3 (E.D.N.Y. June 14, 2019) (collecting cases); *see also Shimon*, 994 F.3d at 91-92. "[T]he threshold question is whether the challenged credit information is accurate; if the information is accurate, no further inquiry ... is necessary." *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 209 (D. Conn. 2013) (collecting cases); *see also Khan*, 2019 WL 2492762, at *3; *Mohnkern*, 2021 WL 5239902, at *3.

As recently explained by the District of Connecticut,

> it is appropriate to resolve the instant dispute at this procedural juncture. Although "[t]he question of whether information that is 'technically correct' is materially misleading is generally a matter for the jury" to decide, where "the parties provide the reported information in dispute and the court determines only one reasonable interpretation of the report exists, a court may determine the accuracy of the report as a matter of law."

*Boyer v. TransUnion, LLC*, No. 21-CV-00918, 2023 WL 1434005, *4 (D. Conn. Feb. 1, 2023) (quoting *Gibbs v. TransUnion LLC*, No. 21-CV-00667, 2021 WL 4439546, *2 (E.D. Pa. Sept. 28, 2021), *aff'd*, No. 22-1075, 2023 WL 193157 (3d Cir. Jan. 4, 2023)).

Plaintiff admits that "a consumer's mortgage is included by default" in bankruptcy filings. *See* Dkt. No. 1 at ¶ 15. However, Plaintiff contends that her full payment of the mortgage, after filing for Chapter 7 bankruptcy, negates the "discharge in bankruptcy" that is reported on her credit report. *See id.* at ¶¶ 13-18; *see also* Dkt. No. 18 at 26.

In detailing the differences between debt and liability in a mortgage, the Supreme Court explained that

> [a] mortgage is an interest in real property that secures a creditor's right to repayment. But unless the debtor and creditor have provided otherwise, the creditor ordinarily is not limited to foreclosure on the mortgage property should the debtor default on his obligation; rather, the creditor may in addition sue to establish the debtor's *in personam* liability for any deficiency on the debt and may enforce any judgment against the debtor's assets generally. *See* 3 R. Powell, The Law of Real Property ¶ 467 (1990). A defaulting debtor can protect himself from personal liability by obtaining a discharge in a Chapter 7 liquidation. *See* 11 U.S.C. § 727. However, such a discharge extinguishes only "the personal liability of the debtor." 11 U.S.C. § 524(a) (1). Codifying the rule of *Long v. Bullard*, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), the Code provides that a creditor's right to foreclose on the mortgage survives or passes through bankruptcy.

**\*6** *Johnson v. Home State Bank*, 501 U.S. 78, 82-83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). The legislative history of section 524 of the Bankruptcy Code explains that bankruptcy "is intended to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it. In effect the discharge extinguishes the debt, and creditors may not attempt to avoid that." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 365-66, 1977 WL 9628, *366 (1977).

In *Horsch v. Wells Fargo Home Mortgage*, 94 F. Supp. 3d 665 (E.D. Pa. 2015), the Eastern District of Pennsylvania was faced with an issue similar to that which is presented in this case whereby the "debtor plaintiffs claim[ed] that their credit reports

were inaccurate or incomplete because they did not reflect any payments made to their mortgage servicers after the Notes were discharged in bankruptcy." *Id.* at 674. Relying on a Tenth Circuit case, the court agreed that the plaintiffs "making payments on the mortgage to prevent foreclosure did not mean that [they] truly owed anything on the discharged account." *Id.* (citing *Schueller v. Wells Fargo & Co.*, 559 Fed. Appx. 733, 737 (10th Cir.) *cert. denied*, 574 U.S. 908, 135 S.Ct. 275, 190 L.Ed.2d 203 (2014)). The court noted that because "a person's credit report by definition provides information about the debts owed by that person[,] ... it is accurate to report zero balances on these accounts after the Notes are discharged in bankruptcy." *Id.* at 675 (footnote and quotation omitted).

The Eastern District of Michigan agreed, stating in *Groff v. Wells Fargo Home Mortgage, Inc.*, 108 F. Supp. 3d 537 (E.D. Mich. 2015), that "[a] discharge in bankruptcy extinguishes the debtor's personal liability for the debt, but leaves 'intact' the remedy against the property, ... characterized as 'an action against the debtor *in rem.*' " *Id.* at 540 (quoting *Schueller*, 559 Fed. Appx. at 737; *see also Jarvis v. Fed. Nat'l Mortg. Assoc.*, No. 16-CV-05194, 2016 WL 7243754, *2 (W.D. Wash. Dec. 15, 2016) ("Bankruptcy discharges personal financial liability on instruments named in petition [including] on a promissory note and on the underlying deed of trust, though, the deed of trust holder maintains an *in rem* interest on the property"). The *Groff* court concluded that, "[t]here was nothing false or 'inaccurate' about the bank's reporting of the mortgage loan account as closed, with a zero balance," because "[t]he plaintiff d[id] not dispute that his personal obligation to pay the note was discharged by his bankruptcy, and he d[id] not contend that [the defendant] ever made any effort to compel him to make further payments, or that he would have had any obligation to do so if it had." *Id.* at 541; *see also Schueller*, 559 Fed. Appx. at 737 (noting that the plaintiff "cited no authority requiring Wells Fargo to report his post-bankruptcy mortgage payments").

> Moreover ... any report of payments voluntarily made by the [plaintiff] as relating to the discharged mortgage loan would suggest to anyone viewing the plaintiff's credit report that the bank was engaged in exactly the conduct prohibited by the bankruptcy discharge—collecting or attempting to collect money from [the plaintiff] to satisfy a previously discharged debt. That reporting would itself have been inaccurate and false, because it would not accurately and completely reflect the truth that the plaintiff's debt had been extinguished.

**\*7** *Id.* at 542; *see also Lawrence v. Paramount Residential Mortg. Grp., Inc.*, No. 19-CV-02103, 2020 WL 6689371, *3 (D. Or. July 20, 2020) (granting the defendant's motion to dismiss because the plaintiff's "complaint fails to allege facts intimating that [the] plaintiff's debt with [the defendant] was not discharged through bankruptcy or that her payments were not voluntary;" therefore, the "complaint fails to plausibly allege that [the defendant]'s reporting was incomplete or inaccurate"); *Blanch v. TransUnion, LLC*, 333 F. Supp. 3d 789, 793 (M.D. Tenn. 2018) (granting the defendant's motion to dismiss because "[t]here was noting false or 'inaccurate' about [the defendant] reporting [the plaintiff]'s accounts as included in her bankruptcy, closed, and with a zero balance"). This logic applies with equal force here as Defendant reported that Plaintiff's debt was discharged in bankruptcy, and that she did not owe a remaining balance. *See* Dkt. No. 18-2 at 5-6. Plaintiff has not demonstrated that this information is inaccurate.

Plaintiff attempts to differentiate this line of cases from her own by relying on *Cohen v. Rosicki, Rosicki & Associates, P.C.*, 897 F.3d 75 (2d Cir. 2018) and stating that "the Second Circuit looks beyond the strict application of the law in a sterilized academic sense and penetrates to the practical effect of [judicial foreclosure] proceedings." Dkt. No. 18 at 20 (citing *Cohen*, 897 F.3d at 75). In *Cohen*, the Second Circuit discussed judicial foreclosure actions, requirements thereof, and alleged violations of the Fair Debt Collection Practices Act. *See Cohen*, 897 F.3d at 78-88. The *Cohen* case makes no mention of bankruptcy filings or credit reporting. *See id.* Plaintiff relies on the *Cohen* court's explanation "that in rem proceedings were really just designed to collect on the underlying note." Dkt. No. 18 at 20 (citation omitted). Based on that conclusion, Plaintiff states that the Second Circuit would likely disagree with the aforementioned line of cases. *See id.* at 21.

To date, the Second Circuit has not disagreed, and based on the available authority across the country on this issue, there appears to be a consensus that a credit report which indicates a discharge in bankruptcy, without mention of subsequent payments, is accurate as there is no legal requirement for a report to reflect such payments. *See Horsch*, 94 F. Supp. 3d at 675; *Groff*, 108 F. Supp. 3d at 541; *Schueller*, 559 Fed. Appx. at 737; *Jarvis*, 2016 WL 7243754, at \*2; *Lawrence*, 2020 WL 6689371, at \*3; *Reichardt*, 2019 WL 1359119, at \*4; *Blanch*, 335 F. Supp. 3d at 793.

Plaintiff also relies on *Irby v. Fashion Bug (In re Irby)*, 337 B.R. 293 (N.D. Ohio 2005). *See* Dkt. No. 18 at 22. Therein, the United States Bankruptcy Court of the Northern District of Ohio stated that "upon discharge, it is only a debtor's personal obligation to pay the debt that is effectively extinguished; the debt itself remains." *In re Irby*, 337 B.R. at 295 (citing *Johnson*, 501 U.S. at 83, 111 S.Ct. 2150). The *Irby* Court focused on violations of Bankruptcy Code § 524, which mandates that creditors cannot take any action to recover a debt which has been discharged; yet "the reporting of the debt will not likely run afoul with the discharge injunction unless it is coupled with other actions undertaken by the creditor to collect or recover on the debt." *Id.* at 296. Further, "[w]hile the [c]ourt can understand [a] desire to have this debt removed from [a] credit report, bankruptcy was never meant to come without a price. And one price that has always existed is that a debtor's ability to obtain credit may suffer." *Id.* at 297 (citing 15 U.S.C. § 1681c(a) (allowing credit reporting agencies to publish a debtor's bankruptcy filing for up to ten years)); *see also* Dkt. No. 18-2 at 7 (Plaintiff's Chapter 7 Bankruptcy "Date Resolved 09/09/2019" and "On Record Until Jun[e] 2029"). The *Irby* court did note, however, "[t]his does not mean that the reporting of a discharged debt is immune from the reach of the discharge injunction. Section [ ] 524(a)(2) enjoins any 'action' or 'act' to recover a debt." *Id.* at 296. "Thus, for example, if the act of reporting a debt was undertaken for the specific purpose of coercing the debtor into paying the debt, a violation of the discharge injunction could be established." *Id.* (citations omitted).

 **\*8** After quoting *Irby*, Plaintiff states, "[a]ll that is being reported is the truth that the debt was subsequently paid off, not, as it was in *Horsch*, subsequent payments that could be viewed as attempts to further collect the debt, in violation of the discharge injunction." Dkt. No. 18 at 22. Plaintiff's point is not entirely clear as *Irby* concluded that the plaintiff's claim had to be dismissed because the plaintiff did not allege "that the Defendants undertook any 'action' or 'act' to collect on their claim." *Irby*, 337 B.R. at 297. Here, too, Defendant reported Plaintiff's mortgage as discharged with a zero-dollar obligation and Plaintiff does not allege that it took any act to recover the discharged debt. *See* Dkt. No. 18-2 at 5-6.

In essence, Plaintiff argues that the failure of her credit report to include more information makes the presented information inaccurate. Absent statutory or caselaw authority supporting such a contention, the fact that Plaintiff continued paying the *in rem* liability to stave off foreclosure does not create an inaccuracy in Plaintiff's credit report. *See Groff*, 108 F. Supp. 3d at 540. Perhaps a report reflecting continued payment, without creditors requiring the payment, might be more inclusive and all-encompassing of the reality of Plaintiff's situation, but it is not required by law. Rather, "as a matter of law, the Court's task is to consider whether the information is inaccurate or misleading, not to look for ways that the information might be *more accurate*." *Holland v. TransUnion LLC*, 574 F. Supp. 3d 292, 300 (E.D. Pa. 2021). In *Holland*, the Eastern District of Pennsylvania explained that

> as a matter of policy, if the Court were to grant [plaintiff]'s request, there would be no limiting principle. If information in a credit report that could be *more accurate* is *inaccurate* for purposes of the FCRA, then every single customer in the United States would be able to state a claim under the FCRA. ... If a plaintiff could make a claim under the FCRA that credit information was inaccurate simply by alleging, entirely subjectively, that there is a 'better' (perhaps only longer, more cumbersome) way to report it, federal courts would take up the unwelcome task of engaging in pedantic pedagogy of phraseology.

*Id.* at 301. [5]

**\*9** Based on the foregoing, Plaintiff's complaint fails to state a claim on which relief can be granted because the credit report is accurate. *See* FED. R. CIV. P. 12(b)(6); *see also Horsch*, 94 F. Supp. 3d at 677; *Neclerio*, 983 F. Supp. 2d at 209; *Shimon*, 994 F.3d at 91-92. As such, Defendant's motion to dismiss is granted on this ground.

### 3. Legal Versus Factual Issues

Defendant also argues that Plaintiff's claim concerning "whether a loan included in bankruptcy was discharged is ultimately a legal rather than a factual question." Dkt. No. 16-1 at 4. Defendant states that, because "[t]his is ultimately a legal question," "Plaintiff may be able to return to the Bankruptcy Court to resolve this question, but it cannot provide the basis for a[n] FCRA lawsuit now." *Id.* Plaintiff argues that her claim "does not involve an interpretation of the Bankruptcy Code, but [is] a factual dispute concerning the failure to report the final payment." Dkt. No. 18 at 22.

The Second Circuit, in *Mader v. Experian Information Solutions, Inc.*, 56 F.4th 264 (2d Cir. 2023), addressed a similar issue, but concerning a credit reporting agency and student loans. There, the plaintiff filed for Chapter 7 Bankruptcy, and sued the credit reporting agency that continued to report an outstanding student debt. *See id.* at 266. In analyzing the FCRA claim, the Second Circuit relied on other circuit court opinions to support the contention that "inaccuracies that turn on legal disputes are not cognizable under the FCRA." *Id.* at 270 (citing *DeAndrade v. TransUnion LLC*, 523 F.3d 61, 68 (1st Cir. 2008); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891-92 (9th Cir. 2010); *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015); *Denan v. TransUnion LLC*, 959 F.3d 290, 293-96 (7th Cir. 2020)). The Second Circuit stated that "[t]he bespoke attention and legal reasoning required to determine the post-bankruptcy validity of [the plaintiff]'s debt means that its status is not sufficiently objectively verifiable to render [the plaintiff]'s credit report 'inaccurate' under the FCRA." *Id.*

The Second Circuit revisited the issue in *Sessa v. TransUnion, LLC*, 74 F.4th 38 (2d Cir. 2023).[6] In *Sessa*, the plaintiff brought an action against the defendant credit reporting agency "alleg[ing] that [the defendant] violated section 1681e(b) by including [a] balloon payment as a debt on [the plaintiff's] credit report and inaccurately reporting [ ] lease information" of the plaintiff's vehicle. *Id.* at 41 (citation omitted). The defendant moved for summary judgment, arguing that the " 'any purported inaccuracy' in its report was 'solely born of legal interpretation,' rendering it non-cognizable under the FCRA." *Id.* (citation omitted). In vacating the district court's grant of summary judgment, the Second Circuit wrote:

[t]he District Court, without the benefit of Mader held that the FCRA incorporates a threshold inquiry as to whether a claimed error is factual or legal in nature. That was error. The question of whether a debt is objectively and readily verifiable will sometimes, as it did in Mader, involve an inquiry into whether the debt is the subject of legal dispute. There, the issue of whether Mader's debt had been discharged presented an "unresolved legal question" under bankruptcy law, which "render[ed] his claim non-cognizable under the FCRA." But that does not mean that *any* dispute that might arguably turn on a question of law is non-cognizable under the FCRA. As the Mader Court explained, [credit reporting agencies] may be "required by the FCRA to accurately report information derived from readily verifiable and straightforward application of law to facts."

**\*10** *Id.* at 43 (internal citations omitted) (quoting *Mader*, 56 F.4th at 270).

Therefore, "in determining whether a claimed inaccuracy is potentially actionable under section 1681e(b), a court must determine, inter alia, whether the information in dispute is 'objectively and readily verifiable.' " *Id.* (quoting *Mader*, 56 F.4th at 269). "For instance, other courts have held that misreporting the clear effect of a bankruptcy discharge order on certain types of debt is a cognizable inaccuracy under the FCRA." *Mader*, 56 F.4th at 270 (collecting cases); *see also Sessa*, 74 F.4th at 43; *Losch v. Nationstar Mortg., LLC*, 995 F.3d 937, 946 (11th Cir. 2021); *Benjamin v. Experian Info. Sols., Inc.*, 561 F. Supp. 3d 1330, 1360 (N.D. Ga. 2021). This is actionable because the inaccuracy in the reporting is objectively and readily verifiable from the application of the law concerning debts and bankruptcy discharge and to the facts of a plaintiff's case. In other words, the law is settled that a plaintiff does not have a continued debt owed on property that has been discharged through bankruptcy. *See Torres v. Chase Bank USA, National Ass'n*, 367 B.R. 478, 488 (Bankr. S.D.N.Y. 2007) ("[A] credit report that continues to show a discharged debt as 'outstanding,' 'charged off,' or 'past due' is unquestionably inaccurate and misleading because end users will construe it to mean that the lender still has the ability to enforce the debt personally against the debtor").

Although Section 1681s-2 requires that a furnisher of information "shall not furnish any information relating to a consumer to any consumer reporting agency if the [furnisher] knows or has reasonable cause to believe that the information is inaccurate," 15 U.S.C. § 1681s-2(a)(1)(A), there is nothing in the relevant statutes or applicable caselaw that requires a furnisher of information to report subsequent payments following a discharge in bankruptcy. *See id.* § 1681s-2(a)(1)(D) ("Reasonable cause to believe that the information is inaccurate" is defined as "having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information").

A straightforward application of 15 U.S.C. §§ 1681s-2(a)(1)(A)-(D) to the facts of Plaintiff's case does not require a furnisher to report subsequent mortgage payments after discharge, nor does any available caselaw. *See Sessa*, 74 F.4th 38. Dkt. No. 18-2 at 5. Rather, Rocket Mortgage accurately reported that Plaintiff's mortgage had been discharged in bankruptcy—a fact Plaintiff does not dispute. *See* Dkt. No. 18-2 at 5. Thus, Plaintiff's challenge to the alleged inaccuracy presents a legal issue—whether furnishers of information are required to report subsequent payments on a mortgage after a discharge in bankruptcy—that is not cognizable under the FCRA. *See Mader*, 56 F.4th at 266.

Plaintiff paints this issue in a different light, arguing that this is a factual issue because Defendant had documentation "evidencing [Plaintiff's] payment of the debt in full," and therefore "[i]t would have been relatively easy for Defendant to review the account documents supplied by Plaintiff see that the loan had been paid off, and report that fact to the credit bureaus." Dkt. No. 18 at 23. However, while an FCRA claim can be actionable when a defendant does not apply readily verifiable and straightforward law to facts, when the matter is one of unsettled law, without instruction from statutes or caselaw, the matter is not cognizable under the FCRA. *See Mader*, 56 F.4th at 270; *Sessa*, 74 F.4th at 43; *see also Hossain v. Portfolio Recovery Assocs., LLC*, No. 22-CV-5124, 2023 WL 6155974, *3 (E.D.N.Y. Sept. 21, 2023) ("It follows under *Mader* and *Sessa*, that CRAs are not required to adjudicate intricate issues, legal or otherwise, to ensure the accuracy of a consumer's credit report. Instead CRAs must focus on straightforward, objectively and readily verifiable information when conducting its investigations under the FCRA to ensure accurate credit reports"); *Cunningham v. TransUnion, LLC*, No. 22-CV-3331, 2023 WL 6823182, *3 (S.D. Ohio Oct. 11, 2023) ("[The p]laintiffs' alleged inaccuracy [of reported delinquent payments for an unsigned lease] is not 'objectively and readily verifiable.' Instead, [the p]laintiffs raise precisely the kind of legal dispute CRAs are ill-equipped to handle"); *Reyes v. Equifax Info. Servs., LLC*, No. 21-CV-00639, 2023 WL 7272368, *6 (E.D. Tex. Sept. 14, 2023) ("[B]ecause there is a live legal dispute between [the plaintiff] and [the defendant] over whether [the plaintiff] is responsible for the outstanding balance, that balance is not 'objectively and readily verifiable.' Accordingly, even if the [the defendant's] information was inaccurate, [the plaintiff's] dispute is not actionable under the FCRA"); *see also* 15 U.S.C. § 1681s-2(a)(1).

**\*11** Plaintiff points out that these cases "focus ... on credit reporting agencies since they are particularly ill-suited to answer legal question surrounding the debt," and that furnishers stand in a different role and are "fully capable of resolving [such] issue[s] ... with ownership of, and access to, account-level documentation." Dkt. No. 18 at 23. "The Second Circuit has not addressed whether an alleged legal dispute regarding the validity or enforceability of an underlying debt renders the debt 'inaccurate' for purposes of a section 1681s-2(b) claim against a furnisher." *Mohnkern*, 2021 WL 5239902, at *6. The First Circuit's ruling in *Chiang v. Verizon New England, Inc.*, 595 F.3d 26 (1st Cir. 2010) is instructive. *See Mohnkern*, 2021 WL 5239902, at *5-6 (citing *Chiang*, 595 F.3d at 38); *Holland v. Chase Bank USA, Nat'l Ass'n*, 475 F. Supp. 3d 272, 276-77 (S.D.N.Y. 2020) (same); *Hunt v. JPMorgan Chase Bank, Nat'l Ass'n*, 770 Fed. Appx. 452, 458 (11th Cir. 2019) (same).

In *Chiang*, the plaintiff claimed that under 15 U.S.C. § 1681s-2(b) the defendant-furnisher failed to adequately investigate the plaintiff's dispute. *See Chiang*, 595 F.3d at 29-30. In its analysis, the First Circuit "emphasize[d] that, just as in suits against CRAs, a plaintiff's required showing [for a claim against a furnisher under section 1681s-2(b)] is *factual* inaccuracy, rather than the existence of disputed legal questions" because "[l]ike CRAs, furnishers are 'neither qualified nor obligated to resolve' matters that 'turn[ ] on questions that can only be resolved by a court of law.' " *Id.* at 38 (quoting *DeAndrade*, 523 F.3d at 68); *see also Mohnkern*, 2021 WL 5239901, at *5. The Eleventh Circuit reiterated this standard in *Hunt v. JPMorgan Chase Bank, National Ass'n*, stating that "[w]hether [the plaintiff] was obligated to make payments on the mortgage after the [state court action] was filed is a currently unresolved legal, not factual, question," and that "even assuming [defendant]

furnished information that turned out to be legally incorrect under some future ruling, [defendant's] purported legal error was an insufficient basis for a claim under the FCRA." *Hunt*, 770 Fed. Appx. at 458; *see also Garey v. BWW Law Grp., LLC*, No. 19-CV-03112, 2021 WL 4521329, *17 (D. Md. Oct. 4, 2021) ("The fact that [the plaintiff] continues to dispute the legality of the [reported] foreclosure is of no object—[furnisher-defendant] is neither qualified nor obligated to resolve a question that can only be resolved by a court of law") (citation omitted); *Garland v. Marine Credit Union*, No. 18-CV-270, 2018 WL 5313769, *2, *4 (E.D. Wis. Oct. 26, 2018) (holding same applied to a furnisher).

Plaintiff cites to *Mileva v. TransUnion, LLC*, No. 20-CV-123, 2021 WL 1172704 (N.D. Ill., Mar. 29, 2021), wherein the plaintiff and the defendant-furnisher entered into a written agreement to modify the plaintiff's mortgage plan that required her to make three "trial period" payments after the plaintiff's loan was four months delinquent. *See id.* at *1-2; Dkt. No. 18 at 26-27. The plaintiff "was making her trial period payments, [but] her account remained delinquent and [the d]efendant ... reported this delinquency to credit reporting agencies." *Id.* at *2. "The parties dispute[d] whether [the d]efendant ... reported any notation of the trial period payments." *Id.* The *Mileva* court denied the furnisher's motion for summary judgment because "the potentially misleading information in the [defendant's] credit report—the failure to report the trial period payments—does not rest on a legal dispute between [the p]laintiff and [the furnisher]." *Id.* at *8. The court came to this conclusion without citation to any caselaw or further explanation. *See id.*

**\*12** Here, Defendant did not report a delinquency after Plaintiff entered bankruptcy, nor did Defendant agree to report subsequent mortgage payments. Plaintiff asks this Court to conclude that under 15 U.S.C. § 1681s-2(b), Defendant, as a furnisher of information, is required to report subsequent mortgage payments after entering Chapter 7 bankruptcy. This is an unsettled legal question that the Court declines to answer at this juncture. As such, dismissal on this ground is also warranted.

### *4. Willful Violation of the FCRA*

As to Plaintiff's willful violation claim, she alleges that Defendant's "conduct, action and inaction" was willful, making Defendant "liable for actual, statutory and punitive damages in an amount to be determined by a jury pursuant to 15 U.S.C. § 1681n." Dkt. No. 1 at ¶ 71. Defendant argues that it should be dismissed because Plaintiff's "pleading is insufficient to satisfy the pleading requirements." Dkt. No. 16-1 at 6.

Willful violations require that the defendant either acted with actual knowledge, or in "reckless disregard," of a legal duty. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47, 57-58, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007); *see also* 15 U.S.C. § 1681n(a). Because there is no legal duty for a furnisher of information to report mortgage payments subsequent to a discharge in bankruptcy, Defendant cannot be said to have willfully violated the FCRA. The Supreme Court has explained that

> a company subject to [the] FCRA does not act in reckless disregard of [the FCRA] unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

*Safeco Ins. Co.*, 551 U.S. at 69, 127 S.Ct. 2201. Thus, Plaintiff must allege that Defendant's conduct was "objectively unreasonable" and would have raised an "unjustifiably high risk" of violating the FCRA. *Id.* at 70, 127 S.Ct. 2201. Plaintiff states that "Defendant failed to fix a fairly obvious error in Plaintiff's credit report" and that "Defendant's failure to report the final payment is inaccurate on its face, which any furnisher would have realized given its basic obligations under the FCRA." Dkt. No. 18 at 27-28. Plaintiff does not cite any authority to support the contention that this was an "obvious error" or that "any furnisher would have realized" this obligation.

Plaintiff cites *Freidman v. CitiMortgage, Inc.*, wherein the court concluded that the plaintiff sufficiently alleged that the defendant's actions "created an unjustifiably high risk of harm that was either known or so obvious it should have been known."

*Friedman v. CitiMortgage Inc.*, No. 18-CV-11173, 2019 WL 4194350, *4 (S.D.N.Y. Sept. 3, 2019); *see* Dkt. No. 18 at 27. There, the information being disputed was a loan which had been transferred to another lender but was still being reported as though the plaintiff had an obligation to pay the original lender and that she was late on payments where there was a $0 balance. *See Friedman*, 2019 WL 4194350, at *1. The court concluded that the plaintiff sufficiently alleged a violation of § 1681n because she alleged that reporting late payments on a $0 balance "was 'nonsensical and wrong.' " *Id.* at *4 (quotation omitted).

Here, the alleged error was not "obvious," as Defendant accurately reported that Plaintiff's mortgage had been discharged in bankruptcy. Plaintiff's other cases do not aid in giving support to her purported conclusion. *See* Dkt. No. 18 at 27-28 (citing *Huggins v. FedLoan Servicing*, No. 19-CV-21731, 2020 WL 13645747, *6 (D.N.J. Dec. 2, 2020) (allowing claims to proceed where the plaintiff disputed the reporting of his loans as past-due after the loans were transferred to another lender); *Ellis v. Equifax Info. Servs., LLC*, No. 18-CV-5185, 2019 WL 3503538, *4 (N.D. Ga. June 6, 2019) (allowing claims to go forward where the plaintiff alleged that her credit reports indicated a "present, ongoing, scheduled monthly payment obligation for both of the two disputed accounts, even though those accounts were closed and had a zero balance")). This is because those cases "involve credit reports that indicated that the plaintiffs still had a monthly payment on the account." *Krausz v. Equifax Information Services, LLC*, No. 21-CV-7427, 2023 WL 1993886, *13 (S.D.N.Y. Feb. 14, 2023).

 **\*13**  Here, Plaintiff's credit report does not indicate that any amount was still owed, as it reflects no balance and no past due payments after she filed for bankruptcy in June 2019. *See* Dkt. No. 18-2 at 5-6; Dkt. No. 18 at 7; *see also See Bibbs v. Trans Union LLC*, 521 F. Supp. 3d 569, 580 (E.D. Pa. 2021); *see Huggins*, 2020 WL 13645747, at *7; *see also Krausz*, 2023 WL 1993886, at *14 (granting the defendant's motion to dismiss because the credit report indicated a zero balance and did not reflect any past due payments). Without such indication, and without facts to demonstrate that the alleged error was obvious, Plaintiff's claim that Defendant willfully violated the FCRA lacks the requisite support. As such, Defendant's motion on this ground is also granted. [7]

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submission and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss (Dkt. No. 16) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 264034

## Footnotes

1    In Defendant's notice of motion, it also cites Federal Rules of Civil Procedure 12(b)(2), (4) and (5). *See* Dkt. No. 16 at 1. However, Defendant does not present an argument concerning those Rules in its brief in support of its motion to dismiss. *See generally* Dkt. No. 16-1. The Court will not consider arguments that have not been briefed.

2    In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider any document incorporated by reference into the complaint or a document "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Plaintiff attaches her Experian credit report to her response. *See* Dkt. No. 18-2. Plaintiff relied heavily on this credit report in her complaint and it forms the basis for her claims. *See* Dkt. No. 1 at ¶¶ 18-20. Thus, the Court will consider the credit report when deciding Defendant's motion to dismiss.

3    The Second Circuit "has recognized 'that dismissals for lack of standing may be made pursuant to Fed. R. Civ. P. 12(b)(6).' " *Bernstein v. City of New York*, 621 Fed. Appx. 56, 57 n.1 (2d Cir. 2015) (quoting *Rent Stabilization Ass'n of New York v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993)).

4    " 'Hard credit pulls refer to credit inquires related to transactions that are initiated by a consumer, whereas soft pulls refer to inquires made by businesses with which the consumer already has a business relationship and inquires made by credit card or insurance companies,' such as pre-screening before making special offers to existing customers." *Krausz v. Loandepot.com, LLC*, No. 22-CV-152, 2022 WL 16960928, *3 n.2 (S.D.N.Y. Nov. 16, 2022) (quoting *Alder v. DirecTV, LLC*, No. 18-CV-1665, 2018 WL 6981838, *1 (C.D. Cal. Oct. 24, 2018)).

5    The Court notes that the definitions of a credit report provided by various federal agencies do not provide clarity on whether a report must include subsequent payments following a discharge in bankruptcy. However, a plain reading of the definitions might make one think that such subsequent payments should be reported. *See, e.g.*, *What is a Credit Report?*, CONSUMER FIN. PROT. BUREAU, https://www.consumerfinance.gov/ask-cfpb/what-is-a-credit-report-en-309/ (Sep. 1, 2020) ("[A] statement that has information about your credit activity and current credit situation such as loan paying history and the status of your credit accounts"); *Credit Reports and Credit Scores*, BD. GOVERNORS FED. RSRV. SYS., https://www.federalreserve.gov/creditreports/pdf/credit_reports_scores_2.pdf (last visited Jan. 9, 2024) ("[A] record of your credit history and includes information about: Your identity ... Your existing credit ... such as your credit card accounts, mortgages, car loans, and student loans"); *Consumer Assistance Topics; Credit Reports*, FDIC, https://www.fdic.gov/resources/consumers/consumer-assistance-topics/credit-reports.html (Aug. 1, 2023) ("[I]ncludes details about your credit history, including the number of credits accounts you have open"); *Understanding Your Credit*, FED. TRADE COMM'N, https://consumer.ftc.gov/articles/understanding-your-credit (Dec. 2021) ("[A] summary of your credit history," such as "your credit cards, your loans, how much money you owe, if you pay your bills on time or late, if you filed for bankruptcy").

6    *Sessa* was decided after the parties submitted their briefs to the Court.

7    Defendant also seeks to dismiss Plaintiff's complaint for failure to provide Defendant with sufficient notice as required by the mortgage agreement. *See* Dkt. No. 16-1 at 3-4. Defendant attaches the mortgage agreement to its motion to dismiss and argues that Plaintiff did not satisfy the condition precedent regarding notice, as outlined therein. *See id.*; *see also* Dkt. No. 16-2. Plaintiff did not incorporate her mortgage by reference, nor are its terms or effects relied on in Plaintiff's complaint. *See* Dkt. No. 1; *see also Chambers*, 282 F.3d at 152-53. Thus, the Court will not consider the mortgage. As the Court has concluded that dismissal is proper on other grounds, the Court will not consider this alternative ground for dismissal. *See In re Beech-Nut Nutrition Co. Baby Food Litig.*, 651 F. Supp. 3d 629, 634 (N.D.N.Y. 2023) ("The Court agrees that dismissal on this ground is proper and need not consider defendant's other arguments").

2020 WL 5543716
Only the Westlaw citation is currently available.
United States Bankruptcy Court, C.D. California.

IN RE: John Martin MATA & Livier Mata Debtors.
John Martin Mata Plaintiff,

v.

Nat'l Collegiate Student Loan Trust 2006-1; Nat'l Collegiate Student Loan
Trust 2006-4; and Nat'l Collegiate Student Loan Trust 2007-1, Defendants.

Bankruptcy Case: 6:13-bk-30625-MH
|
Adversarial Proceeding: 6:18-ap-01089-MH
|
Hearing Date: May 8, 2019
|
Signed July 31, 2020

**Attorneys and Law Firms**

Michael E. Clark, Borowitz & Clark LLP, West Covina, CA, Austin C. Smith, Smith Law Group, New York, NY, for Plaintiff.

Debbie P. Kirkpatrick, James Schultz, Sessions Fishman Nathan & Israel LLP, San Diego, CA, Damian P. Richard, Camp Pendleton, CA, for Defendants.

**MEMORANDUM DECISION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Mark Houle, United States Bankruptcy Judge

### I. PROCEDURAL BACKGROUND

**\*1** On December 31, 2013, John ("Plaintiff") [1] and Livier Mata (collectively with Plaintiff, "Debtors") filed a Chapter 7 voluntary petition. On April 14, 2014, Debtors received a discharge and, the following day, their case was closed.

On April 18, 2018, Plaintiff filed a complaint against National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-4, and National Collegiate Student Loan Trust 2007-1 (collectively, "Defendants" or "Trusts") seeking a determination of dischargeability. Specifically, Plaintiff seeks a declaratory judgment that his student loans have been discharged as part of his Chapter 7 discharge. On May 18, 2018, Defendants filed their answer.

On January 9, 2019, Defendants filed a motion for summary judgment (the "Motion"). On February 5, 2019, Plaintiff filed his opposition. Defendants filed their reply to Plaintiff's opposition on February 13, 2019. Plaintiff filed his supplemental memorandum on April 10, 2019, and Defendants filed their supplemental memorandum on April 24, 2019. Defendants subsequently filed a notice of supplemental authority on April 30, 2019, and Plaintiff filed a reply to Defendants' notice of supplemental authority on May 3, 2019. After a continued hearing on the Motion was held on May 8, 2019, Plaintiff filed a notice of supplemental authority on July 8, 2019, which Defendants responded to on July 24, 2019. Finally, Plaintiff filed an additional supplemental authority pleading on May 7, 2020, which Defendants responded to on May 18, 2020.

## II. FACTUAL BACKGROUND

First Marblehead Corporation is a formerly NYSE listed private company that, in the mid-2000's, was a dominant player in the private student loan business. In early 2001, it purchased the operating assets of The Education Resources Institute (hereinafter "TERI"), a nonprofit group primarily involved in the guaranteeing of private student loans. *In re First Marblehead Corp. Secs. Litig.*, 639 F. Supp. 2d 145, 148-9 (D. Mass. 2009). Beginning in 2001, First Marblehead established a financial plan under which banks would offer private student loans, and the notes would be purchased by National Collegiate Student Loan Trusts (each, a "NCSLT"). *Id.* The loans, once packaged into the trusts, would be, at least ostensibly, guaranteed by TERI, in order to preclude the loans from being discharged, and the NCSLTs would then be offered on the open market for investment. *Id.* The banks involved in the funding of these loans include JP Morgan, HSBC, Citizens, PNC, and, in this particular case, Charter One, among many others. There were 15 NCSLTs in total, owning more than 800,000 private loans totaling billions of dollars.

**\*2** Beginning in 2005, First Marblehead began creating new loan product lines aimed at borrowers with riskier credit scores. *In re First Marblehead Corp.*, 639 F. Supp. 2d at 156-7. As the economy began its downturn in 2007, default rates began rapidly increasing, resulting in the eventual bankruptcy of TERI in 2008. *Id.* at 157-8, 160.

The question of whether the loans held by NCSLTs and guaranteed by TERI are excepted from discharge has been addressed by courts across the country since the beginning of the program.

In this case, Plaintiff took out three $30,000 loans - in January of 2006, September of 2006, and August of 2007 (each a "Loan," and, collectively, the "Loans") - for his three years of graduate studies in counseling at Loma Linda University from 2005 to 2007. Each Loan was cosigned by Livier Mata and carried an interest rate of 9%, 12%, and 14%, respectively. The loan agreements each stated that the applicable Loan was explicitly limited to the costs of attending the school. The loan documentation for one of the Loans, that of January 2006, stated that TERI was guaranteeing the Loan, while the loan documentation for the other two Loans stated that TERI had the option to guarantee the Loan. Each of these Loans was allegedly then repackaged into one of the three trusts that are currently the Defendants in this matter (NCSLT 2006-1, 2006-4, and 2007-1).

By the Motion, since Plaintiff's complaint does not contain any allegation that the Loans caused an undue hardship, Defendants seek to have the Loans determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(8)(A)(i) by showing that the Loans were educational loans made under a program funded or guaranteed by a nonprofit.

## III. LEGAL STANDARD

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. Rule 56(a) (incorporated into bankruptcy proceedings by FED. R. BANKR. P. Rule 7056).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324. The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *Id.* However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact...." *Matsushita Electrical Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## IV. <u>LEGAL ANALYSIS</u>

**\*3**  11 U.S.C. § 523(a)(8) provides that:

(a) A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt –

(8) unless excepting such debt from discharge would impose an undue hardship on the debtor and the debtor's dependents, for –

(A) (i) an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

Defendants base the Motion solely on 11 U.S.C. § 523(a)(8)(A)(i). In order for Defendants to establish that Plaintiff's debts are not dischargeable under § 523(a)(8)(A)(i), they must prove that: (1) the loans to the Plaintiff were "educational loans"; and (2) the loans were made under any program funded in whole or in part by a nonprofit institution. *See* 11 U.S.C. 523(a)(8)(A)(i).

### A. Whether the Loans were "educational loans."

The three different student loan discharge standards under 11 U.S.C. § 523(a)(8) cover distinct forms of educational lending. Section 523(a)(8)(A)(i) applies to educational benefits or loans, section 523(a)(8)(A)(ii) applies to obligations to repay funds received as educational benefits, scholarships, or stipends, and § 523(a)(8)(B) applies to "qualified educational loans." "Qualified educational loans" must meet additional requirements imposed by 26 U.S.C. § 221 and 20 U.S.C. § 1087II, which include limiting the loan disbursement to the cost of attendance of an institution. "Educational loans" do not need to meet the higher standard for "qualified educational loans." *See* 11 U.S.C. § 523(a)(8)(A)(i); *compare* § 523(a)(8)(B); *see also Kashikar v. Turnstile Capital Mgmt., LLC* (*In re Kashikar*), 567 B.R. 160, 166 (B.A.P. 9th Cir. 2017); *see also In re Oliver*, 499 B.R. 617, 623-4 (Bankr. S.D. Ind. 2013). As Defendants are basing the Motion solely on 11 U.S.C. § 523(a)(8)(A)(i), the question before the Court is whether or not the Loans in question here are "educational loans," not whether they meet the higher standard for "qualified educational loans," including the disbursement limit.

The question of whether a loan is an "educational loan" is determined by its stated purpose, not its actual use. *See Busson-Sokolik v. Milwaukee Sch. of Eng'g (In re Busson-Sokolik)*, 635 F.3d 261, 266-7 (7th Cir. 2011). Living and social expenses are included within the bounds of "educational" purposes. *See Murphy v. Pa. Higher Educ. Assistance Agency*, 282 F.3d 868, 873 (5th Cir. 2002). This includes the costs of room and board for a student without dependents residing at home with their parents, as calculated by the institution, as well as other personal expenses. *See id.* at 872-3 (*citing* 20 U.S.C. § 1087II(2)-(3) as a guide for what kinds of expenses are considered "educational").

**\*4**  Each of the respective Loans in this matter was explicitly restricted to the costs of attending Linda Loma University. [ECF No. 33, Exh. A-1 at 3 (January 2006 loan); ECF No. 33, Exh. A-5 at 3 (September 2006 loan); ECF No. 33, Exh. A-9 at 3 (August 2007 loan)]. This clearly states that the purpose of the loans was educational. *See In re Busson-Sokolik*, 635 F.3d at 266-7.

Plaintiff seeks to challenge the status of the Loans as "educational loans" on three grounds: (1) that the amounts disbursed were in excess of Linda Loma's graduate cost of attendance; (2) that the Loans carry an unusually high interest rate, have high origination fees, and require a cosigner and credit check; and (3) that the Loans are not educational loans because they were provided directly to the consumer and bypassed the school's financial aid office.

### 1. Whether the Loans needed to be limited to Linda Loma's stated cost of attendance, and whether the cost of attendance includes off-campus room and board.

Strict limitation to the institution's stated cost of attendance is only a requirement for "qualified educational loans," not "educational loans." *See* § 523(a)(8)(A)(i) and (B). However, disbursement in significant excess of the cost of attendance may weigh against a loan being for "educational" purposes. Plaintiff argues that the cost of attendance is limited solely to the fees charged by the school, and that off-campus room and board should not be included in such costs. [ECF No. 46, Exh. 3 at 25 (claiming a yearly cost of attendance for Loma Linda of $19,640 purely through the addition of the average full-time graduate tuition of $17,760 and the required fees of $1,880, as reported by Institutional Characteristics)]. The Court disagrees. This is in direct contradiction to 20 U.S.C. § 1087II(3)(A) and (D), which state that the cost of attendance includes allowances for room and board for students living at home with their parents, as well as "for all other students," such as those living off-campus in private housing.

Linda Loma itself provided, as part of its stated cost of attendance for graduate students, a calculation of off-campus living costs for year-round students of $15,360 in 2005-2006, $18,520 for 2006-2007, and $19,640 for 2007-2008. In addition, Defendants have shown that the total tuition costs required for completing Plaintiff's degree rose from between $33,480-$47,895, as calculated in 2006, to between $39,960-$57,160 as calculated in 2007. [ECF No. 55, Ex. 1 at 10-12, Ex. 2 at 16-19, and Ex. 3 at 24-26.]

As such, according to Linda Loma's stated cost of attendance calculations, the total cost of Plaintiff's three-year education ranged from $87,000 (using the three-year off-campus living cost of $53,520 and the minimum tuition cost of $33,480) to $110,680 (using the three-year off-campus living cost of $53,520 and the maximum tuition cost of $57,160). Even if the Court were to find that "educational loans" are strictly limited to the cost of attendance, which it does not, Plaintiff borrowed $90,000 for the three years of Plaintiff's attendance, placing the Loan amounts firmly at the lower end of the range of Linda Loma's cost of attendance for a student with off-campus housing. Therefore, the Court finds that there is no issue of fact or question of law that the amount of the Loans was within Loma Linda's costs of attendance, to the extent such finding is required under 11 U.S.C. § 523(a)(8)(a)(i).

**\*5** Plaintiff next claims in his supplemental memorandum that Plaintiff's federal student loans already covered a significant amount of the cost of attending Linda Loma University, meaning that Charter One was disbursing amounts in excess of Linda Loma's cost of attendance. This implies that Charter One had both knowledge of Plaintiff's other Loans and the obligation to adjust the amounts disbursed accordingly. Plaintiff, however, has provided no persuasive authority to support such a legal or factual conclusion, and thus the argument fails.

### 2. Whether commercial features, disbursement directly to the student, or the method of funding the Loan, disqualify a loan from being an educational loan

Plaintiff next argues that the Loans are not "educational loans" because they carry an unusually high interest rate, have high origination fees, and require a cosigner and credit check. There are no statutory requirements as to commercial form for "educational loans." *See* 11 U.S.C. § 523(a)(8). As such, the Court finds that it is the purpose of the loan, which determines whether it is "educational," not the commercial features. *See Busson-Sokolik v. Milwaukee Sch. of Eng'g (In re Busson-Sokolik)*,

635 F.3d 261, 266-7 (7th Cir. 2011); *see also Murphy v. Pa. Higher Educ. Assistance Agency*, 282 F.3d 868, 873 (5th Cir. 2002); *Page v. JP Morgan Chase Bank (In re Page)*, 592 B.R. 334, 336 (B.A.P. 8th Cir. 2018).

Plaintiff also challenges whether the Loans are "educational loans" because they were provided directly to the consumer, bypassing the school's financial aid office. As to the form of disbursement, the Court maintains its finding that the commercial features of a loan do not disqualify it from being an "educational loan." *see also McDaniel v. Navient Solutions Inc. (In re McDaniel)*, 590 B.R. 537, 542, 546-551 (Bankr. D. Colo. 2018) (analyzing whether a direct to consumer student loan was dischargeable, with the form of disbursement being considered irrelevant to the court's analysis).

In view of the above, even after drawing all reasonable inferences for the Plaintiff, the Court finds Plaintiff has not established any genuine issue of material fact, or question of law, as to the issue of whether these loans were "educational loans."

### B. Whether the loans were "funded, in whole or in part, by a nonprofit institution."

11 U.S.C. § 523(a)(8)(A)(i) renders excepted from discharge: "an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, *or* made under any program funded in whole or in part by a governmental unit or nonprofit institution." (Emphasis added).

Defendants' claim for exception from discharge under (A)(i) is dependent on them establishing that the Loans were made under a program funded in whole or in part by a nonprofit institution. They argue that a nonprofit (TERI) guaranteeing loans under a loan program is sufficient to establish that the nonprofit funded the loan program.

Plaintiff, on the other hand, argues that Congress deliberately structured § 523(a)(8)(A)(i) into two parts. The first, covering guarantees, allegedly limits exception from discharge to only those loans guaranteed by a governmental unit. The second, covering the direct funding of the loan itself, applies to loans made under a program funded by a government unit or a nonprofit like TERI. Thus, under the principle that the inclusion of one is the exclusion of the others, Plaintiff argues that Congress did not intend for nonprofits to be able to render "educational loans" excepted from discharge by guaranteeing them. Assuming, arguendo, that Plaintiff is correct, this essentially divides the question into two parts: (1) whether a nonprofit can "fund" a loan program by guaranteeing loans made under the program, and (2) if the nonprofit can fund the loan program through guarantees, whether TERI actually guaranteed the loans made under the loan program in question here.

**\*6** Plaintiff also raises a third issue, by arguing that TERI's alleged, subsequent voiding of the guarantees of the Loans in its bankruptcy should, if the Court finds that TERI's guarantees rendered the Loans originally nondischargeable, retroactively strip the Loans of their status as exempt from discharge.

### 1. Whether a nonprofit can "fund" a loan program by guaranteeing loans made under the loan program.

The Court begins by noting that the rules of construction provided for the bankruptcy code at 11 U.S.C. § 102 states that "or" is not exclusive. As such, the Court will not assume, as Plaintiff argues, that the separation through "or" between the provision in § 523(a)(8)(A)(i) concerning the guaranteeing of the loan by a government unit and the provision concerning the funding of a loan program by a governmental unit or nonprofit was meant by Congress to exclusively limit the right of exception from discharge through guarantees to student loans issued by governmental units

Section 523(a)(8)(A)(i) states that a nonprofit can render loans made under a loan program excepted from discharge through "funding" the loan program "in whole or in part." The statute does not provide a definition for what constitutes "funding" a loan program, nor does it provide a standard for "in whole or in part." In particular, the Court notes that the statute determines exception from discharge based on the nonprofit funding the loan program, not the specific loans made under the program, which appears to open a wide door for what may be considered "funding." The question before the Court is thus how it should

balance Congress' clear intent that exception from discharge require material funding from the nonprofit with the broad language covering how the funding can occur.

Several courts have considered this question, and the consensus is that a nonprofit guaranteeing loans under a loan program functions as the nonprofit funding, in whole, or in part, the loan program. *See O'Brien v. First Marblehead Educ. Res., Inc. (In re O'Brien)*, 419 F.3d 104, 106 (2nd Cir. 2005); *see also Educ. Res. Inst. Inc. v. Taratuska (In re Taratuska)*, 2008 U.S. Dist. LEXIS 93206 at *17-18 (D. Mass. 2008) (reversing *In re Taratuska*, 374 B.R. 24 (Bankr. D. Mass. 2007).

In the *O'Brien* decision, the Second Circuit similarly addressed First Marblehead Corporation issued student loans which had been guaranteed by TERI. *In re O'Brien*, 419 F.3d at 106 (2nd Cir. 2005). The debtor in the *O'Brien* cases made the same argument as Plaintiff does here, that Congress intended for § 523(a)(8)(A)(i) to limit loans excepted from discharge through guarantees only to governmental units. *In re O'Brien*, 419 F.3d at 106 (2nd Cir. 2005). At the bankruptcy court level, the court disagreed, based on the foundation that § 102(5) defined "or" as non-exclusive, and found that the standard for determining whether a nonprofit guaranteeing loans under a loan program was a "funding" of the program was whether (1) whether the nonprofit actually paid out the guarantees when they came due, and (2) whether the existence of the loan program under which the loans were made was causally linked to the guaranteeing of the loans under the program by the nonprofit. *In re O'Brien*, 299 B.R. 725, 729-30 (Bankr. S.D.N.Y. 2005). More broadly, the *O'Brien* bankruptcy court found that the "the word 'funded' in § 532(a)(8) encompasses 'any meaningful contribution' to the provision of the loan, *including* the guarantee of the loan." *In re O'Brien*, 299 B.R. 725, 730 (Bankr. S.D.N.Y. 2003). The district court affirmed the bankruptcy court ruling that the loans were not dischargeable, and the Second Circuit adopted the district court's analysis and applied a relatively expansive standard to determine whether a non-profit funded a loan program "in whole or part." *In re O'Brien*, 419 F.3d at 106 (2nd Cir. 2005). The analysis was focused on whether the non-profit was "devoting some of its financial resources to supporting the [loan] program", which in turn included guaranteeing loans made thereto. *Id.*

**\*7** Critically, the Second Circuit in *O'Brien* acknowledged that the test under § 523(a)(8) does not require that TERI "funded" a particular loan (stating "... it may be true that TERI merely guaranteed, without funding, O'Brien's particular loan ..."), but rather that the non-profit funded, in part or whole, the loan program under which the particular loan was made, which can be established if the non-profit guaranteed loans under the program. *Id.*

Another case supporting Defendants' position is *Taratuska*, which also concerned itself with a First Marblehead Corporation student loan guaranteed by TERI. *In re Taratuska*, 2008 U.S. Dist. LEXIS 93206 at *3-4. In the underlying bankruptcy case the debtor made an identical argument to the one made in *O'Brien* and in this case. *In re Taratuska*, 374 B.R. at 26-7. The bankruptcy court agreed with the debtor, found that the student loans were dischargeable, and granted the debtor's motion for summary judgment. *Id.* at 30-1. This bankruptcy court holding is the only one cited by Plaintiff which directly agrees with his assertion that "guaranteeing" and "funding" loans under a loan program are two explicitly distinct actions, meaning that a nonprofit cannot "fund" a loan program through guaranteeing loans. The district court reversed this holding, adopted the *O'Brien* standard, and found that the student loans were excepted from discharge due to TERI's guaranteeing of the loans. *In re Taratuska*, 2008 U.S. Dist. LEXIS 93206 at *17-18.

The Ninth Circuit Bankruptcy Appellate Panel also agrees with this line of reasoning, interpreting § 523(a)(8)(A)(i) as covering "an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit *or* nonprofit institution." *Inst. of Imaginal Studies v. Christoff (In re Christoff)*, 527 B.R. 624, 632 (B.A.P. 9th Cir. 2015) (emphasis added).

In contrast, the Bankruptcy Court for the District of Maine reached the opposite conclusion, finding that the guarantee of a loan by a nonprofit did not constitute the "funding" of the loan. *Wiley v. Wells Fargo Bank, N.A. (In re Wiley)*, 579 B.R. 1, 6-7 (Bankr. D. Me. 2017). The *Wiley* court built this holding on their interpretation of *O'Brien*, finding that it required the nonprofit to both guarantee the loan *and* fund the loan program (emphasis added), as well as on *Educ. Res. Inst., Inc. v. Hammarstrom (In re Hammarstrom)*, 95 B.R. 160, 165 (Bankr. N.D. Cal. 1989), which held that a nonprofit must directly provide the funds

through which the loans are made to render them excepted from discharge. *In re Wiley*, 579 B.R. at 6-7. There are two issues with the reasoning in *Wiley*.

The first is that the *Wiley* court's interpretation of *O'Brien* is distinctly flawed. The Second Circuit in *O'Brien* did state that the nonprofit had to "fund" the program. However, it defined "funding" much more broadly, looking at the various circumstances of TERI's relationship to the loan program in that case and noting TERI's financial support of the loan program. *O'Brien*, 419 F.3d at 106. As the Second Circuit stated:

> "The district court noted that it is undisputed that O'Brien's loan was made through a program that in turn was funded by a nonprofit institution. *Id.* at 262. Similarly, TERI's uncontested description of its relationship with the Law Access Loan Program strongly suggests that TERI funded the program. *TERI was clearly devoting some of its financial resources to supporting the program. See Klein*, NO. 92-B-44249, slip. op. at 12 (S.D.N.Y. Apr. 29, 1997) (*concluding that TERI funded program by guaranteeing loans made pursuant thereto*). We also note that the Promissory Note for O'Brien's loan itself stated that it "evidences an educational loan made pursuant to a loan program funded in part by a nonprofit institution and is therefore subject to the limitations on dischargeability contained in Section 523(a)(8) of the United States Bankruptcy Code."

**\*8**  Id. (emphasis added). Contrary to the *Wiley* court's interpretation, there is no distinction under *O'Brien* between "funding" and "guaranteeing" a loan program. *Id.* Instead, a nonprofit's guaranteeing loans under a loan program is one way the nonprofit can "fund" the loan program for purposes of § 523(a)(8). *Id.* at 106

The second is that *Hammerstrom*'s requirement of the direct funding of the loan by the nonprofit, is based on an older version of the bankruptcy code, is not supported by the statute, has been adopted by almost no other courts, and was soon explicitly criticized by the Ninth Circuit Bankruptcy Appellate Panel in *HEMAR Service Corp., Inc. v. Pilcher*, 149 B.R. 595, 600 (B.A.P. 9th Cir. 1993) (reversing the bankruptcy court's holding that a student loan could be discharged due to lack of a nonprofit providing the actual funds that debtor received, and finding that *Hammarstrom*'s direct funding requirement was a matter of pure judicial construction.)

As such, the Court finds persuasive the Second Circuit's reasoning in *O'Brien*, and adopts the expansive test provided for determining exception from discharge under 11 U.S.C. § 523(a)(8)(A)(I); i.e., whether the nonprofit devoted financial resources to supporting a loan program, including whether the nonprofit guaranteed loans made under the loan program that originated the loan in question. *See O'Brien*, 419 F.3d at 105-107. Specifically to frame its analysis, while perhaps narrower than the holding of the Second Circuit, the Court will look to the explicit test proposed by the *O'Brien* bankruptcy court: if Defendants can establish that (1) TERI guaranteed on paper the loans in question, (2) TERI paid out its guarantees on loans made under the loan program when they came due, and (3) TERI's guarantees of the loans made under the loan program were casually linked to the loan program's existence, then the loans in question here are excepted from discharge under § 523(a)(8)(A)(i). The Court will begin its analysis by noting that (3) is not in controversy here, as no party contests the critical role that the TERI guarantees played in the creation of First Marblehead Corporation's student loan trust program.

### 2. Whether Defendants have established that there is no genuine issue of material fact that TERI actually guarantee the Loans.

### a. Did TERI guarantee the Loans on paper?

Plaintiff argues that there is a material issue of fact as to whether TERI was the actual guarantor of the September 2006 and August 2007 Loans. This is in part because the loan agreements do not explicitly state that TERI will guarantee the Loans, merely that they have the option to do so. In addition, the NSCLT trust agreement schedules do not specifically list the NextStudent Graduate Loan program as one of the programs transferred or sold to the Trusts (listing instead NextStudent Alternative Loan Program).

These arguments, however, are insufficient to create a material issue of fact. Here the Court finds there is no material question of fact that Plaintiff's Loans were in fact guaranteed on paper by TERI, and that they were each sold to the respective Defendants. Defendants have disclosed the Loan Financial Activity pages for each Loan, which identify Plaintiff by name and social security number, state that the Loans were guaranteed by TERI, and include the Trust into which they were securitized. [Decl. Bradley Luke at ¶15, ECF No. 33; *id.*, Exh. A-2 at 1, ECF No. 33 (January 2006 loan); *id.*, Exh. A-6 at 1, ECF No. 33 (September 2006 loan); *id.*, Exh. A-10 at 1, ECF No. 33 (August 2007 loan)]. By contrast, in *Golden*, the genuine issue of material fact was due to the Defendants only providing the loan documentation stating that the loan potentially *could* be guaranteed by TERI. *Golden v. JP Morgan Chase Bank, et. al. (In re Golden)*, 596 B.R. 239, 266 (Bankr. E.D.N.Y. 2019).

**\*9** Plaintiff raises several additional questions as to the loan activity pages in their supplemental brief. First, they assert that the listing of the current balance of the loan being $0 calls into question the accuracy of the loan financial activity pages. Given evidence that the loans have been charged off, the Court finds this is insufficient to create a material issue of fact. Second, they call into question why the loan program is labeled as "PEPLN" when the student loan program was NextStudent Graduate Loan. The Court notes that "PEPLN" appears to simply be the code used for private student loans as opposed to federal student loans, and otherwise is insufficient to raise a material issue of fact. Third, Plaintiff states that the evidence that loans originated under the NextStudent loan program were securitized into the respective trusts stems from excel pages that were not part of the securitization filing. However, the Court notes that the trust agreements on the SEC's EDGAR site for: (1) NSCLT 2006-1 [ECF No. 34, Exh. D at 42 (note purchase agreement) and 46 (guarantee agreement)], (2) NSCLT 2006-4 [ECF No. 34, Exh. E at 31, (note purchase) and 33 (guarantee)], and (3) 2007-4 [ECF No. 34, Exh. F at 34, (note purchase) and 36 (guarantee)], all list loans originated under the NextStudent loan program as being securitized into the trusts through note purchase agreements and guaranteed by TERI.

Based on the foregoing, and in light of the evidence provided, the Court finds there is no genuine issue of material fact or question of law as to whether TERI guaranteed the loans in question on paper when the evidence establishes that (1) loans originated under the NextStudent loan program were purchased by the Trusts and guaranteed by TERI, and (2) the loan financial activity statements clearly identify Plaintiff, state the respective Defendants as the owner of the Loans, and all state that TERI guaranteed the Loans. Plaintiff's speculative arguments simply do not raise a "material" question of fact.

### b. Did TERI actually guarantee the loans?

In order to fund a loan program through guaranteeing the underlying loans, the guarantee must actually come into effect, instead of just being a paper promise to render the debt excepted from discharge. *See In re O'Brien*, 419 F.3d 104, 105-6 (2nd Cir. 2005). Plaintiff's student loan servicer has declared that Plaintiff's student loans were guaranteed by TERI, but Plaintiff alleges that the guarantees did not actually occur. [Decl. Luke ¶¶ 17, 25, 34 ECF No. 33-4]. As noted by Plaintiff, evidence demonstrating the actual guarantee by TERI of the loans within the loan program may include guarantee agreements between TERI and the loan originators, and evidence that the loan originators actually paid TERI guarantee fees as agreed upon. [P. Opp. to Def.'s Mot. for Summ. J., Exh. 4, Def.'s Responses and Objections to Requests for Production No. 7, ECF No. 46].

However, the Court finds sufficient evidence showing that Defendants had refunded the Royal Bank of Scotland ("RBS") (which wholly owned, at the time of Plaintiff's loan creation, Citizens Bank, which in turn owned Charter One, the loan originator) $46,000,000 in guarantee fees as part of resolving RBS's secured claims against TERI concerning loans extended prior to TERI's bankruptcy. [*Id.* at Exh. 6, Fourth Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. at 65; *id.* at 11; *see also* Supplementary Request for Judicial Notice, Exh. 4, Disclosure Statement for Fourth Amended Joint Plan of Reorganization of The Education Resources Institute at 3-7, ECF No. 55]. The massive balances on the collateral accounts of the NCSLTs, including all three Trusts in question, revealed by the disclosure statement to the confirmed Fourth Amended Plan, show that the combined guarantee fees sequestered for guarantee payments, as well as the recoveries collected, numbered in the hundreds of millions of dollars. [*Id.* at 11].

Based on this showing, this court cannot reasonably find that Plaintiff has raised a genuine question of fact as to the substance of TERIs guarantees, when evidence establishes that hundreds of millions of dollars were being paid in guarantee fees to TERI, including tens of millions by Charter One, while TERI was simultaneously disbursing tens of millions of dollars in loan purchases under their guarantees. Notably, it was these disbursements which caused TERI's bankruptcy.

### 3. Whether TERI has voided their guarantee of the loan program in question, and whether, if shown, this would retroactively change whether the loans were funded by a nonprofit institution.

 **\*10**  Plaintiff asserts that TERI's guarantees for loans extended prior to TERI's petition were "voided" as a part of their confirmed plan for reorganization. [Fourth Amended Plan, ECF No. 46 at page 40]. Defendants argue that TERI's guarantees for the Loans were not voided but rather that the guaranty obligations were settled by TERI's bankruptcy, and, therefore, "honored." Defendants also argue that the specific guarantee obligations actually rejected in TERI's bankruptcy case did not pertain the Loans. In any event, it is abundantly clear that the resolution of the guarantees in TERI's bankruptcy, including the Loans at issue, does not retroactively affect the characterization of the Loans as being "funded" by a non-profit.

Plaintiff's argument on this point is a red herring. Plaintiff incorrectly asks this Court to analyze the nature of the loan program under which the Loans were made at the moment that Plaintiff filed for bankruptcy, instead of at the actual time the Loans were made. The text of 11 U.S.C. § 523(a)(8)(A)(i) states that a loan is nondischargeable when it is "*made* under any program funded in whole or in part by a governmental unit or nonprofit institution" (emphasis added). This clearly points to the status of a loan being determined by the nature of its creation, not its nature at the time of petition. *See, e.g.*, *In re Roberts*, 149 B.R 547, 549 (C.D. Ill. 1993) ("When the plain language of the Bankruptcy Code is clear, the Court need not inquire beyond the text of the statute."); *see also In re Francis*, 385 B.R. 800 (B.A.P. 10th Cir. 2008). The Court is mindful of the Pandora's box that would be opened, as well as of the chaos that would ensue, if nondischargeability under § 523(a)(8) depended on a moving target – i.e., what the status is of the guarantor or the guarantees at the time the borrower decides to file bankruptcy. Neither the plain language of the statute on its face, nor the case law supports such a conclusion. As such, the Court finds unpersuasive Plaintiff's argument that TERI's treatment of its guarantees during its bankruptcy somehow retroactively changed the nondischargeability characteristics of the Loans in question.

Construing all reasonable inferences in favor of the Plaintiff, the Court finds that Plaintiff has not established any genuine issue of material fact, or question of law, and that the Loans should be determined to be non-dischargeable. As such, and based on the pleadings in support of and in opposition to the Motion, the evidence presented by Defendants, and the arguments of counsel on the record of the hearings on the Motion, and good cause appearing, Defendants' motion for summary judgment is hereby granted.

### All Citations

Not Reported in B.R. Rptr., 2020 WL 5543716

### Footnotes

| | |
|---|---|
| 1 | The Court notes that most of the pleadings identify only John Mata as a plaintiff in this action, although Livier Mata cosigned on the underlying Loans, was a named plaintiff in the complaint, and has not been formally removed from the action. Nevertheless, the Court will use "Plaintiff" in the singular, as the parties appear to consider John Mata to be the sole plaintiff. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 440744
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

NCR CORPORATION, Plaintiff,

v.

BB 2009 TRUST, Defendant.

Civil Action No. 11–0481 (NLH)(AMD).
|
Feb. 9, 2012.

**Attorneys and Law Firms**

Melanie K. Sharp, Erika R. Caesar, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, James E. Brant, Latham & Watkins LLP, New York, NY, Maximilian A. Grant, Michael David, Washington, DC, for plaintiff.

Rodger Dallery Smith II, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Paul S. Hessler, Robert H. Bell, Linklaters LLP, New York, NY, for defendants.

**OPINION**

HILLMAN, District Judge.

## I. *INTRODUCTION*

**\*1** Presently before the Court is defendant's Federal Civil Procedure Rule 12(b)(7) motion to dismiss this declaratory judgment action because of plaintiff's failure to join an indispensable party under Rule 19. For the reasons expressed below, the parties will be ordered to provide supplemental briefing, and defendant's motion will be continued for thirty-days.

## II. *BACKGROUND* [1]

On March 2, 2009, plaintiff NCR Corporation entered into a Trademark Usage License ("License Agreement") with defendant BB 2009 Trust (the "Trust"), which is the owner of the trademarks "BLOCKBUSTER EXPRESS" and "BLOCKBUSTER EXPRESS & Design," for NCR's use of these marks in connection with DVD vending kiosks. The Trust had been created just a few days before through a Trust Agreement entered into between NCR, Blockbuster, Inc., and the Wilmington Trust Company. [2] Under the Trust Agreement, Blockbuster conveyed all its rights to the two trademarks to the Trust so that the Trust could license the marks to NCR, and NCR could pay the Trust license fees on revenue generated from the branded kiosks. According to NCR, such a Trust was necessary in order to protect NCR's investment in developing, marketing and operating the kiosks should Blockbuster became insolvent. [3]

During the next two years, NCR established and operated kiosks branded with the trademarks throughout the United States, while Blockbuster filed Chapter 11 Bankruptcy. [4] As part of the bankruptcy proceedings, Blockbuster transferred substantially all of its assets to Blockbuster LLC, which is a wholly-owned, indirect subsidiary of DISH Network Corporation, and hereinafter referred to as "New Blockbuster." That transfer included all rights, title and interests in the Trust, as well as all rights, title and interests in all of Blockbuster's trademarks. As a result, the Court "forever barred, estopped and permanently enjoined" "all

persons and entities" from "asserting, prosecuting or otherwise pursuing Interests" against New Blockbuster in any way relating to Blockbuster or the trademarks at issue here. (Def Ex. F ¶¶ L, 4, 6.)

Thereafter, in May 2011, counsel for Blockbuster notified NCR in writing that Blockbuster had (1) determined to discontinue the use of the marks, (2) withdrew its approval and terminated NCR's license to use the marks because NCR's use of the marks had become "inappropriate" due to the bankruptcy transfer, and (3) this "inappropriate use" was incurable and NCR was to immediately cease using the marks.[5] (Def. Ex H.) Blockbuster and New Blockbuster also filed a joint instruction letter to the Trust, instructing the Trustee to notify NCR of the termination of its license, and acknowledging that the termination would dissolve the Trust.[6] (Def.Ex. I.) The Trustee then provided NCR with written notice of the withdrawal of approval of NCR's usage of the marks and the termination of the license. (Def.Ex. J.) As per the License Agreement, NCR was to have 180 days to cease its use of the marks. (Def.Ex. D.)

**\*2** NCR then filed its declaratory judgment action against the Trust, seeking a declaration that the Trust does not have the right to terminate the License Agreement and that NCR is not infringing on the Trust's trademarks. NCR contends that it did not use the marks in any way not provided for by the License Agreement or that had denigrated their value.[7] NCR also contends that it was not provided with the opportunity to cure any inappropriate use, as required by the License Agreement. Ultimately, NCR claims that no grounds exist for the termination of its license to the marks, and a termination will cause substantial hardship and irreparable harm.

In lieu of filing an answer to the complaint, the Trust filed the instant motion to dismiss NCR's complaint because of NCR's failure to join a required party—Blockbuster. The Trust contends that Blockbuster remains a party to the Trust Agreement, and it continues to have the right to direct the Trust with respect to the enforcement of the Trust's rights under the License Agreement. Because Blockbuster retains the right under the License Agreement to instruct the Trust to terminate the license, the Trust argues that an adjudication of NCR's rights without the participation of Blockbuster would provide hollow relief. The Trust therefore deems Blockbuster to be an indispensable party. Due to Blockbuster's bankruptcy, however, the Trust believes that Blockbuster is incapable of being joined because of the automatic stay entered by the bankruptcy court. Thus, the Trust argues that NCR's complaint must be dismissed in its entirety because of the impossibility of joining Blockbuster as a required party.

In response, NCR argues that it is seeking a declaration of its rights under the License Agreement, and that the only parties to that agreement are NCR and the Trust. NCR contends that Blockbuster is not a required party because NCR's rights under the License Agreement can be adjudicated entirely on that contract and solely between NCR and the Trust. NCR argues that to require Blockbuster's joinder, and subject NCR to Blockbuster's bankruptcy court dealings of which NCR has no part, would subvert the very purpose of establishing the Trust and the resulting License Agreement.

### III. *DISCUSSION*

#### A. Jurisdiction

This Court has subject matter jurisdiction over NCR's declaratory judgment action pursuant to 15 U.S.C. §§ 1051, 1121(a), 28 U.S.C. § 1338(a), and 28 U.S.C. § 1332.

#### B. Standard for 12(b)(7) and Rule 19 motions

Federal Rule of Civil Procedure 12(b)(7) allows a motion to dismiss to be filed for "failure to join a party under Rule 19." Rule 19 provides a two-step analysis. Under Rule 19(a), the court must determine whether a party is "required to be joined if feasible." Fed.R.Civ.P. 19(a). If the court determines that party should be joined but joinder is not feasible, the court moves to the second step of the analysis under Rule 19(b) to determine whether, "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed.R.Civ.P. 19(b) (listing four factors to consider). If a party is not necessary under Rule 19(a), the court does not need to conduct an analysis under Rule 19(b). *Kuhn Const. Co. v. Ocean*

*and Coastal Consultants, Inc.,* 723 F.Supp.2d 676, 686 (D.Del.2010) (citing *Field v. Volkswagenwerk AG,* 626 F.2d 293, 300 (3d Cir.1980)).

## IV. *ANALYSIS*

**1. Whether Blockbuster is a required party under Rule 19(a)**

**\*3** Rule 19(a) provides:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or that person claims an interest

(B) relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(I) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Under subsection 19(a)(1)(A), the inquiry is whether complete relief can be accorded to the parties absent the unjoined party. *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 405 (3d Cir.1993). The focus is on the parties to the action and not on the effect the decision may have on the nonparty. *Id.* Under subsection 19(a)(1)(B), the focus shifts from the effect on the parties to the effect of judgment on the non-party. *Huber v. Taylor,* 532 F.3d 237, 248 (3d Cir.2008).

Under both subsections, Blockbuster is a required party.[8] NCR's main argument is that its declaratory judgment action can be adjudicated solely on the allegations in its complaint and the License Agreement it entered into with the Trust, and that Blockbuster is irrelevant to that controversy. It is clear, however, that even though Blockbuster is not a signatory to the License Agreement, Blockbuster and its actions are essential to the interpretation, validity, and scope of the License Agreement. Because the interpretation, validity, and scope of the License Agreement is exactly what NCR is asking this Court to decide in its declaratory judgment action, this case cannot proceed without Blockbuster.

Blockbuster's indispensability is demonstrated by the numerous references to Blockbuster in the License Agreement. For example, the "Grant of License" provision states, "Upon notice to [the Trust] by an authorized representative of Blockbuster that Blockbuster has timely and properly exercised its rights under Section 9.e) of the Alliance Agreement ... NCR's license shall cease to be exclusive with respect to DVD Vending Kiosks." (Def. Ex. D ¶ 2.) In the "Approvals" section, the Agreement provides, "[The Trust] reserves the right to approve the final form of the usage of the Licensed Marks and may, at any time, withdraw its approval and terminate this license, effective after reasonable notice to NCR and opportunity to cure, if [the Trust] receives instruction from Blockbuster, that the use of the Licensed Marks ... is or becomes inappropriate ...." (*Id.* ¶ 6(a).) The provisions regarding termination of the Agreement also involve Blockbuster: "This License may be terminated by [the Trust] ... Upon receipt of notice from Blockbuster affirming that (I) it has terminated the Alliance Agreement pursuant to Section 9.e)2) and that such termination has not been disputed by NCR within thirty days after the notice to NCR, or (ii) if disputed, Blockbuster has been awarded the right to termination through final determination of the arbitrator under section 13.c) of the Alliance Agreement." (*Id.* ¶ 14(a)(4).) These provisions clearly show that Blockbuster has its hand in the License Agreement and the overall administration of the use of its trademarks.

**\*4** Despite this, NCR has asked the Court to declare, without Blockbuster's participation, that it has not used inappropriately the trademarks or otherwise violated the terms of the License Agreement, and that it is the Trust instead that has breached the Agreement's terms. The Court cannot do so, however, unless the Court considers Blockbuster's actions, such as through its exercise of rights under the Alliance Agreement, or by instructing the Trust about NCR's inappropriate use of the marks. This is not to say that Blockbuster is only an important witness. The Court must consider Blockbuster's actions in the context of Blockbuster as a party because of the effect on Blockbuster's, the Trust's, and NCR's separate and competing interests.

For instance, Rule 19(a)(1)(A) makes joinder of Blockbuster required if complete relief among NCR and the Trust cannot be afforded in the absence of Blockbuster. If, under that provision, the Court were to find, as NCR asks, that "the Trust has no grounds to terminate the License or the Agreement" (Pl.Compl.¶ 25), it would follow that the Trust breached the License Agreement. The Trust's actions, however, were purportedly directed by Blockbuster. Without Blockbuster as a party to the case, the Trust does not have the ability to assert any cross-claims against Blockbuster for Blockbuster's conduct. Thus, any judgment against the Trust would be incomplete without Blockbuster.

Moreover, if the Court were to find that the Trust breached the License Agreement, NCR would be permitted to use the marks, despite Blockbuster's right to instruct the Trust on how NCR may use those marks, and despite Blockbuster's right to determine that NCR's use has become inappropriate. This would leave Blockbuster without the ability to protect its interests, in violation of Rule 19(a)(1)(B). It would also subject the Trust to inconsistent obligations-should it follow the command of Blockbuster, as required by the License Agreement, or should it follow a conflicting court order?

We conclude that because of Blockbuster's active role in the administration of the License Agreement, despite it not being a party to the Agreement, and because of the effect Blockbuster's absence from this case would have on Blockbuster, the Trust, and NCR, Blockbuster must be considered a "required party" under Rule 19(a). [9]

**2. Whether Blockbuster can be joined under Rule 19(b)**

The next step in the Rule 19 necessary party inquiry is whether it is feasible to join that required party. If not, the Court must consider several factors to determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed.R.Civ.P. 19(b)(1)-(4). [10]

The Trust argues that it is not feasible to join Blockbuster to this action because of the automatic stay provided in § 362 of the Bankruptcy Code, which operates to stay the commencement or continuation of any "action or proceeding" against a debtor in bankruptcy. *See* 11 U.S.C. § 362(a)(1). In a footnote in its opposition brief, however, NCR questions whether Blockbuster's bankruptcy court stay would apply to NCR's claim here. (Pl. Opp. at 18 n. 11.) NCR cites to *In re Grossman's Inc.,* 607 F.3d 114, 122 (3d Cir.2010) (citing 11 U.S.C. § 362(a)(1)), which explains that the automatic stay is applicable only to stay a claim that arose pre-petition. NCR contends that Blockbuster could freely join in this case because its claim arose after Blockbuster filed for bankruptcy. The Trust's reply brief does not appear to address this issue raised in NCR's footnote.

**\*5** Thus, before the Court can consider the equities of whether this suit can continue without Blockbuster, it must first be determined whether Blockbuster's bankruptcy truly prevents it from being joined here. Accordingly, the Trust is directed to provide a supplemental letter brief addressing whether NCR's claims are subject to Blockbuster's automatic stay. The Trust shall do so within 20 days from the date of this Opinion, and NCR may file a response within 15 days of the submission of the Trust's brief. No supplemental brief shall be no longer than five, double-spaced pages. The Court will issue a final decision of the Trust's motions to dismiss after consideration of the supplemental submissions. [11]

## V. *CONCLUSION*

For the foregoing reasons, the Court will continue the Trust's motion to dismiss for thirty days pending the submission of supplemental briefing from the parties. An order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 440744

## Footnotes

1   For the purpose of Rule 12(b)(7), the Court accepts as true the factual allegations of the complaint. *See Utility Lines Const. Services Inc. v. HOTI, Inc.,* 799 F.Supp.2d 331, 337–38 (D.Del.2011) (citing *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.,* 65 Fed. Appx. 803, 805 (3d Cir.2003)). The Court also may consider evidence outside the complaint in conducting a Rule 19 indispensable party analysis. *See Cephalon, Inc. v. Watson Pharmaceuticals, Inc. .,* 629 F.Supp.2d 338, 346 (D.Del.2009).

2   The Trust Agreement is dated February 27, 2009. (Def. Ex. C at 1.) The Trust itself arose from a provision in an "Alliance Agreement" entered into between NCR and Blockbuster on January 23, 2009 (signed by NCR on January 25th) which contemplated the Trust as a vehicle to hold and administer the marks to be used in conjunction with the vending kiosks.

3   The Trust Agreement explains that the BB 2009 Trust was created "for the purpose of safeguard[ing] and protecting the Trademarks and preserving the rights of NCR to use the Trademarks under the terms of the Trademark Usage License and to induce NCR to make the investment that it will make in reliance of such License." (Def. Ex. C at 1.)

4   The jointly administered Chapter 11 cases are currently pending in the United States Bankruptcy Court for the Southern District of New York. *See In re Blockbuster, Inc. et al.,* Case No. 10–14997.

5   As noted previously, approximately one month before entering into the Trust Agreement in late February 2009 (which in turn led to the execution of the License Agreement between the Trust and NCR in early March), NCR and Blockbuster entered into an Alliance Agreement, which set forth the two entities' plans to deploy and market Blockbuster-branded DVD kiosks. (*See* Def. Ex. B.) Both the Trust Agreement and the License Agreement refer to the Alliance Agreement. (*See* Def. Ex. C at 1, Ex. D ¶ 15.) It was, in part, pursuant to provisions in this Alliance Agreement that Blockbuster based its authority for withdrawing its approval of NCR's use of the trademarks. (*See* Def. Ex. H.) The bankruptcy court, however, has approved Blockbuster's request to reject the Alliance Agreement. (*See* Pl.Ex. A to Reply Br, Docket No. 10.) This Court does not need to opine on the validity of Blockbuster's reliance upon the now-rejected Alliance Agreement to terminate NCR's license to use the trademarks in order to resolve the current motion.

6   For its part, NCR contends that dissolution of the Trust as a result of the bankruptcy would be not only contrary to the express terms of the Trust but also contrary to the very reason it was created.

7   Indeed, NCR argues that the termination has nothing to do with its use of the mark at all but is rather a cynical and improper repudiation by the New Blockbuster of its predecessor's obligations under the various agreements.

8   The Trust notes that because the bankruptcy court assigned to New Blockbuster all rights to the Trust and the Blockbuster trademarks, it is an indispensable party as well. The Trust represents that New Blockbuster will move to intervene in the matter should its motion to dismiss be denied. NCR questions the basis for such an intervention, and indicates it will address the merits of such a motion if New Blockbuster files it. The Court takes no position on this issue at this time.

9   Stated differently, the License Agreement, while a stand alone document, was not entered into in a vacuum. It was part and parcel of three separate agreements that are nonetheless inextricably intertwined: the Alliance Agreement, the Trust

Agreement, and the License Agreement. The Alliance Agreement not only contemplated the additional agreements, it mandated the creation of the latter two which followed within a few short weeks; the License Agreement itself post-dates the Trust Agreement by just a few short days. In this Court's preliminary view these documents should be read *in pari materia*. To exclude Blockbuster, party to two of the agreements and an instigator of the third, would elevate form over substance. In short, and without intending to denigrate its purpose or legal status, the Trust exists merely because NCR and Blockbuster negotiated and agreed to its existence.

10    It is not lost on this Court that NCR may have powerful arguments sounding in equity as to why this case may proceed in this Court even if Blockbuster may not be joined. While we have not allowed those arguments to color our judgment on the narrow issue of whether Blockbuster is a required party (because we do not view them as directly relevant to that issue), they remain an issue in the case. It would be arguably ironic for a dispute over the License Agreement to be decided, even in an ancillary proceeding, in bankruptcy court when the agreements could be read to contemplate the avoidance of that complication altogether. And to induce an investment based on a structure that promised continuity in the face of the threat of insolvency only to later revoke such a promise may be something more than an ironic breach of contract. To be clear, we resolve today only the issue of Blockbuster's status as a required party. We will seek to next address whether it is feasible to join it as contemplated by Rule 19 as seen through the lens of bankruptcy law. Then and only then can we address the outstanding issues of equity which appear to animate much of NCR's arguments as to why this forum and not the bankruptcy court is the best forum for this case.

11    NCR states in its brief that it would not object to intervention by Blockbuster or New Blockbuster, "provided that any intervention is coupled with protections to ensure that the matter remains in this Court," and it is not used "as a vehicle to attempt to move the matter to the Bankruptcy Court or any other court." (Pl. Br. at 19 n. 11.) The Court does not discourage the parties from jointly presenting a proposed plan to address the various issued raised in this Opinion or by the parties in their briefs.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3727892
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Andrew RITZ and Michael Ritz, Plaintiffs,

v.

NISSAN-INFINITI LT; Trans Union, LLC; Equifax Information
Services, LLC; and Experian Information Solutions, Inc., Defendants.

Civil Action No. 20-13509-GC-DEA
|
Signed May 30, 2023

**Attorneys and Law Firms**

Jacob Marc Polakoff, Berger Montague PC, Philadelphia, PA, for Plaintiffs.

Steven L. Fox, Lindabury, McCormick, Estabrook & Cooper, P.C., Red Bank, NJ, Thomas J. Sateary, Lindabury, McCormick, Estabrook & Cooper, Westfield, NJ, for Defendant Nissan-Infiniti Lt.

**MEMORANDUM OPINION**

CASTNER, District Judge

**\*1** This matter comes before the Court on Defendant Nissan Motor Acceptance Corporation's [1] ("NMAC") Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure ("Rule") 56, on the only claim against NMAC. (ECF No. 66.) Plaintiffs Andrew Ritz and Michael Ritz opposed (ECF No. 67), and NMAC replied (ECF No. 71). The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, and other good cause shown, NMAC's Motion is **GRANTED**.

# I. BACKGROUND [2]

### A. Procedural History

On or abound September 29, 2020, Plaintiffs [3] filed this action against NMAC; TransUnion, LLC; Equifax Information Services, LLC; and Experian Information Solutions, Inc. (*See* ECF No. 1.) Plaintiffs later voluntarily dismissed their claims against TransUnion, LLC; Equifax Information Services, LLC; and Experian Information Solutions, Inc. (ECF Nos. 43, 44, 45.) Plaintiffs claim that NMAC willfully or negligently violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681n, and 1681*o*, by reporting inaccurate or incomplete information to credit reporting agencies ("CRAs") related to an automobile lease, failing to investigate Plaintiffs' request for reinvestigations, and failing to respond to Plaintiffs' requests for reinvestigation. (*See generally* ECF No. 1; *see also* RSMF ¶ 4.)

### B. Facts Undisputed, or Substantiated by Record Evidence [4]

Nearly all of the material facts are based on documentary evidence and, as such, are generally undisputed. Plaintiffs' lease of a Nissan vehicle was set to end on August 9, 2019. (RSMF ¶ 6.) The lease included the following terms concerning the vehicle's return:

**12.** *Vehicle Return*

When your Lease terminates ... you will return the Vehicle to a Nissan dealer or other location we specify. You will complete a statement of this Vehicle's mileage at termination as required by federal law. If you keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments.... You will pay us for any damages we suffer because you failed to return this Vehicle to a Nissan dealer ... or because you failed to return this Vehicle at the end of the lease term. We may determine our damages in one of the following two ways at our election and in our sole discretion: a) by charging you the Total Monthly Payment for each month the Vehicle is not returned as required ....

**\*2** [(*Id.* ¶ 7; ECF No. 66-9 at 4 ¶ 12.[5])]

Leading up to the lease-end date, NMAC (who acts as a servicer for the lessor, Nissan-Infiniti LT) emailed Plaintiffs information about the procedure for returning the vehicle and terminating the lease. (RSMF ¶¶ 5, 9.) The email detailed "steps to help you complete your lease return," such as "[s]chedul[ing] your complimentary, but required, vehicle inspection," and "[m]ak[ing] a vehicle-return appointment with your Nissan Dealership," and advised that "you are required to complete a Federal Odometer/ Lease Termination Statement." (ECF No. 66-11 at 3-4 (emphasis omitted).) Plaintiffs contest that the lease documents required Plaintiffs to schedule an appointment. (*See* RSMF ¶ 9.)

On August 9, 2019, the final day of the term, Plaintiffs went to the dealership to return the vehicle, without scheduling an appointment or inspection. (*Id.* ¶ 12.) Dealership representatives refused to accept the vehicle's return, claiming that they could not meet with Plaintiffs without an appointment to inspect the vehicle; complete lease-return paperwork, including the contractually required odometer statement; and terminate (or "ground") the vehicle. (*Id.* ¶¶ 13, 19.) After a contentious encounter with the dealership's representatives, Plaintiffs tossed the vehicle's keys on a desk and abruptly walked out, leaving the vehicle at the dealership, not having signed the odometer statement. (*Id.* ¶¶ 19-20.) That day, Plaintiffs sent a chat message to Nissan's Complaints Management Department ("Complaints Department"), describing the incident and noting, among other things, that they had left the vehicle at the dealership. (RSSMF ¶ 1; *see also* ECF No. 67-8.)

Because the vehicle was not marked as "grounded" on the last day of the lease, Plaintiffs were charged an additional monthly payment of $181.51, due on August 9, 2019. (RSMF ¶¶ 27-28.) The parties dispute who is to blame for the vehicle's untimely grounding. (*See id.* ¶ 28.) In any event, Plaintiffs did not pay the additional charge, and so on August 19, 2019, NMAC notified Plaintiffs that $181.51 was past due and that another $181.51 would be due on September 9, 2019. (*Id.* ¶ 29; *see also* ECF No. 66-28 at 3.)

On September 20, 2019, after receiving NMAC's notice of the additional charges, Plaintiffs called the Complaints Department and again advised that they had returned the vehicle on August 9. (RSSMF ¶ 4; *see also* ECF No. 67-10.) NMAC's notes from its calls that day show that NMAC tried to understand what had happened and how to resolve the grounding issue. (*See* ECF Nos. 67-10, 67-11, 67-12.) That same day, September 20, Plaintiffs returned to the dealership and signed the odometer statement. (RSMF ¶ 25.)

By letter dated September 24, 2019, the dealership advised NMAC that Plaintiffs' "vehicle was dropped off to our dealership on 8.9.19," and that Plaintiffs "wanted it to be grounded and turned in but didn't want to follow procedure and abandoned the Vehicle." (ECF No. 67-13.) The subject line included the vehicle's VIN with a typographical error. (RSSMF ¶ 12.)

**\*3** Two days later, Plaintiffs sent another chat message to the Complaints Department, reiterating that they had returned the vehicle on August 9 and expressing concern about the impact of NMAC's reporting on their credit. (*Id.* ¶¶ 13-14; *see also* ECF No. 67-14.) NMAC's customer service department then submitted a "service request" asking NMAC's credit bureau management team (the "CBM Team") to remove the "August delinquency" from Plaintiffs' files, noting that the "[v]ehicle was returned 8/9/2019 but dealer grounded late," and attaching a copy of the dealership's September 24 letter.[6] (RSSMF ¶¶

15-16; *see also* ECF No. 74-1 at 2.) However, due to the VIN-number typo, the CBM Team did not process this request, and the delinquency remained on Plaintiffs' account. (RSSMF ¶ 17.)

Between September 28 and October 4, 2019, NMAC processed seven automated consumer dispute verifications ("ACDVs") that it received from the CRAs Experian, Equifax, and Trans Union, in which Plaintiffs disputed their account information, namely the thirty-day payment delinquency that NMAC was reporting. (RSSMF ¶¶ 19-20; *see also* ECF No. 67-19 at 2-15.)

On October 8, 2019, Plaintiffs called NMAC's customer service department and disputed again NMAC's reporting. (RSSMF ¶ 21; *see also* ECF No. 67-20.) The department then sent the CBM Team a second service request asking to "remove August delinquency," again noting that the "[v]ehicle was returned 8/9/2019 but dealer grounded late," and attaching the dealership's September 24 letter, among other documents. (RSSMF ¶¶ 22-23; *see also* ECF No. 74-2 at 2, 23.) But, again due to the VIN-number typo, the CBM Team did not process this request, and the delinquency remained. (RSSMF ¶ 24; *see also* ECF No. 74-2 at 25.)

Between October 18 and November 4, 2019, NMAC processed seven more ACDVs that it received from the CRAs, in which Plaintiffs disputed payment delinquency on their account information with NMAC. (RSSMF ¶¶ 26-27; *see also* ECF No. 67-19 at 16-29; ECF No. 67-22.)

By letter dated October 23, 2019, in response to Plaintiffs' September 26 call, NMAC advised Plaintiffs that its investigation indicated that its reporting on Plaintiffs' account was accurate. (ECF No. 66-28 at 8.) By letter dated November 25, 2019, Plaintiffs responded to NMAC's October 23 letter, pleading for NMAC to correct its reporting on Plaintiffs' account. (*Id.* at 6-7.) In response, by letter dated December 19, 2019, NMAC advised Plaintiffs that its prior determination was unchanged. (*Id.* at 6-7, 9.)

On December 19, 2019, NMAC received a complaint from the Consumer Financial Protection Bureau (CFPB) concerning Plaintiffs' dispute. (RSSMF ¶ 28; *see also* ECF No. 67-23.) The Complaints Department then sent the CBM Team a third service request to remove the delinquency. (RSSMF ¶ 29; *see also* ECF No. 67-23; ECF No. 74-3.) On January 6, 2020, after communications exchanged between the departments, the CBM Team issued the CRAs an automated universal data ("AUD") form to remove the late payment entry from Plaintiffs' credit reports. (RSSMF ¶¶ 30-31; RSMF ¶ 34; *see also* ECF No. 67-19 at 30-31; ECF No. 67-23.)

That same day, January 6, NMAC responded to Plaintiffs' CFPB complaint, advising that "[o]n September 27, 2019, NMAC received notice that the vehicle arrived at [the dealership] on September 20, 2019"; that "NMAC's records show that it received a letter from [the dealership] stating that the vehicle was returned on August 9, 2019, and they were late in grounding the vehicle"; and that "[o]n January 6, 2019 NMAC submitted an update to the credit bureaus to remove the 1×30 for the September 2019 payment." (RSSMF ¶¶ 32-33; *see also* ECF No. 67-25.)

## II. LEGAL STANDARD

**\*4** Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)). "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.*

## III. DISCUSSION

NMAC moves for summary judgment on Plaintiffs' FCRA claim for four reasons. First, NMAC's reporting was accurate as a matter of law. Second, even if the reporting was inaccurate, Plaintiffs' dispute concerns a legal issue, not a factual inaccuracy needed to sustain an FCRA claim. Third, because NMAC did not willfully violate the FCRA, this precludes an award of statutory and punitive damages under Section 1681n. Fourth, and finally, Plaintiffs have not suffered damages. (*See* ECF No. 66-5 at 16-26.)

The FCRA "was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Seamans v. Temple Univ.*, 744 F.3d 853, 860 (3d Cir. 2014) (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010)). Although many of the FCRA's provisions may only be enforced by federal and state officials, *see id.* at 864, a private cause of action against furnishers [7] of information to CRAs is available for violations of Section 1681s-2(b), which requires a furnisher to investigate disputes received from a CRA. Under Section 1681s-2(b), once a CRA notifies a credit furnisher of a dispute, the furnisher must "1) conduct an investigation with respect to the disputed information; 2) review all relevant information received from the CRA; 3) report the results of the investigation to the CRA; and 4) if the information is found to be inaccurate or incomplete, report the results to all CRAs to which it originally provided the erroneous information." *Esperance v. Diamond Resorts*, Civ. No. 18-10237, 2022 WL 1718039, at *5 (D.N.J. May 27, 2022) (quoting *Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599, 604 (E.D. Pa. 2012)).

As a threshold matter, "courts have explicitly held that a showing of inaccuracy is essential to a [Section] 1681s-2(b) claim." *Gatanas v. Am. Honda Fin. Corp.*, Civ. No. 20-07788, 2020 WL 7137854, at *3 n.3 (D.N.J. Dec. 7, 2020) (citing *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 629 (6th Cir. 2018) (collecting cases)); *see* *Holland v. Trans Union LLC*, 574 F. Supp. 3d 292, 302 (E.D. Pa. 2021) (ruling that the "construction of [Section] 1681s-2" dictates that "there must be some threshold showing of inaccuracy to make a claim against a furnisher"). Even reported information that is "technically correct" may still "be inaccurate if, through omission, it 'create[s] a materially misleading impression.' " *Seamans*, 744 F.3d at 865 (quoting *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008)). "Whether technically accurate information was 'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect' is generally a question to be submitted to the jury." *Id.* at 865 (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)).

**\*5** Here, Plaintiffs argue that NMAC's furnishing of information concerning their nonpayment of additional monthly lease charges after August 9 was inaccurate because NMAC had no "contractual or legal right," in the lease or otherwise, to assess those charges. (*See generally* ECF No. 67.) This is because, Plaintiffs assert, Plaintiffs did exactly what the lease required of them: to return and relinquish possession of the vehicle by the lease-end date. (ECF No. 67 at 21.) On the other hand, NMAC argues that its reporting was, in fact, accurate. (*See generally* ECF Nos. 66-5, 71.) NMAC asserts that Plaintiffs' failure to follow certain lease-termination procedures made their alleged return of the vehicle ineffective, which triggered the lease provision that, "[i]f [Plaintiffs] keep possession of this Vehicle past the end of the lease term, [Plaintiffs] will continue to pay the monthly payments...." (ECF No. 66-5 at 18; *see* ECF No. 66-9 at 4 ¶ 12.) As a result, NMAC contends, the lease permitted NMAC to assess additional charges, which Plaintiffs never paid. (ECF No. 71 at 8.) And still, according to NMAC, Plaintiffs' claim turns on a legal question, not a factual inaccuracy, because at issue is "whether Nissan's charge was valid." (ECF No. 66-5 at 22.) NMAC argues that such a legal question cannot support a claim under Section 1681s-2. (*Id.* at 19.) The Court agrees.

The United States Court of Appeals for the Third Circuit has not addressed whether a legal dispute as to the validity or enforceability of a debt renders that debt a "factual inaccuracy" for purposes of a Section 1681s-2(b) claim against a furnisher. Other courts across the country that have addressed this question, including district courts in the Third Circuit, agree that such a legal dispute alone is insufficient to maintain a Section 1681s-2(b) claim. *See* *Chiang*, 595 F.3d at 38 ("[J]ust as in suits against CRAs, a plaintiff's required showing is *factual* inaccuracy, rather than the existence of disputed legal questions." (citing *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008)) (emphasis in original)); *Hunt v. JPMorgan Chase Bank, Nat'l Ass'n*, 770 F. App'x 452, 458 (11th Cir. 2019) (dismissing a Section 1681s-2(b) claim and reasoning that "[w]hether [plaintiff] was obligated to make payments on the mortgage after the Foreclosure Action was filed is a currently unresolved legal, not a factual, question," and that "even assuming [defendant] furnished information that turned out to be legally incorrect under some

future ruling, [defendant]'s purported legal error was an insufficient basis for a claim under the FCRA" (applying *Chiang*)); *Holland v. Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 276 (S.D.N.Y. 2020) ("[Plaintiff]'s claim of 'factual inaccuracy' relies entirely on his legal conclusion that his debts had been discharged due to the purported running of the relevant state's statute of limitations," and "[s]uch a dispute is a legal, not factual, challenge and ... plainly insufficient to support [plaintiff]'s FCRA claim"); *Esperance*, 2022 WL 1718039, at *5 ("[C]ourts have held that 'a plaintiff's required showing [under Section 1681s-2(b)] is factual inaccuracy rather than the existence of disputed legal questions,' such as whether a plaintiff was legally billed for the services disputed." (quoting *Chiang*, 595 F.3d at 38)); *Farrington v. Freedom Mortg. Corp.*, Civ. No. 20-4432, 2022 WL 16552779, at *10 (D.N.J. Oct. 31, 2022) (following *Esperance*); *Alston v. Wells Fargo Home Mortg.*, Civ. No. 13-3147, 2016 WL 816733, at *10 (D. Md. Feb. 26, 2016) (ruling that defendant's determination on "the legal question whether" a cashier's check "was a legally valid payment ... cannot be deemed patently incorrect because it is not a factual question, but a legal one"); *Okocha v. Trans Union LLC*, Civ. No. 08-3107, 2011 WL 2837594, at *5 (E.D.N.Y. Mar. 31, 2011) ("Plaintiff's argument that he did not agree to the terms of the overdraft line of credit is a collateral legal attack on the validity of the debt, ... not a factual inaccuracy, and, thus, is insufficient to withstand summary judgment."), *aff'd*, 488 F. App'x 535, 536 (2d Cir. 2012) (affirming "for the reasons articulated by the district court in its well-reasoned order").

Here, the subject information is Plaintiffs' failure to pay additional monthly charges assessed beyond the lease term. There is no dispute that Plaintiffs did not pay these charges and that they left the vehicle at the dealership without executing the lease-end documents. (RSMF ¶ 29.) At issue, as Plaintiffs put it, is "whether or not Plaintiffs returned the vehicle on August 9" and whether the return of the vehicle was consistent with the terms of the lease. (ECF No. 67 at 28.) The resolution of that issue will dictate whether NMAC had a right to assess the additional charges under the lease and related lease-return documents.

**\*6** The challenge for Plaintiffs is that their dispute turns on interpretations of "possession" and "return" under the lease. (*See* ECF No. 71 at 9.) In Plaintiffs' own words, "[i]f Plaintiffs **did not** return the vehicle, they could be charged. If Plaintiffs **did** return the vehicle, they cannot be charged." (ECF No. 67 at 26 (emphasis in original).) NMAC assessed the additional monthly charge against Plaintiffs based on the notion — well-founded or not — that Plaintiffs had not returned the vehicle in accordance with the lease or Nissan's protocols. Plaintiffs insist that they had. Regardless of whether the conditions in the lease were met for assessing additional monthly charges, Plaintiffs' dispute concerns not "patently incorrect" information,[8] but rather the legal validity of an additional monthly charge. And that dispute can only be resolved by a court of law. *See Chiang*, 595 F.3d at 38 ("Like CRAs, furnishers are 'neither qualified nor obligated to resolve' matters that 'turn[ ] on questions that can only be resolved by a court of law.' " (quoting *DeAndrade*, 523 F.3d at 68)). Thus, even if NMAC furnished information that turned out to be legally incorrect under some future ruling, NMAC's alleged legal error is an insufficient basis for a claim under the FCRA.

Plaintiffs' strict reliance on the lease terms and witnesses' interpretation of them, in contesting NMAC's right to assess additional monthly charges, only underscores the dispute's legal nature. Indeed, Plaintiffs' briefing is replete with arguments that oft appear in breach-of-contract actions. For example, Plaintiffs maintain that "neither the Lease nor the Lease extension agreement make return or possession subject ... to whether the dealership ... 'did not accept' or 'refused to take' possession" (ECF No. 67 at 21); that "there is nothing in the Lease or the Lease extension agreement which required Plaintiffs to make an appointment to return the vehicle" (*id.* at 22); that "there is simply nothing in the Lease or the Lease extension agreement that gives Nissan the contractual right to charge Plaintiffs an additional monthly payment for failing to sign an odometer statement" (*id.* at 22-23); and that because "the term 'grounding' is not in the Lease at all ... it cannot be that Nissan could charge Plaintiffs an additional monthly payment because the dealership did not ground the vehicle" (*id.* at 24). Plaintiffs also claim that the odometer statement is dated September 20, yet the official "grounding date" is August 9, indicating that Plaintiffs returned the vehicle on time. (*Id.* at 23.) Plaintiffs further argue that NMAC's right to assess additional monthly charges under the lease should start and stop with the lease's terms and ignore NMAC's notice leading up to the lease end. (*See id.* at 29 n.2 ("Nissan's reliance on Exhibit F, the end of lease email, is pointless. That email is not part of the Lease or the Lease extension agreement....") (internal citations omitted).) Finally, Plaintiffs assert that "[n]othing in those [Code of Federal Regulations] or [Odometer Disclosure Requirements] give Nissan the contractual right to charge an additional monthly payment. That is all that matters here." (*Id.* at 28.[9])

Boiled down, these arguments concern a contract dispute, not a factual inaccuracy. Indeed, Plaintiffs' claim is truly that NMAC failed to accept Plaintiffs' interpretation of what the lease required of Plaintiffs to surrender possession of the vehicle properly and terminate the lease. But "[f]urnishers are neither qualified nor obligated to resolve matters that turn on questions that can only be resolved by a court of law." *Esperance*, 2022 WL 1718039, at *5 (quoting *Chiang*, 595 F.3d at 35); *seeCohen v. Mercantile Adjustment Bureau, LLC*, Civ. No. 21-16977, 2022 WL 1567798, at *5 (D.N.J. May 18, 2022) ("The question of whether a person is indebted to another is ultimately one of law, concerning the legal obligation of one party to another.") (citing *Rosenberg v. Frontline Asset Strategies, LLC*, 556 F. Supp. 3d 157, 161 (E.D.N.Y. 2021)); *see alsoBrusco v. WIP Moonachie LLC*, Civ. No., 2020 WL 5201379, at *4 (D.N.J. Sept. 1, 2020) ("[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." (quoting *Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998))).

**\*7**  Plaintiffs place too much weight on NMAC ultimately submitting an AUD to the CRAs to remove the late payment entry from Plaintiffs' credit reports. (*See generally* ECF No. 67.) NMAC's decision, even when viewed in a light most favorable to Plaintiffs, does not change the dispute's legal nature. Plaintiffs also point to NMAC's internal notes that allegedly show NMAC's customer-service representatives affirming that the additional charges should be removed because the dealership grounded the vehicle late. However, the dealership's September 24 letter states that Plaintiffs "wanted it to be grounded and turned in but didn't want to follow procedure and abandoned the Vehicle" (ECF No. 67-13), not that the dealership grounded the vehicle late. This squares with another of NMAC's internal notes that it "reviewed trans history ... found delinquency 1×30 (08/09/19) completed grounding 09/20/19 ... dealer did not admit fault for delq ... account reporting accurate." (ECF No. 74-1 at 10 (all-capitalizations revised).) Indeed, NMAC consistently maintained that its reporting was accurate. NMAC reiterated such in its December 19 letter to Plaintiffs, despite its customer service department having by that point generated at least two service requests to remove the payment delinquency. And, as NMAC soundly asserts, "whether customer service chooses to resolve issues favorably to a consumer does not address whether the information was inaccurate." (ECF No. 71 at 7.)

Moreover, Plaintiffs suggest that NMAC failed to resolve Plaintiffs' dispute because the dealership believed that Plaintiffs were "rude." (*See* ECF No. 67 at 21, 23, 28, 43.) Presumably, Plaintiffs seek to infer that NMAC willfully failed to comply with reporting requirements. *See*15 U.S.C. § 1681n (imposing liability on "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter"). But Plaintiffs have proffered no evidence for a factfinder to infer that NMAC's reporting was motivated by the dealership's view of Plaintiffs rather than the consequences under the lease for failing to return the vehicle. Absent such evidence, the Court cannot draw that inference. *SeeDenckla v. Maes*, 313 F. Supp. 515, 524 (E.D. Pa. 1970) (" '[U]nresolved issues of fact' may not be created or manufactured by drawing inferences from general conclusions which are not factually supported.").

Plaintiffs' reliance on *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022), is also misplaced here. Plaintiffs cite *Gross* for the proposition that not all courts have let furnishers avail themselves of the defense against FCRA claims that are truly collateral attacks on the underlying credit information. *Seeid.* at 1253 ("FCRA does not categorically exempt legal issues from the investigations that furnishers must conduct."). However, *Gross*'s facts are distinguishable from this case's. In *Gross*, the Court held that a furnisher's reporting of a debt was "patently incorrect" because a statute had abolished plaintiff's obligation to repay the debt. *Id.* at 1249-51. Here, of course, no statute has made NMAC's reporting inaccurate. And although not all courts have endorsed *Chiang*'s extension of the collateral-attack defense to furnishers, *Chiang*'s appears to be the prevailing approach among courts that have faced the issue directly, including district courts in this circuit, as noted above. *SeeEsperance*, 2022 WL 1718039, at *5; *Farrington*, 2022 WL 16552779, at *10 ("[A] plaintiff must show a factual inaccuracy in the furnisher's report to a CRA, not the existence of a disputed legal issue." (internal citations omitted)). This Court adopts *Chiang*'s approach too. [10]

Having determined that Plaintiffs failed to satisfy the essential requirement of showing a factual inaccuracy, the Court need not address NMAC's remaining arguments as to the reporting's accuracy as a matter of law or Plaintiffs' damages.

## IV. CONCLUSION

For the foregoing reasons, and other good cause shown, NMAC's Motion for Summary Judgment (ECF No. 66) on Plaintiffs' FCRA claim is **GRANTED**. The FCRA claim against NMAC in Plaintiffs' Complaint (*see* ECF No. 1 ¶¶ 40-53) is **DISMISSED** with prejudice. An appropriate Order and Judgment follows.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3727892

<br>

**Footnotes**

1      Purportedly improperly pled as "Nissan-Infinity LT."

2      On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark New Jersey Field Off Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

3      In line with the parties' briefing, the Court refers to Plaintiffs collectively regardless of whether a particular fact involved only Andrew Ritz or Michael Ritz.

4      NMAC's Rule 56.1 Statement of Material Facts ("SMF") is at ECF No. 66-1; Plaintiffs' Responsive Statement of Material Facts ("RSMF") is at ECF No. 67-1; Plaintiffs' Supplemental Statement of Material Facts ("SSMF") is at ECF No. 67-2; and NMAC's Response to Plaintiffs' Supplemental Statement of Material Facts ("RSSMF") is at ECF No. 71-1.

5      Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

6      A separate note states: "rcvd sr dispute reason delinquency pay/history inquiry ... reviewed trans history ... found delinquency 1×30 (08/09/19) completed grounding 09/20/19 ... dealer did not admit fault for delq ... account reporting accurate." (ECF No. 74-1 at 10 (all-capitalizations revised).)

7      A "furnisher" is "[a]ny person with relevant data about a consumer's financial activity may voluntarily provide it to a CRA, but '[t]he most common ... furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies.' " *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 35 n.7 (1st Cir. 2010) (quoting H.R. Rep. 108-263, at 24 (2003)).

8      *See, e.g., Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 568-69 (7th Cir. 2021) ("[E]xamples of factual inaccuracies include the amount a consumer owes, and what day a consumer opened an account or incurred a payment," or where "the furnisher has factually misidentified [a consumer]—say with the wrong social security number" (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010))).

9      Plaintiffs argue this is in opposition to NMAC's contention that federal law requires an odometer statement to be executed when a lease terminates. (*See* RSMF ¶ 18; ECF No. 66-5 at 22; *see also* 49 CFR § 580.7.)

10     Because the Court joins its fellow courts' adoption of *Chiang*, it need not address each of the several other cases Plaintiffs cite to oppose NMAC's collateral-attack defense. (*See* ECF No. 67 at 32-42.)

2010 WL 1523996

Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. New Jersey.

Re: Rob E. ROY

and

Deborah A. Roy.

Deborah A. Roy

v.

Sallie Mae.

Bankruptcy No. 08–33318.

|

Adversary No. 09–1406.

|

April 15, 2010.

**Attorneys and Law Firms**

Deborah A. Roy, Larnbertville, NJ.

**Opinion**

KATHRYN C. FERGUSON, Bankruptcy Judge.

**\*1** Dear Ms. Roy:

The Court has reviewed your Request to Enter Default Judgment but cannot enter the judgment requested because you have not proven a *prima facie* case for the relief requested. Your complaint seeks a finding that the debt owed to the defendant is dischargeable in your bankruptcy case pursuant to 11 U.S.C. § 523(a)(8). That section provides that, except in cases of undue hardship, a discharge in bankruptcy does not discharge a debtor from any debt for:

> (A)(I) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

11 U.S.C. § 523(a)(8).

You make several arguments in support of your position: 1) that the debt was not made under a government or non-profit student loan program; 2) that it is considered a career training loan; 3) that the Sylvan Learning Center is a for profit institution; 4) that Sylvan is not a school accredited under Title IV of the Higher Education Act; and 5) that the student was not enrolled at least half-time and was not degree seeking. None of those argument support a finding that the debt to Sylvan is dischargeable.

As the statutory language quoted above demonstrates, it is enough that the debt at issue be "an obligation to repay funds received as an educational benefit...." 11 U.S.C. 523(a)(8)(A)(ii). This section of the statute was revised by Congress in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act and "must be read as encompassing a broader range of educational benefit obligations". *In re Baiocchi,* 389 B.R. 828 (Bankr.E.D.Wis.2008). Under the current version of the statute it

is immaterial whether Sylvan is government supported, a school, or a for-profit institution. There is also no requirement under § 523(a)(8)(A)(ii) that the student have been enrolled full time or be seeking a degree. The term "educational benefit" is not defined in the Bankruptcy Code, but Congress through successive amendments to § 523(a)(8) has expended the scope of the section. *See, In re Rosen,* 179 B.R. 935 (Bankr.D.Or.1995). In keeping with that, this Court finds that the loan at issue here, which provided an educational benefit to your child in the form of tutoring, is not dischargeable. *See, e.g., In re Kesler,* 401 B.R. 356 (Bankr.S.D .Ill.2009) (court found that costs paid for a training program as a carpenter were not dischargeable under § 523(a)(8)).

Your request for entry of default judgment is denied. The Court will enter an order dismissing the complaint.

**All Citations**

Not Reported in B.R., 2010 WL 1523996

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3633062

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States Bankruptcy Court, D. New Jersey.

In re Vathsala SRINIVASAN, Debtor.

Vathsala Srinivasan, Plaintiff,

v.

Sallie Mae, Inc, Defendant.

Bankruptcy No. 10–12732(RTL).

|

Adversary No. 10–1545(RTL).

|

Sept. 7, 2010.

**Attorneys and Law Firms**

Vathsala Srinivasan, Plaintiff Pro Se.

Yablonsky & Associates, LLC, Ilissa Hook, Esq., Attorneys for Sallie Mae, Inc.

### *MEMORANDUM OPINION*

RAYMOND T. LYONS, U.S.B.J.

### *INTRODUCTION*

 **\*1** The Plaintiff/Debtor moved for judgment by default against the Defendant, Sallie Mae, Inc. seeking a determination that her student loan debt is dischargeable under 11 U.S.C. § 532(a)(8). Sallie Mae, Inc. disclaims any debt due to it from the Plaintiff/Debtor; it claims to have merely been the servicer of Debtor's student loan. Because the court finds that the Debtor does not owe a debt to Sallie Mae, Inc., a determination of dischargeability would serve no purpose. Therefore, the court denies the Debtor's motion to enter judgment by default and will close the adversary proceeding.

### *JURISDICTION*

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) to determine the dischargeability of a particular debt.

### *FINDINGS OF FACT AND PROCEDURAL HISTORY*

**Consolidated Student Loan.** Plaintiff/Debtor obtained two student loans to pay for her education. She sought to consolidate her loans under the Federal Family Education Loan Program. On March 3, 2002 she signed a Federal Consolidation Loan

Application and Promissory Note. The Promissory Note reads "I promise to pay to the order of the lender", but fails to identify the lender. In block 21 of the Application the "Lender/Servicer" for the two loans to be consolidated were identified as "Sallie Mae" and "Nellie Mae". No lender for the consolidated loan is named in the document.

A Loan Consolidation Disclosure Statement and Repayment Schedule, dated March 21, 2002, sent by SallieMae Servicing Corp. states, "The Guarantor of your consolidation loan is UNITED STUDENT AID FUNDS and your Consolidating Lender is SALLIE MAE." However, as the court learned, Sallie Mae is a trade name used by a number of entities and does not identify a particular entity.

**Bankruptcy.** The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on January 30, 2010. Because the Debtor's petition indicated that there were no assets available for liquidation and distribution to creditors, the Clerk of the Court served all creditors with a Notice of Bankruptcy that directed them not to file a proof of claim unless they received a notice to do so. The trustee filed a Report of No Distribution indicating that she had found no assets to administer.

On April 22, 2010, the Debtor filed a Complaint naming as the Defendant, Sallie Mae Inc. (The adversary proceeding is described below). On May 8, 2010, despite the Clerk's direction not to file proofs of claim, two proofs of claim were filed by "Salle Mae, Inc. on behalf of USAF."

On March 10, 2010, the court entered an order discharging Debtor and on May 17, 2010, the bankruptcy case was closed.

**\*2 Adversary Proceeding.** As mentioned above, the Plaintiff/Debtor filed a complaint seeking a determination that her consolidated student loan is dischargeable under section 523(a)(8) of the bankruptcy code. She named as the Defendant, Sallie Mae, Inc. Sallie Mae, Inc. did not answer. On May 25, 2010, an answer was filed by Educational Credit Management Corporation ("ECMC"). In paragraph 2 of its answer ECMC stated that "it has or will take assignment of two (2) Federal Consolidation Loans from United Student Aid Funds, Inc."

ECMC filed a motion for an order substituting ECMC for the Defendant Sallie Mae, Inc. In this motion, ECMC stated that "it has or will soon have an interest in the loans which are a subject of this adversary proceeding." ECMC asserted that it is the real party in interest and should be substituted as the main defendant. Plaintiff/Debtor objected to ECMC's motion and asked the court to enter default and judgment by default against the named Defendant, Sallie Mae, Inc. She challenged ECMC's standing and asserted that her student loan was still with Sallie Mae, Inc. The Debtor produced a report from the National Student Loan Data System dated May 27, 2010 showing as follows:

| | |
|---|---|
| Current Servicer: | Sallie Mae, Inc. |
| Current Lender: | BONY Mellon ELT SLM Trust |
| Current Guaranteeing Agency: | USA Funds, Inc. |

ECMC filed a certification of its in-house counsel asserting that Sallie Mae, Inc. is merely the servicer for the loans and never was a holder of the Promissory Note. She certified that "the original lender Chase USA Trust/Sallie Mae Trust" assigned the consolidated loan to United Student Aid Funds. Attached to the certification was a report from the National Student Loan Data System dated May 6, 2010, showing the Lender at that time as Chase USA Trust/SLMA Trust MS 1814. Also attached were copies of letters dated June 7, 2010, assigning the student loans from United Student Aid Funds Inc. to ECMC.

At the hearing on ECMC's motion to intervene, the court inquired as to documentation showing the chain of title from the original holder of the Promissory Note for the consolidated student loans to ECMC. The court gave ECMC additional time to provide that documentation.

On July 19, 2010, Sallie Mae, Inc. submitted a statement in support of ECMC's motion to intervene. The Declaration of the Director of Bankruptcy Litigation for Sallie Mae, Inc. asserts that the "owner/holder of the loans, as of the petition date, was Sallie Mae Trust, ('SMT')." Attached to the Declaration was a copy of the Promissory Note that was illegible. (As noted above, the Debtor subsequently provided the court with a legible copy of the Federal Consolidation Loan Application and Promissory Note. The Promissory Note reads "I promise to pay to the order of the lender," but fails to identify the lender.) Also attached to the Declaration as Exhibit E was a Claim Purchases and Adjustments report naming as Lender "BONY TRUST CO NA AS ELT FOR SLM." The Declarant also asserted that Sallie Mae, Inc. was merely the servicing agent and never had a proprietary interest in the loan at any time. He further asserted that upon receipt of notice of this adversary proceeding Sallie Mae Trust had made a claim against the Guarantor, USA Funds, "who honored the guarantee and become the owner/holder of the debt pursuant to the guarantee." No documentation was provided to show that Sallie Mae Trust was the owner/holder of the loans, that USA Funds was the guarantor, that USA Funds honored its guarantee by making payment, or that there was a transfer of the promissory note to USA Funds.

 **\*3**  ECMC submitted another certification by in-house counsel who agreed that the owner of the loan as of the filing of bankruptcy was Sallie Mae Trust. She stated that Sallie Mae Trust made a claim with the guarantor, United Student Aid Funds, Inc., "who paid consideration to Sallie Mae Trust and became the owner of the Loans." No documentation was provided to show who owned the loan or the transfer of the loan from the owner to USA Funds or the payment on the guaranty. The only documentation was a status report that named the Original Lender as SLM ECFC and the Lender as SLM Entities–Bank of N.Y. ELT. Because ECMC failed to prove its standing, the court denied ECMC's motion to intervene. The court granted the Debtor's request to have default entered against the Defendant, Sallie Mae, Inc., but denied her request for judgment by default because it did not appear that she owed a debt to Sallie Mae, Inc.

Subsequently the Plaintiff/Debtor renewed her request for judgment by default against Sallie Mae, Inc. She attempted to prove that Sallie Mae, Inc. was the owner of her consolidated student loan by referencing documents filed with the SEC, including a 10–K from Dec. 2009 for SLM Corporation, describing the company as "more commonly known as Sallie Mae," and financial statements showing that it owned student loans. Those documents did not show who owned the Debtor's consolidated student loan. She also attached updated printouts from the National Student Loan Data System as of June 23, 2010 identifying the Current Lender as BONY MELLON ELT SLM TRUSTS and the Current Guaranty/Agency as TRANSITIONAL GUARANTY AGENCY. In reply Sallie Mae, Inc. moved to dismiss the complaint asserting that it has no interest in the Debtor's student loans, except as servicer. At oral argument Sallie Mae, Inc.'s counsel confirmed that Sallie Mae, Inc. would take no action as holder or owner of the consolidated student loan to collect against the Debtor, to execute against her assets or to intercept a tax refund, social security benefit or other government benefit.

**Decision**

As a review of all the evidence presented to the court shows, the holder of the Debtor's student loan has been identified as various entities:

BONY Mellon ELT SLM Trust

BONY TRUST CO NA AS ELT FOR SLM

Chase USA Trust/Sallie Mae Trust

Chase USA Trust/SLMA Trust MS 1814

Sallie Mae Trust

SLM ECFC

SLM Entities—Bank of N.Y. ELT

None of the entities identified as the holder or owner of the consolidated loan is Sallie Mae, Inc. The court finds that the Debtor does not owe a debt to Sallie Mae, Inc. and did not owe a debt to Sallie Mae, Inc. on the date she filed bankruptcy. Sallie Mae, Inc. has merely been the servicer of her consolidated student loan. Since there is no debt due from the Plaintiff/Debtor to the Defendant, Sallie Mae, Inc., no purpose would be served in declaring the debt dischargeable. In light of the foregoing, the court denies the application by the Debtor for entry of judgment by default against Sallie Mae, Inc. and will close this adversary proceeding.

**All Citations**

Not Reported in B.R., 2010 WL 3633062

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2573825
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Stafford A. TOWNSEND; and Beryl R. Townsend, Plaintiffs

v.

M & T MORTGAGE CORPORATION; Richman, Berenbaum
Associates, P.C.; and Chase Home Finance, LLC., Defendants.

No. 3:09cv1866.
|
June 23, 2010.

**Attorneys and Law Firms**

Adam R. Weaver, Willam G. Schwab and Associates, Lehighton, PA, for Plaintiffs.

Christopher J. Fox, Richman, Berenbaum & Associates PC, Philadelphia, PA, for Defendants.

William G. Schwab, William G. Schwab & Associates, Lehighton, PA, for Plaintiffs/Defendants.

*MEMORANDUM*

JAMES M. MUNLEY, District Judge.

**\*1** Before the court is defendants' motion to dismiss the instant complaint. Having been fully briefed, the matter is ripe for disposition.

**Background**

This case arises from a debt owed by the plaintiffs to the defendants. (Complaint (Doc. 1) (hereinafter "Complt.") at ¶ 11). The debt, which apparently involved a home mortgage, was incurred primarily for personal and family or household purposes. (*Id.*). Defendant M & T Mortgage Corporation ("M & T") did not record or perfect a security interest in this debt. (*Id.* at ¶¶ 12–13). Defendant Chase Home Finance ("Chase") began to collect this debt on December 12, 2004. (*Id.* at ¶ 14).

Plaintiffs Stafford and Berryl Townsend petitioned for Chapter 7 Bankruptcy on May 16, 2006. (*Id.* at ¶ 15). The Bankruptcy Court subsequently discharged plaintiffs' debt, on September 6, 2006. (*Id.* at ¶¶ 15, 18). Chase Home Finance held a claim listed in the plaintiffs' bankruptcy petition. (*Id.* at ¶ 16). Plaintiffs allege that they provided Chase with notice that all future communications regarding that debt should be addressed to their attorney by filing for Chapter 7 bankruptcy and listing Chase Home Finance in their schedules. (*Id.* at ¶ 17). Despite this notice, Defendant Chase contacted plaintiffs by U.S. Mail at their residence on November 18, 2007. (*Id.* at ¶ 19). In that letter, Defendant Chase demanded payment of the debt plaintiffs alleged owed on their mortgage. (*Id.* at ¶ 20). They contacted plaintiffs directly, and did not first notify their attorney. (*Id.*). The notice Defendant Chase sent declared that "Chase Home Financial LLC is attempting to collect a debt and any information obtained will be used for that purpose." (*Id.* at ¶ 21). Plaintiffs insist that this debt had been discharged in bankruptcy. (*Id.* at ¶ 22).

Defendant Richman, Berenbaum & Associates, PC ("Richman") brought legal action against the plaintiffs to allow M & T to collect on the debt, despite knowing that the debt had been discharged in bankruptcy. (*Id.* at ¶ 23). Richman never sent plaintiffs a letter validating the debt as prescribed by 15 U.S.C. § 1692(g). (*Id.* at ¶ 23). No one took action to reopen the case and lift the

discharge injunction from plaintiffs' bankruptcy. (*Id.* at ¶ 25). Despite knowledge of the bankruptcy discharge, Defendants M & T and Richman filed a complaint against plaintiffs to quiet title in the Court of Common Pleas of Carbon County, Pennsylvania on January 25, 2008. (*Id.* at ¶ 26). Plaintiffs allege that M & T and Richman have acknowledged in that state-court suit that the debt was discharged in bankruptcy, and that their sole purpose in filing the suit was to place a lien on plaintiffs' property to secure payment of the discharged debt. (*Id.* at ¶¶ 27–28).

Plaintiffs brought the instant three-count action in this court on September 29, 2009. Count I alleges that defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, et seq., by attempting to collect a debt that was lawfully discharged. Count II, brought pursuant to 11 U.S.C. § 524(a)(2), alleges that defendants violated the discharge injunction set forth in bankruptcy court by attempting to collect on the debt. Count III alleges violations of the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.

**\*2** Plaintiffs then served the complaint, and defendants filed answers and counterclaims. After the Hon. Edwin M. Kosik, a judge who also sits on this court, issued an opinion that addressed a nearly identical complaint and found that the plaintiffs' claims should be dismissed for failure to state a claim, defendants demanded that plaintiffs withdraw their claim in this court. When plaintiffs refused to do so, defendants filed the instant motion to dismiss (Doc. 35). The parties then briefed the issues, bringing the case to its present posture.

## Jurisdiction

Because this case is brought pursuant to the FDCPA, 15 U.S.C. § 1692 and the Bankruptcy Act, 11 U.S.C. § 524, the court has jurisdiction pursuant to 28 U.S.C. § 1332. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiffs' state-law claim pursuant to 28 U.S.C. § 1367(a) ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution.").

## Legal Standard

Defendants seek dismissal of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When a defendant files a motion pursuant to Rule 12(b)(6), all well-pleaded allegations of the complaint must be viewed as true and in the light most favorable to the non-movant to determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township,* 838 F.2d 663, 665–66 (3d Cir.1988) (citing *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 506 (3d Cir.1985), (quoting *Helstoski v. Goldstein,* 552 F.2d 564, 565 (3d Cir.1977) (per curiam)). The court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir.1994) (citations omitted). The court does not have to accept legal conclusions or unwarranted factual inferences. *See CurayCramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 133 (3d Cir.2006) (citing *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997)).

The federal rules require only that plaintiff provide " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' " a standard which "does not require 'detailed factual allegations,' " but a plaintiff must make " 'a showing, rather than a blanket assertion, of entitlement to relief' that rises 'above the speculative level.' " *McTernan v. City of York,* 564 F.3d 636, 646 (3d Cir.2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). Such "facial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id.*

## Discussion

**\*3** Defendants seek dismissal of each of plaintiffs' claims. The court will address them in turn.

### i. Discharge Injunction

Plaintiffs bring a claim pursuant to 11 U.S.C. § 524(a)(2). That section of the bankruptcy code provides that "[a] discharge under this title ... (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2). Defendants contend that there is no private right of action for a violation of the discharge injunction under this section, and that plaintiffs' only remedy is an action for contempt in the bankruptcy court. Plaintiffs agree that Section 524 contains no explicit private right of action, but argue that this court has the power through 11 U.S.C. § 105(a) to issue an order of contempt against the defendants for violating the discharge injunction. That portion of the bankruptcy code permits courts to "issue any order, process, or judgment that is necessary or appropriate to carry out this title." 11 U.S.C. § 105(a).

The Third Circuit has not ruled explicitly on whether section 524(a)(2) creates a private right of action for violation of a bankruptcy court's discharge injunction. In discussing another section of the bankruptcy code, 11 U.S.C. § 506(b), however, the appeals court cited approvingly to cases that concluded that section 524(a)(2) contains no private right of action, and that section 105(a) also does not permit an action in district court seeking enforcement of the bankruptcy court's orders. Among other cases, the court cited *Walls v. Wells Fargo Bank,* 276 F.3d 502 (9th Cir.2002), which explored the legislative history of Section 524 and concluded that "we cannot say that Congress intended to create a private right of action under § 524, and we shall not imply one." *Walls,* 276 F.3d at 510; *see also Petruso v. Ford Motor Credit Co.,* 233 F.3d 417, 423 (6th Cir.2000) (finding that " § 524 does not impliedly create a private right of action"); *Cox v. Zale Delaware Inc.,* 239 F.3d 910, 917 (7th Cir.2001) (suit for contempt in bankruptcy court only remedy for § 524 violation); *Bassette v. AVCO Fin. Servs., Inc.* 230 F.3d 439, 444–45 (1st Cir.2000) (finding that there is no need to address whether a private right of action exists under Section 524, since plaintiff had "a remedy ... readily and expressly available through another section of the Bankruptcy Code, namely § 105(a)). The Third Circuit examined these opinions on Section 524 and found that "[w]e agree with the reasoning of these cases, and see no reason why the rule should be different for actions asserted under § 506(b) than § 524." *Joubert,* 411 F.3d at 456. As such, the court concludes that no private cause of action exists pursuant to Section 524 and plaintiff cannot bring a claim in this court based on a violation of the discharge injunction.

**\*4** Plaintiffs' contention that Section 105(a) allows this court to exercise jurisdiction to find defendants in contempt for violating the discharge injunction is equally unavailing. The Third Circuit of Appeals has concluded that the power contained in Section 105(a) to issue orders and injunctions to enforce the bankruptcy code "is a power tool, but ... it operates only within the context of bankruptcy proceedings." *Joubert,* 411 F.3d at 455. Plaintiffs here attempt to add a private cause of action to the remedies provided in the bankruptcy code by using 11 U.S.C. § 105(a). The Third Circuit Court of Appeals has concluded that " § 105(a) 'has a limited scope. It does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code.' " *Id.* at 455 (quoting *In re Continental Airlines,* 203 F.3d 203, 211 (3d Cir.2000). Plaintiffs must therefore go before the bankruptcy court to obtain that relief, since "the traditional remedy for violation of an injunction lies in contempt proceedings, not in a lawsuit such as this one." *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417, 421 (6th Cir.2000). The court will grant defendants' motion to dismiss on this point. Plaintiff may not obtain damages in this court for defendants' alleged violations of 11 U.S.C. § 524(a). To the extent that plaintiffs seek contempt citations as a remedy, they should seek such relief from the appropriate tribunal, the bankruptcy court.

### ii. Fair Debt Collection Practices Act

Defendants next argue that plaintiffs' claims brought pursuant to the FDCPA are preempted by the Bankruptcy Act and should be dismissed. Plaintiffs' claims for violation of the FDCPA are based on defendants' alleged violations of the bankruptcy code. Defendants insist that the remedies under the bankruptcy code are the sole remedies for their alleged actions, and plaintiffs claim therefore cannot be brought under the FDCPA.

The plaintiffs allege that defendants' actions in attempting to collect a debt lawfully discharged constitute violations of numerous provisions of the FDPCA. Plaintiffs contend that defendants violated the act's prohibition on communicating with a consumer in connection with a debt collection "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address." 15 U.S.C. § 1692c(a)(2). They also allege that defendants violated the law through "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). Finally, the plaintiffs allege a violation of 15 U.S.C. § 1692(g), which requires a debt collector to provide information on the account after communicating with a consumer. *See* 15 U.S.C. § 1692(g).

All of these complaints flow from defendants' alleged attempt to collect a debt that had been discharged through plaintiffs' bankruptcy. The plaintiffs contend that the debt no longer existed because of this discharge and any attempt to recover was barred by the injunction established in 11 U.S.C. § 524(a)(2). Thus, plaintiffs' attempt to use the FDCPA to obtain damages from these actions is an attempt to enforce section 524(a)(2) outside of the bankruptcy court. As explained above, courts in this circuit have determined that a plaintiff's remedy for violations of the discharge injunction is a contempt citation from the bankruptcy court.

 **\*5** "The Third Circuit has not addressed the issue of whether claims under the FDCPA are precluded under the Bankruptcy Code." *Dougherty v. Wells Fargo Home Loans, Inc.,* 425 F.Supp.2d 599, 604 (E.D.Pa.2006). As demonstrated above, however, the Third Circuit has relied on the Ninth Circuit's reasoning in *Walls* on issues of the functioning of the bankruptcy act. In that case, the court found that "[t]here is no escaping that Wall's FDCPA calim is based on an alleged violation of § 524." *Walls,* 276 F.3d at 510. The court in *Walls* had just found that no private right of action existed under Section 524 and reasoned that "[t]o permit a simultaneous claim under the FDCPA would allow through the back door what [plaintiff] cannot accomplish through the front door—a private right of action." *Id.* Since the Third Circuit has adopted the reasoning of the Ninth Circuit that no private right of action exists under Section 524, the conclusion that Section 524 precludes FDCPA claims follows logically.

Moreover, district courts in this circuit that have examined the question of whether plaintiff can bring an action pursuant to the FDCPA to remedy violations of a discharge injunction under Section 524(a)(2) have concluded that a plaintiffs' only remedy in that situation is contained in the bankruptcy act. Judge Edwin M. Kosik of this court, for instance, examined a nearly identical complaint and concluded that plaintiff could not bring a claim under the FDCPA. Judge Kosik surveyed decisions from a variety of jurisdictions and concluded that "[I]n light of the clear-and we believe, correct—trend in other circuits to hold that a FDCPA claim cannot remedy a § 524 discharge violation, we agree with Defendants that civil contempt is [plaintiff's] sole remedy." (*Zehnder v. FDS Bank,* No. 3:09cv1865, at 9 (M.D.Pa., March 18, 2010) (attached as Exh. 2 to defendants' motion to dismiss (Doc. 35)). Similarly, in *Jones v. Wolpoff & Abramson, L.L.P.,* the court found plaintiff's FDCPA claims precluded by the bankruptcy act, reasoning that since the Third Circuit had adopted the Ninth Circuit's reasoning on the private right of action in *Walls,* the court would also follow that court's conclusions on whether FDCPA claims could be brought in a Section 524 case. *Jones v. Wolpoff & Abramson, L.L.P.,* No. 05cv5774, 2006 U.S. Dist. LEXIS 4031 at *10, 2006 WL 266102 (E.D.Pa., Feb. 1, 2006).

One reported case in this circuit has found that FDCPA claims were not precluded by the bankruptcy act, but the facts are different here. In *Dougherty v. Wells Fargo Home Loans, Inc.,* 425 F.Supp.2d 599, 602–603 (E.D.Pa.2006), the district court found that plaintiff's FDCPA claims were not precluded by the Bankruptcy Act. In that case, plaintiff complained that defendant had improperly sought to assess attorney's fees for debt collection on a mortgage during a pending bankruptcy. The court, noting that plaintiff complained about actions occurring before the discharge of her bankruptcy, found that Section 524(a) of the bankruptcy code did not apply. *Id.* at 604. Thus, the court found that it need not follow the holdings of courts in other circuits that "to permit a claim under the FDCPA 'would allow through the back door what [plaintiff] cannot accomplish through the front door-a private right of action [under § 524].' " *Id.* (quoting *Walls,* 276 F.3d at 510). The court there thus agreed that FDCPA claims were unavailable in the Section 524 context. Therefore, since the only remedy in this circuit for claims under Section 524(a)(2) is an action for contempt in the bankruptcy court and plaintiffs' claims are all based on violations of the discharge injunction under that statute, plaintiffs' claims under the FDCPA are precluded. The court will grant the motion on this point.

### iii. State–Law Claim

**\*6** Finally, defendants argue that plaintiff cannot state a claim under the Pennsylvania FCEUA. In any case, they contend, having dismissed all of plaintiffs' federal claims, the court should decline to exercise its jurisdiction over this state-law claim. The court agrees with the defendants, and will exercise its discretion to decline to hear this state-law claim since no federal interests exists in this case any longer. *See* 28 U.S.C. §§ 1367(a), 1367(c)(3) (providing supplemental jurisdiction over "all other claims that are so related to claims in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution" but allowing courts to decline jurisdiction after having "dismissed all claims over which it has original jurisdiction.").

### Conclusion

For the reasons stated above, the court will grant the defendants' motion and dismiss the plaintiffs' case. An appropriate order follows.

## *ORDER*

**AND NOW,** to wit, this 22nd day of June 2010, the defendants' motion to dismiss (Doc. 35) is hereby **GRANTED.** The Clerk of Court is directed to **CLOSE** the case.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2573825

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 11575034
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Anthony J. ZEHNDER, Plaintiff,
v.
FDS BANK, et al., Defendants.

Case No. 3:09-CV-1865
|
Signed 03/18/2010

**Attorneys and Law Firms**

William G. Schwab, William G. Schwab & Associates, Lehighton, PA, for Plaintiff.

Richard C. Maider, Deily, Mooney & Glastetter, LLP, Albany, NY, for Defendants.

## <u>MEMORANDUM</u>

Edwin M. Kosik, United States District Judge

 **\*1** On November 20, 2009, following the filing of a Complaint (Doc. 1), Plaintiff Anthony J. Zehnder ("Zehnder") filed his Amended Complaint (Doc. 8) in this matter pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692p (1977) (the "FDCPA"). Defendant FDS Bank moved to dismiss Zehnder's Amended Complaint on January 15, 2010. Defendants' Motion (the "Motion") (Doc. 13) is presently before the court and ripe for adjudication. We have subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, because the claims in the Amended Complaint raise federal questions. Pursuant to 28 U.S.C. § 1367(a), we exercise supplemental jurisdiction over Zehnder's state law claim for the purposes of the Motion.

## **BACKGROUND**

This case involves Defendants' attempts to collect a debt previously discharged in a bankruptcy proceeding. In his Amended Complaint, filed November 20, 2009, Zehnder alleges that that Defendants FDS Bank ("FDS"), Department Stores National Bank ("DSNB"), and Citigroup, Inc. d/b/a Citicards ("Citigroup") (collectively, "Defendants") violated the FDCPA and the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa. Stat. Ann. § 2270.1–2270.6 (2000) (the "PFCEUA"). (Doc. 8 at 1–2.) Zehnder also alleges that Defendants ignored a bankruptcy discharge injunction issued pursuant to the United States Bankruptcy Code, 11 U.S.C. § 524(a)(2) (in general, the "Bankruptcy Code"). (Doc. 8 at 1, 17.)

Sometime prior to this action, Zehnder opened a credit card account with Macy's Department Stores (the "Macy's credit card"). (<u>Id.</u> at 2.) By December 11, 2008, Zehnder was unable to pay his debts and filed for bankruptcy under Chapter 7. (<u>Id.</u> at 2.) In bankruptcy, Zehnder listed his outstanding creditor obligations, including the debt to DSNB. (<u>Id.</u> at 2.) Zehnder argues that listing DSNB as a creditor in his bankruptcy proceedings "gave proper legal notice that the debt was to be discharged, and that all future communications regarding the debt was [sic] to be addressed to Zehnder's attorney." (<u>Id.</u> at 2–3.)

Nevertheless, on April 20, 2009, Zehnder alleges that he received a letter from FDS and/or DSNB stating that unless Zehnder paid his debt in full or contacted them within seven days, FDS and DSNB would initiate collection actions. (<u>Id.</u> at 3.) "[T]he letter was sent on Macy's letterhead, was signed by an agent of FDS, and identified DSNB as the issuer of the Macy's [credit card]." (<u>Id.</u>

at 3.) On April 27, 2009, Judge Robert Opel of the United States Bankruptcy Court for the Middle District of Pennsylvania issued an injunction discharging Zehnder's debts pursuant to 11 U.S.C. § 727 (the "discharge injunction") (Discharge of Debtor, No. 5:08-bk-53522 (Bankr. M.D. Pa.)). (<u>Id.</u> at 2 & Ex. B at 12–17.) When Zehnder called the telephone number listed in the letter, he reached Citigroup, which informed him that the letter was in regard to his outstanding balance on his Macy's credit card. (<u>Id.</u> at 3.)

On April 28, 2009, Defendants allegedly began a campaign of telephone calls to Zehnder's house in an attempt to coerce him to pay them. (<u>Id.</u> at 2.) The caller identification system on Zehnder's telephone registered these calls as coming from two telephone numbers. (<u>Id.</u> at 3.) When Zehnder placed outgoing telephone calls to the numbers, he reached Citigroup, which informed him that the calls were in regards to his outstanding balance on his Macy's credit card. (Doc. 8 at 3.) Defendants allegedly contacted Zehnder repeatedly between April 28, 2009 and May 22, 2009, from approximately 9:15 a.m. to 8:30 p.m. each day. (<u>Id.</u> at 4.) Zehnder estimates that during that period, Defendants called him approximately fifty-three times—roughly four times per day —regarding his Macy's credit card balance. (<u>Id.</u> at 4.)

 **\*2**  Defendants also pursued the discharged debt by mail. (<u>Id.</u> at 4.) On May 6, 2009, and again on May 18, 2009, Zehnder received letters from Defendants regarding the Macy's credit card balance. (<u>Id.</u> at 4.) The May 6, 2009 letter was an account statement for the Macy's credit card showing an outstanding balance despite the existence of the discharge injunction. (<u>Id.</u> at 4.) Similarly, the May 18, 2009 letter stated "that unless the debt is paid in full or Zehnder contacts FDS within 7 days from the letter, FDS will proceed with further collection actions." (<u>Id.</u> at 4.) Zehnder notes that "[t]his letter was sent on Macy's letterhead, was signed by an agent of FDS, and identified DSNB as the issuer of the Macy's Card." (<u>Id.</u> at 4.)

In his Amended Complaint, Zehnder alleges that the Defendants attempted to collect a debt that had been lawfully discharged in bankruptcy proceedings, that they improperly communicated with him when he was represented by counsel, and that their collection practices were unfair. (<u>Id.</u> at 5.) Zehnder invokes the FDCPA, specifically §§ 1692c(a)(2), 1692d(5), 1692e(11), and 1692f(1), as well as the PFCEUA and § 524 of the Bankruptcy Code. (<u>Id.</u> at 5–8.) Count I outlines Zehnder's allegation that Defendants violated the FDCPA. (<u>Id.</u> at 5–6.) Count II involves Defendants' violation of the discharge injunction. (<u>Id.</u> at 6-7.) Count III raises a claim against Defendants for violating the PFCEUA. (<u>Id.</u> at 7–8.)

Based on these three claims, Zehnder requests actual damages pursuant to 15 U.S.C. § 1692k(a)(1) and 11 U.S.C. § 524(a)(2), statutory damages pursuant to 15 U.S.C. § 1692k(a)(2)(A), and litigation costs and attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3). (Doc. 8 at 5-8.) Zehnder also requests a trial by jury and an order declaring that Defendants violated the FDCPA, the discharge injunction, and the PFCEUA. (<u>Id.</u> at 5–8.)

Defendants filed their Motion (Doc. 13) and a Supporting Brief (the "Support Brief") (Doc. 14) on January 15, 2010. In the Motion and Support Brief, Defendants raise three arguments for dismissal of Zehnder's Amended Complaint. (<u>Id.</u> at 2, Doc. 14 at 3–11.) First, Defendants argue that we should dismiss Count I of the Amended Complaint because DSNB is not a debt collector for purposes of the FDCPA, and therefore the FDCPA does not apply. (Doc. 14 at 5–7.) Defendants also argue that the Bankruptcy Code precludes [1] the FDCPA claim. (<u>Id.</u> at 5-7.) Second, Defendants argue that Count II fails to state a claim upon which relief may be granted because 11 U.S.C. § 524 does not provide a private cause of action for violations of bankruptcy discharge injunctions. (<u>Id.</u> at 7–9.) Third, Defendants argue that because Zehnder's federal law claims under the FDCPA and § 524 of the Bankruptcy Code fail, we should not exercise supplemental jurisdiction over Zehnder's state law claim involving the PFCEUA. (<u>Id.</u> at 9.) In the alternative, Defendants argue that Zehnder has failed to state a PFCEUA claim because he failed to allege any improper conduct by Defendants or a specific provision of the PFCEUA that they violated. (<u>Id.</u> at 10–11.) Defendants request that the court dismiss the Amended Complaint with prejudice. (<u>Id.</u> at 12.)

 **\*3**  On February 3, 2010, Zehnder filed two documents: a Brief in Opposition to Defendants' Motion (the "Opposing Brief") (Doc. 18) and a document captioned "Plaintiff's Response to Defendants' Motion to Dismiss Amended Complaint" (the "Response") (Doc. 17). In these documents, Zehnder opposes dismissal. (Docs. 17 & 18.) Zehnder also provides a "Counter

Statement of Facts" (Doc. 18 at 2–3) and admits or denies the specific averments of the Motion (Doc. 17 at 1–2), an undertaking frankly more appropriate for summary judgment proceedings.

On February 19, 2010, Defendants filed their Reply Brief (the "Reply Brief") (Doc. 19) and a "Notice of Filing Exhibits to Defendants' Reply Brief to Plaintiff's Brief in Opposition to Defendants' Brief in Support of Motion to Dismiss Amended Complaint" (the "Notice") (Doc. 20). In the Reply Brief, Defendants argue that we should disregard the facts alleged in the Opposing Brief because it would be improper to consider facts not contained in the Amended Complaint for the purposes of the Motion. (Doc. 19 at 4–5.) Defendants also reiterate their arguments from the Support Brief. (Doc. 19 at 5–9.)

Defendants' Motion is before the court and ripe for adjudication. For the reasons that follow, we will grant Defendants' Motion and dismiss Zehnder's Amended Complaint.

**DISCUSSION**

### I. Motion to Dismiss Standard

Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief; the complaint must provide the defendant with fair notice of the claim. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When considering a Rule 12(b)(6) motion to dismiss, the court must view the complaint in the light most favorable to the plaintiff and must accept all well-pleaded allegations as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007); Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985). The issue in a motion to dismiss is whether the plaintiff should be entitled to offer evidence to support the claim, not whether the plaintiff will ultimately prevail. See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (the Rule 8 pleading standard " 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element"); Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

The onus is on the plaintiff to provide a well-drafted complaint that alleges factual support for its claims. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original, internal citations omitted). The court need not accept unsupported inferences, Cal. Pub. Employees Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004), nor legal conclusions cast as factual allegations, Twombly, 550 U.S. at 556. Legal conclusions without factual support are not entitled to the assumption of truth. See Ashcroft v. Iqbal, ⸻ U.S. ⸻, ⸻, 129 S. Ct. 1937, 1949-50 (2009) ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not" satisfy the requirements of Rule 8).

Once the court winnows conclusory allegations from those allegations supported by fact, which it accepts as true, the court must engage in a common sense review of the claim to determine whether it is plausible. This is a context-specific task, for which the court should be guided by its judicial experience. The court must dismiss the complaint if it fails to allege enough facts "to state a claim for relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. The complaint that shows that the pleader is entitled to relief—or put another way, facially plausible—will survive a Rule 12(b)(6) motion. See Fed. R. Civ. P. 8(a)(2).

### II. The Bankruptcy Code and the FDCPA

#### A. Preclusion

**\*4** Defendants argue that we should dismiss Count I of the Amended Complaint because § 524 of the Bankruptcy Code and its remedies preclude Zehnder's FDCPA claim. Defendants also argue that even absent preclusion by the Bankruptcy Code, the

FDCPA does not apply to them because they are not debt collectors within the meaning of the Act. Zehnder challenges the Defendants' preclusion argument and argues that some, if not all, Defendants acted as debt collectors as defined by the FDCPA.

After surveying the case law from our sister circuits and our own, we have found a growing consensus regarding § 524's preclusive effect on FDCPA claims. For the majority of courts, where a plaintiff seeks to raise a FDCPA claim grounded on a creditor's violation of a § 524 discharge injunction, the Bankruptcy Code precludes that claim. See Necci v. Universal Fid. Corp., 297 B.R. 376, 379 (Bankr. E.D.N.Y. 2003) (discussing Bankruptcy Code preclusion of FDCPA claims and providing an overview of circuit decisions).

"The [United States Court of Appeals for the] Third Circuit has not addressed the issue of whether claims under the FDCPA are precluded by the Bankruptcy Code." Dougherty v. Wells Fargo Home Loans, Inc., 425 F. Supp. 2d 599, 604 (E.D. Pa. 2006) (summarizing case law from other jurisdictions and distinguishing the plaintiff's claim from those cases, which overwhelmingly involved FDCPA claims based on § 524 discharge injunction violations). Our courts have addressed the issue implicitly, however, by examining the appropriate remedy for discharge injunction violations under § 524. See In re Joubert, 411 F.3d 452, 456 (3d Cir. 2005) (holding that civil contempt is the remedy for a discharge injunction violation and that no private right of action exists under § 524); In re Beck, 272 B.R. 112, 126 (Bankr. E.D. Pa. 2002) (citing numerous cases for the proposition that the remedy for a violation of a discharge injunction is contempt and that a private right of action does not exist under § 524).

In reaching its decision in Joubert that § 524 did not provide for a private right of action, the Third Circuit surveyed relevant case law from other circuits. See Joubert, 411 F.3d at 456 (citing Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 421–23 (6th Cir. 2000) (analyzing the legislative history of § 524, contrasting § 524 with Congress's choice in § 362(h) to create private causes of action for violations of bankruptcy stays, and concluding § 524 does not impliedly create a private right of action); Walls v. Wells Fargo Bank, 276 F.3d 502, 507–10 (9th Cir. 2002) (tracking and adopting Pertuso's analysis); Cox v. Zale Del., Inc., 239 F.3d 910, 917 (7th Cir. 2001) (agreeing with the result in Pertuso and concluding that a contempt action in the bankruptcy court that issued the discharge is the only relief available to remedy alleged § 524 violations); see also Bessette v. Avco Fin. Servs. Inc., 230 F.3d 439, 445 (1 st Cir. 2000) (refusing to address whether § 524 implies a right of action, because, in the First Circuit's view, a bankruptcy court's contempt power under § 105(a) offers sufficient remedies)). As the United States Court of Appeals for the Ninth Circuit declared, permitting FDCPA claims based on § 524 discharge injunction violations "would allow through the back door what [plaintiffs] cannot accomplish through the front door—a private right of action." Walls, 276 F.3d at 510.

We have found the Ninth Circuit's Walls decision to be most informative, especially as it involves facts almost identical to our case. See id. at 504–05. Walls, a Chapter 7 bankruptcy debtor whose debts had been discharged, brought suit in federal district court against Wells Fargo, her creditor, when Wells Fargo attempted to collect the discharged debt. Id. at 504-05. Alleging violations of the FDCPA and § 524, Walls argued that the Bankruptcy Code did not preclude "a simultaneous claim under the FDCPA" because the bankruptcy proceeding was "over and done with" and the FDCPA was "outside of the bankruptcy proceeding." Id. at 510. The Ninth Circuit held that there was "no escaping that Walls's FDCPA claim is based on an alleged violation of § 524. As the district court noted, this necessarily entails bankruptcy-laden determinations." Id. at 510. The court also observed that "[t]he Bankruptcy Code provides its own remedies for violating § 524," and that to allow the FDCPA claim to proceed would be to contravene congressional intent. Id. at 508–10 (observing that "Congress certainly knows how to create a private right of action when it wants to" and declined to do so with § 524).

**\*5** In light of the clear—and, we believe, correct—trend in other circuits to hold that a FDCPA claim cannot remedy a § 524 discharge injunction violation, we agree with Defendants that civil contempt is Zehnder's sole remedy. We will therefore dismiss Zehnder's FDCPA claim.[2]

### B. Enforcing § 524 Violations

Defendants argue that we should dismiss Zehnder's discharge injunction violation claim because § 524 does not permit a private right of action. We agree and will therefore dismiss Count II of the Amended Complaint.

"A creditor who attempts to collect a discharged debt in violation of the discharge injunction is in contempt of the bankruptcy court that issued the order of discharge." 8A C.J.S. Bankruptcy § 544 (2009). This is true regardless of where or when the violation occurs. See Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 452 (1932) ("Disobedience constituted contempt of the court which rendered the decree, and was none the less contempt because the act was committed outside the district, as the contempt lay in the fact, not in the place of the disobedience to the requirement."). "Sanctions for violations of an injunction ... are generally administered by the court that issued the injunction." Baker by Thomas v. Gen. Motors Corp., 522 U.S. 222, 236 (1998); see also Peloro v. United States, 488 F.3d 163, 172 (3d Cir. 2007) (noting that district courts do not divest themselves of jurisdiction by referring cases to bankruptcy court; rather, they confer concurrent jurisdiction on the bankruptcy court); Joubert, 411 F.3d at 456 & n.3 (because there is no private right of action under § 524, there is no authority for a plaintiff to bring a separate lawsuit to remedy discharge injunction violations—the remedy is a motion for contempt, although such a motion need not be brought in the court that issued the original discharge injunction).

Because the discharge injunction is an order from the bankruptcy court that dealt with Zehnder's bankruptcy proceedings, his remedy for its violation rests with that court. Although the Third Circuit noted that a plaintiff need not bring a motion for contempt to enforce a discharge injunction violation before the court that issued the order, Joubert, 411 F.3d at 456 n.3. Zehnder did not petition this court for such a remedy. Instead, Zehnder attempted to bring a private right of action, which § 524 does not permit. We will therefore dismiss Count II of Zehnder's Amended Complaint; he may file a motion for contempt with the bankruptcy court or with this court to remedy the discharge injunction violation.

### III. The PFCEUA

Defendants argue that if we dismiss Counts I and II of the Amended Complaint, which contain Zehnder's federal law claims, we should also dismiss the state law claim in Count III. We agree and will therefore dismiss Count III of the Amended Complaint.

Federal district courts have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The court may decline to exercise its supplemental jurisdiction under certain circumstances, including where the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The language of § 1367(c) is permissive rather than mandatory; district courts have the discretion to choose whether or not to exercise their supplemental jurisdiction. See 28 U.S.C. § 1367(c); New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1508 (3d Cir. 1996).

 **\*6** In the present case, we have dismissed Zehnder's FDCPA claim and the § 524 discharge injunction violation claim, as discussed above. Left with only the state law claim, we invoke our discretion under 28 U.S.C. § 1367(c)(3) and decline to exercise supplemental jurisdiction over it. [3]

For the reasons stated above, we will grant Defendants' Motion and dismiss Zehnder's Amended Complaint. An appropriate order follows.


### ORDER

AND NOW, this 18th day of March, 2010, IT IS HEREBY ORDERED THAT:

  1. Defendants' Motion to Dismiss Zehnder's Amended Complaint (Doc. 13) is **GRANTED**;

  2. Zehnder's Amended Complaint (Doc. 8) is **DISMISSED**; and

  3. The Clerk of Court is directed to **CLOSE** this case.

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11575034

## Footnotes

1    Both parties use the word "preemption" throughout their filings in discussing whether the Bankruptcy Code and its remedies bar Zehnder from bringing a FDCPA claim. Preemption has a very specific legal meaning, however, that in a conflict between state and federal law, the latter prevails. See U.S. Const. art. IV, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding."); Maryland v. Louisiana, 451 U.S. 725, 746 (1981) ("It is basic to this constitutional command that all conflicting state provisions be without effect."). We therefore understand the parties' contention to be whether the Bankruptcy Code precludes Zehnder's claim under the FDCPA.

2    We follow the Walls court's well-reasoned path and find that we need not reach Defendants' contention that the FDCPA does not apply to them because they are not "debt collectors" within the meaning of 15 U.S.C. § 1692a(6). See id. at 511 n.5.

3    We need not reach the issue of the validity of the PFCEUA claim in light of our dismissal of Zehnder's federal claims. However, insofar as Zehnder grounds the PFCEUA claim on the alleged discharge injunction violation, we believe that the Bankruptcy Code provides Zehnder's sole remedy.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.